```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                               :
                                        Docket #17cv8560
WENTWORTH RATTRAY,                    : 17-cv-08560-PGG-KHP

              Plaintiff,             :

  - against -                        :

CADAVID, et al.,                     :
                                        New York, New York
                                     : January 7, 2021
              Defendants.
----------------------------------- : TELEPHONE CONFERENCE

                    PROCEEDINGS BEFORE
            THE HONORABLE JUDGE KATHARINE H. PARKER,
               UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For Plaintiff:          WENTWORTH RATTRAY, Pro Se
                        42 West 120th Street, #3C
                        New York, New York 10027


For Defendants:         NEW YORK CITY LAW DEPARTMENT
                        BY:  KATHLEEN REILLY, ESQ.
                        100 Church Street
                        New York, New York 10007




Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com

Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service.
```

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

```
 1                          PROCEEDINGS                    3
 2            THE CLERK:  Calling case 17cv8560, Rattray v.
 3  Cadavid, et al., the Honorable Katharine H. Parker,
 4  presiding.
 5            Beginning with the plaintiff, can you please state
 6  your name for the record?
 7            THE HONORABLE KATHARINE H. PARKER (THE COURT):
 8  Mr. Rattray, are you on the phone?
 9            MR. WENTWORTH RATTRAY (THE PLAINTIFF):  Plaintiff,
10  Wentworth Rattray, pro se.
11            THE COURT:  Okay, welcome.
12            THE CLERK:  And defendants' counsel?
13            MS. KATHLEEN REILLY:  Kathleen Reilly for City
14  defendants Cadavid and Trigueno, good afternoon, Your
15  Honor.
16            THE COURT:  Good afternoon.  All right, a few
17  preliminaries before we get started. I'd ask that you
18  keep your phones on mute unless you're speaking, that
19  way everybody has better clarity hearing the phone
20  call. This call is open to the press and public on a
21  listen-only basis. The Court prohibits the recording
22  and rebroadcasting of court conferences.  Violations
23  of this rule may result in sanctions. And the Court is
24  making an official recording of this call so if you'd
25  like a transcript you could order one within three
```

```
 1                          PROCEEDINGS                    4
 2  days of today's conference.
 3          Now this is a discovery conference that we're
 4  having and, Ms. Reilly, you've raised concerns about
 5  various discovery that Mr. Rattray has served, and I
 6  wanted to talk about that discovery.  Mr. Rattray is a
 7  pro se plaintiff and it may be that some of the
 8  interrogatories may be a better way to proceed. You
 9  know, perhaps they can be viewed as written deposition
10  questions rather than interrogatories.  Let me talk
11  about this though.  Mr. Rattray, have you had a chance
12  to review Ms. Reilly's letter to the Court from
13  December 2nd?
14          THE PLAINTIFF:  I have, Your Honor. I have
15  reviewed this letter.
16          THE COURT:  And let me just ask you about some
17  of these requests because some of them, to the extent
18  you're asking for information related to claims that
19  are not in the case, those requests are improper.  To
20  the extent your requests concern claims that are still
21  in the case, then the question is whether they're
22  requesting relevant information and whether they're
23  proportional to the needs of the case.  And generally,
24  with respect to interrogatories, those are limited to,
25  limited in number and they are supposed to be
```

```
 1                         PROCEEDINGS                    5
 2   initially directed at identifying witnesses, people
 3   with information and knowledge about the facts
 4   pertaining to the case.  And later on in discovery
 5   contention interrogatories are permitted and
 6   contention interrogatories are more of the nature of
 7   the kind that you've raised. The Court can allow
 8   contention interrogatories at the beginning of
 9   discovery, however.
10           But let's just talk about some of the document
11   requests that you've made and what kind of, this
12   incident is a relatively defined incident, you know,
13   it happened on a single day, and so there really
14   shouldn't be a lot of paperwork concerning the
15   incident, itself. But I want to hear from you, what's
16   the key information that you think is necessary to
17   prosecute your case here.
18           THE PLAINTIFF:  So, Your Honor, about what, I
19   agree the incident, you know, the initial incident
20   happened over a single day, the impact and the
21   subsequent actions by NYPD has lasted over the past
22   four years and continue to this day and is part of a
23   pattern and practice that we've experienced. Not just
24   in words, but I've experienced a pattern of practice
25   where the NYPD controls all the facts, all the
```

information and all the records, all the resources
that I, as a taxpayer, pay for, and they do not make
that information available. So even just to file a
claim to establish the voracity of this incident
having occurred, I was already at a disadvantage
because I can't get sufficient information from the
NYPD to document what the officers wrote down, what
they heard on the 911 call, what my 911 call said.
All of that information that I would expect based on
my reading of the FOIA and FOIL laws I should be
entitled to in order to properly prepare a case, I'm
not entitled to at this point.

          So only through discovery, only now do I have
access to that information. So to limit it would be to
put me in a doubly difficult situation of having to
prepare in an even shorter timeframe something that
NYPD has had the past four years to review, listen to
tapes, conduct investigations, get statements from the
officers, have, you know, deep discussions about these
topics while simultaneously denying me access to that
same information.

          So I am trying to get information about what
the NYPD knew on the night of the incident, what they
knew about Officer Cadavid, his state of mind. What

PROCEEDINGS                              7

1

2    they knew about his motivations. What they knew about

3    relations that he had with his partner, Officer

4    Trigueno, and how that motivation, how that

5    relationship would have impacted his motivation to,

6    you know, basically blow up, and man up and be macho

7    in a situation that did not warrant use of force.

8    There was no allegation of danger, no allegation of

9    someone breaking the law or anyone making a threat.

10   None of that was present yet he took it upon himself

11   to force himself into my home looking for my child.

12   The impact on me is lasting because I sit here in my

13   home wondering every day when will they come back and,

14   you know, am I safe in my own home because I have no

15   guarantee that NYPD will not revisit my home for

16   whatever reason they choose and conduct a similar

17   sweep.

18           I had done everything I needed to do by law,

19   by the Courts, to safeguard my child, to get her in my

20   custody lawfully, the only thing I was missing was the

21   piece of paper that was, unfortunately, in the mail

22   that day. So whatever, I understand there are rules

23   for court but I don't see this as a one day incident,

24   because I feel like I am under threat from NYPD's

25   actions every day. And every time I see, you know,

```
 1                          PROCEEDINGS                    8
 2  some dad who is trying to take his kid, you know, to a
 3  birthday party to get shot in the back seven times, it
 4  affects me deeply.  Deeply.
 5          This is not a trivial case in my mind. And I
 6  understand that to the Judge, the things that the
 7  Court sees every day, I understand that his may pale
 8  in comparison to that, but from my perspective, from
 9  this taxpayer's perspective, this is about as serious
10  as it every gets. The cops coming into my home without
11  warrant, without reason, lying about it, and denying
12  me access to the government documents that I pay for
13  as a taxpayer.
14          THE COURT:  Okay --
15          THE PLAINTIFF:  The documents I'm looking to
16  get my hands on are the training records, the mental
17  health records, and the documents I'm asking for are
18  no different than the documents that the NYPD has
19  asked me for, going back ten years of my employment.
20          THE COURT:  Let me stop you for a moment. Why
21  is it that you need medical records pertaining to, or
22  mental health records pertaining to these two
23  defendants? That's not --
24          THE PLAINTIFF:  I need to know if they have
25  issues with --
```

```
 1                        PROCEEDINGS                    9
 2             THE COURT:  It doesn't go to an element of the
 3  claim.
 4             THE PLAINTIFF:  The claim is that they
 5  violated my rights when they didn't need to do so,
 6  there was no basis for this. Officer Cadavid has had
 7  issues where he has in the past punitive, he's been
 8  accused of punitively arresting someone, and that is,
 9  in fact, what happened with me.  He pushed his way
10  into the door, the allegation is he pushed his way
11  into the door, he came in. He immediately saw that the
12  child was not home, right, which should have assuaged
13  any concern of safety. And instead of leaving, he
14  basically demanded my ID and remained in the home for
15  another hour, holding me prisoner in my living room.
16             THE COURT:  I (indiscernible) you need to
17  prove the facts of what happened. You need to prove
18  the facts of what happened, as you say, and so
19  documents that you're seeking that pertain to any
20  warrant that they have or requested, their notes, any,
21  the 911 call transcript to the extent it exists, those
22  are all completely fair game. But to the extent that
23  you want medical records or information about these
24  officers' mental health, those requests are beyond the
25  scope of what's relevant in this case.  And so I'm
```

```
 1                         PROCEEDINGS                    10
```

going to not allow those document requests and sustain

the defendants' objection to those --

        THE PLAINTIFF:  I reserve the right to appeal,

thank you.

        THE COURT:  Yes, there's no appeal on these

discovery rulings at this point, so just you have to

wait till the end of the case until there's a

dispositive ruling to appeal.  So those are not

relevant because their mental health records don't

pertain to what actually happened and whether they

made an improper search or used improper force, that

is going to be demonstrated through the facts of what

happened that day and leading up to that day.

        THE PLAINTIFF:  Well, I'm sorry, Your Honor,

I'd allege that those records are relevant to the

officers' state of mind and their propensity for using

violence as opposed to de-escalation tactics. Whether

or not they're on drugs is relevant, whether they were

on drugs that night is relevant. Whether they had a

pattern of using drugs is relevant to my being able to

show, because there is no other, this was an

unwarranted search. There was no reason to suspect me

of being a danger to anyone, much less my child that

I've been taking care of for --

```
 1                          PROCEEDINGS                    11
 2            THE COURT:  I'm not going to entertain
 3   argument unless you have reasonable basis for
 4   believing that either of these defendants had mental
 5   health problems and/or was inebriated or on drugs at the
 6   time of the incident. So if you don't have any evidence of
 7   that I'm not going to permit discovery into that, and that's
 8   the ruling, I'm not going to take further argument on that.
 9            THE PLAINTIFF:  Understood. So, Your Honor, I
10   would ask that you consider defendants' requests for
11   similar documents from plaintiff, similarly mental
12   health records, medical records going back, you know,
13   ten years, those should --
14            THE COURT:  With respect to your emotional
15   health, am I correct that you are alleging and seeking
16   damages for emotional distress caused by this
17   incident?
18            THE PLAINTIFF:  Yes, Your Honor, you are, but
19   I think the records since the incident are relevant,
20   anything before that --
21            THE COURT:  Okay, and have you been treating
22   with a therapist or other mental health provider
23   pertaining to the emotional effects of this incident?
24            THE PLAINTIFF:  I have been, Your Honor.
25            THE COURT:  Okay.  And did you have mental
```

```
 1                          PROCEEDINGS              12

 2   health treatment prior to this incident?

 3            THE PLAINTIFF:  I did not, Your Honor.

 4            THE COURT:  You did not?

 5            THE PLAINTIFF:  I did not.

 6            THE COURT:  Okay.

 7            THE PLAINTIFF:  And even if I did, I don't

 8   think it would be relevant because the officers didn't

 9   have that information then so they weren't acting on

10   that information.

11            THE COURT:  Okay.  Well, so there is some

12   information, historical mental health treatment

13   information that can be relevant. I agree that ten

14   years is excessive, but what I'm hearing is you didn't

15   have any mental health treatment prior to this

16   incident, is that correct?

17            THE PLAINTIFF:  Correct, Your Honor.

18            THE COURT:  Okay.  So I'm going to, I'm going

19   to deny your request that defendants not be able to

20   request any mental health treatment records. I'll

21   allow defendants to request mental health treatment records

22   for the year prior to the incident and, Mr. Rattray, what

23   I'm hearing is that you don't have any such records

24   because you didn't have any such treatment, and so when

25   you respond to that request, that's what you're going to
```

PROCEEDINGS                    13

respond, you don't have any, okay?

THE PLAINTIFF:  Yes.

THE COURT:  But they're entitled to know if you
had any preexisting, preexisting condition that might have
been the cause or preexisting mental health issues.

Okay, so in terms of the, in terms of other
records that you're seeking, I'm just looking at your
document 115-2, and I think the most efficient way to go
through this is just to say which requests I think are
appropriate and which are not. So, Ms. Reilly, why don't
you write this down.

MS. REILLY:  Yes, Your Honor.

THE COURT:  All right, so request number one
is asking for copies of law, ordinance or regulation
that the defendants believe Mr. Rattray was in violation
of.  Given his pro se status I think it is appropriate for
him to ask or understand if he was suspected of a violation
of any particular law and what that law is. So you can
identify those and provide him with the copy of the law
since he's pro se. I don't think that's that onerous.

MS. REILLY:  Your Honor, just a question before
going through these in connection with one of the
statements made by plaintiff earlier, he had noted,
I'm sorry, I'm just looking at my notes, that his

PROCEEDINGS                    14

1

2    allegations alleged a pattern and practice and in the

3    impact, you know, for four years, essentially, you

4    know, just to note that to the extent that any of

5    these requests go to the Monell claim, you know, that

6    would have been one of the arguments that was

7    dismissed on --

8              THE COURT:  Right, and I've already said that

9    I'm granting your and sustaining your objection to any

10   discovery relating to those Monell claims.

11             MS. REILLY:  Okay.  And then --

12             THE COURT:  Go ahead?

13             MS. REILLY:  I just wanted to note, you also,

14   and I didn't want to interrupt, you had also raised

15   the issue of interrogatories of possibly the discovery

16   request be construed as written deposition questions.

17             THE COURT:  Yes.

18             MS. REILLY:  Plaintiff also served notices of

19   deposition. So to the extent that it would be

20   duplicative to sit for a deposition as well as either,

21   you know, respond to any of the requests in the

22   interrogatories or document requests, just that would

23   be a factor if we're going to, for instance, you know,

24   identify what Officer Cadavid had believed plaintiff

25   to be in violation of, if that's also, you know, an

1
2  anticipated question for the deposition, some may be
3  them more proper for a deposition as opposed to the
4  written request.

5       THE COURT:  Yes, okay, we'll get to that in
6  just a moment. So who is (indiscernible), Mr. Rattray?

7       MS. REILLY:  I believe, I apologize, I didn't
8  hear plaintiff chime in, but I believe that was the
9  complainant in this case that had called for the
10 police assistance.

11      THE PLAINTIFF:  I'm sorry, what was the
12 complainant complaining of?

13      THE COURT:  Who is Wendy (indiscernible), why
14 do you, she is complaining about you?

15      THE PLAINTIFF:  I'm actually just trying to
16 clarify defendants' characterization of her as a
17 complainant, I'm wondering what she was the complainant of?

18      THE COURT:  I think complainant meaning that she
19 made a complaint you.

20      THE PLAINTIFF:  She made the 911 call or she made
21 a complaint, because the complaint would have to have a
22 subject of the complaint, I don't know what the
23 subject of that complaint is?

24      THE COURT:  Okay, so you want to understand,
25 so number two is you want to understand why she is

2    named, documents pertaining to whatever complaint that

3    she made?

4         THE PLAINTIFF:  I'm just trying to clarify

5    defendants' labeling of her as the complainant now.  Wendy

6    Sandy (phonetic) is the minor child's mother and I'd

7    characterize her as the 911 caller, the initial 911 caller.

8    I am the secondary 911 caller. I called 911 to get the

9    police out of my home, and so I would have it recorded if I

10   was shot or killed in my home. She called 911 for her own

11   purposes and I'm trying to understand what defendants'

12   representation is of her complaint.

13        THE COURT:  All right, so Ms. Reilly, do you have

14   any documents pertaining to any complaints that Ms. Sandy

15   made?

16        MS. REILLY:  Your Honor, I believe Mr. Rattray

17   is asking right now about my use of the word

18   complainant. I'm just stating she was the individual

19   that called in and so we would generally term her the

20   complaining witness for purposes of making the 911

21   all.  Other than that, you know, it goes to the point

22   that Your Honor made earlier, this is a very, very

23   discreet incident with minimal documentation. So far

24   as I'm really able to gather, still looking through

25   discovery but, you know, there's a 911, you know, call

PROCEEDINGS                          17

record of, you know, the Sprint report, if you will, a

domestic incident report and then, you know, there was

no arrest. I don't believe there was a complaint filed

with the police department.  We're talking about a

very small universe of documents, but I don't believe

--

THE COURT:  Okay --

MS. REILLY:  And I don't believe there's a

complaint report.

THE COURT:  So I'm going to construe or narrow

request number two and you should produce any

documents you have reflecting the, reflecting Sandy's

call to 911, any transcript of that 911 call or any

police records reflecting the substance of that call

and the complaint.

THE PLAINTIFF:  Well, Your Honor, I had asked

for the audio recordings, Your Honor, 911 calls are

recorded and I specifically placed a 911 call.

THE COURT:  You're going to (indiscernible).

MS. REILLY:  I will (indiscernible) with the

incident, they're only retained for a year from the

actual date of call, so there won't be an audio

recording as of, I believe, November 5, 2017, which

was before the filing of the complaint, if I'm

```
 1                          PROCEEDINGS                18
 2  correct.
 3          THE COURT:  Okay, so the audios don't exist.
 4          MS. REILLY:  Correct.
 5          THE COURT:  Okay, so then you're going to have
 6  to answer that they don't exist and why.
 7          MS. REILLY:  Yes, I just (indiscernible).
 8          THE PLAINTIFF:  I would have expected there to
 9  be a legal hold on those recordings since there was a
10  filing made in both federal and state court of this
11  incident.
12          THE COURT:  Mr. Rattray, we're not going to
13  have a -- Mr. Rattray, I'm going through these
14  quickly, we're not going to have a discussion on every
15  single one, okay? So just hang on.
16          If there were any signed warrants those should
17  be produced.  Number four is redundant, I believe, of
18  number one.  And number five is fine, you're going to
19  have to respond to that.  The same with six.  In terms
20  of seven, that's, that is okay.  Okay, number eight is
21  okay.  Number nine is okay.  Ten and 11, the officers'
22  notes, I assume if they made any notes they would be
23  in their logbook so those should be produced.
24          THE PLAINTIFF:  And, Your Honor, I asked --
25          MS. REILLY:  (indiscernible) notes were
```

```
 1                         PROCEEDINGS                   19
 2   produced.
 3           THE PLAINTIFF:  The notes were produced, they
 4   were heavily redacted and produced in pieces. So they
 5   were, you know, one line with my name and then a huge
 6   chunk of redactions, and then another line with a time
 7   or date. I would just ask for the unredacted notes or
 8   at least the entire page that my name is on be
 9   unredacted.
10           THE COURT:  Why are they redacted, Ms. Reilly?
11           MS. REILLY:  Your Honor, I would have noted it
12   in the cover page which I produced to plaintiff, I can
13   pull that up and check, but it would have been
14   unrelated incidents. So the memo books had all of the
15   officers' actions taken for their tour, if it was
16   unrelated to the incident involving plaintiff, it
17   would have been redacted. I don't believe there would
18   have been any other information unless it was the date
19   of birth of the nonparty. But as we're going through
20   this, I'm happy to pull up the document to review.
21           THE COURT:  Okay, so, yes, why don't you do
22   that. It's perfectly okay to redact notes that don't
23   pertain to this incident.  To the extent it's a
24   birthdate of the child's mother or the child, Mr.
25   Rattray already knows these dates so those don't need
```

1

2  to be redacted and can be dealt with through a

3  protective order.

4        MS. REILLY:  Yes, Your Honor, I think it's

5  just always in the abundance of caution just since we

6  had, we were the producing party, understandably so,

7  that is information he does know.

8        THE COURT:  Yes, okay.

9        THE PLAINTIFF:  And I would ask the Court to

10  review the pages for redactions and relevancy for the

11  case, I understand you can't let me do that.

12        THE COURT:  Yes, I'm not going to do that

13  because the defense counsel is an officer of the court

14  and there's no basis to believe that she has done

15  anything untoward. And so until you have evidence that

16  she's making misrepresentations to the Court, there's

17  no need for me to review that if she's making those

18  representations to the Court.

19        In terms of the, a lot of these document

20  requests are redundant.  I think they can be summed up

21  what Mr. Rattray needs are all copies of any documents

22  generated by the officers or anybody else in the

23  police department after the incident, or before, that

24  relate to why the officers showed up at Mr. Rattray's

25  house, why they searched, what authority they had to

 1
 2  search, what their version of the events was, what
 3  statements they made or any reports they made,
 4  including any reports prepared by supervising officers
 5  or others in the police department about the incident.
 6  So those are the documents that will need to be
 7  produced.

 8        So that, if there is a domestic incident
 9  report, that should be included.  I don't know whether
10  there was a probable cause statement, I don't know
11  what that is. If there were any statements made by the
12  officers, those should be produced.  However,
13  defendant does not need to provide marital status,
14  number of dependents for either of the defendants, other
15  (indiscernible) defendants.  Similarly, you are not going to
16  be required to produce electronic records except to the
17  extent they have text pertaining to this incident.

18        MS. REILLY:  Yes, Your Honor.

19        THE PLAINTIFF:  Your Honor, I would simply ask
20  also that they have, they produce the records that
21  they had at the time the officers came to the house
22  because they may not pertain to this incident, but
23  those are the records that the officers should have
24  been reviewing in approaching, or could have relied
25  on, anything the police department knew about me

1                              PROCEEDINGS                    22

2   personally I would like to review to see how that

3   could have impacted their state of mind.

4          THE COURT:  Any texts or electronic

5   communications pertaining to the reasons why the

6   officers showed up at Mr. Cadavid's (sic) apartment

7   should be produced, as well, to the extent they exist.

8          MS. REILLY:  Yes, Your Honor.

9          THE COURT:  Okay, I think that 18 falls within

10  what I've already suggested, encounter records, I

11  think that pertains to the incident.  You are not

12  going to be required to produce the medical records of

13  either defendant or psychiatric --

14         MS. REILLY:  Your Honor, I'm sorry, just going

15  back to 18, one of my concerns with this wasn't

16  limited, at least in the text of the request, to this

17  particular incident. So I just wanted to be clear that

18  this was not a list of all of Officer Trigueno's

19  encounter records which is --

20         THE COURT:  I'm limiting it to the incident.

21         MS. REILLY:  I don't know exactly what

22  plaintiff was asking for in that, but I'll also state

23  in my written response any records that exist

24  pertaining to the incident.

25         THE COURT:  Okay. Nineteen, 20, 21, 22, those

PROCEEDINGS                                    23

are stricken, your objection is upheld. You're not

getting, you don't have to produce any information

about that.

        In terms of training, that is, training

information is requested in 23 through 25, and what I

am going to require is any training, any records

pertaining to training received by these officers on

the topics of entry of departments responding to

domestic incidents and searches of apartments. That's

the training that's relevant here.  So any training

that they received on that prior to the date of the

incident.

        MS. REILLY:  Okay.

        THE COURT:  So there may be, for example,

there may be some training materials or there may be

something from the police guidebook that talks about

what the procedures are for responding to a domestic

incident or for searching or getting a search warrant.

That is the, and there may be some other training

materials on that, that should be produced.

        MS. REILLY:  Yes, Your Honor. I think to the

extent there's documents, I will look into that, but

part of this may just only be responses to information

from the officers, but I will look to see if there's

```
 1                          PROCEEDINGS                    24

 2  any responsive documents --

 3          THE COURT:  Well there's a, technically

 4  there's the standard operating procedures of the NYPD

 5  and there's some kind of policy guide. It's not very

 6  long but there are things on different topics, so

 7  there may be something on warrants, probable cause,

 8  you know, responding to domestic incidents, so take a

 9  look at the procedures and the training. Because I

10  know that there is training so they may have some

11  training materials and you may know, you know, you may

12  have records in their personnel files about when they

13  received that training.

14          MS. REILLY:  Yes, Your Honor.

15          THE COURT:  Now, in terms of complaints, what

16  I'm going to require you to provide are complaints and

17  disciplines, complaints about these officers and

18  disciplines received for conducting unlawful searches

19  or unlawful entry into apartments.  Or for, I don't

20  know if there's a separate type of complaint or

21  discipline for failure to properly respond to a

22  domestic incident, but if there is any complaint or

23  discipline for that, that's what you'll need to

24  produce.

25          MS. REILLY:  Yes, Your Honor, I don't know
```

1                               PROCEEDINGS                    25

2    that it is separately delineated as clearly, but I

3    will look for something similar to the allegations of

4    the incident within that parameter.

5              THE COURT:  All right.

6              MS. REILLY:  And just to clarify for

7    complaints, that would be a lawsuit, that would be for

8    a ten year period --

9              THE COURT:  Yes.

10             MS. REILLY:  And is that substantiated/

11   unsubstantiated or just substantiated?

12             THE COURT:  Any complaint.

13             MS. REILLY:  Okay.

14             THE COURT:  Substantiated and unsubstantiated.

15             MS. REILLY:  Yes, Your Honor.

16             THE COURT:  Okay.  And the shift schedules,

17   that's fine, you can give him their shift schedules

18   for that, for the, I mean I would do the day before,

19   the day of and the day after the incident. I don't

20   know why you need this big, long time period.

21             THE PLAINTIFF:  Your Honor, the officers'

22   level of rest over the prior week I would say at least

23   is relevant. Because if they're doing excessive

24   amounts of overtime that could impair their judgment

25   and their ability to think clearly when they're on the

PROCEEDINGS                        26

1

2   job. So the day before is --

3         THE COURT:  Well that's only relevant if

4   they're saying that's a defense.  So --

5         THE PLAINTIFF:  Your Honor, this was an

6   unwarranted search and they have not provided --

7         THE COURT:  I understand what you're

8   asserting, I'm denying, I'm upholding the objection as

9   to the extent of the request and just produce the

10  schedules for the day before, day of and day after the

11  incident.

12        In terms of the disciplinary records, we've

13  talked about that, that's 30 and 31.

14        MS. REILLY:  Your Honor, I'm just looking at

15  them again, it's for the prior, it would not be for

16  the subsequent to the incident, is that correct, for

17  the ten years of discipline?

18        THE COURT:  You're talking about the

19  discipline?

20        MS. REILLY:  Yes, so --

21        THE COURT:  Ten years prior -- no, it should

22  be ten years prior to the incident and up to now.

23        MS. REILLY:  Because the defendants' position

24  would be that any subsequent disciplinary history, be

25  that as it may, would be irrelevant for the purposes

```
 1                          PROCEEDINGS                    27
 2  of the claim.  If it's something that happened after,
 3  it wouldn't have any propensity. So I'm happy to
 4  provide further legal argument on it, I don't have it
 5  handy with me at the moment, but I believe if held
 6  that anything subsequent wouldn't be relevant to the
 7  actions taken on that date.
 8            THE COURT:  For now, for now I'll order the
 9  ten years prior and then you can provide me in a
10  letter within a week why you shouldn't be require to
11  produce disciplinary records after.
12            THE PLAINTIFF:  Yes, and I would counter that
13  I would show, it would go to show their pattern and
14  practice of behavior.
15            MS. REILLY:  Your Honor, I think --
16            THE PLAINTIFF:  Individual officers.
17            THE COURT:  Okay, I'm not taking argument on
18  this now, I made my ruling, you can make, you can put
19  your letter in.
20            In terms of the work schedule, again, these,
21  32 and 33 are redundant, I've already stated what
22  their schedule, what you are to produce about their
23  schedule.
24            The performance evaluations, what I'll permit
25  would be any performance about, any portion of
```

performance evaluations that pertain to responding to

complaints, to domestic incidents or improper or

proper searches. So to the extent that they have a

performance evaluation in the five year period up to

the incident that notes, make any notations about

that, then those should be produced. Other things in

the performance evaluation can be redacted.

Thirty-six and 37 pertain to substance abuse.

I'm sustaining the objection, you don't have to

produce that stuff.

Okay. So 38 and 39, 40, 41, all appear to

relate to the documents pertaining to the incident, so

those should be produced only to the extent they

relate to the incident. Now there was a report related

to this incident is that, there was an IAB report, is

that right?

MS. REILLY: So there was an IAB complaint

that was exonerated and so we do have a copy of, it's

only a several page document. I think had been

anticipating during discovery working out the

protective order that Your Honor had suggested. And so

we'll be producing it but we would just seek to have

the protective order endorsed first.

THE COURT: Okay, fine. So, yes, that should

1    be produced --

2          THE PLAINTIFF:  Thank you, Your Honor, and the

3    actual investigation, at least plaintiff's experience

4    with the investigation was recorded and submitted

5    along with the complaint as item L as a CD.

6          THE COURT:  Okay.  Anything related to the

7    complaint and investigation and findings of IAB should

8    be produced.

9          Were there body cameras on the officers at the

10   time of the incident?

11         MS. REILLY:  No, this incident predated the

12   use of the body cameras.

13         THE COURT:  Okay, so for 43 and 44, just

14   respond that there are none.

15         MS. REILLY:  Yes.

16         THE PLAINTIFF:  Notably -- notably, Your

17   Honor, there was a standing order from this Court for

18   body cameras to be instituted by the NYPD, so the NYPD

19   was not in compliance with that one at the time.

20         THE COURT:  Okay, that's something you'll

21   point out in your evidence, but we don't need to argue

22   that now.

23         THE PLAINTIFF:  Okay.

24         THE COURT:  We're just talking about what

1                            PROCEEDINGS                    30

2    information you're getting right now, Mr. Rattray.

3            THE PLAINTIFF:  Thank you.

4            THE COURT:  Then in terms of the, okay, so

5    we've already addressed 45 which is the IAB, I don't

6    know what log or logs for IAB means but if there are

7    IAB records pertaining to this particular complaint

8    and the investigation of it, that should be produced.

9    So I think all of these relate to the IAB records, the

10   46, 47, 48, 49.

11           And then 50, I think that this is, it's

12   appropriate to provide training information on use of

13   force or de-escalation techniques. I know that there's

14   something in the police handbook about that and I know

15   that there's some limited training materials on that,

16   so you can provide that.

17           MS. REILLY:  Your Honor, defendants would just

18   submit that the fourth claim has been dismissed, so to the

19   extent that it addresses any use of force, it would no

20   longer be relevant to the claim.

21           THE COURT:  I hear what you're saying but he can

22   have the policy, he can understand what the policy is.  It's

23   just the policy. And then the domestic incident policy, to

24   the extent there is one.

25           MS. REILLY:  And, Your Honor, just follow up on

that, I actually did note, and I didn't state it in

the letter, but these are each asking for at the time

of the incident, as well as current policy as of, I

guess approximately the date plaintiffs put these

requests together --

THE COURT:  The ones that you need to produce

are the ones, the policies you need to produce are the

ones that were in place at the time of the incident.

Okay.  So then here you have a lot of stuff

about, a lot of requests going through to 64 that

relate to training and evaluation of the two

defendants and whatever their supervisors have

training on to evaluate them on their performance and

compliance with rules and regulations.  So I think

these requests are appropriate to the extent they

pertain to training related to the search and the

response to the domestic incident and how supervisors

are supposed to evaluate them for that so Mr. Cadavid

(sic) has a full picture of how these officers were

trained (indiscernible) at the time and how they were

evaluated and how their supervisor was supposed to

evaluate them at the time on these aspects of their

job.

MS. REILLY:  Your Honor, if you may just to

PROCEEDINGS                    32

say, and I understand, I've raised it before, there is

no negligent hiring, training or supervision claim

remaining in the case beyond the Monell.  But in

conjunction with that, and I'm happy to look into it

further and follow up with the Court on this, but I

don't believe with regards to this evaluation just

that there's going to be such specifics to meet those

requirements.  It's more of a yearly evaluation, you

know, at the end of the yearly cycle, you know, you

get checkmarks or scale of one to five, you know,

you're doing great, X, Y, Z, but I don't know that it

will be, and I don't have a copy of it handy to review

as we sit here, I don't believe there will be anything

to say there is training and evaluation on searches or

domestic incident situations.

          THE COURT:  Yes, I understand. If they don't

exist on this then you can say that and I understand

the Monell claim has been dismissed. But to the extent

these officers, you know, knew about these, to the

extent there are policies and they knew about them and

they, nevertheless, violated them, or the NYPD

supervisor, they violated them and the NYPD supervisor

didn't, you know, before, and the NYPD supervision

didn't ever say anything about it, I think that, I

 1

 2 think that's relevant to what happened on that day.

 3 Whether they were, you know, acting within the scope

 4 of their duties, within the role, with that. So that's

 5 why I'm going to require production of that

 6 information.

 7          MS. REILLY:  Yes, Your Honor, I think, I

 8 understand Your Honor's point to the Monell or to the

 9 training specific for the officers.  I would

10 respectfully, you know, disagree, but I do see what

11 Your Honor's point is there. I think with regards to

12 anything involving a supervisor, then that becomes

13 more of the supervisory liability aspect or, you know,

14 including any of that sort of element which, in

15 addition to being dismissed, I think in light of the

16 recent *Sangretti* (phonetic) decision on supervisor

17 reliability is just another added element of why going

18 too far into the weeds of, you know, the supervisor's

19 training or the supervisor's evaluation and, et

20 cetera, on how that's done, is going more far afield

21 than just, you know, the evaluations of the individual

22 officers or what they do, you know, with regards to

23 their evaluations.

24          THE PLAINTIFF:  If plaintiff could speak up

25 just for a moment and sort of to support what Your

```
 1                        PROCEEDINGS                    34
 2  Honor has said.  Really it speaks to how the officers
 3  conduct themselves should be constrained by how
 4  they're supervised, and their mental state should be
 5  affected by whether or not they believe their boss
 6  will care whether they do X or why.  And if they, if
 7  they don't, if the supervisors aren't supervising
 8  them, then they will behave differently.
 9              So this isn't about going after a supervisor,
10  this is about what are the things that fit into the
11  officer's state of mind where he felt like he could do
12  whatever he wanted and all he had to do was pencil
13  with the report and nothing was going to come of it
14  and he could just walk away. And that's --
15              THE COURT:  All right --
16              THE PLAINTIFF:  (continuing) -- the thing I'm
17  trying to get to.
18              THE COURT:  I hear you.  I'm going to permit
19  it, I'm going to permit it, but it's a limited
20  production in terms of what you're looking at for
21  purposes of the supervisor.  There may not be
22  anything.
23              THE PLAINTIFF:  Yes.
24              MS. REILLY:  And, Your Honor, it's specific to
25  the time of the incident and not to current date, same
```

PROCEEDINGS                                35

1  as --

2  as --

3          THE COURT:  Correct. That's correct.

4          MS. REILLY:  Thank you.

5          THE COURT:  And the insurance policies, I

6  think that that's not something that is -- are there

7  any insurance policies at issue?

8          MS. REILLY:  Your Honor --

9          THE PLAINTIFF:  Sorry.  Plaintiff's thinking,

10 Your Honor, is that officers' understanding of their

11 liability for any wrongdoing that they should do is

12 affected by the indemnification that they have.

13         THE COURT:  You're entitled to insurance

14 policies under the Federal Rules, I just don't know if

15 there are any.

16         MS. REILLY:  Your Honor, I'm happy to respond

17 to that, there are none. I would want to just confirm,

18 I'm 99 percent sure, but I don't believe in our cases

19 we've encountered that. I think, you know, I'm happy

20 to get to check but to my understanding, that's my

21 understanding, it's irrelevant to that request at this

22 point.

23         THE PLAINTIFF:  So formal insurance policies

24 or indemnification agreements, whatever would

25 indemnify the officers is what we are looking for,

1                           PROCEEDINGS                    36

2  Your Honor, and I've attached that to a filing this

3  morning.  But we're looking to see do those officers

4  feel like no matter what they do, it doesn't come out

5  of their pockets because there is somebody that's

6  going to back them.  And just the fact that we have

7  New York City's counsel here representing them at no

8  cost to them is an example of that, right, this

9  provides them with a shield, a layer of protection

10  from any misdeeds that they can provide. So it may not

11  be a formal insurance policy, but it is a layer of

12  protection against any wrongdoing that they may be

13  accused of. And that's the agreement that I'm looking

14  to see, Your Honor.

15          MS. REILLY:  And, Your Honor --

16          THE COURT:  I don't know if there are any, so

17  why don't you (indiscernible) insurance policy and if

18  there isn't, you can do that.  And I don't know if

19  there's anything written about indemnification either.

20          So let's now go to the certifications. Mr.

21  Rattray, what are you looking for here, what do you

22  mean, certifications?

23          THE PLAINTIFF:  Officers usually have to be

24  certified, have some level of certification with their

25  weapons, certification with the escalation tactics

1                              PROCEEDINGS                    37

2   that they understand the rules of the laws of the

3   county that they're working in and that they received

4   a police officer certificate and they can sort of take

5   that with them as they go. That's the level of

6   certification that I'm looking to see --

7            THE COURT:  That certification doesn't pertain

8   to what happened to this incident, so I don't think

9   that's relevant to the case.

10           THE PLAINTIFF:  If the officers aren't

11  certified police officers and they're still employed,

12  Your Honor, then that would explain why they didn't

13  know the law.  Why they didn't understand what my

14  rights were.

15           MS. REILLY:  Your Honor --

16           THE COURT:  Ms. Reilly?

17           MS. REILLY:  Because the officers were duly

18  employed by the New York City Police Department at the

19  time, I don't think this is a question that needs to

20  be addressed.

21           THE PLAINTIFF:  So does that mean you need to

22  be certified to be employed by the City of New York?

23           THE COURT:  So, again, Mr. Rattray, you can

24  ask these questions in depositions if you want.  We're

25  not going through it all now.

1
2        In terms of log searches, I think, I don't

3  know whether these officers ever did searches on Mr.

4  Rattray.  I guess --

5        THE PLAINTIFF:  Your Honor, they demanded my

6  ID and kept it for an hour while they were inside my

7  home. I don't know what they were doing with my

8  information.

9        THE COURT:  Okay --

10       MS. REILLY:  Your Honor, it would be a

11  question -- I apologize, go ahead.

12       THE COURT:  Why don't you ask the defendants

13  whether they ever did internet searches on the plaintiff,

14  and if they didn't do any, just you can say that in response

15  that there are no documents.

16       Logbooks we've already addressed.

17       MS. REILLY:  Your Honor, again, I hate to be

18  redundant, but once more there is the date of incident

19  through October, 2020 --

20       THE COURT:  (indiscernible) only pertaining to

21  this incident.

22       MS. REILLY:  Yes, Your Honor.  And then I just

23  wanted to go back to the issue that plaintiff had

24  raised regarding the redactions. I did pull up my

25  draft and the redactions that were made had to do with

2  the incident, before or after the incident involving

3  plaintiff. The point of the matter was there really

4  wasn't much put into the officer's memo book because

5  it was just, you know, the (indiscernible) at the

6  apartment. And so that is, you know, what the

7  remaining redactions would have been.

8            THE COURT:  Okay, thank you.

9            THE PLAINTIFF:  And plaintiff's concern is

10 that the redactions have been, the pieces of the

11 unredacted information have blocks of redacted

12 information in between those unredacted pieces which

13 seems unlikely that they would have written down

14 information about my incident, then written something

15 about a prior incident, and then gone back to writing

16 information about mine, and that's my concern.

17           MS. REILLY:  The clarification to that was

18 there was one line, and I can clear that up, the

19 entries in the beginning would have been the start of

20 the tour, the date of, you know, the incident or the

21 date of, you know, who was the recorder, et cetera,

22 general information, then the redactions as they began

23 the tour, then the entry for, you know, dealing with

24 the incident with Mr. Rattray, then the rest of the

25 officer's involvement or police action taken for the

```
  1                        PROCEEDINGS                    40
  2   rest of the tour. So I don't know whether that will
  3   clarify --
  4            THE COURT:  So I had only, I had only allotted
  5   45 minutes for this conference and we're getting onto
  6   about an hour. I actually have another meeting that
  7   I'm late for.  So what I'm going to do is I'm going to
  8   issue an order on the remaining aspects of this
  9   document request. I'm extending the fact discovery
 10   through the end of May so that you can complete this.
 11   And I'll schedule another status conference within a
 12   couple of weeks so we can address any other issues
 13   that have arisen, okay?
 14            MS. REILLY:  Your Honor, I just had one
 15   pressing issue to discuss, I apologize.  Plaintiff had
 16   filed a number of the documents on the docket this
 17   morning, approximately 3 a.m. I believe they were just
 18   exhibits, I'm not sure if they were supposed to be in
 19   response to our written discovery requests or document
 20   requests, which would be improper just in the
 21   beginning to file them and then not actually put the
 22   formal request. But that's something we could address
 23   later.
 24            Plaintiff actually filed a page that included
 25   Officer Cadavid's full date of birth and address, and
```

```
 1                          PROCEEDINGS                    41

 2   so I'm happy to write a letter, but I would like to

 3   have --

 4            THE COURT:  Yes, just put a letter in for

 5   sealing of that information.

 6            MS. REILLY:  Yes, Your Honor, thank you.

 7            THE PLAINTIFF:  And plaintiff would just like

 8   to assert that that is public information that was

 9   pulled down from a website, a publicly available

10   website.

11            THE COURT:  That doesn't matter.  We're saying

12   --

13            THE PLAINTIFF:  Understood.

14            THE COURT:  That's not supposed to be filed

15   and nor are discovery materials. Okay, we're

16   adjourned, have a good afternoon.

17            MS. REILLY:  Thank you, Your Honor, you, as

18   well.

19                 (Whereupon, the matter is adjourned.)

20

21

22

23

24

25
```

42

## C E R T I F I C A T E

    I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Wentworth Rattray v. Cadavid, et al., Docket #17cv8560, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature_____*Carole Ludwig*_____

                     Carole Ludwig

Date:    April 9, 2021