# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

WENTWORTH RATTRAY,

    Plaintiff,

vs.                                    Case No. 17-CV-8560 (PGG)

CITY OF NEW YORK, et al.,

    Defendants.
_____

**CONFIDENTIAL**

**REMOTE DEPOSITION OF**

**JOSE CADAVID**

**TAKEN ON**
**FRIDAY, AUGUST 13, 2021**
**10:08 A.M**

**NEW YORK, NEW YORK**






1  5, 2016.  Do you recall that incident?
2      A    Yes.
3      Q    I'm going to ask you if you can tell me
4  just in your words what you recall of that incident.
5      A    Me and my partner received a 911 call from
6  your child's mother in regards to a custody dispute.
7  Me and my partner, we arrived to the location of
8  where the caller stated.  We approached -- we
9  arrived to the scene of the address and were met by
10 your child's mother.
11          She explained to us that there is an issue
12 with a custody order, she wanted to see her child,
13 that you had refused to give her your daughter.  So
14 I explained to the complainant, your child's mother,
15 that I will do a domestic incident report and if she
16 wishes, she could take that to the judge and show it
17 to the judge.
18          At this time, she stated to me and my
19 partner that her daughter's life was in danger.
20      MR. UDALOV:  This is calling for
21 narrative.  Mr. Rattray, could you ask a specific
22 question and the officer can answer that question?
23      Q    Okay.  Officer Cadavid, you said that you
24 received a call from the child's mother.  How did
25 you receive that call?

```
 1      A    I received that call through the radio.
 2      Q    So she had a radio to contact you.  How
 3 were you familiar with her for her to know how to
 4 contact you?
 5           MR. UDALOV:  Objection.  That's not what
 6 Officer Cadavid said.
 7      Q    I believe -- Officer Cadavid, how did you
 8 receive that call?
 9      A    I received a call through the radio.
10      Q    Who was the call that you received through
11 the radio from?  Who was on the other end of the
12 line?
13      A    The NYPD dispatcher.
14      Q    You received a call not from the child's
15 mother but from the NYPD dispatcher?
16      A    Yes.
17      Q    Understood.  Thank you for correcting that
18 for us.
19           So you received the call from the
20 dispatcher.
21           What did the dispatcher tell you?
22      A    The dispatcher told me and my partner
23 that there is a female caller having a child
24 custody dispute with the child's father at the
25 location.
```

1  Q   Okay. Thank you. What else did the 911
2  operator tell you about the call?
3  A   To my recollection, that was it. She --
4  the address, obviously the address, and that was it.
5  Q   Okay. Did she tell you who the person was
6  that this dispute was with?
7  A   No.
8  Q   Did she provide a description?
9  A   No.
10 Q   Who did you understand this dispute to be
11 with in the absence of a description?
12 A   From the call that we received, it was
13 between the complainant and father of the child.
14 Q   Where did you understand, based on the
15 information from the dispatcher, that the father of
16 the child was? Was he on the scene?
17 A   From the call, it was -- I believe -- I'm
18 sorry. The apartment was stated in the call, but
19 that's it. All the other information was given by
20 the complainant at the scene.
21 Q   The apartment was in the call, but the
22 other information was given by the complainant at
23 the scene. What other information was given by the
24 complainant at the scene?
25 A   About the custody dispute, the court

```
 1  order, and also that she believed her daughter's
 2  life was in danger.
 3       Q    And so she told you -- the complainant
 4  told you that she believed that her daughter's life
 5  was in danger?
 6       A    Yes.
 7       Q    Okay.  At that point did you have -- did
 8  you call for backup?
 9       A    No.
10       Q    Okay.  Did you believe that a child was in
11  danger?
12       A    Based on the information the complainant
13  gave me, yes.
14       Q    So you believed her when she told you that
15  a child's life was in danger.  What did you do at
16  that point?
17       A    I asked her why she believed her daughter
18  was in danger.
19       Q    Okay.  What did she tell you?
20       A    She stated to me that you use drugs and
21  you have drug dealers over the apartment.
22       Q    So she told you that?
23       A    Yes.
24       Q    Okay.  And at that point, you did what?
25       A    At that point, I explained to her that
```

1  me and my partner will go and check on her
2  daughter.
3      Q    Okay.  So you told her that you were going
4  to go check on her daughter.  Then what did you do?
5      A    Then me and my partner proceeded to the
6  building to go upstairs to the apartment.
7      Q    Did you come in the front door or the back
8  door?
9      A    Front door.
10     Q    Front door.  So you made a front entry
11 into the building.  How did you get into the
12 building?
13     A    I don't -- through the doors.
14     Q    The doors were wide open or are they -- do
15 they have a security system on them?
16         MR. UDALOV:  Objection.  It's a compound
17 question.  Please ask each question separately.
18     Q    Okay.  How did you enter the building?
19 How did you gain access through the doors?
20     A    I don't remember.
21     Q    Do you remember how you got upstairs?
22     A    Yes.  I believe I -- we took the elevator.
23     Q    So you took the elevator up.  Which floor
24 was it on?
25         MR. UDALOV:  Hold on.  There's background

```
 1  noise.
 2          MR. RATTRAY:  Sorry.  I'm stopping it.
 3          My apologies about that.
 4          MR. UDALOV:  Please reask the question.
 5          MR. RATTRAY:  I'll just close this for
 6  now.
 7     Q    So how did you get upstairs?
 8     A    Took the elevator.
 9     Q    You took the elevator up, okay.  So you
10  took the elevator up to which floor?
11     A    Third floor.
12     Q    You took the elevator up to the third
13  floor of the building, and then what did you do once
14  you got to the third floor?
15     A    Me and my partner proceeded to go to the
16  apartment.
17     Q    Okay.  And once you were at the apartment,
18  what did you do?
19     A    I knocked on the door.
20     Q    Okay.  And what happened after you knocked
21  on the door?
22     A    You verbally responded.
23     Q    Okay.  Do you remember the response?
24     A    No, I don't.
25     Q    Okay.  You don't recall the response.  Did
```

```
 1  you say anything after the response?
 2      A   I stated that I would like to see your
 3  daughter.
 4      Q   Do you recall the response from that?
 5      A   No, I don't.
 6      Q   All right.  What happened after that?  Did
 7  I say something, or did you say something?
 8          MR. UDALOV:  Objection, compound question.
 9  Please just ask separate questions.
10      Q   Okay.  What did you say after my response?
11      A   I don't remember.
12      Q   You don't remember what you said.  So was
13  this the end of the interaction?
14      A   No.
15      Q   Did you knock on the door again?
16      A   I don't remember.
17      Q   Do you recall offering to take down the
18  door if plaintiff didn't open the door?
19      A   Yes.
20      Q   You said that?
21      A   Yes.
22      Q   And did plaintiff open the door at that
23  point?
24      A   Eventually, you did open the door.
25      Q   So I eventually opened the door.  So once
```

```
 1      A    I don't recall.
 2      Q    You don't recall saying that, okay.  What
 3 do you recall saying to plaintiff about the
 4 daughter?
 5      A    I do recall asking the whereabouts about
 6 your daughter and you being very hostile and
 7 argumentative and being very rude and refusing to
 8 say the whereabouts about your daughter.
 9      Q    Okay.  Do you recall asking to come in and
10 look around?
11      A    No, I don't.
12      Q    You don't recall asking to come in and
13 look around, okay.  Do you recall plaintiff refusing
14 to allow you to come in and look around?
15      A    Yes.
16      Q    Okay.  So you recall plaintiff's refusal,
17 but you do not recall you asking for permission?
18      A    I don't recall.
19      Q    I'm sorry.  You don't recall refusing or
20 you don't -- you don't recall plaintiff's refusal or
21 you don't recall you asking?
22           MR. UDALOV:  Objection.  Please ask the
23 question separately.
24           MR. RATTRAY:  Sorry.  Thank you,
25 Counsel.
```

1  **Q   You don't recall plaintiff refusing you**
2  **entry, or do you recall that?**
3  A   I do recall you refusing entry.
4  **Q   Do you recall you asking plaintiff to**
5  **allow you to enter to look around?**
6  A   I do not recall.
7  **Q   You do not recall that, okay.  All right.**
8  **So after plaintiff's refusal for you to enter, what**
9  **happened?**
10 A   After going back and forth of asking to
11 see your daughter and your refusal, I made my -- I
12 made entry into the apartment.
13 **Q   You made entry.  Did you get a warrant for**
14 **that entry?**
15 A   No.
16 **Q   And you made that entry based on what**
17 **information?**
18 A   I made that entry based on the
19 complainant's information from the day of the
20 incident.  And also the way you were being hostile,
21 being rude, and being very aggressive towards me and
22 my partner, that gave me more of a concern.
23 **Q   So hostile, rude and aggressive.  I'm**
24 **going to ask you if you can tell me what hostile --**
25 **what you categorize as hostile that plaintiff --**

```
 1  what about plaintiff was hostile to you?
 2      A    When I knocked on the door, you initially
 3  refused to open the door.
 4      Q    So refusing to open the door is your
 5  definition of hostile?
 6      A    And you were yelling behind the door.
 7      Q    I was yelling.  Do you recall what I was
 8  yelling?
 9      A    I do not.
10      Q    You do not recall.  You just heard
11  yelling?
12      A    I remember you yelling at us through the
13  closed door.
14      Q    Through the closed door.  It's difficult
15  to hear someone through a closed door unless they're
16  yelling, correct?
17           MR. UDALOV:  Objection, calls for
18  speculation.
19      Q    Okay.  Rude, let's do "rude."  Let's try
20  to understand what we mean by "rude."  What was rude
21  about plaintiff that day?  Can you define the acts
22  that you categorized as rude a moment ago?
23      A    Yes.  You were yelling at us through the
24  door, the fact that you were yelling at us, we had
25  no interaction prior to that.  And just the simple
```

```
 1  fact that there was houses on the other side of the
 2  door and we knocked on the door, you started yelling
 3  at us, cursing us out.
 4      Q    So there was cursing?
 5      A    Yes.
 6      Q    Can you repeat for me the cursing that you
 7  heard?
 8           Because a moment ago, you didn't remember
 9  what was said, so now I'm asking you again about the
10  yelling and the cursing.  Can you tell me what was
11  said during that yelling?
12      A    I don't recall exactly what was said.  I
13  just do remember that there was cursing, yelling.
14      Q    There was yelling and cursing going on,
15  but you don't recall what was said, just that it was
16  cursing?
17      A    Yes.
18      Q    Understood.  Okay.  Tell me about when you
19  forced your way into the home --
20           MR. UDALOV:  Objection.
21      Q    -- when you made entry.  Tell me about
22  when you made entry, using your words.
23      A    Can you repeat the question?
24      Q    Tell me about what happened when you made
25  entry.
```

```
 1            What made you decide to make entry into
 2   the home as you described it?
 3       A    My decision to make entry was based on
 4   your refusal to tell me the whereabouts about your
 5   daughter or to produce your daughter, and my concern
 6   was the safety of your daughter.
 7       Q    So your concern was the safety of my
 8   daughter.  Did you consider that your forcible entry
 9   could put her in more danger?
10            MR. UDALOV:  Objection.
11       A    No.
12       Q    Did you consider that your entry may be
13   dangerous to plaintiff?
14       A    No.
15       Q    Okay.  When you made entry, what did you
16   do?
17       A    I made entry.  You backed up.  And I was
18   asking you about the whereabouts about your
19   daughter.
20       Q    Okay.  Did you notice anything when you
21   made entry and I backed up?
22       A    You seemed -- you were upset.
23       Q    I was upset.  Did I look like I was in
24   pain?
25       A    No.
```

1  A   I don't remember.
2  Q   So you searched for the child?
3  A   Yes.
4  Q   Just inside the apartment?
5  A   I'm sorry.  Can you repeat that?
6  Q   Did you search only inside the apartment?
7  A   Yes.
8  Q   So did you check her bedroom?
9  A   I checked the whole apartment.
10 Q   You checked the whole apartment.  So you
11 checked the whole apartment.  You did not find the
12 child.  How long did that take?
13 A   I do not remember.
14 Q   Do you have an approximation?
15 A   Maybe 10, 15 minutes.
16 Q   So for 10 to 15 minutes, you searched the
17 home.
18     Would you say this was a large apartment?
19 A   To my recollection, it was a small
20 apartment.
21 Q   A small apartment.  So it took you 10 to
22 15 minutes to search the small apartment for a
23 child?
24 A   With going back and forth with you, yes.
25 Q   Okay.  After the search, did you have any

1  doubts whether the child was still in the apartment
2  or not?
3      A   After the search, I did not have any
4  doubts that she was in there.
5      Q   So at this point, you have no doubt the
6  child is not in the apartment or you're certain the
7  child is not in the apartment.  What did you do
8  then?
9      A   I requested for the supervisor.
10     Q   Okay.  So at that point, you requested a
11 supervisor.
12         Why did you need a supervisor at this
13 point?
14     A   I needed a supervisor to do -- to help me
15 in the investigation to find out the whereabouts of
16 your daughter.
17     Q   Okay.  Would you say you needed a warrant?
18     A   No.
19     Q   You didn't need a warrant?
20     A   Is that a question?
21     Q   I'm just confirming what you said.  Sorry.
22 Thank you.
23         So you needed a supervisor to help you
24 conduct the investigation.
25         MR. UDALOV:  Mr. Rattray, please state it

```
 1            MR. UDALOV:  It calls for speculation.
 2            The child wasn't found.
 3            MR. RATTRAY:  Okay.  I will rephrase the
 4   question.
 5       Q    What was your intent, Officer Cadavid, in
 6   looking for the child?  What did you intend to do?
 7       A    My intent was to make sure she was safe.
 8       Q    Okay.  And you were concerned for her
 9   safety because the mother had told you that all
10   sorts of things were happening at the apartment?
11            MR. UDALOV:  Objection.  What do you mean
12   by "all sorts of things"?
13       Q    You were concerned for her safety -- I
14   withdraw the question.
15            You were concerned for her safety because
16   of what the mother had told you; is that correct?
17       A    Yes.
18       Q    So the parent -- that parent had told you.
19   Do you recall plaintiff telling you that the child
20   was not home?
21       A    I do not.
22       Q    Do you recall plaintiff telling you that
23   the child was safe?
24       A    I do not.
25       Q    Do you recall plaintiff telling you that
```

```
 1        A    I did.
 2        Q    Did you record those statements?
 3        A    I did not.
 4             MR. RATTRAY:  Counsel, is this a good time
 5   for a break?  I'm not sure what's normal for this.
 6             MR. UDALOV:  Yes, if you'd like to take a
 7   break, yeah, you can take a break.  How long do you
 8   want to take a break for?
 9             MR. RATTRAY:  I think ten minutes is
10   great.  Does that seem fair?
11             MR. UDALOV:  Yeah.  So we can come back at
12   11:16.
13             MR. RATTRAY:  11:16.  Thank you.
14             (Recess taken.)
15   BY MR. RATTRAY:
16        Q    Officer Cadavid, did you ever tell Mr.
17   Rattray that he was under control?  Did you ever
18   tell me that I was under your control?
19        A    I do not recall.
20        Q    Did you ever tell me that I was under
21   arrest?
22        A    I never stated that.
23        Q    Okay.  Did you ever read me my rights?
24        A    No.
25        Q    Did you ever tell me that I was free to
```

```
 1  the supervisor arrived?
 2       A    Yes.
 3       Q    Was Mr. Rattray free to leave?
 4       A    You were not.
 5       Q    Did Mr. Rattray consent to your entry into
 6  his home?
 7       A    I do not recall.
 8       Q    Did Mr. Rattray object to you being in his
 9  home after you had made entry?
10       A    Yes.
11       Q    Did Mr. Rattray do anything to get you to
12  leave his home?
13       A    I do not recall.
14       Q    Did Mr. Rattray ask you if he could get
15  his phone?
16       A    I do not recall.
17       Q    Do you recall Mr. Rattray placing a call?
18       A    Yes.
19       Q    Do you recall who Mr. Rattray called?
20       A    I recall you dialing 911.
21       Q    Okay.  Do you recall what was said?
22       A    I do not.
23       Q    Do you recall saying anything during that
24  call?
25       A    I remember stating my badge number.
```

```
 1      Q      So you left my apartment together?
 2      A      Yes.
 3      Q      Do you have an indication of why he had
 4   you leave the scene?
 5      A      Can you repeat the question?
 6      Q      Why did you leave the scene after the
 7   lieutenant arrived?
 8          MR. UDALOV:  Mr. Rattray, please be more
 9   specific when you ask that.  If by "scene," you mean
10   your apartment, please ask it that way.
11          MR. RATTRAY:  Thank you.
12      Q      Why did you leave your apartment after
13   Lieutenant Koch arrived?
14      A      After my lieutenant arrived, he aided me
15   in my investigation to the whereabouts of your
16   daughter, and once we concluded with the
17   investigation, then we left.
18      Q      Did he help you search for the child to
19   conclude the investigation?  How did he help you
20   conclude the investigation?
21      A      He helped me by getting information from
22   you about the whereabouts of your daughter and
23   confirming the whereabouts of your daughter.
24      Q      So when Lieutenant Koch left, he knew the
25   whereabouts of the child?
```