# EXHIBIT B



*Powerful* LITIGATION SUPPORT

COURT REPORTING
LEGAL VIDEOGRAPHY
VIDEOCONFERENCING
TRIAL PRESENTATION
MOCK JURY SERVICES
LEGAL TRANSCRIPTION
COPYING AND SCANNING
LANGUAGE INTERPRETERS







(800) 528-3335
NAEGELIUSA.COM

UNITES STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WENTWORTH RATTRAY,

    Plaintiff,

against                                          Index No.:   17-CV-8560

POLICE OFFICER JOSE CADAVID
BADGE #9085 in his individual
and official capacity, POLICE OFFICER
ALYSSA TRIGUENO BADGE #16807
in her individual and official capacity,

    Defendant.
_____

**REMOTE DEPOSITION OF**

**ALYSSA TRIGUENO, OFFICER**

**TAKEN ON**
**MONDAY, SEPTEMBER 20, 2021**
**10:15 A.M.**

**NEW YORK**

1  November 6th you received a call on the radio.
2  Could you categorize that call for us or summarize
3  that call for us?
4         **MR. UDALOV:**  Objection.  Hold on.  Do you
5  mean November 6th, Mr. Rattray or November 5th?
6         **MR. RATTRAY:**  November 5th.  Thank you.
7      **Q**   You received a call.  Could you
8  categorize that call for us?
9      A   The call that I received that day was
10 over a dispute of a custodial dispute.  The mother
11 called that day.  From what I recall, she wasn't
12 able to pick up her daughter, so that's why I
13 responded.
14     **Q**   She was not able to pick up her daughter.
15 That's the call you received over the radio?
16     A   Yes.  That's the call the dispatch gave
17 us.
18     **Q**   So dispatch gave you a call that a mother
19 is not able to pick up her child.  I'm getting a
20 request to send an invitation out.  Sorry.  Officer
21 Trigueno, when you arrived at the scene, do you
22 recall what time that was?
23         **MR. UDALOV:**  Objection.
24     **Q**   When you arrived at the caller's
25 location, do you recall the time?

1  question.

2  **Q    Officer Trigueno, when you arrived at the**
3  **scene sometime between 1851 and 1913, when you**
4  **arrived at the location of the initial caller**
5  **between 1851 and 1913, what were your first steps?**
6      A    From what I recall from that day, we met
7  with the initial caller which was a female and she
8  stated she just wanted to go across to check on her
9  daughter because it was her time to pick her
10 daughter up and her husband "wouldn't let her" and
11 her daughter wasn't answering her phone.
12     Q    Did you make note of those statements?
13     **MR. UDALOV:**  Objection.
14     **MR. RATTRAY:**  State your objection,
15 counsel?
16     **MR. UDALOV:**  I'm objecting to the form of
17 the question.
18     **Q    Officer Trigueno, did you document what**
19 **the caller told you?**
20     A    On the domestic incident report it's in
21 the brief summary of what occurred and also there
22 is a statement that the initial caller wrote, which
23 was on the second page of the domestic incident
24 report.
25     Q    Of the domestic incident report.  And

```
 1      A    Yes.
 2      Q    And plaintiff refused to let you see the
 3 child?
 4      A    Correct.
 5      Q    And you needed to make sure the child was
 6 okay based on the 9-1-1 call.  Was that your
 7 statement?
 8      A    Yes.
 9      Q    And plaintiff refused that request as
10 well?
11      A    Correct.
12      Q    And plaintiff refused to open his door
13 and that was a problem as well and so that's all
14 the things that are encapsulated and refused
15 officers?
16      A    Yes.
17      Q    Thank you.  Now, "nor show court papers."
18 Can you help us understand what is that statement
19 based on?
20           MR. UDALOV:  Objection.
21      Q    Did you make a request to see court
22 papers, Officer Trigueno?
23      A    I don't recall making a request, I just
24 know that no court papers were provided stating
25 which party has sole custody of the child.  Why it
```

```
 1  is -- "nor show court papers that P2 had custody of
 2  the child."
 3      Q    Okay.  I believe there must have been a
 4  dialogue for this information that you just
 5  described to us to become a part of the record;
 6  right?  We wouldn't just assume these things.  Was
 7  there a dialogue from where you extracted this
 8  information?
 9           MR. UDALOV:  Objection.
10      Q    Was there a request made to open the
11  door?
12           MR. UDALOV:  Objection.
13      Q    Officer Trigueno, did you make a request
14  to open the door?  For plaintiff to open his door?
15      A    I believe I did.  I don't recall the
16  specific instance that occurred here.  I just know
17  -- I remember that we were trying to have the P2
18  open the door.  Did not want to open the door and
19  that's all I remember.
20      Q    So how long did it take for P2 to open
21  the door?  Because you said the door was open at
22  some point.  How long did that take?  How long was
23  the refusal period?
24           MR. UDALOV:  Objection.
25      Q    Officer Trigueno, from the time you
```

```
 1      Q    Did you ask to see their driver's
 2 license?
 3           MR. UDALOV:  Objection.
 4           MR. RATTRAY:  What is your objection,
 5 counsel?
 6           MR. UDALOV:  Object to the form of the
 7 question.
 8      Q    Officer Trigueno, the female caller, when
 9 you responded to the scene, the female caller, did
10 you ask the female caller for identification?
11           MR. UDALOV:  Objection.
12      Q    Officer Trigueno, did you ask the female
13 caller to provide her driver's license?
14           MR. UDALOV:  Objection.
15      Q    Officer Trigueno?
16      A    Yes.  So what I recall, the way I was
17 able to identify the caller/mother, she approached
18 us and said I called 9-1-1.  From what I recall
19 that day.  That's how I was able to know that that
20 was the caller/mother.
21      Q    Based on the fact that she identified
22 that she had called 9-1-1?
23      A    Correct.  And in the narrative, of the 9-
24 1-1 call it states that she will be in front of the
25 building, which is where we -- I arrived with
```

1  to the caller, so it was predominantly Officer
2  Cadavid.  However, that's all I remember from
3  there.
4      Q    So Officer Cadavid is really the only
5  police officer that spoke to the female caller at
6  the scene prior to you coming upstairs to the
7  plaintiff's apartment?
8      A    Yes.
9      Q    Thank you.  And how about after leaving
10 plaintiff's apartment?  Did you then speak to the
11 female victim?
12     A    After we left the plaintiff's apartment,
13 I spoke to the caller to get -- to see her ID so we
14 can do the domestic incident report and for her to
15 fill out her statement on the second page of the
16 domestic incident report.
17     Q    You spoke with caller after leaving the
18 apartment and got ID after leaving the apartment?
19     A    Yes.
20     Q    At that time, did the female caller
21 provide you with the court custody papers we were
22 talking about before?
23     A    No, she did not.
24     Q    Did you ask for those court custody
25 papers at that time?

1  chain was still on the door at that moment?

2      A    No, I don't recall.  Just based off how

3  the door was open.  It was based on how the door

4  was open slightly and it appears to be there was,

5  but I'm not sure if there was a chain lock.

6      Q    Do you recall plaintiff closing the door

7  or attempting to close the door?

8      A    Yes, I do.

9      Q    And when plaintiff attempted to close the

10 door, what happened?

11     A    I remember the door was being open and

12 then --

13     Q    I'm sorry, I'm sorry.  Officer Trigueno,

14 we're talking about plaintiff was closing the door.

15         MR. UDALOV:  Objection, Mr. Rattray.  I

16 would ask that -- let her answer.

17         MR. RATTRAY:  I'm asking about closing --

18         MR. UDALOV:  I understand --

19         MR. RATTRAY:  I'll redirect.

20         MR. UDALOV:  I request that you let the

21 witness finish answering and then you can ask the

22 next question.

23         MR. RATTRAY:  Okay.

24     Q    Officer Trigueno, I'll restate the

25 question.  Officer Trigueno, do you recall what

```
 1      A    No, he did not.
 2      Q    He did not.  Did you believe that you had
 3  the power to stop Officer Cadavid's actions that
 4  day?
 5           MR. UDALOV:  Objection.
 6      Q    Did you have the power to stop Officer
 7  Cadavid that day, Officer Trigueno?
 8           MR. UDALOV:  Objection.
 9      A    What do you mean to stop?  To stop him
10  from checking if the daughter was home or which?
11  I'm not understanding to stop.
12      Q    To stop him from conducting his search
13  without a warrant.
14           MR. UDALOV:  Objection.
15      A    It wasn't a thorough search of the
16  apartment that was conducted.  I know we were there
17  just to check on the well being of the child, if
18  the child was okay considering the mother's 9-1-1
19  call to dispatch stating that she has not heard
20  from her daughter and the plaintiff did not want
21  her to see the daughter so that drew concern.  It
22  wasn't a thorough search of the apartment at all.
23      Q    Officer Trigueno, have you had training
24  on domestic -- handling domestic incidents as a
25  NYPD officer?
```