# EXHIBIT C

Page 1

1  UNITED STATES DISTRICT COURT

   SOUTHERN DISTRICT OF NEW YORK

2  -----------------------------------------------------------X

   WENTWORTH RATTRAY,

3

                                        PLAINTIFF,

4

5              -against-            Case No:

                                    17-CV-8560

6

7  THE CITY OF NEW YORK; POLICE OFFICER JOSE CADAVID, BADGE

   NO. 9085, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY; POLICE

8  OFFICER SGT MERVIN BAUTISTA, IN HIS INDIVIDUAL AND OFFICIAL

   CAPACITY; POLICE OFFICER ALYSSA TRIGUENO, IN HER INDIVIDUAL

9  AND OFFICIAL CAPACITY,

10                                      DEFENDANTS.

   -----------------------------------------------------------X

11

12                      DATE:  July 30, 2021

13                      TIME:  10:24 a.m.

14

15

16              DEPOSITION of the Plaintiff,

17  WENTWORTH RATTRAY, taken by the Defendants, pursuant to a

18  Court Order and to the Federal Rules of Civil Procedure,

19  held via ZOOM Video Conference, before Tina M. Haywood, a

20  Notary Public of the State of New York.

21

22

23

24

25

RATTRAY

```
                                          Page 35
 1   York 10027.
 2       Q.     How long have you lived at this address?
 3       A.     I have lived at this address approximately ten
 4   years.
 5       Q.     And who lives with you at that address?
 6       A.     The minor child that we mentioned before.
 7       Q.     Does anybody else live with you there?
 8       A.     No one else lives with me at this address.  These
 9   are all questions that Officer Cadavid asked.
10       Q.     Do you own or rent your apartment?
11       A.     I rent the apartment that I live in.
12       Q.     And on November 5, 2016, were you living at
13   42 West 120th Street, Apartment 3C, New York, New York
14   10027?
15       A.     On November 5, 2016, I resided with my minor
16   child at 42 West 120th Street, Apartment 3C, New York, New
17   York 10027.
18       Q.     Was anybody else living with you at that time?
19       A.     At that time, no one else was living in this
20   apartment besides myself and my minor child at
21   120th Street, Building 42, Apartment 3C, New York, New York
22   10027.
23       Q.     Did you ever live with the mother of the child?
24       A.     I did.
25       Q.     When did you live with her?
```

1      A.      She didn't go anywhere.  So the parts where we

2   get up, her routine is she goes to classes for a few hours,

3   then I pick her up from those classes and then, you know,

4   we usually have hangout time, and then we met up with some

5   of her friends and, you know, they wanted to do stuff and

6   we did stuff and then the day was wrapping up.  They had an

7   event planned and they invited her, she wanted to go, so I

8   said fine and I said, you know, I'll go home and rest my

9   hooves and circle back later.

10     Q.      At what time did your daughter go with her

11  friends to the event?

12     A.      About six.

13     Q.      Is that 6 p.m.?

14     A.      6 p.m.

15     Q.      Now prior to her going to see her friends, did

16  you have any interaction with the mother?

17     A.      I did not.

18     Q.      When did you first encounter the mother of the

19  child on November 5, 2016?

20     A.      When I got home.  I got home; walked in my

21  building through the front door; through the second door;

22  up the stairs to my mailbox; checked my mail; took my mail

23  out; was reading through it; turned around; saw there was

24  someone at the door; thought Oh, let me go open it; then I

25  realized it was her.

Page 41

```
1        Q.      And what time did this take place?

2        A.      That was probably about 6:45, maybe -- somewhere

3   between 6:30 and 6:45.

4        Q.      You said you were getting your mail and then you

5   noticed her standing by the door.  Was she inside of the

6   building or outside of the building?

7        A.      She was outside of the building.

8        Q.      And what happened when you encountered her?

9        A.      I went, I opened the door.  She said she was here

10  to pick up the child and I said, "Well, I don't know

11  anything about that," and she said she sent an e-mail to

12  her attorney and I said, "You need to talk to your attorney

13  then because I don't have an e-mail."

14       Q.      Did she say anything else to you?

15       A.      She said she came all the way down to pick her up

16  and I said, "I can't help you with that.  She's not even

17  available, you know, so you got to talk to your attorney."

18       Q.      Did she ask to talk to the daughter?

19       A.      She said -- well, she asked if she could pick her

20  up anyway because she came down and I said, "No.  She's not

21  available."

22       Q.      Did you tell her where she was?

23       A.      I did not tell her where she was, no.

24       Q.      Why didn't you tell her?

25       A.      It's not relevant.  It wasn't relevant to her and
```

RATTRAY

Page 42

1    I'm not going to give someone access to my child when they

2    shouldn't have access to my child.  Like, why would you --

3    like, it would be like me asking you where's your kid,

4    right?  You have no reason to give me that information.

5        Q.    Did she say anything else to you?

6        A.    She wanted to continue the conversation and I

7    said, "I'm sorry.  I can't talk to you.  You have an

8    attorney.  You should talk to them."

9              I'm my own attorney, so I'm not going to risk,

10   you know, whatever -- I wasn't going to risk her saying X,

11   Y or Z in court by having a conversation with her.  So I

12   just stopped the conversation, I closed the door and I went

13   upstairs.

14       Q.    How long did this conversation last?

15       A.    It lasted maybe 30 seconds, maybe a minute.  It

16   wasn't a very long conversation at all.

17       Q.    During the conversation with the mother, was she

18   upset?

19       A.    She seemed frustrated, which I can understand,

20   but...

21       Q.    And then before you left, did you say anything

22   else to her?

23       A.    No.  I just ended the conversation.

24       Q.    Did she say anything to you when you ended the

25   conversation?

RATTRAY

1      A.      No.

2      Q.      And what did she do when you ended the

3  conversation?

4      A.      No idea.  She was outside the outer door of the

5  building and I just closed the door.  The door locks when

6  you close it so.  Then I just turned around, walked away

7  and went upstairs.

8      Q.      Approximately what time did you go back upstairs

9  to your apartment?

10     A.      I went upstairs probably 6:45.

11     Q.      And what did you do after you got back upstairs?

12     A.      I don't know; same regular stuff one does when

13  one gets in the apartment.  I took my wallet, my keys, my

14  phone, I put them on the nightstand, the little table thing

15  where I keep them.  Then I got myself something to drink, a

16  glass of water, and then I thought, you know what?  I just

17  don't want this to become a problem later, so I said, I

18  should let the Court know that she showed up today.

19     Q.      And how were you going to let the Court know that

20  the mother showed up?

21     A.      Via an e-mail.

22     Q.      And who were you going to reach out to the Court

23  to?

24     A.      The Court.  So the Court is, I don't know, they

25  have an attorney and there was an e-mail thread with the

1      A.     Again, this e-mail is what we -- we rely on

2    e-mail to communicate.

3      Q.     After you returned to your apartment, what

4    happened next?

5      A.     So I realized that this is something the Court

6    should know about, so I started notifying them.  I started

7    an e-mail to notify them.  I just took one of the e-mails

8    that were bouncing back and forth, and hit Refly All,

9    saying Ms. Sandy is downstairs, don't know why; and as I

10   was writing that e-mail, there was a knock at the door.  So

11   then I started multitasking while writing the e-mail.

12     Q.     And who was knocking at the door?

13     A.     Police, NYPD, police officers.

14     Q.     Did they say anything while they were knocking at

15   the door?

16     A.     Yes.  They said, "Police."

17     Q.     Did they say anything else?

18     A.     No.  I think initially that's what they said.

19   They said, "Police," and I said, "Yes."

20     Q.     And what happened after that?

21     A.     After I said "yes," they said, "Can we talk to

22   you?"

23     Q.     And what did you say in reply?

24     A.     And I said, "Sure."

25     Q.     What happened after that?

RATTRAY

Page 47

1    A.    After that, they said, "Can you open the door."

2    Q.    And what happened after that?

3    A.    After that, I said, "I can hear you fine" -- I

4    said, "No, I'm good" first, I think.

5    Q.    And why did you not want to open the door?

6    A.    Because I was writing an e-mail.

7    Q.    Did they say anything when you responded "No, I'm

8    good"?

9    A.    Yes.

10   Q.    What did they say?

11   A.    They said, "Open the door," and I said, "I can

12   hear you fine."

13   Q.    And what was said after that?

14   A.    I continued writing my e-mail and then the male

15   voice said, "Do you want us to take the door down?"

16   Q.    And what happened after that?

17   A.    I thought for a moment.  I hit Send on the e-mail

18   to get that off my brain.  Then I put my phone down,

19   thought for another moment, sighed and opened the door.

20   Q.    When you say you opened the door, did you fully

21   open the door?

22   A.    I opened the door -- well, the maximum my door

23   opens is a full on 90 degrees, but the most I opened it

24   that day was 45 degrees.

25   Q.    And what happened when you opened the door?

RATTRAY

Page 48

1    A.    I opened the door, I said, "Yes?" and the

2  officers engaged me in conversation as to my identity,

3  etc., etc.

4    Q.    When you say "the officers," who do you mean?

5    A.    There was a female officer that was standing on

6  the left and a male officer that was standing on the right.

7  At that point, I didn't know who either of them were.

8    Q.    Do you know who those officers are today?

9    A.    I do.  I believe the female officer on the left

10 was Officer Alyssa Trigueno.  I believe the male officer on

11 the right was Officer Jose Cadavid.

12   Q.    Do you remember what the female officer looked

13 like?

14   A.    I don't know what anyone looks like.  I don't

15 know what, like -- I couldn't tell you what the Mona Lisa

16 looks like.  I don't know what that question means.  I'm

17 confused.  Could you be more specific?

18   Q.    What were the officers wearing?  Were they in

19 uniform?

20   A.    They were in uniform.  Both officers were in

21 uniform, yes.

22   Q.    So what did they say to you after you opened the

23 door?

24   A.    So there was a conversation that ensued and

25 verbatim, I can tell me you they basically asked if I knew

RATTRAY

1    why they were there and if I was Gary Rattray and if I

2    could have my daughter come talk to them, if I could have

3    her go outside and I stated, "No, no and no."  Reiterated

4    that she was not home and then the officer asked if he

5    could come in and look around.

6         Q.    Mr. Rattray, let me back up a little bit.

7              When you say that the officers were asking you

8    where your daughter was and they were telling you they

9    wanted to see your daughter, who was telling you what?

10   What did Officer Cadavid say to you?

11        A.    Officer Cadavid -- okay.  So the first thing was,

12   you know, "Are you Gary Rattray?

13             "Yes.

14             "Do you know why we're here?

15             "Don't know.

16             "Well, do you know Wendy Sandy?" or I think they

17   said Sandy Wendy.

18        Q.    When you say "they," who do you mean?

19        A.    Officer Cadavid said -- Officer Cadavid was

20   leading the discussion up until the point where it was "Can

21   you have your daughter come to the door."

22        Q.    So just describe to me what was said between you

23   and Officer Cadavid before he asked you to have your

24   daughter come to the door.

25        A.    "Are you Gary Rattray?  Do you know why we're

RATTRAY

Page 50

1    here?  Do you know Wendy Sandy?  Is she the mother of the

2    child?"

3                Then he asked, you know, "She said that you're

4    not giving her the child" and if I could have my child come

5    to the door.  I said, "No."  I said, "No.  I already told

6    you she's not here," and then --

7    Q.      How did you respond to the questions that

8    Officer Cadavid asked you?  What answer did you give him

9    for those questions?

10   A.      I said, "Yes.  She's my -- that is the child's

11   mother."

12   Q.      And that's referring to Wendy Sandy, right?

13   A.      Yes.

14               That I know she was downstairs, I just saw her;

15   that my daughter lives here with me in my home, but she

16   wasn't home; and then he asked if he could come in and look

17   around and I said, "No."

18               And that's the point where it switches over to

19   the other officer who then says -- interjects --

20   Q.      And the other officer is who?

21   A.      There are only two.  Officer Trigueno then says,

22   "Well, if you don't have a piece of paper saying she's

23   supposed to be with you, you're going to spend the night

24   downtown."

25               I took that to mean jail.  I took that as a

RATTRAY

Page 51

1    threat.  I started to realize that I was not safe even

2    though I knew I hadn't broken any law or committed any

3    crimes.  So I said, "You know what?  You guys need to get

4    your supervisor because I'm done talking."

5        Q.    At any point, did the officers tell you they

6    wanted to check on the well-being of the child?

7        A.    They didn't.  They just said they wanted -- they

8    asked if I could bring her to the door.  I said, "No.  I

9    already told you she's not here."

10            Then he asked if I mind if they come in and just

11   look around or just come in and have a look around.  I

12   said, "I do mind.  I don't want you in my apartment."

13       Q.    Did you ask them why they wanted to see the

14   child?

15       A.    I did not.

16       Q.    So after Officer Trigueno told you that and you

17   said you wanted to speak to the supervisor, was anything

18   said in reply?

19       A.    Yes.  So I did have one additional response to

20   her which was, "Do you have a piece of paper saying the

21   child was supposed to be someplace else?"

22            She's saying I need to have papers to show that

23   I'm supposed to have my daughter and I said, "Well, do you

24   have papers saying the child is supposed to be someplace

25   else?"  That was what I said and then I said, "You need to

RATTRAY

Page 54

1    this was an ongoing custody thing, that the mother has

2    filed in court and that she has an attorney.  We talked

3    about that for a little bit.

4        Q.    And do you remember the content of that

5    conversation?

6        A.    Just kind of generic content.  They were trying

7    to understand the situation, I guess, or get comfortable

8    with the reality that they had heard downstairs.  I don't

9    know what they heard downstairs, but they were asking very

10   specific, very pointed questions, and I answered the ones I

11   could and, you know, challenged the ones I didn't think

12   were relevant or were wrong; the basis of which were wrong.

13       Q.    Which questions did you believe were wrong?

14       A.    I think them asking me to produce my daughter or

15   tell them, you know, like, where my -- at that time

16   actually, the only questions that I thought were wrong was

17   just their assumption.  They had this assumption that the

18   child belonged with the mother and I wanted to know, Well,

19   do you have a piece of paper saying she's supposed to be

20   with her?  Because they were saying I needed to show them

21   papers to prove that I had custody.  Papers which,

22   incidentally, I did not have.  No one had them.

23       Q.    Did you tell the officers that you didn't have

24   those type of papers?

25       A.    I told them I didn't have papers.  The point is

Page 55

1    they're saying if I don't have papers, I'm going to jail,

2    so at that point, I'm done talking because I know I don't

3    have papers and I don't want to go to jail.

4        Q.    But did you tell them that you couldn't produce

5    them before Officer Cadavid entered your apartment?

6        A.    I did.  I did.  That's what elicited that "if you

7    don't have papers saying she's supposed to be with you,

8    you're spending the night downtown," and so the only

9    response I had to that at that point was "well, do you have

10   papers?"

11       Q.    But did you tell them directly that you did not

12   have --

13       A.    Cadavid had asked, "Do you have the papers?" and

14   this and that, and I said, "Do you have papers?"

15       Q.    But did you tell the officers that you didn't?

16       A.    No.  I don't think I said, no, I don't have any

17   papers.  I said it was an ongoing thing in court.

18       Q.    And at that time, did you tell the officers that

19   there was a person that they could try to talk to who could

20   have resolved the custody issue or explain the custody

21   issue in court?

22       A.    I don't know who could have resolved the issue

23   for them at that time.  That thought didn't occur to me.

24   At that moment, I'm trying to stay out of jail.  That's

25   really all I was concerned with at that moment.

RATTRAY

Page 58

1    was with her friends?

2        A.    I'm sorry.  Are you asking a question or are you

3    imposing a statement?

4        Q.    I'm just asking why didn't you just explain to

5    them where your daughter was?

6        A.    I explained to them that she was not home, that

7    she lived with me and that I had custody of her; that she

8    had lived with me her entire life and that this was an

9    ongoing custody matter.

10       Q.    But you didn't tell the officers that your

11   daughter was with her friends.

12       A.    I did tell the officers that my daughter was not

13   home, she is not home.  That is the important and relevant

14   fact here.  I'm not sure what relevance of where she is or

15   what activity she's engaged in is to this particular

16   situation.

17       Q.    Mr. Rattray, just please answer the question.

18       A.    I'm trying to, but I need you to give me a clear

19   question without the fluff around it.  If you have a

20   question, state the question; but you're saying "hey, how

21   come you just didn't tell them this?"

22       Q.    That's the question:  Why didn't you tell the

23   officers that your daughter was with her friends?

24       A.    I did tell the officers that my daughter was with

25   her friends after they broke into the apartment.  Prior to

RATTRAY

Page 59

1    that, I told them that she was not home.

2        Q.    When you were talking to them at the door, why

3    didn't you tell the officers that your daughter was with

4    her friends?

5        A.    They didn't ask me where she was.  They asked me

6    to bring her to the door and they asked me if they could

7    come in and look around.  Those were the two questions they

8    asked me.  They did not ask where she was at that point

9    before they broke in.

10        Q.    If they asked you, would you have told them?

11        A.    I probably would have.  There's nothing

12    privileged about that information.  I told them after they

13    broke in.  I told them she was with friends and they wanted

14    to know then which friends and where she was so that they

15    could send the car to check on her.

16        Q.    So let's talk about now what happened in the

17    apartment.

18              So at what point did Officer Cadavid enter the

19    apartment?

20        A.    So immediately after I said, you know, "I'm done

21    talking here"; after Trigueno said, "If you don't have a

22    piece of paper saying she's supposed to be with you, you're

23    going to spend the night downtown," I said, "Okay.  If you

24    guys don't have a piece of paper saying she's supposed to

25    be somewhere else, I'm done talking" and I went to close my

RATTRAY

Page 60

1   door.

2          Officer Cadavid's foot was blocking the door.  I

3   looked down to look around the door to see what was keeping

4   the door from closing.  At that point, he pushed the door

5   in, the door struck me, I went back.  My instinct was to

6   sort of push the door back as -- you know, as a New York

7   City kid, that's what you're taught, right?  Someone tries

8   to push your door in, you just push back.  But I didn't.  I

9   put my hands back, I stepped back into the apartment.  As I

10  stepped back, he advanced into the apartment and then

11  turned and went into my daughter's room.

12      Q.     Before he entered the apartment, did he say

13  anything to you?

14      A.     Nothing.  The last words that were exchanged was,

15  "You know what?  You guys need to get your supervisor.  I'm

16  done talking here," and I went to close the door.

17      Q.     And once he went inside the apartment, you said

18  he began to look around the apartment?

19      A.     He turned and he went into my daughter's room.

20  That terrified me because, again, the instinct was no one

21  is going to go in my daughter's room; but then I remembered

22  she's not in there, so I don't have any action.  There's no

23  action for me because there's no threat, right?  There's no

24  threat to my child as this armed police officer who pushed

25  his way in is turning and going into my daughter's room.

Page 61

1    Instinct says grab him, but I have to remind myself that

2    she wasn't home, and I reminded myself she wasn't home, I

3    was, like, all right, whatever.

4             So he goes in, looks around; goes into her

5    closet, comes back out; walks past me, doesn't say a word;

6    past me into my room, this room here, looks around, looks

7    in the closet; walks out past me again, goes into the

8    bathroom, looks around; comes back out and then that's when

9    he wants to know where she is.

10            The first thing he actually did was -- no.  He

11   did ask me, "Where is she?" and I said, "I told you, she's

12   not here."  And he wants to know where she is.  I said,

13   "She's with friends," and then he said, "Which friends?"

14   and I'm, like, "Well, do you know her friends?"

15            Then he starts getting cocky and was, like,

16   "Well, I need your ID."  I was, like, "Why do you need my

17   ID?  You don't know whose house you just pushed your way

18   into?"  He said, "I need to know who I'm talking to."  I

19   was, like, "All right."

20            So then I got my wallet.  So I got my wallet,

21   took out my ID, kept my wallet in my hand, gave him my ID.

22   He looked at it and I said, "Great.  Can I get my ID back?"

23   and he said, "No.  Where is your daughter?"

24   Q.    Mr. Rattray, let's go back a little bit.

25            So when he was looking in the rooms, in your

RATTRAY

Page 62

1    daughter's room, the bathroom, how long did that search

2    take?

3        A.      How long did the search take?  It took maybe a

4    minute.

5        Q.      And did he say anything during this time?

6        A.      Nothing.  It was very quiet because I was

7    terrified.  I was in shock.  I'm, like, looking at this,

8    like, This can't be happening.  What the -- so I was

9    just -- I didn't realize this was a real thing that was

10   happening.

11       Q.      Did you say anything while he was doing that?

12       A.      I said nothing.  I was just, like -- like I said,

13   I was just dumbfounded.  I was just, like, standing there

14   with my mouth open.  And I remember looking up at

15   Officer Trigueno and just like with a look on my face,

16   like, Really?  Are we doing this?

17              I just had this look on my face for her and she

18   just looked back and that's when she was, like, frantically

19   on the radio.  I think she was trying to get a supervisor

20   or someone to come over.  But she stayed outside the door

21   at the threshold, you know, watching this unfold.  She

22   couldn't see him when he went in the room, but she saw him

23   walk back by to go into my room, walk back by to go into

24   the other room, and I'm just dumbfounded and I didn't say

25   anything to him until, you know, he asked for my ID.

RATTRAY

Page 63

1       Q.      Did Officer Trigueno ever enter the apartment?

2       A.      She did not.

3       Q.      And you said when Officer Cadavid was searching

4   the apartment, she was standing in the threshold of the

5   entryway; is that correct?

6       A.      Yes; the same place they were both standing in

7   the beginning.  He came in, she remained.

8       Q.      Was she standing more outside like in the hallway

9   or was she --

10      A.      She was outside the door right at the threshold,

11  like, on the doormat basically.

12      Q.      And you said that after Officer Cadavid completed

13  the search, he asked you for your ID, correct?

14      A.      Yes.

15      Q.      And you gave him your ID?

16      A.      I did.

17      Q.      Did you say anything to him as you were giving it

18  to him?

19      A.      I asked him why he needed my ID because I --

20  like, Dude, do you not know who you're searching and

21  whatever?  I asked him why he needed my ID.

22      Q.      And what did he say in reply?

23      A.      He said he needed to know who he was talking to.

24      Q.      Did you say anything back?

25      A.      I said, "You don't know who you're talking to?

RATTRAY

Page 65

1    that it's in, like, whatever that gun belt is.

2        Q.    So did he have his hand on his weapon?

3        A.    No.  His hand was not on his weapon.  His hand

4    was on his hip, we'll call it to be generous.

5        Q.    And you said earlier that you didn't want to be

6    shot.  What did you mean when you said that?

7        A.    I said I didn't want to -- I asked permission to

8    get my wallet because I didn't want someone to say "well,

9    he was reaching for something" - which would be true - I

10   was reaching for a wallet, so I asked permission before

11   getting my wallet.

12       Q.    And did Officer Cadavid ever take his weapon out

13   or anything like that?

14       A.    No.  I didn't see it come out at all, no.

15       Q.    Did he ever threaten to use a weapon against you?

16       A.    No.

17       Q.    Did he say that he would use any weapons against

18   you?

19       A.    Beyond his physical push of the door, the door to

20   me was a weapon because if I hit a police officer with a

21   door, it's considered assault.  So I consider myself to

22   have been assaulted, so yes.

23       Q.    Did any of the weapons that you described that he

24   had on himself, did he threaten to use any of those weapons

25   against you?

RATTRAY

Page 66

```
 1      A.      He did not.  Not verbally.

 2      Q.      What did he do physically?

 3      A.      Well, he physically pushed himself in.  He

 4  assaulted me with the door.  To me, I took that to be a

 5  threat that any further resistance would escalate the

 6  situation.  So I backed up, complied with my New York duty

 7  to retreat and retreated; backed up in my apartment and

 8  gave him full reign to do his thing.  When I thought he was

 9  done, I asked him to leave.

10      Q.      Did he physically touch you in any way?

11      A.      Besides with the door?  He didn't touch me, but

12  the door that he was pushing touched me.

13      Q.      And when you say he was pushing the door, how

14  close were you to the door?

15      A.      I had the door in my hand.  I was trying to close

16  the door and I had leaned closer to the door to look around

17  it to see what was keeping it from closing.

18      Q.      Now did Officer Trigueno threaten you in any way?

19      A.      Her presence in the doorway was threatening

20  enough, but she did not say anything verbally, no.

21      Q.      Did she threaten to use any of her weapons

22  against you?

23      A.      She did not, no.

24      Q.      Now you said Officer Cadavid let you get your

25  wallet; is that correct?
```

RATTRAY

Page 71

1      Q.     Now after he asked you where the daughter was,

2  the friends' questions, you said at some point, you started

3  to yell at them?

4      A.     Yes, because I had given him my ID, I had

5  answered his questions and now I was prepared for them to

6  depart; to leave my apartment, to return my ID and leave my

7  apartment.

8      Q.     At what point did you start yelling?

9      A.     When I asked for my ID back and he refused to

10  give my ID back and then I said, "Get out of my apartment,"

11  and he says, "I need you to tell me where your daughter is

12  right now," and I said, "Why?  She is safe.  She is where

13  she's supposed to be," and he refused to leave and then I

14  said, "Get the eff out of my apartment" quite loud and I

15  started getting very irate because he was standing there

16  like he owned my apartment and he was going to tell me how

17  to live my life.

18      Q.     You said earlier that he also said, "Do you talk

19  to your daughter like that?"  How did you respond to that?

20      A.     That hasn't happened yet; not at this time.

21      Q.     At what time did that happen?

22      A.     It happened immediately after when I said, "Get

23  the eff out of my apartment."  He said, "Do you talk to

24  your daughter that way?" and I realized he had this smirky

25  kind of look on his face that he was getting the reaction

RATTRAY

Page 72

1    out of me that he wanted.  At least that's how I perceived

2    it.

3        Q.    I just want to go back to the portion of the ID.

4             You said that Officer Cadavid refused to give you

5    your ID back.  How did he refuse that?

6        A.    I asked for my ID back and he just kept asking me

7    questions.  He had the ID in his hand like this

8    (indicating), you know, flipping it over, doing this, and I

9    said, "Can I have my ID back?" and he wouldn't give me my

10   ID, so I shifted from the ID to just say, "You know what?

11   Just get out.  Just get out of my house."

12       Q.    Did he tell you verbally that he was not going it

13   give you your ID back?

14       A.    No.  He didn't tell me he wasn't going to give me

15   my ID back nor did he ever tell me that he wasn't going to

16   leave my apartment; but he didn't leave my apartment and he

17   didn't give me my ID back.

18             So, you know, there is verbal communication and

19   then there is physical communication.  Physical

20   communication in that situation is not giving me my ID back

21   and not leaving my apartment.  So it was clearly

22   communicated to me that he was not giving me my ID back and

23   that he was not leaving my apartment.

24       Q.    Just to be clear.  He never told you?

25       A.    Never orally said so, but he never left my

RATTRAY

Page 73

1    apartment until the supervisor arrived.

2        Q.    Now you said at some point, you called 9-1-1?

3        A.    Yes.  So once I had the conversation and I felt

4    like I was being goaded and I realized I was getting

5    agitated.  I caught myself, sat down, did some deep

6    breathing exercises, thought about how to get out of this

7    situation alive because I realized I was in my apartment

8    alone with an armed police officer inside and another armed

9    police officer at the threshold, and me yelling was not the

10   smart move in this moment, but I didn't know how to end

11   the -- didn't know how to end it; end the stand off.

12            I didn't have any way of making them leave.  I

13   had not done anything wrong and I had no real way to comply

14   with their directives that would end it, right?  Because I

15   complied by opening the door and that just went south fast,

16   so I was not going to give them access to my child.  So I

17   didn't no what else to do.

18            So I sat down, started breathing, spread my

19   fingers on the counter, thinking about my options.  Ruled

20   out a knife attack from the knife stand, ruled that out as

21   feasible; thought about physically carrying him out,

22   realized that he's armed, his partner is armed, that was

23   probably a bad move.  Kept staring at my fingers.  Then

24   thought, you know what?  "Officer Cadavid, can I get my

25   phone?" and he said, "Yes."

RATTRAY

Page 85

1    chuckled to myself and I said, "And so, like, what are you

2    doing?  What are you investigating?"

3        Q.    Did he prevent you from sitting by the

4    countertop?

5        A.    He did not.

6        Q.    And you said that you asked him to use the phone

7    also; is that correct?

8        A.    I did.

9        Q.    And did he allow you to use the phone?

10       A.    He did, yes.  He said, "Yeah.  Go ahead."

11       Q.    And what did you do after that?

12       A.    I waited for him to step aside, he did and then I

13   went over to get my phone and brought it back.

14       Q.    When you say "the phone," is it a mobile phone or

15   is it a landline?

16       A.    It's a mobile phone.

17       Q.    And after you got your mobile phone, what

18   happened after that?

19       A.    I called 9-1-1 and as quickly as I could, I said,

20   "9-1-1, this is Wentworth Rattray, 42 West 120th Street, I

21   have two police officers searching my apartment against my

22   wishes."  I tried to get it out as quickly as I can because

23   I was well aware that back in those days, police officers

24   used to just take your phone and smash it when they -- you

25   know, if you tried to record them or do stuff like that.

RATTRAY

Page 86

1    So I spoke very quickly.

2        Q.      Now when you said that you were aware that police

3    officers did that, did that happen to you?

4        A.      That did not happen to me, no, but I was

5    concerned that it might happen and then I would be left in

6    my apartment alone without a means of communicating with

7    the outside world with two armed police officers that I

8    could not comply with their demands.

9        Q.      Did anything like that ever happen to you or your

10   family members or friends?

11       A.      Family members, no, not to my knowledge.

12       Q.      What about friends?

13       A.      Not that I know; that directly, no.

14       Q.      So what was the source of your information --

15       A.      I've actually seen videos of police officers

16   yanking phones out of people's hands and smashing them.

17       Q.      Where did you see these videos?

18       A.      Online, in the news, in news articles.  They've

19   been, you know, news reports where two people -- as phones

20   became more and more prevalent, there'd be more than one

21   person recording and then, you know, one person would be

22   recording across the street and the police would walk over

23   to the first person and grab the phone out of their hand,

24   throw it on the ground and stomp on it.

25       Q.      Has that personally ever happened to you?

RATTRAY

1     A.      That has never personally happened to me, no.

2     Q.      Or any of your family or friends?

3     A.      As far as I know, no.

4     Q.      So after you got on with 9-1-1 and you told the

5     9-1-1 operator what was going on, what happened after that?

6     A.      After that, the 9-1-1 operator asked if, you

7     know, what I needed help with, like, do I want the -- I

8     think she asked for some acronym that I didn't understand

9     at the time and she asked about a sergeant.  She gave me,

10    like, a menu of options and I picked the one that I

11    understood what it was, which was, you know, supervisor.

12    Q.      So you said you wanted to talk to a supervisor?

13    A.      Yes.

14    Q.      And what was said in reply to that?

15    A.      She said, "Hold one minute," and then she asked

16    me if -- you know, who the officers were.  She repeated

17    what I had said and then she asked if I knew their names.

18    Q.      And what did you say?

19    A.      I started hemming and hawing because I really

20    didn't know their names at that point, so I started looking

21    at them to see if I could see a nameplate and

22    Officer Cadavid, who was standing right there, just spoke

23    up and read his badge number into the phone, so she had

24    that and, I guess, she made the entry.

25    Q.      You said he read his badge number into the phone?

RATTRAY

Page 88

```
1       A.      Yes.  He just said -- you know, identified
2    himself.  He didn't use his name; he just read off a
3    number.
4       Q.      Now when you were talking to the 9-1-1 operator,
5    was the phone on speaker phone?
6       A.      It was on speaker phone, yes.
7       Q.      So did you give the phone to Officer Cadavid to
8    read his badge number?
9       A.      No.  He was close enough already that he could
10   just speak and it would go in.
11      Q.      And what happened after he read his badge number
12   in?
13      A.      After he read his badge number in, you know, the
14   phone was quiet for a little bit and there was a beep and
15   then it started again and then a couple more beeps and then
16   she came back and said, "Okay; just stay on the line" -- or
17   she asked if I wanted her to stay on the line and I said,
18   "Yes, please."
19      Q.      And then what did she say in response?
20      A.      She said, "That's fine"; she would stay on the
21   line.
22      Q.      And what happened after that?
23      A.      After that, we were on the line and, you know, we
24   were on the phone call and, you know, just trying to
25   convince them that they needed to leave my apartment for
```

RATTRAY

Page 89

1    the next hour and 15 minutes or so till the supervisor

2    showed up.

3        Q.    So the 9-1-1 operator was trying to convince the

4    officers to leave?

5        A.    No.  I was trying to convince the officers to

6    leave.

7        Q.    And this was while you were on the phone with the

8    9-1-1 operator, correct?

9        A.    While I was on the phone with the 9-1-1 operator,

10   yes.

11       Q.    Did the 9-1-1 operator tell you that a supervisor

12   would be coming?

13       A.    She didn't.  I just presumed that that's why she

14   wanted me to stay on the line.  Usually they have you stay

15   on the line until help arrives, right; so that's generally

16   how it goes.  At some point, I asked, you know, if someone

17   was coming; not sure.

18             And then the only other thing I think was I asked

19   if I could leave.  I said, "Okay, fine.  You guys want to

20   stay here, fine.  Then can I go?" and Cadavid said, "No.

21   You got downtown involved.  You gotta stay."

22       Q.    When did you ask to leave?

23       A.    I don't know.  I don't have a timestamp for you,

24   but --

25       Q.    But did you ask that while you were on the phone

1    with the 9-1-1 operator?

2        A.      Yeah.  Yeah.  There was a lot going on in the

3    room back and forth, and I was a little disappointed

4    because I didn't see it written down.  I thought they would

5    have written everything down, but it doesn't seem like

6    that's their MO.  This was a conversation between myself

7    and Officer Cadavid.

8        Q.      And where was Officer Trigueno at this point?

9        A.      She was still outside the door.

10       Q.      Were you able to see her?

11       A.      From where I was, I couldn't see her, but I could

12   hear her radio; and when I got up to get the phone, I saw

13   she was still standing in the doorway because the way the

14   door opens -- the reason the door only opens 90 degrees

15   open is because the counter is directly behind it.  So when

16   I sit at that counter and the door is only at a 45, I can't

17   see out the door.

18       Q.      So from where you were sitting, you were not able

19   to see - if I understand correctly - you weren't able to

20   see Officer Trigueno?

21       A.      Correct.  When I sat down, I wasn't able to see

22   Officer Trigueno.  When I was standing, I was able to see

23   Officer Trigueno.  When I went to get my phone -- when I

24   went to get my ID, I saw Officer Trigueno was still outside

25   the door and I could at all times hear her radio because

Page 91

1    Cadavid's radio was pretty low, but hers was turned up.  I

2    think she had the radio up because I could hear her radio

3    in the hallway even though she was in the hallway, but

4    Cadavid's was almost quiet.

5        Q.    How long did it take for the supervisor to arrive

6    on scene?

7        A.    I couldn't answer that.  I don't know how long it

8    took for him to arrive on scene, but I can tell you that it

9    was about an hour and 15 minutes before the 9-1-1 operator

10   hung up; and after she hung up, it was about another five

11   or so minutes before the supervisor was on the floor.  So

12   he may have been downstairs talking to the initial caller,

13   but I couldn't tell you, but I could tell you it was about

14   an hour and -- from my phone call, it was probably about an

15   hour and 20, an hour and 25 minutes before he was there.

16       Q.    Now before the supervisor arrived, did you have

17   any further dialogue with Officer Cadavid?

18       A.    The dialogues that I remember, I think I

19   recanted.  You know, I said, "Hey, why are you in my house?

20   You wouldn't want me coming into your house searching for

21   your kid.  In fact, I know you would just shoot me if I

22   stuck my foot in your door and pushed my way into your

23   house; wouldn't you?"

24            No.  Initially, beyond initially yelling at him,

25   telling him to get the hell out of my house, telling him to

RATTRAY

Page 94

1    be and unless someone has a piece of paper saying she's

2    supposed to be someplace else, you guys need to get the

3    hell out of my house."

4        Q.    After the supervisor arrived, what happened?

5        A.    Supervisor arrived and, you know, the 9-1-1

6    operator had already hung up because, I guess, he had

7    radioed her that he was on the scene; but then she didn't

8    come up -- he didn't come upstairs, so I was concerned

9    again and then I asked Cadavid again, "Can I go?" and he

10   was, like, "No," and I was, like, "All right," because at

11   that point, it was getting late and I have a child to take

12   care of that he was keeping me from, so I started to become

13   a little concerned about what the duration of this thing

14   was, but also did not want to go to jail and did not want

15   to be shot.

16       Q.    When he said that you couldn't leave, did he say

17   why?

18       A.    He said because I got downtown involved, now I

19   have to wait.

20       Q.    And how many times did he say that to you?

21       A.    Twice.

22       Q.    When was the first occasion when he said that?

23       A.    I think it was when he came in.  I got on the

24   phone and I was saying something about "are they sending a

25   supervisor or what?" and he was, like, "Yeah, they're

RATTRAY

Page 95

1    sending somebody," and I said, "Okay.  Can I go then?" and

2    he said, "No.  You got downtown involved.  Now you gotta

3    wait" and then I was, like, "Okay, fine."

4              But then once the 9-1-1 -- you know, once the

5    call had progressed and it was like a really long time, I

6    was, like, "Can I go now?" and he was, like, "Well, you got

7    downtown involved."

8    Q.      So Officer Cadavid told you that a supervisor was

9    coming?

10   A.      The radio calls of the other officer out in the

11   hallway told me that a supervisor was on the way.  The

12   9-1-1 operator never really said a supervisor was on the

13   way.  I just took that as that's what they must be doing,

14   and the officer out in the hallway never said that a

15   supervisor was on the way, but by her, you know, talking on

16   the radio, I took that to mean she was also working on

17   getting a supervisor to the scene at that point.  They

18   hadn't done that before Cadavid came in, but afterwards,

19   she was working the radios and I don't really know what she

20   was doing, but I assume she was trying to get a sergeant or

21   lieutenant or whoever supervisors are to come to the scene.

22   Q.      When you say "she," who are you referring to

23   specifically?

24   A.      That is Officer Trigueno, the other officer

25   involved in the situation who remained outside the door and

RATTRAY

1    think he perceived me as a threat to him.

2        Q.    He didn't threaten to use any other weapons

3    against you, correct?

4        A.    He had, in fact, actually used the door against

5    me, but no other weapons were used against me by

6    Officer Cadavid.

7        Q.    After the supervisor arrived on scene, did you

8    talk to the supervisor?

9        A.    I did speak with the supervisor, yes.

10       Q.    And what was the supervisor's name?

11       A.    Don't recall his name.

12       Q.    And what was the content of the conversation?

13       A.    Content of the conversation was "please get these

14   police officers out of my apartment."

15       Q.    And what was said in response?

16       A.    He said -- you know, he wanted to know why they

17   were there.  He talked to the distraught mother downstairs

18   and, you know, he had a conversation with her.  I'm not

19   sure if he said he explained the situation to her or not,

20   but had a conversation with her and, you know, I talked to

21   him and he asked me sort of, like, some specifics about

22   when was our last date in court or something like that, and

23   I used my phone to look that up and I showed it to him and

24   he was satisfied.  I explained I didn't have any papers

25   beyond, you know, what we were looking at and he told the

RATTRAY

Page 98

1    officers that they needed to go and they walked out.

2        Q.    At any point, did the supervisor tell you what

3    the mother told the officers?

4        A.    He did not.

5              Sorry.  I'm going to be plugging my computer in

6    again here so it does not die.

7        Q.    How long did the conversation with the supervisor

8    last?

9        A.    Conversation with the supervisor probably lasted

10   three minutes.

11       Q.    What happened after the conversation with the

12   supervisor ended?

13       A.    The supervisor, you know, escorted his officers

14   away.  They walked out to the elevator.  They were asking

15   him questions about how to write it up.

16       Q.    How were you able to hear that?

17       A.    Because, like I said, it's a small apartment, the

18   door was wide open and they were walking out to the

19   elevator which is maybe 30 feet from my front door, if that

20   far.

21       Q.    Did any of the officers threaten to put you in

22   handcuffs?

23       A.    Yes.  Officer Trigueno had explicitly said if I

24   didn't have a piece of paper, that I know I did not have, I

25   was going to be spending the night downtown.  I take that

RATTRAY

Page 99

1    to mean I'm going to jail.  People go to jail in handcuffs,

2    usually with bruises and...

3        Q.    But did she ever tell you that she was going to

4    put you in handcuffs?

5        A.    She told me if I didn't have a piece of paper, I

6    was going to spend the night downtown.  To me, that implies

7    I'm going to be in handcuffs and removed from my dwelling

8    and arrested and put in jail.

9        Q.    Mr. Rattray, did she specifically tell you that

10   she was going to put you in handcuffs?

11       A.    Yes, she did.  That phrase in my interpretation

12   means she's going to put me in handcuffs.

13       Q.    Mr. Rattray, not in your interpretation.  Did she

14   use those words?

15       A.    Which words?  Tell me the words and I can answer

16   your question.

17       Q.    That she was going to put you in handcuffs?

18       A.    Put me in handcuffs?  She did not use the word

19   handcuffs.

20       Q.    Did anybody attempt to place you in handcuffs?

21       A.    No one attempted to put me in handcuffs.

22       Q.    Were you arrested as a result of this incident?

23       A.    I feel like I was arrested.  I was in fear for my

24   life.  I felt that my ability to move around my apartment

25   was constrained.  I feel like I was under the control of

RATTRAY

Page 101

1      Q.      When was your last interaction with

2  Officer Cadavid?

3      A.      My last interaction with Officer Cadavid was the

4  evening of November 5, 2016, when he left my home.

5      Q.      And when was your last interaction with

6  Officer Trigueno?

7      A.      My last interaction with Officer Trigueno was

8  November 5, 2016, when she also left the threshold of my

9  home.

10     Q.      Were you taken to the precinct?

11     A.      I was not removed from my apartment.

12     Q.      Were you charged with any crime as a result of

13 this?

14     A.      I was -- I have a Domestic Incident Report

15 against me.

16     Q.      But were you charged with any crime?

17     A.      I don't know what charged means.  You're the

18 attorney.  You need to describe for what charge.  What do

19 you mean by charged?  I know it comes up on background

20 investigations and I know that the police have access to a

21 Domestic Incident Report against me.  So I don't know what

22 charged means.  Help me.

23     Q.      Did any of the officers tell you that you were

24 going to be charged with a crime?

25     A.      No officer told me that I was going to be -- that

RATTRAY

Page 102

1    I was charged with a crime.  They said I would be going to

2    jail which, to me, implied that I would be charged with

3    something.  I don't know which thing though.  So if you're

4    going to ask me that question, please be specific as to

5    what they're telling me that I'm being charged with and

6    then I can give you a yes or no answer.

7        Q.    I just want to go back to the apartment.

8              The way you described the outlay of the

9    apartment, you said there was a nightstand and I was

10   wondering, did you have a knife on the nightstand?

11       A.    A knife on the nightstand?  No.

12       Q.    Mr. Rattray, did you talk with NYPD Internal

13   Affairs because of this incident?

14       A.    I did.

15       Q.    And when did that take place?

16       A.    That took place probably in December.  It was a

17   slow, simmering rage that built inside of me until I needed

18   to do something about it.  I went to the precinct, who

19   would not give me the information.  I heard that there

20   would be a Domestic Incident Report and I said, "But there

21   was no Domestic Incident."  They said, "No; there probably

22   is one."

23             So then I went to the precinct to try to see it

24   and they wouldn't provide it to me at the precinct because

25   they said that it was about me, so they don't give out