UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WENTWORTH RATTRAY,

                                    Plaintiff,

                v.

THE CITY OF NEW YORK, POLICE
OFFICER JOSE CADAVID (BADGE NO.
9085), POLICE OFFICER SGT MERVIN
BAUTISTA, and POLICE
OFFICER ALYSSA TRIGUENO,

                                    Defendants.

**MEMORANDUM
OPINION & ORDER**

17 Civ. 8560 (PGG) (KHP)

PAUL G. GARDEPHE, U.S.D.J.:

Pro se Plaintiff Wentworth Rattray brings this action under Section 1983 against New York City Police Department ("NYPD") officers Jose Cadavid and Alyssa Trigueno. (Third Am. Cmplt. ("TAC") (Dkt. No. 99))

Defendants have moved for summary judgment as to the remaining claims against them:  (1) unlawful search as to both Defendants; (2) false arrest as to Cadavid; and (3) as to Trigueno, failure to intervene in the false arrest and unlawful search.  (Mot. (Dkt. No. 206))  This Court referred Defendants' motion to Magistrate Judge Katharine Parker for a Report and Recommendation ("R&R").  (Dkt. No. 208)  On September 14, 2022, Judge Parker issued an R&R recommending that the summary judgment motion be granted in part and denied in part. (R&R (Dkt. No. 221))  Defendants have not objected to the R&R, but Plaintiff has filed objections to the R&R.  (Pltf. Obj. (Dkt. No. 222))

For the reasons stated below the R&R will be adopted in part.

## BACKGROUND

I.   **FACTS**[1]

On November 5, 2016, Plaintiff Rattray had full custody of his then ten-year-old daughter.  (R&R (Dkt. No. 221) at 2)[2]  At 6:49 p.m. that evening, Wendy Sandy – the girl's mother – called 911 and reported that she was having a custodial dispute with Rattray, the father of her child, and that Rattray was refusing to give the child back to her.  (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶ 16)  Sandy reported that she was standing in front of Rattray's home, and she identified his apartment.  (Def. Ex. D (911 Event Chronology) (Dkt. No. 207-6) at 2)  She also reported that there were "no weapons" and "no injuries" involved.  (Id.)  The 911 operator's report indicates that Sandy was "hysterical crying."  (Id.; Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶ 16)

NYPD Officers Cadavid and Trigueno responded to the 911 call.  As they approached Rattray's apartment building located at 42 West 120th Street in Manhattan (Def. Ex. D (911 Event Chronology) (Dkt. No. 207-6) at 2; Pltf. R. 56.1 Stmt. (Dkt. No. 217) ¶ 10), the officers encountered Sandy, who identified herself as the 911 caller.  (Def. R. 56.1 Stmt. (Dkt.

---

[1]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where the non-movant disputes the movant's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-movant's characterization of the evidence for purposes of deciding the motion at issue.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).  Unless otherwise indicated, the facts cited by the Court are undisputed.

[2]  Except as to deposition transcripts, the page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.  With respect to deposition transcripts, the Court cites to the page numbers originally assigned by the court reporter.

No. 216-1) ¶¶ 18-19)  Sandy explained that (1) it was her time to pick up her daughter; (2) Rattray had refused to let Sandy see her; (3) Sandy had not heard from her daughter; and (4) the girl was not answering her phone.  (Id. ¶ 20)

There is conflicting evidence about whether Sandy indicated that she was concerned for her daughter's safety.  Officer Cadavid testified at his deposition that Sandy "stated to [him] that [Rattray] use[s] drugs and [has] drug dealers over [to] the apartment," and that "she believed her daughter's life was in danger."  (Cadavid Dep. (Dkt. No. 207-3) at 7-10)[3]

At her deposition, however, Sandy denied telling the officers that (1) she was concerned for her daughter's safety; (2) Rattray is a drug user; or (3) Rattray has drug dealers over to his apartment.  (Sandy Dep. (Dkt. No. 217-1) at 24-25)  Sandy testified that she would have "never" said such things, because "that's not the truth."  (Id.)

The officers knocked on Rattray's apartment door at 7:01 p.m., announcing themselves as police officers.  (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶¶ 24, 27-29)  They asked Rattray to open the door so that they could speak with him.  (Id. ¶ 30)  Rattray did not open the door and told the officers he could hear them with the door closed.  (Id. at ¶¶ 30-34; Pltf. R. 56.1 Stmt. (Dkt. No. 217) ¶¶ 29-30)  Officer Cadavid told Rattray that if he did not open the door, Cadavid "may have to take the door down."  (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶ 36) Rattray then opened the door "at a 45-degree angle."  (Id. ¶ 37)

---

[3]  At deposition, Officer Trigueno did not testify that she believed that the child was in danger or that Rattray had been associated with drugs or drug dealers.  (Trigueno Dep. (Dkt. No. 217-3) at 66-67, 155 ("Q:  Did the caller state that the child was in danger?  A:  I did not speak to the mother – I mean to the caller, so it was predominantly Officer Cadavid.  However, that's all I remember from there. . . .  Q: . . . Were you told that the child's life was in danger? . . . A:  No.  I did not have a conversation with the female, the mother of the child."))

The officers told Rattray they needed to see his daughter.  (Id. ¶ 38)  Rattray told the officers that she was not at home.  (Id. ¶ 42)  The officers nonetheless insisted that Rattray tell his daughter to come to the door.  (Id. ¶¶ 43-49)  Rattray responded, "No, I already told you she's not here.'"  (Id. ¶ 44)[4]

Officer Trigueno told Rattray that if he did not "have a piece of paper saying [his daughter] is supposed to be with [him], [he was] going to spend the night downtown."  (Rattray Dep. (Dkt. No. 207-5) at 50-51)  Rattray told the officers to "get [their] supervisor because [he was] done talking," and he attempted to close the apartment door, but Cadavid used his foot to block the door from closing.  (Id.; Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶¶ 50-51)

Officer Cadavid then "made entry" to the apartment and searched for the child inside the apartment for as much as fifteen minutes.[5]  (Cadavid Dep. (Dkt. No. 211-2) at 21, 26; Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶ 52, 56; Pltf. R. 56.1 Resp. (Dkt. No. 217) ¶ 56)  The child was not inside the apartment.  (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶¶ 56-57)  After Officer Cadavid searched the apartment, he remained inside, interrogating Rattray about the whereabouts of his daughter.  (Id. ¶¶ 59-71)  Cadavid asked where the child was, and Rattray responded, "She's with friends." (Rattray Dep. (Dkt. No. 207-5) at 61)  When Officer Cadavid asked Rattray

---

[4] There is conflicting evidence as to whether the officers asked Rattray where the child was. The officers say that they asked Rattray this question while speaking to him at the door of his apartment, but that he refused to answer.  (Id. ¶ 49)  Rattray testified that the officers did not ask for the child's location at that time, and that when they asked later, he immediately informed the officers that his daughter was at a friend's house.  (Rattray Dep. (Dkt. No. 207-5) at 58-59)

[5] Rattray asserts that when Cadavid entered Rattray's apartment, he "forcefully pushed the door open and the door knocked Plaintiff back into the apartment."  (Pltf. R. 56.1 Resp. (Dkt. No. 217) ¶ 52)  "Plaintiff [then] stood and watched as NYPD officer Jose Cadavid moved into the apartment and conduct[ed] a search of each room in the apartment."  (Id.)  In their Local Rule 56.1 statement, Defendants do not say whether the entry was forceful.  (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶ 52)  Cadavid testified, however, that as he made entry Rattray "backed up" and that the door "did not [strike Rattray]."  (Cadavid Dep. (Dkt. No. 211-2) at 21-22)

which friend his daughter was with, Rattray answered "do you know her friends?" and stated that the child was "'safe" and "where she's supposed to be." (Id. at 61, 71; Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶¶ 62-64)  Rattray asked Officer Cadavid to "'get the eff out' of his apartment," but Officer Cadavid did not leave. (Rattray Dep. (Dkt. No. 207-5) at 71; Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶ 62)

Rattray then asked Officer Cadavid for permission to retrieve his cellphone. Cadavid said, "Yeah.  Go ahead." (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶ 65)  After retrieving his cell phone, at about 7:12 p.m., Rattray called 911.  Rattray reported to the 911 operator that he had "two police searching [his] apartment against [his] wishes" and that they refused to leave his home. (Id. ¶ 67; Rattray Dep. (Dkt. No. 207-5) at 85; Pltf. R. 65.1 Resp. (Dkt. No. 217) ¶ 67)

At some point while inside Rattray's apartment, Officer Cadavid called his supervisor to request assistance.[6]  Rattray remained on the line with the 911 operator for about an hour until Officer Cadavid's supervisor, NYPD Lieutenant Koch, arrived at about 8:15 p.m. (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶¶ 69-71, 74-75; Pltf. R. 56.1 Resp. (Dkt. No. 217) ¶¶ 67, 69-75)

Officer Cadavid remained inside Rattray's apartment during the more than one-hour wait for the supervisor to arrive. (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶ 71)  During this period, Rattray said to Officers Cadavid and Trigueno:  "Okay, fine. You guys want to stay here fine.  Then can I go?" (Rattray Dep. (Dkt. No. 207-5) at 89 (internal quotation marks omitted))  Officer Cadavid told Rattray that he could not leave the apartment:  "No. You got downtown

---

[6]  Officer Cadavid maintains that he called his supervisor to seek assistance concerning the child's whereabouts after completing his initial search of Rattray's apartment. (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶ 58)  Rattray testified that Officer Cadavid did not call his supervisor until Rattray called 911 to report the alleged illegal search of his apartment. (Pltf. R. 56.1 Resp. (Dkt. No. 217) ¶ 58)

involved.  You gotta stay."  (Id. (internal quotation marks omitted))  Officer Cadavid confirmed

at his deposition that Rattray was not free to leave his apartment:  "Q: . . . Did you intend to keep

Mr. Rattray in the apartment until the supervisor arrived?  A:  Yes.  Q:  Was Mr. Rattray free to

leave?  A:  [He] w[as] not."  (Cadavid Dep. (Dkt. No. 211-2) at 46-47)

　　　　Although Rattray was told that he could not leave his apartment, he was not

handcuffed at any point, and he was not told that he was under arrest.  (Def. R. 56.1 Stmt. (Dkt.

No. 216-1) ¶¶ 79-82))

　　　　Officer Trigueno remained at the door of Rattray's apartment throughout Officer

Cadavid's encounter with Rattray.  (Id. ¶ 54)

　　　　At about 8:15 p.m., NYPD Lieutenant Koch – Officer Cadavid and Officer

Trigueno's supervisor – arrived at Rattray's apartment.  (Pltf. R. 56.1 Resp. (Dkt. No. 217) ¶ 69)

　　　　There is conflicting evidence about whether Rattray shared new information with

Lieutenant Koch that he had not already shared with Officer Cadavid.  Defendants assert that

while Rattray would not tell Officer Cadavid where his daughter was, Lieutenant Koch "obtained

information about the whereabouts of the daughter and confirmed [her] location."  (Def. R. 56.1

Stmt. (Dkt. No. 216-1) ¶¶ 59, 61-64, 73-74)  Cadavid testified that Koch "aided [him] in [his]

investigation [as] to the whereabouts of [Rattray's daughter] . . . by confirming [her]

whereabouts."  (Cadavid Dep. (Dkt. No. 211-2) at 50)  At deposition, Officer Cadavid gave the

following account:

　　　　Q:　　So when Lieutenant Koch left, he knew the whereabouts of the child?

　　　　A:　　Yes.

　　　　Q:　　And where was the child?

　　　　A:　　At a friend's house.

6

> Q:     And that was the first time you were told that the child was at a friend's house; is that your testimony here?
>
> A:     That's my recollection.
>
> Q:     That's your recollection.  So you did not know this before?  Plaintiff had not told you that the child was at a friend's house before this, before the lieutenant arrived?
>
> A:     That's correct.

(Id. at 50-51)

Defendants' Local Rule 56.1 Statement states, however, that "Plaintiff eventually told PO Cadavid that the daughter was with her 'friends.'"  (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶ 63)  Defendants' Local Rule 56.1 Statement indicates that Rattray shared this information with Officer Cadavid before Lieutenant Koch arrived at the apartment.  (Id. ¶¶ 63-72)

Rattray asserts that "no new information was provided to" Lieutenant Koch with respect to his daughter's whereabouts, and that he had "shared the same information about the child's location . . . with [Officer] Cadavid."  (Pltf. R. 56.1 Resp. (Dkt. No. 217) ¶ 74)  Rattray testified that he told "the officers that [his] daughter was with her friends after they broke into the apartment."  (Rattray Dep. (Dkt. No. 207-5) at 58, 61)  According to Rattray, he communicated this information to the officers after Cadavid completed his initial search of the apartment – i.e., before Koch arrived at Rattray's apartment.  (Id. at 60-61)

Rattray further testified that – as with Officer Cadavid – he explained to Lieutenant Koch that the court custody order was not yet available, but that he had "communications regarding the case.  Plaintiff showed the email communications about the case to the supervisor."  (Pltf. R. 56.1 Resp. (Dkt. No. 217) ¶ 73)  Rattray testified that Lieutenant Koch asked for "some specifics about when was [Rattray and Sandy's] last date in court . . . [and that Rattray] used [his] phone to look that up[,] . . . [and] showed [that] to [Koch, who] . . . was

7

satisfied.  [Rattray further] explained [to Koch that he] didn't have any [custody] papers beyond [the information on his phone]."  (Rattray Dep. (Dkt. No. 207-5) at 97)

It is undisputed that – after Lieutenant Koch and Rattray spoke – Koch and the Defendants left Rattray's apartment.  (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶ 75)

## II.   <u>PROCEDURAL HISTORY</u>

The Complaint was filed on November 2, 2017 (Cmplt. (Dkt. No. 2)); an Amended Complaint was filed on November 20, 2017 (Dkt. No. 6); and the Second Amended Complaint ("SAC") was filed on June 29, 2018.  (Dkt. No. 42).  The SAC asserts Section 1983 claims for unreasonable search and seizure, violations of due process, failure to intervene, false arrest and false imprisonment, excessive force, municipal and supervisory liability, and conspiracy.  (<u>Id.</u>)  The SAC also includes state law claims for false arrest and false imprisonment, assault, battery, intentional infliction of emotional distress, and <u>respondeat superior</u> liability.  (<u>Id.</u>)  The SAC names as Defendants NYPD Officers Jose Cadavid and Alyssa Trigueno, NYPD Sergeant Mervin Bautista, and the City of New York.

On November 21, 2018, Defendants moved to dismiss the SAC pursuant to Fed. R. Civ. P. 12(b)(6).  (Dkt. No. 54)  On September 9, 2019, this Court granted Defendants' motion as to all of Rattray's claims except his Section 1983 unlawful search claim against Officers Cadavid and Trigueno, and his Section 1983 failure to intervene claim against Officer Trigueno, to the extent that claim is premised on an unlawful search.  (Sept. 9, 2019 Order (Dkt. No. 72) at 27-28)  Rattray's claims against the City and Sergeant Bautista were dismissed.  The Court granted leave to move to amend the SAC as to Rattray's federal claims but not as to his state law claims, on grounds of futility.  (<u>Id.</u> at 26-28)

Rattray moved for leave to file the Third Amended Complaint on October 28, 2019, and on November 7, 2019, this Court referred his motion to Magistrate Judge Parker for an R&R.  (Dkt. Nos. 75, 81)  On July 16, 2020, this Court adopted Judge Parker's April 20, 2020 R&R recommending that Rattray be granted leave to amend as to "only the following claims: (1) a Section 1983 unlawful search claim against Officer Cadavid and Officer Trigueno; (2) a Section 1983 false arrest claim against Officer Cadavid; and (3) a Section 1983 failure to intervene claim against Officer Trigueno based on the alleged unlawful search and false arrest." (July 16, 2020 Order (Dkt. No. 98) at 20)

Rattray filed the TAC on July 28, 2020.  (TAC (Dkt. No. 99))  The TAC asserts a Section 1983 unlawful search claim against Officer Cadavid and Officer Trigueno; a Section 1983 false arrest claim against Officer Cadavid; and a Section 1983 failure to intervene claim against Officer Trigueno based on the alleged unlawful search and false arrest.  (Id.)  Officers Cadavid and Trigueno filed an answer on August 10, 2020 (Def. Ans. (Dkt. No. 100)), and the parties then proceeded to discovery before Judge Parker.  (See Am. Order of Ref. (Dkt. No. 108))

Rattray sought to depose Sandy during discovery, and Judge Parker issued an order permitting Rattray to take her deposition.  The deposition was scheduled for October 26, 2021.  (Sept. 14, 2022 Order (Dkt. No. 220) at 1-2)  Under Fed. R. Civ. P. 28, "a deposition must be taken before . . . an officer authorized to administer oaths either by federal law or by the law in the place of examination."  Rattray hired the reporter for Sandy's deposition.  At the outset of the deposition it became clear that the court reporter was not authorized to administer oaths under federal or state law.  (Sept. 14, 2022 Order (Dkt. No. 220) at 1-2)  The parties called Judge Parker from the deposition about this issue.  Judge Parker "suggested that the questioning

proceed, and that Plaintiff provide Ms. Sandy with a copy of the deposition transcript

[afterwards] . . . and ask her to attest to its accuracy before a notary public so that the testimony

could be used as sworn testimony in this case." (Id. (citing Dkt. No. 180))

    Rattray represents that he mailed a copy of the deposition transcript to Sandy's

"Connecticut address as listed on the NYPD records on November 12, 2021," but that the

"deposition and attestation were returned-to-sender, undelivered, on December 1, 2021." (Pltf.

Mot. to Compel (Dkt. No. 197) at 1)  Rattray was not able to communicate with Sandy regarding

the attestation (id.),  and she did not comply with Rattray's request to attest to the accuracy of her

deposition transcript before a notary public.  (Sept. 14, 2022 Order (Dkt. No. 220) at 2)

    Accordingly, on January 31, 2022, Judge Parker authorized "Plaintiff to serve a

modified subpoena [on Sandy] informing [her] about the transcript, her right to note corrections

in an errata sheet, and how to attest to the accuracy of the transcript." (Dkt. No. 198; Sept. 14,

2022 Order (Dkt. No. 220) at 2)  Sandy did not comply with the subpoena.  (Id.)  Instead, Rattray

filed a copy of Sandy's deposition transcript bearing her unnotarized signature.  (Id. at 3; Dkt.

No. 204-1)  Sandy's signature appears on the transcript below the following statement:  "I

declare under penalty of perjury the following to be true:  I have read my deposition and the

same is true and accurate save and except for any corrections as made by me on the correction

Page herein." (Dkt. No. 204-1)

    In an April 5, 2022 letter, Defendants requested that Judge Parker preclude

Rattray from relying on Sandy's deposition in his opposition to Defendants' anticipated motion

for summary judgment.  (Sept. 14, 2022 Order (Dkt. No. 220) at 3 (citing Dkt. No. 204))  In a

September 14, 2022 order, Judge Parker denied Defendants' application, finding that while

Sandy's testimony at her deposition was unsworn – due to the absence of a court reporter

authorized to administer oaths – it was admissible as a declaration made under penalty of perjury.  (Id. at 4-5)

In so ruling, Judge Parker noted that, "[u]nder federal law, unsworn declarations made under the penalty of perjury have the same evidentiary weight as affidavits."  (Id. at 5 (citing 28 U.S.C. § 1746))  Judge Parker thus concluded that "even though Plaintiff did not obtain a proper court reporter or a notarized attestation from Ms. Sandy, her testimony nevertheless can and should be considered in connection with the motion for summary judgment as an unsworn declaration."  (Id.)

On April 15, 2022, Defendants moved for summary judgment on all of Rattray's claims.  (Mot. (Dkt. No. 206))  This Court referred Defendants' motion to Judge Parker for an R&R.  (Dkt. No. 208)  Judge Parker issued her R&R on September 14, 2022, recommending that Defendants' motion be granted as to Rattray's false arrest claim against Officer Cadavid, failure to intervene/false arrest claim against Office Trigueno, and unlawful search claim against Officer Trigueno, but denied as to Rattray's unlawful search claim against Cadavid and failure to intervene/unlawful search claim against Trigueno.  (R&R (Dkt. No. 221))

Rattray filed objections to the R&R on September 29, 2022.  (Dkt. No. 222) Defendants have not objected to the R&R nor have they responded to Rattray's objections.

## DISCUSSION

## I.      LEGAL STANDARDS

### A.      Review of Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C).  "'The district judge evaluating a magistrate

judge's recommendation may adopt those portions of the recommendation, without further

review, where no specific objection is made, as long as they are not clearly erroneous.'"

Gilmore v. Comm'r of Soc. Sec., 2011 WL 611826, at *1 (S.D.N.Y. Feb. 18, 2011) (quoting

Chimarev v. TD Waterhouse Inv. Servs., Inc., 280 F. Supp. 2d 208, 212 (S.D.N.Y. 2003)).   A

decision is "clearly erroneous" when, "upon review of the entire record, [the court is] left with

the definite and firm conviction that a mistake has been committed."   United States v. Snow, 462

F.3d 55, 72 (2d Cir. 2006) (quotation marks and citation omitted).

   Where a timely objection has been made to a magistrate judge's recommendation,

the district judge "shall make a de novo determination of those portions of the report or specified

proposed findings or recommendations to which objection is made."   28 U.S.C. § 636(b)(1).

However, "[o]bjections that are 'merely perfunctory responses argued in an attempt to engage

the district court in a rehashing of the same arguments set forth in the original [papers] will not

suffice to invoke de novo review.'"   Phillips v. Reed Grp., Ltd., 955 F. Supp. 2d 201, 211

(S.D.N.Y. 2013) (second alteration in original) (quoting Vega v. Artuz, 2002 WL 31174466,

at *1 (S.D.N.Y. Sept. 30, 2002)).   "To the extent . . . that the party . . . simply reiterates the

original arguments, [courts] will review the Report strictly for clear error."   IndyMac Bank,

F.S.B. v. Nat'l Settlement Agency, Inc., 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008)

(citing Pearson-Fraser v. Bell Atl., 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003) and Camardo

v. Gen. Motors Hourly-Rate Emp. Pension Plan, 806 F. Supp. 380, 382 (W.D.N.Y. 1992)); see

also Ortiz v. Barkley, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) ("Reviewing courts should

review a report and recommendation for clear error where objections are merely perfunctory

responses, . . . rehashing . . . the same arguments set forth in the original petition." (quotation

marks and citations omitted)).

B.   **Summary Judgment Standard**

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted). "'[W]here the non[-]moving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the non[-]moving party's claim.'" Lesavoy v. Lane, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Mags., Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quotation marks and citation omitted).   However, a "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.   Mere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks, alterations, and citation omitted).

"'Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" Eviner v. Eng, 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).

A moving party can demonstrate the absence of a genuine issue of material fact "in either of two ways:  (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim."  Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quotation marks and citation omitted).

Pro se submissions are "construed liberally and interpreted to raise the strongest arguments that they suggest."  Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (quotation marks, emphasis, and citation omitted).  A pro se litigant must, however, still "meet the requirements necessary to defeat a motion for summary judgment."  Jorgensen v. Epic/Sony Recs., 351 F.3d 46, 50 (2d Cir. 2003) (quotation marks and citation omitted).

## II.    ANALYSIS

### A.    Unlawful Search Claim Against Cadavid

No party has objected to the R&R's recommendations that the Defendants' motion for summary judgment be denied as to Rattray's unlawful search claim against Officer Cadavid.  This Court therefore reviews this recommendation for clear error only.  See Gilmore, 2011 WL 611826, at *1.

In seeking summary judgment on Rattray's unlawful search claim, Cadavid contends that (1) the warrantless search of Cadavid's home was justified by exigent circumstances, i.e., concern for the safety of Rattray's daughter; and (2) even if the circumstances were not exigent, Cadavid is entitled to qualified immunity.  (Def. Br. (Dkt. No. 207) at 16-24)

As Judge Parker notes, the Fourth Amendment bars unreasonable searches and seizures, and a search is presumed unreasonable in the absence of a warrant or an exception to

the warrant requirement.  (R&R (Dkt. No. 221) at 7 (citing U.S. Const. Amend. IV; <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980); <u>Anthony v. City of New York</u>, 339 F.3d 129, 135 (2d Cir. 2003); <u>Harris v. O'Hare</u>, 770 F.3d 224, 231-32 (2d. Cir. 2014)))  One exception to the warrant requirement is exigent circumstances.

> Exigent circumstances exist when there is an "urgent need to render aid," <u>United States v. MacDonald</u>, 916 F.2d 766, 769 (2d Cir. 1990) (quotations omitted), because someone is "in distress," <u>Tierney v. Davidson</u>, 133 F.3d 189, 196 (2d Cir. 1998) (quotations omitted), or "injured" or threatened with "imminent injury," <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398, 403 (2006) (citations omitted).

(<u>Id.</u>)

Judge Parker concludes that there are material issues of fact as to whether exigent circumstances justified the warrantless search of Rattray's apartment:

> As to the undisputed facts, Defendants assert that the 911 operator conveyed to the officers that Plaintiff had refused to hand over the child to Sandy and Sandy was crying hysterically, (Def. 56.1 ¶¶ 17-18); that Sandy informed the officers that it was her day to visit the child and that she hadn't heard from the child, (id. ¶ 21); and that Plaintiff was uncooperative with the officers when they went to check on the child because he initially refused to open his door and then attempted to close the door after the officers threatened to arrest him if he did not present proof establishing that he had custody of the child, (id. ¶¶ 30-35, 38, 40-41, 50, 51).

> As to the disputed facts, the officers assert that Sandy informed Cadavid that she believed the child's life was in danger because Plaintiff was a drug user and had drug dealers to his apartment (id. ¶ 22) and that when the officers initially asked Plaintiff exactly where the child was, Plaintiff refused to answer (id. ¶ 47).  Both assertions are disputed by evidence in the record.  In a sworn statement, Sandy denied telling the officers that she was concerned for the child's safety or that Plaintiff is a drug user, and in his sworn deposition testimony, Plaintiff stated that he told the officers the child was at a friend's house as soon as the officers asked the question.  As discussed below, the disputed facts are material to determining whether exigent circumstances existed for a search, and thus Defendants cannot rely on them on this motion.

(<u>Id.</u> at 8-9)

In recommending that Defendants' motion be denied as to the unlawful search claim against Officer Cadavid, Judge Parker finds that Sandy's claim that it was her day to visit

the couple's child; that Sandy hadn't heard from the child that day; that Sandy was crying

hysterically when speaking with the 911 operator; and that Rattray was uncooperative with the

police when first approached, do not demonstrate exigent circumstances as a matter of law.  (Id.

at 8-11)  In support of her recommendation, Judge Parker cites extensive case law, including

cases that involve domestic disputes in which one party is uncooperative with or hostile towards

responding officers.  (Id. at 9-11)  She notes that an officer's subjective concern for a child,

"without any objective evidence supporting the concern," is "generally insufficient to establish

exigent circumstances."  (Id. at 10 (citing Rivera, 2008 WL 5062103, at *4, n.4 ("[An] "officer's

subjective belief as to whether exigent circumstances existed . . . is not relevant.")))  Judge

Parker also distinguishes cases in which exigent circumstances existed based on objective

evidence that a child's life might be at risk, including cases in which officers were told that a

perpetrator had made violent threats, possessed a weapon, had a history of domestic abuse, or

was a known child abuser who refused to answer questions about a child's whereabouts.  (Id. at

10-11)

        Judge Parker rightly concludes that material facts are in dispute here – including

whether the police were told that Plaintiff was a drug user who had drug dealers over to his

apartment, and whether Plaintiff refused to disclose the whereabouts of the child – and that it is

for a jury to "assess the facts to determine whether Cadavid was justified in entering the home to

search for the child."  (Id. at 11)

        As to Cadavid's qualified immunity argument, Judge Parker notes that

> [a]n officer is entitled to qualified immunity under § 1983 unless (i) the officer
> violated a federal statutory or constitutional right, and (ii) the unlawfulness of the
> officer's conduct was 'clearly established at the time.'"  D.C. v. Wesby, 138 S.
> Ct. 577, 589 (2018). . . . [T]he law is "clearly established" . . . [if] the "rule's
> contours" are "so well defined" that it would be clear to a reasonable officer that
> the conduct in question was unlawful in the situation the officer confronted."

D.C., 138 S. Ct. at 590. . . . Accordingly, while there does not need to be "a case directly on point," "existing precedent must place the lawfulness" of the behavior "beyond debate." Id. (citation omitted). The rule must be "dictated by 'controlling authority' or a 'robust 'consensus of cases of persuasive authority.'" Id. at 589-90 (citation omitted).

(Id. at 12-13)

Having concluded that the undisputed material facts do not demonstrate exigent circumstances as a matter of law, Judge Parker further concludes that "it would not be reasonable for an officer in this precise situation to enter a home without a warrant." (Id. at 13) In reaching this conclusion, Judge Parker cites case law demonstrating that the law regarding exigent circumstances in the context of a warrantless search of a home is well established:

> Ample Supreme Court and Second Circuit case law establish that "probable cause plus exigent circumstances" constitutes an exception to the warrant requirement and define the contours of what constitutes exigent circumstances. Loria, 306 F.3d at 1283 (2d Cir. 2002) (collecting cases); see also Rivera, 2008 WL 5062103, at *7 (finding the law regarding exigent circumstances in the context of warrantless entry "clearly established" in light of "numerous and consistent Second Circuit decisions"). Specifically, the case law is clear that exigent circumstances in the context of a home entry are "rare[]," Stanton v. Sims, 571 U.S. 3, 8 (2013), and exist only in those situations where there is "clear factual evidence showing an urgent need to render assistance," Rivera, 2008 WL 5062103, at *5 (collecting cases); see also Hurlman, 927 F.2d at 77 (explaining that there needs to be evidence supporting the officers' knowledge that an emergency exists, and the "mere 'possibility'" of danger is not sufficient).

(Id. at 13-15)

Judge Parker also distinguishes three cases cited by the Defendants in support of their motion: Ray v. Township of Warren, 626 F.3d 170, 172 (3d Cir. 2010); Howard v. Town of Dewitt, 2015 WL 2381334 (N.D.N.Y. May 19, 2015); and Hunsberger v. Wood, 570 F.3d 546 (4th Cir. 2009). (Id. at 16)

> Ray and Howard also involved custody disputes, but in those cases, facts on the record not present here reasonably led the officers to believe a child inside the house might be in danger. See Ray, 626 F.3d at 172-77 (plaintiff entirely failed to respond to the officer's repeated knocking, despite previously always responding and turning over the child after police arrived on the scene); Howard, 2015 WL

2381334, at *1-4 (plaintiff refused to answer door for over 20 minutes, and eventually acknowledged the child was in fact home but refused to allow the officers to see the child, and made an odd remark that nobody was "bleeding"). Moreover, and significantly, in <u>Ray</u>, the officers received authorization from a municipal court judge to enter the home, 626 F.3d at 172, and in <u>Howard</u>, the officers were in fact denied summary judgment on the warrantless search claim, and only at trial did a jury find for the defendants, 2015 WL 2381334, at *2. Defendants' third case, <u>Hunsberger</u>, involves entirely different facts concerning a reported break-in, where the circumstances confronted by the officers suggested that the home "was being vandalized and that a missing teenage girl was in the house and in need of assistance." 570 F.3d at 549-50.

(<u>Id.</u>)

Judge Parker goes on to conclude that, "[a]t this stage, making all inferences in favor of Plaintiff, the Court cannot conclude that it was objectively reasonable for Cadavid to think that exigent circumstances existed to justify his warrantless search of Plaintiff's apartment." (<u>Id.</u> at 18)  The same issues of material fact concerning Rattray's unlawful search claim preclude summary judgment on Cadavid's qualified immunity claim.  (<u>Id.</u> at 17-18)

Having reviewed this portion of the R&R, this Court finds no clear error in Judge Parker's analysis or conclusions.  Accordingly, this Court will adopt the recommendation that Defendant Cadavid's motion for summary judgment on Plaintiff's unlawful search claim be denied.

**B.** **<u>Unlawful Search Claim Against Trigueno</u>**

No party has objected to the R&R's recommendation that the Defendants' motion for summary judgment be granted as to Rattray's unlawful search claim against Trigueno.  The Court therefore reviews this recommendation for clear error only.  <u>See</u> <u>Gilmore</u>, 2011 WL 611826, at *1.

As discussed above, there is no evidence here that Officer Trigueno ever entered Rattray's apartment.  In recommending that Trigueno be granted summary judgment on the unlawful search claim against her, Judge Parker notes that it "is well established that 'the

common halls' of apartment buildings 'are not within an individual tenant's zone of privacy.'"
(R&R (Dkt. No. 221) at 18 (quoting <u>United States v. Holland</u>, 755 F.2d 253, 255 (2d Cir. 1985)))
Judge Parker concludes that because "Trigueno never crossed the threshold into Plaintiff's
apartment or searched the apartment, she did not commit an unlawful search."  (<u>Id.</u>)

This Court finds no clear error in this portion of the R&R.  Accordingly, the Court
adopts the R&R's recommendation that Defendant Trigueno be granted summary judgment on
Plaintiff's unlawful search claim against her.

### C.    Failure to Intervene Claim Against<br>Trigueno Based on Alleged Unlawful Search

Plaintiff contends that Officer Trigueno is liable for failing to intervene to prevent
Officer Cadavid's unlawful search.  (TAC (Dkt. No. 99) ¶¶ 127-134)  Defendants argue that
even if an unlawful search occurred, Trigueno "had no realistic opportunity to intervene."  (Def.
Br. (Dkt. No. 207) at 30)

As Judge Parker notes, an "officer who 'observes or has reason to know that . . .
[a] constitutional violation has been committed by a law enforcement official' is liable for failing
to intervene and preventing the harm, provided there was 'a realistic opportunity' to do so."
(R&R (Dkt. No. 99) at 19 (quoting <u>Anderson v. Branen</u>, 17 F.3d 552, 557 (2d Cir. 1994)))  It is
undisputed here that Officer Trigueno was present at the door of Rattray's apartment throughout
Officer Cadavid's encounter with Rattray, including for more than an hour while Cadavid
remained inside Rattray's apartment.  (<u>Id.</u> at 19-20)

Given these circumstances, Judge Parker concludes that a reasonable jury could
find that "Trigueno could have intervened."  (<u>Id.</u> at 20 (citing <u>Figueroa v. Mazza</u>, 825 F.3d 89,
108 (2d Cir. 2016) (concluding that even if the unlawful action lasted "less than twenty
seconds," it was legal error for the district court to conclude that the defendants did not have

sufficient time to intervene)))  Judge Parker further concludes that Officer Trigueno is not entitled to qualified immunity for the same reasons that Officer Cadavid is not entitled to qualified immunity – i.e., the law on exigent circumstances was clearly established at the time, and there are disputed issues of material fact as to whether it would be reasonable for an officer to believe that he was authorized to enter Rattray's home without a warrant.  (Id.)

Having reviewed this portion of the R&R, this Court finds no clear error in Judge Parker's analysis or conclusions.  Accordingly, this Court adopts the R&R's recommendation that Defendant Trigueno's motion for summary judgment be denied as to Rattray's failure to intervene claim premised on the alleged unlawful search.

### D. False Arrest Claim Against Cadavid and Failure to Intervene/False Arrest Claim Against Trigueno

#### 1. The Parties' Arguments and the R&R's Conclusions

Rattray alleges that Officer Cadavid's actions during the incident amount to false arrest in violation of the Fourth Amendment, and that Officer Trigueno is liable for failing to intervene to prevent that false arrest.  (TAC (Dkt. No. 99) ¶¶ 113-26)  Defendants argue that (1) Rattray was not arrested; (2) if Rattray was arrested, the arrest was justified by probable cause; and (3) even if there was no probable cause for an arrest, Officer Cadavid is entitled to qualified immunity, because there was "arguable probable cause" to arrest Rattray.  (Def. Br. (Dkt. No. 207) at 25-30)

As Judge Parker notes, to "state a claim for false arrest under § 1983 . . . a plaintiff must show that he was 'seized' for purposes of the Fourth Amendment and that the seizure was sufficiently intrusive to constitute an arrest."  (R&R (Dkt. No. 221) at 21-22 (citing Posr v. Doherty, 944 F.2d 91, 100 (2d Cir. 1991)))  "A person is 'seized' when an officer 'even

briefly' restrains the person's 'right to walk away.'"  (Id. (quoting United States v. Moreno, 897

F.2d 26, 30 (2d Cir.), cert. denied, 497 U.S. 1009 (1990)))

> A seizure constitutes a false arrest when the officers acted with an "unreasonable
> level of intrusion given the totality of the circumstances."  Posr, 944 F.2d at 99
> . . . . In United States v. [Perea], the Second Circuit set forth several factors to
> consider in assessing whether the level of intrusion was unreasonable, including:
> the amount of force used by police and the need for such force; the extent to
> which the plaintiff's freedom of movement was restrained; the number of agents
> involved; whether the plaintiff was suspected of being armed; the duration of the
> stop; and the physical treatment of the plaintiff.  986 F.2d 633, 645 (2d Cir. 1993)
> (citations omitted).  Courts in this Circuit continue to rely on these factors in
> assessing whether an effective arrest occurred.  See, e.g. Scott v. City of Mount
> Vernon, 2017 WL 1194490, at *18 (S.D.N.Y. Mar. 30, 2017)

(Id. at 22)

Judge Parker concludes that Rattray has not proffered evidence sufficient to create

a material issue of fact as to whether he was arrested under the Fourth Amendment:

> Cadavid's presence in the apartment and his refusal to leave, as well as Cadavid's
> informing Plaintiff he was not allowed to leave, coupled with Trigueno's presence
> at the doorway, all support Plaintiff's contention that he reasonably believed his
> "right to walk away" and leave his apartment was restrained.  However,
> regardless of whether a seizure was effectuated by this restraint, no reasonable
> juror could conclude, based on the evidence, that the officers acted with such an
> unreasonable level of intrusion to amount to an arrest.  None of the factors set
> forth in [Perea] are seriously implicated here:  the police never drew their
> weapons or used physical force against the Plaintiff; Plaintiff was able to move
> freely about his apartment and, accordingly, his freedom of movement was not
> especially restrained; Plaintiff was free to use his phone; Plaintiff was not
> handcuffed; only two officers were involved in the incident, only one of whom
> was in the apartment; and the incident lasted approximately one hour, which was
> about the length of time needed for the supervisor to arrive following calls from
> both Cadavid and Plaintiff requesting a supervisor's assistance in resolving the
> situation.

(Id. at 22-23)

Judge Parker further concludes that – even if a jury could find that Rattray was

unlawfully arrested – Defendant Cadavid is entitled to qualified immunity, because there is "no

precedent rendering it beyond debate that Cadavid was effectuating an arrest when he stayed in

the apartment asking questions and waiting for a supervisor." (Id. at 22)  For these same reasons,

Judge Parker "also recommend[s] granting summary judgment on the failure to intervene claim

against Trigueno with respect to the alleged unlawful arrest."  (Id. (citing Felix v. City of New

York, 408 F. Supp. 3d 304, 312 (S.D.N.Y. 2019)))

        In his objections, Rattray asserts that (1) he was "in police custody the moment he

opened the door," because he "was prevented from retreating into his home and closing his

door"; (2) after completing the search Officer "Cadavid continued the detention of Plaintiff"; (3)

"a reasonable jury may find [] malice . . . since no provocation or reasonable cause exists to

justify an hour-long unwarranted and nonconsensual detention"; and (4) a "jury could draw

adverse inferences about the credibility of [Cadavid's] testimony" regarding his allegation that

Sandy told him there were drugs and drug dealers in Rattray's home.  (Pltf. Obj. (Dkt. No. 222)

at 1-4)  Rattray also points to the "unreasonable delay" in the supervisor's response time of more

than an hour, given that the police precinct in which Rattray resides "is one-mile wide at its

widest point."  (Id. at 5) Rattray also asserts that he was "not free to, for example, move into

another room in the home and close the door."  (Id. at 6)  According to Rattray, considering the

totality of the circumstances, a "reasonable jury presented with these facts could find for

Plaintiff, that Plaintiff was unlawfully arrested."  (Id.)

        In recommending that Defendants be granted summary judgment on Rattray's

false arrest claims, Judge Parker relies solely on United States v. Faux, 828 F.3d 130 (2d Cir.

2016)  Faux addresses when a suspect is in "custody" for purposes of Miranda warnings.  That

case does not address when an arrest has occurred for purposes of a Section 1983 claim for false

arrest.  And while (1) the FBI agents' encounter in Faux took place in the defendant's home, and

(2) the defendant was told that she could not leave her home during the search, the agents in that

case arrived at Faux's home with a valid search warrant and entered her home lawfully and without using force.  Faux, 828 F.3d at 132-34.

Here, Officer Cadavid did not have a search warrant, and there is evidence that (1) he used force to enter Rattray's apartment to conduct a warrantless search; (2) he remained in Rattray's apartment against Rattray's expressed wishes for more than an hour; (3) he told Rattray that Rattray was not free to leave; and (4) Officer Trigueno had told Rattray that he would be arrested if he could not produce a court order showing that he had custody over his daughter. (See Rattray Dep. (Dkt. No. 207-5 at 50-51) (Rattray testifying that Officer Trigueno told him that if he did not "have a piece of paper saying [that his daughter] is supposed to be with [him], [he was] going to spend the night downtown").

### 2.  Whether there Are Material Issues of Fact as to Whether Rattray Was Arrested

#### a.  Applicable Law

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Supreme Court has instructed that the "ultimate touchstone of the Fourth Amendment is reasonableness."  Riley v. California, 573 U.S. 373, 381 (2014) (citation and internal quotations omitted).

The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  Payton, 445 U.S. at 585.  It is a "'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  Id. at 586.  "[T]his distinction has equal force when the seizure of a person is involved."  Id.; Loria v. Gorman, 306 F.3d 1271, 1283 (2d Cir. 2002) ("There can be no doubt that . . . the Fourth Amendment guarantees an individual the right to be secure against forcible

23

entry of his home save in exceptional circumstances and that seizures inside a home without a warrant are presumptively unreasonable.") (quoting Hurlman v. Rice, 927 F.2d 74, 79 (2d Cir. 1991).  Accordingly, "'police officers need either a warrant or probable cause plus exigent circumstances in order to make lawful entry into a home.'"  Loria, 306 F.3d at 1283 (quoting Kirk v. Louisiana, 536 U.S. 635, 638 (2002)).

In concluding that Rattray was not under arrest, Judge Parker first discusses United States v. Perea, 986 F.2d 633, 645 (2d Cir. 1993), a case that sets out the factors courts use to differentiate Terry stops from arrests.  Perea, 986 F.2d at 644 ("Nonetheless, an encounter that began as a permissible Terry stop may have ripened into an arrest, which must be supported by probable cause.")  As discussed above, Judge Parker then turns to United States v. Faux, a case that addresses whether a defendant was in "custody" for Miranda purposes.  Neither Perea nor Faux are applicable here, however.

As to Faux, cases that raise a Miranda issue address a different constitutional interest:  "the [Fifth Amendment] privilege against self-incrimination."  Miranda v. Arizona, 384 U.S. 436, 441 (1966).  Here, however, the constitutional interest presented by Plaintiff's false arrest claim is the "right of the people to be secure in their persons[] . . . against unreasonable . . . seizures."  U.S. Const. amend. IV.

As to Perea and Terry stop cases, a different analysis is required for an encounter that takes place in a person's home.  "[I]n the context of citizen-police encounters in the home . . . the traditional totality-of-the-circumstances analysis provides the appropriate framework [to determine whether an unlawful seizure has occurred]."  United States v. Allen, 813 F.3d 76, 80 (2d Cir. 2016) (citing United States v. Mendenhall, 446 U.S. 544, 554, (1980); see also Fla. v. Royer, 460 U.S. 491, 498 (1983) ("Terry created a limited exception to [the] general rule" that

"any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause."); United States v. Crapser, 472 F.3d 1141, 1149 (9th Cir. 2007) ("Terry does not apply inside a home.") (emphasis in original);Wayne R. LaFave, Search & Seizure § 9.4(a) (6th ed.) ("As for the much-less-frequent occurrence of an encounter within private premises, it is certainly true 'that an officer's actions taken within a house can have a more coercive effect than actions taken in public places.'") (quoting State v. K.A.M., 361 Or. 805 (2017)).

In Allen, the defendant moved to suppress evidence obtained by the police in the course of a warrantless arrest inside Allen's home.  Allen, 813 F.3d at 78.  The facts of that case are as follows:

> On July 27, 2012, four Springfield police officers went to Allen's apartment with the "pre-formed plan . . . to arrest [him] for [an] alleged assault and process him . . . at the Springfield police station." . . .
>
> After they arrived, the officers knocked on Allen's door.  Allen heard the knock, and stepped onto his second-floor porch.  One of the officers requested that Allen come down to speak with him; Allen complied.  Allen opened the door to his apartment, and during the next five to six minutes that he spoke with the officers, he remained "inside the threshold" while the officers stood on the sidewalk. The district court noted that during the encounter, "[n]o weapons were drawn and the officers did not physically touch [Allen]."
>
> Allen told the officers [he had not committed the assault of which they suspected him]. . . . Allen at one point handed the officers his cell phone so that they could view his call log.  The officers looked at the phone, and returned it to Allen. The officers then told Allen that he would need to come down to the police station to be processed for the assault.  In other words, he was under arrest.  Allen, who had appeared at the door in his stocking feet, asked whether he could retrieve his shoes and inform his 12-year-old daughter, who was upstairs in the apartment, that he would be leaving with the officers.  The officers advised Allen that he could not return upstairs unless they accompanied him, which they did.

Id. (citations omitted).

While the officers accompanied Allen upstairs, the officers asked Allen if he had anything in his pockets, and he showed them that he had marijuana.  The officers also saw "drug

paraphernalia in plain view."  After handcuffing Allen and taking him to the police station, the

officers obtained a search warrant for Allen's apartment.  While executing that warrant, the

officers discovered a firearm and other incriminating evidence.  Id.  Allen was then charged with

felon in possession.  Id.

      "Allen moved to suppress the firearm, and the statements he made, contending

that both were fruits of a warrantless in-home arrest in violation of the Fourth Amendment."  Id.

at 79.  The district court held that the arrest did not violate the Fourth Amendment, relying on

California v. Hodari, 499 U.S. 621 (1991).  While "neither party directly challenge[d] on appeal"

that Allen was under arrest, the Second Circuit observed that "Hodari D.[] [does not] provide[]

the proper analytical framework [to determine whether an arrest was made]. . . . Neither the

parties nor the district court cites appellate authority applying Hodari D. in the context of citizen-

police encounters in the home.  In that context, we believe that the traditional totality-of-the-

circumstances analysis provides the appropriate framework."  Id. at 79 n.6 (citing United States

v. Mendenhall, 446 U.S. 544, 554, (1980)).

      Applying the totality of the circumstances test, the Second Circuit concluded that

Allen had been arrested while inside his home:

> There is no dispute in this case that Allen was arrested while still in his
> home.  The government does not contend that Allen was free to refuse the
> officers' command that he would have to come to the police station with them, or
> that a "reasonable person" would have felt free to do so.  See
> Mendenhall, 446 U.S. 544 (1980).  The government does not and could not
> contend that Allen made a consensual decision to accept a police invitation to
> discuss matters with them at another location.  From the point at which the
> officers told Allen that he would need to come down to the police station to be
> processed for the assault, they had asserted control over his person.

Id. at 86.

      Allen teaches that – for purposes of a citizen-police encounter that takes place in

the home – the "ultimate inquiry" is whether "under the totality of circumstances, a reasonable

person would have believed that he was not free to leave . . . [or] 'would have believed that he . . . was in police custody of the degree associated with a formal arrest.'" See Mara v. Rilling, 921 F.3d 48, 70 (2d Cir. 2019) (quoting State v. Mangual, 311 Conn. 182, 197 (2014)).

In determining whether a "reasonable person would have believed that he was not free to leave," courts consider, inter alia, "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554. "This 'necessarily imprecise' test 'is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation.'" Simon v. City of New York, 893 F.3d 83, 99 (2d Cir. 2018) (quoting Michigan v. Chesternut, 486 U.S. 567, 573 (1988)); see also id. (considering the same factors in determining whether a "material witness arrest" was unlawful under clearly established law)).

b.   **Analysis**

Here, Officers Cadavid and Trigueno did not draw their firearms and did not handcuff Rattray. But by their language, tone, and actions, the officers communicated to Rattray that "compliance with the officer[s'] request[s] might be compelled." Mendenhall, 446 U.S. at 554. Indeed, the officers' threats of force began at the outset of the encounter, when Officer Cadavid told Rattray that Officer Cadavid "may have to take the door down" if Rattray did not open the door to his apartment. (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶ 36) Officer Trigueno then overtly threatened Rattray with arrest, telling him that if he did not "have a piece of paper saying [his daughter] is supposed to be with [him], [he was] going to spend the night downtown." (Rattray Dep. (Dkt. No. 207-5) at 50-51)

At this point, Rattray attempted to terminate the encounter with the officers by closing the door to his apartment.  (Id.; Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶¶ 50-51)  Officer Cadavid prevented Rattray from closing his apartment door, however, and forced his way into the apartment, over Rattray's objection.  (Rattray Dep. (Dkt. No. 207-5) at 59-60; Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶¶ 51-52)

As to "physical touching" and the use of force, there is evidence that Officer Cadavid "pushed the door in, [so that it] struck [Rattray and forced him] back."  (Rattray Dep. (Dkt. No. 207-5) at 59-60)

Once Officer Cadavid was inside the apartment, Rattray told him to "'get the eff out' of his apartment," but Officer Cadavid did not leave.  (Rattray Dep. (Dkt. No. 207-5) at 71; Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶ 62)  Instead, over the next hour, Officer Cadavid continued to interrogate Rattray, inside Rattray's apartment, about the whereabouts of his daughter.  (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶¶ 59-70)  During the more than hour-long interrogation, Rattray sought to leave, saying to the officers:  "Okay, fine. You guys want to stay here, fine.  Then can I go?"  (Rattray Dep. (Dkt. No. 207-5) at 89 (internal quotation marks omitted))  Officer Cadavid told Rattray that he was not free to leave the apartment:  "No. You got downtown involved.  You gotta stay."  (Id. (internal quotation marks omitted))  And Officer Cadavid confirmed at his deposition that Rattray was in fact not free to leave the apartment.  (Cadavid Dep. (Dkt. No. 211-2) at 46-47)

Given this evidentiary record, there are material issues of fact as to whether "a reasonable person would have believed that he was not free to leave."  Mara, 921 F.3d at 70.

Finally, the Court notes that Defendants – who bear the burden of showing that they are entitled to summary judgment – have not cited any relevant case law, much less case

law demonstrating that Rattray was not under arrest during the more than hour-long period that

he was interrogated and told that he was not free to leave his home.  (See Def. Br. (Dkt. No. 207)

at 27)[7]

For all these reasons, to the extent that Defendants' motion for summary

judgment on Plaintiff's false arrest claim is premised on the argument that Rattray was not

arrested, the motion will be denied.

###    3.    Probable Cause, Exigent Circumstances, and Qualified Immunity

Defendants argue that – even if an arrest occurred – the arrest was "supported by

probable cause."  (Def. Br. (Dkt. No. 207) at 27-29)  According to Defendants, Officer Cadavid

had probable cause to arrest Rattray for obstructing governmental administration.  (Id. at 28-29)

A person is guilty of obstructing governmental administration when:

> he intentionally obstructs, impairs or perverts the administration of law or other
> governmental function or prevents or attempts to prevent a public servant from
> performing an official function, by means of intimidation, physical force or
> interference, or by means of any independently unlawful act. . . .

N.Y. Penal Law § 195.05.

---

[7]  Defendants' cases were all decided at the motion to dismiss stage and involved claims
predicated on the issuance of desk appearance tickets or summonses, where it was plain from the
face of the complaint that no arrest had occurred.  See Bissinger v. City of New York, 2007 WL
2826756, at *8 (S.D.N.Y. Sept. 24, 2007) (dismissing false arrest claims premised on the
issuance of court summonses); Porat v. Lincoln Towers Cmty. Ass'n, 2005 WL 646093, at *4
(S.D.N.Y. Mar. 21, 2005), aff'd, 464 F.3d 274 (2d Cir. 2006) ("Officer Lopez issued Plaintiff a
"summons for trespassing" and stated that if he 'did not appear in court on the appointed date, a
warrant would issue for his arrest.'  Therefore, Plaintiff's false arrest and imprisonment claim
fails because his pleading states that he was simply never arrested.")

Defendants also note that in a September 19, 2019 order, this Court dismissed Rattray's false
arrest claim as pled in the Second Amended Complaint.  (See Def. Br. (Dkt. No. 207) at 27)
This Court granted Rattray leave to amend, however, and then rejected Defendants' argument
that his proposed third amended complaint failed to state a claim for false arrest.  (July 16, 2020
Order (Dkt. No. 98) at 15-16)

While probable cause is an "'an absolute defense to a false arrest claim'" Dancy v. McGinley, 843 F.3d 93, 107 (2d Cir. 2016) (quoting Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006)), "'police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.'" Loria v. Gorman, 306 F.3d 1271, 1283 (2d Cir. 2002) (quoting Kirk v. Louisiana, 536 U.S. 635 (2002)).  The Fourth Amendment has "drawn a firm line at the entrance to the house," id., and it is a "'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980)  "[T]his distinction has equal force when the seizure of a person is involved." Id.; Loria, 306 F.3d at 1283 ("There can be no doubt that . . . the Fourth Amendment guarantees an individual the right to be secure against forcible entry of his home save in exceptional circumstances and that seizures inside a home without a warrant are presumptively unreasonable.").[8]

Accordingly, even assuming arguendo that there was probable cause to arrest Rattray for obstructing governmental administration, this Court must go on to consider whether there are material issues of fact as to whether the warrantless arrest inside Rattray's home was justified by exigent circumstances.

---

[8]  Multiple courts have applied Payton to Section 1983 false arrest claims premised on a warrantless entry into a plaintiff's home.  See, e.g., Parker-El v. Morales, 2015 WL 5920031, at *5 (S.D.N.Y. Oct. 9, 2015) ("But establishing probable cause only gets the Defendants halfway to a dismissal – '[a]s Payton makes plain, police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.'  Even if probable cause is treated as established, there is no indication of any warrant or exigent circumstances. . . . [T]herefore, [plaintiff] has stated a § 1983 claim for false arrest.") (quoting Kirk, 536 U.S. 638); Burke v. Cicero Police Dep't, 2011 WL 1232107, at *5 (N.D.N.Y. Mar. 30, 2011) ("[A] warrant-less arrest can form the basis of a false arrest claim under 42 U.S.C. § 1983 even if probable cause is present.") (quoting Durney v. City of New York, 1996 WL 1057148, at *7 (E.D.N.Y. Oct. 25, 1996)).

Loria v. Gorman, 306 F.3d 1271, illustrates this principle on somewhat comparable facts.  In Loria, police officers investigated a complaint regarding noise at Loria's home.  When an officer arrived at Loria's home, Loria attempted to shut the door in the officer's face.  Id. at 1276-77.  "To prevent the door from closing, [the defendant police officer] stuck out his arm and leaned into the door[,] . . . he pushed the door back and it hit Loria in the face, knocking him backwards."  Id.  The police officer then seized Loria inside his home and arrested him.  Id.  Loria later filed a complaint alleging "common-law false arrest and . . . unconstitutional search and seizure."  Id. at 1282.

On interlocutory appeal from the denial of defendants' summary judgment motion premised on qualified immunity, the Second Circuit held that the officer's "entry into Loria's home and seizure of him without a warrant violated a constitutional right unless justified by exigent circumstances."  Id. at 1284-85.  In so holding, the Second Circuit distinguished United States v. Santana, which holds that where a person is standing in their doorway such that they are "'exposed to public view,'" and then retreats inside their home, probable cause alone will sustain an arrest within the home.  Id. at 1286-87 (quoting United States v. Santana, 427 U.S. 38, 42-43 (1976) (applying the "hot pursuit" exception to the warrant requirement).  The Loria court found Santana inapplicable, because "under the circumstances no reasonable officer could have concluded that – simply because Loria was near the door – taking two steps into the house and seizing Loria inside did not constitute a Fourth Amendment entry."  Loria, 306 F.3d at 1286; see also United States v. Crespo, 834 F.2d 267, 270 (2d Cir. 1987) (finding Santana inapplicable where apartment door was opened halfway in response to DEA agents' demand, and defendant was not exposed to public view as if outside).

Here, there is evidence that Rattray was not exposed to public view when he opened his apartment door in response to Officer Cadavid's threat to "take the door down." (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶ 36; see also id. ¶ 37 ("[Rattray] opened the door at a 45-degree angle."); Trigueno Dep. (Dkt. No. 207-4) at 106 ("[T]he door was open slightly.")) Accordingly, both probable cause and exigent circumstances are required to justify any warrantless arrest within Rattray's home.  Loria, 306 F.3d at 1283-84 ("[Defendant's] entry into [Plaintiff's] home and seizure of him without a warrant violated a constitutional right unless justified by exigent circumstances.").[9]

In their briefing, Defendants do not address Payton or Loria.  (Def. Br. (Dkt. No. 207) at 25-30)  For reasons discussed above, this Court concludes that there are material issues of fact as to whether any warrantless arrest of Rattray was justified by exigent circumstances.

Finally, this Court considers whether Officer Cadavid has demonstrated that he is entitled to qualified immunity in connection with Plaintiff's false arrest claim.

"State executive officials 'are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" Simon, 893 F.3d at 92.  Qualified immunity "is an affirmative defense, [and] 'the defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time.'"  Tellier v. Fields, 280 F.3d 69,

---

[9] Hogan v. Buttofocco, 2009 WL 3165765 (N.D.N.Y. Sept. 28, 2009), aff'd, 379 F. App'x 35 (2d Cir. 2010) (summary order) – cited by Defendants (Def. Br. (Dkt. No. 207) at 28) – provides no support for their position.  While the Second Circuit affirmed – by summary order – the district court's decision granting defendants' summary judgment on plaintiff's Section 1983 false arrest claim, the court reiterated that "warrantless entry into a suspect's home violates the Fourth Amendment unless exigent circumstances justify the entry."  Hogan, 379 F. App'x 36 (citing Payton, 445 U.S. at 586).  The Second Circuit went on to find that there was both probable cause for the arrest and exigent circumstances justifying the warrantless arrest inside plaintiff's home.

84 (2d Cir. 2000) (quoting <u>Varrone v. Bilotti</u>, 123 F.3d 75, 78 (2d Cir. 1997)).  "It is [] settled law that, at a minimum, law enforcement officers violate <u>Payton</u> when, in the absence of exigent circumstances or consent, they physically enter protected premises to effect a warrantless search or arrest."  <u>Allen</u>, 813 F.3d at 81 (citing <u>Payton</u>, 445 U.S. 573, 585; <u>see also</u> <u>Loria</u>, 306 F.3d at 1271 ("[It is a] firmly established rule that 'police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.'") (quoting <u>Kirk</u>, 536 U.S. at 638); <u>Hurlman v. Rice</u>, 927 F.2d 74, 79 (2d Cir. 1991) ("There can be no doubt that it was established prior to November 1986 that the Fourth Amendment guarantees an individual the right to be secure against forcible entry of his home save in exceptional circumstances and that seizures inside a home without a warrant are presumptively unreasonable." (citations and quotation marks omitted)).

Here, Defendants argue that Officer Cadavid is entitled to qualified immunity based on the existence of "arguable probable cause."  (Def. Br. (Dkt. No. 207) at 29-30)  Defendants do not address the exigent circumstances requirement, however, and as discussed above exigent circumstances are required to justify a warrantless arrest inside a person's home. Based on the evidence discussed above, this Court finds no error in Judge Parker's conclusion that, "[a]t this stage, making all inferences in favor of Plaintiff, the Court cannot conclude that it was objectively reasonable for Cadavid to think that exigent circumstances existed to justify his warrantless [entry] of Plaintiff's apartment."  (R&R (Dkt. No. 207) at 18).  Accordingly, Officer Cadavid is not entitled to summary judgment on qualified immunity grounds because there was "arguable probable cause."

Defendants have also not demonstrated that no reasonable officer would think that Rattray's rights under the Fourth Amendment had been violated by Officer Cadavid's conduct.

As discussed above, there is evidence that Officer Trigueno threatened Rattray with arrest at the outset of the encounter; that Officer Cadavid threatened to "take down the door" of Rattray's apartment if Rattray did not open his apartment door; that Officer Cadavid forced his way into Rattray's apartment over Rattray's objection and without the presence of exigent circumstances; that the force Officer Cadavid used had a physical impact on Rattray; that Officer Cadavid interrogated Rattray for more than an hour inside Rattray's apartment and over Rattray's vociferous objection; that when Rattray asked whether he could leave, Officer Cadavid told him that he could not; and that Officer Cadavid intended to, and did in fact communicate to Rattray, that he could not leave the apartment.  Finally, the Court notes that Officer Trigueno remained outside the apartment throughout Officer Cadavid's encounter with Rattray, and did not participate in his interrogation of Rattray or direction to Rattray that he remain in the apartment.

For reasons discussed above, there was well settled law at the time of Officer Cadavid's conduct indicating both that the warrantless entry of Rattray's apartment was – absent exigent circumstances – unlawful, Kirk, 536 U.S. at 638; Payton, 445 U.S. at 586; Loria, 306 F.3d at 1283, and that under "the totality of the circumstances [here]," "a reasonable person would have believed that he was not free to leave."  Mendenhall, 446 U.S. 544; Allen, 813 F.3d at 78; Mara, 921 F.3d at 70; Simon, 893 F.3d at 99.

Accordingly, Defendants have not demonstrated that Officer Cadavid is entitled to summary judgment on qualified immunity grounds.

### 4. Failure to Intervene Claim Against Trigueno Based on Alleged Unlawful Arrest

Defendants contend that Plaintiff's failure to intervene claim against Officer Trigueno – which is premised on Officer Cadavid's alleged false arrest – should be dismissed for the same reasons that the false arrest claim against Cadavid should be dismissed.  (Def. Br. (Dkt.

No. 207) at 33)  Defendants also argue – as they did with respect to Rattray's failure to intervene claim against Officer Trigueno based on the alleged unlawful search – that "there were no circumstances warranting PO Trigueno's intervention and, as such, she is entitled to qualified immunity."  Id.  Judge Parker recommends that Trigueno be granted summary judgment on Rattray's failure to intervene claim, because she finds that Rattray was never under arrest.  (R&R (Dkt. No. 221) at 24)

Because this Court concludes that Defendants have not demonstrated as a matter of law that (1) an arrest did not occur; (2) any arrest that did occur was supported by probable cause and exigent circumstances; or (3) that Defendant Cadavid is entitled to qualified immunity, this Court must consider whether Rattray may proceed with his claim against Officer Trigueno for failure to intervene with respect to the alleged unlawful arrest.

Judge Parker's analysis with respect to Officer Trigueno's duty and opportunity to intervene with respect to the alleged unlawful search applies with equal force to Rattray's failure to intervene/false arrest claim against Officer Trigueno.  As discussed above, an "officer who 'observes . . . a constitutional violation . . . by a law enforcement official' is liable for failing to intervene and preventing the harm, provided there was 'a realistic opportunity' to do so."  (R&R (Dkt. No. 221) at 19-20 (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994))  Here, Officer Trigueno was present at the door of Rattray's apartment throughout Officer Cadavid's more than hour-long encounter with Rattray inside Rattray's apartment.  (Id.)  Accordingly, a reasonable jury could find that "Trigueno could have intervened" to prevent the alleged false arrest of Rattray.  (Id. at 20 (citing Figueroa v. Mazza, 825 F.3d 89, 108 (2d Cir. 2016) (finding that although an unlawful action lasted "less than twenty seconds," the district court erred in concluding that the defendants did not have sufficient time to intervene))  Moreover, Officer

Trigueno has not shown as a matter of law that she is entitled to qualified immunity for the same reasons that Officer Cadavid has not shown as a matter of law that he is entitled to qualified immunity.

## **CONCLUSION**

Judge Parker's R&R (Dkt. No. 221) is adopted in part, as set forth above. Defendants' motion for summary judgment is (1) denied as to Plaintiff Rattray's claim against Officer Cadavid for unlawful search; (2) granted as to Rattray's claim against Officer Trigueno for unlawful search; (3) denied as to Rattray's claim against Officer Trigueno for failure to intervene in Officer Cadavid's alleged unlawful search; and (4) denied as to Rattray's claims against Officer Cadavid for false arrest and against Officer Trigueno for failure to intervene with respect to Officer Cadavid's alleged false arrest.

This case will proceed to trial on **May 15, 2023**, **at 9:30 a.m.** in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York. The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pretrial order.  The joint pretrial order, motions in limine, voir dire requests, and requests to

charge are due on April 17, 2023.  Responsive papers, if any, are due on April 24, 2023.  There

will be a final pretrial conference on **May 12, 2023, at 10:00 a.m**. in Courtroom 705.

The Clerk of Court is directed to terminate the motion (Dkt. No. 206), and to mail

a copy of this order to <u>pro</u> <u>se</u> Plaintiff.

Dated: New York, New York
       March 30, 2023

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge