N911RAT1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  WENTWORTH RATTRAY,

4              Plaintiff,

5         v.                              17 Civ. 8560 (PGG)

6  POLICE OFFICER JOSE CADAVID
   (Badge No. 9085) and POLICE
7  OFFICER ALYSSA TRIGUENO,

8              Defendants.               Jury Trial
   ------------------------------x
9                                        New York, N.Y.
                                         September 1, 2023
10                                       9:40 a.m.

11 Before:

12                    HON. PAUL G. GARDEPHE,

13                                       District Judge

14                       APPEARANCES

15 DUANE MORRIS, LLP
        Attorneys for Plaintiff
16 BY:  MELISSA S. GELLER, ESQ.
        YUDI KATIE WANG, ESQ.
17      ANGELA J. BENOIT, ESQ.

18 NEW YORK CITY LAW DEPARTMENT
   OFFICE OF THE CORPORATION COUNSEL
19      Attorneys for Defendants
   BY:  FELIX DE JESUS, ESQ., Assistant Corporation Counsel
20      HANNAH V. FADDIS, ESQ., Assistant Corporation Counsel

21

22

23

24

25

1            (in open court; jury not present)

2            THE COURT:  Please be seated.

3            My deputy is distributing a new draft of the verdict

4    sheet.  I have made some changes in response to defendants'

5    email from last night.

6            I also wanted to remind the parties that I want the

7    exhibits prepared, the documentary exhibits to be prepared to

8    send back into the jury room immediately once they begin

9    deliberations.  So please put together the exhibits that have

10   been received in evidence so that we're in a position to send

11   the admitted exhibits back into the jury room immediately once

12   they begin their deliberations.

13           Is there anything else we should discuss before I

14   bring out the jury?

15           MS. FADDIS:  Your Honor, for the defendants—I

16   apologize for not raising this last night—there is one minor

17   comment that we have on the verdict form as even in the final

18   draft, which is, with regard to the question of the amount

19   of—that should be awarded as punitive damages, we would

20   request—and this is based on juror confusion that we've

21   experienced in prior trials—that it read as "punitive damages

22   to the plaintiff."  Because what we've heard from jurors in

23   past trials, sometimes they believe that punitive damages don't

24   go directly to the plaintiff; they believe it goes to some

25   public fund or something like that.  Just to avoid any

N911RAT1                    Summation – Ms. Faddis

1    confusion about that.

2              THE COURT:  Well, it says he is entitled to an award

3    of punitive damages.

4              MS. FADDIS:  I understand, your Honor.

5              THE COURT:  All right.  So you want me to add to the

6    statement, "If yes, state the amount that should be awarded as

7    punitive damages to plaintiff"?  That's what you want?

8              MS. FADDIS:  That's it, your Honor, and I apologize

9    again for not raising it last night.

10             THE COURT:  Okay.  Any objection to that change?

11             MS. GELLER:  No, your Honor.

12             THE COURT:  All right.  It will be made.

13             MS. FADDIS:  Thank you.

14             THE COURT:  So you can throw those versions out.

15   We'll do another version, distribute it.

16             Please bring in the jury.

17             THE DEPUTY CLERK:  Yes, your Honor.

18             (Jury present)

19             THE COURT:  Please be seated.

20             Good morning, ladies and gentlemen.

21             THE JURORS:  Good morning.

22             THE COURT:  We will now hear closing argument on

23   behalf of defendants.

24             Please proceed.

25             MS. FADDIS:  Thank you, your Honor.

1          Good morning.  This case is about these two officers

2     doing what every parent hopes the police would do if they

3     couldn't find their child—look for her.  Even the plaintiff

4     agrees with that.  We could end there, and this trial has

5     already gone on at least 20 times as long as the incident the

6     plaintiff is suing over, so I'm going to try to be as brief as

7     possible.

8          In a little while you're going to get a verdict form,

9     with a series of questions that you need to answer to decide

10    this case.  The first four questions are going to ask you

11    whether the plaintiff has proven—because it's his burden—that

12    these two officers violated his constitutional rights.  The

13    answers to those questions should be no.  And I want to talk

14    about how you get there.

15         The plaintiff's claims all arise under the Fourth

16    Amendment.  The Fourth Amendment guarantees the right to be

17    free from unreasonable search and seizure.  Now Judge Gardephe

18    is going explain the law to you, but the word you need to bear

19    in mind is "reasonable"—were these officers' actions

20    reasonable; not the best or only choice, just were they

21    reasonable.  They were.  Again, it's so obvious.  Even the

22    plaintiff has said, these officers did exactly what he would

23    want officers to do if his child were missing, which is exactly

24    the situation defendants were in.

25         So let's walk through this.

1          The defendants get a 911 call.  Female caller,

2    hysterical crying, says the father of her child won't give the

3    child back.  That is the complaint, that a child is not where

4    she's supposed to be.  I'll remind you that this is 7 p.m. on a

5    Saturday night in November, so it's already dark out.

6          They go to the location.  Ms. Sandy is out front

7    crying, says her daughter's father won't give her back.  She

8    doesn't have any paperwork for custody or visitation.  Officer

9    Cadavid says, *We can give you a report to take to family court,*

10   *but there's not much more we can do.*  And then Ms. Sandy gets

11   even more upset, says her daughter's life is in danger, says

12   the plaintiff is a drug user, that he has drug dealers in the

13   apartment.  Now those are allegations about a child's welfare,

14   so we've graduated past custody or visitation.  So now Officer

15   Cadavid feels like he has to look into it.  And that's

16   reasonable.

17         I want to stop here to talk about Ms. Sandy for a

18   moment.  You saw how upset she was, talking about this incident

19   seven years later, so imagine how upset she was on the day of

20   the incident.  You also heard how hurt she was, how mad she was

21   for all the untrue things she'd been hearing in family court.

22   You know from his own email that the plaintiff was claiming she

23   was incompetent, an emotionally disturbed person, had special

24   needs.  It's not hard to imagine that she was mad or hurt

25   enough to tell Officer Cadavid that the plaintiff used drugs

1    and had drug dealers over, even if it weren't true, maybe to

2    get back at him or just to get these officers' attention.  You

3    heard her say the only thing she wanted was for her daughter to

4    know she showed up for her.  And it worked.  She got these

5    officers up to the apartment.  And now she denies making those

6    statements.  And you heard her give the same canned answer at

7    least three times——essentially, "I would never say he used

8    drugs, it's not true, he never even drank in front of me"; "I

9    would never say he used drugs, it's not true, he never even

10   drank in front of me"; "I would never say he used drugs, it's

11   not true, he never even drank in front of me."  Three times she

12   used the exact same words, because it's a story that she's

13   rehearsed for her daughter, because if she admitted back then

14   or at her deposition that she'd made these allegations or even

15   made them up, he would have used it against her in family

16   court.  And he would still use it against her today.  He has

17   all of the power in that dynamic.  He would use it to put even

18   more distance between her and her daughter.  And you know that

19   because she told you.  She told you she only testified at a

20   deposition in this case because she was afraid.  She was afraid

21   if she didn't, he could make it even harder for her to see her

22   daughter.  So even if she did lie to Officer Cadavid——and he

23   would have no reason to know that she was lying, but you can

24   understand why she might.  Because she needed Officer Cadavid's

25   help in getting access to her daughter.  The plaintiff

certainly wasn't helping her.  And you can also understand why
she's still lying about lying——to keep him from retaliating
against her today.

        I want to explain one more thing here, which is, when
you're deciding whether these officers' actions were
reasonable, you can only consider what they knew at the time.
So what do they know when they go to plaintiff's apartment on
November 5, 2016?  They know mom says her daughter's life is in
danger; she's raised safety concerns about drug use in the
apartment; and she is very upset that her daughter is not being
returned to her.

        So they knock, announce themselves as police.  And the
defendants remember some of the details that followed
differently, but there's a lot they both remember very clearly,
and the first is that the plaintiff was yelling and cursing at
them before anyone set foot in his apartment.  And he certainly
wasn't answering their questions.

        So at some point he opens the door a crack.  Standing
behind it, he's still aggressive, uncooperative, not answering
their questions——questions about the welfare of his child.  And
as Officer Cadavid put it, that's surprising, to say the least,
because most parents would want the police to know that their
children were fine.  But no, the plaintiff stands behind his
partially open door, yelling at them, cursing at them, refusing
to tell them anything about his daughter.  And they have made

1    clear they are there to check on Autumn's welfare.  We know

2    that because Officer Cadavid told you, he told the plaintiff

3    that's why they were there, and because the plaintiff admitted

4    it in an email he wrote the next day, and because he then said

5    it to IAB again several weeks later.

6          So having told the plaintiff that they are there to

7    check on his daughter's welfare, the fact that the plaintiff is

8    uncooperative, aggressive, evasive, it's not just surprising,

9    it's very concerning for Autumn's well-being.

10          And I want to focus on this detail just a little bit

11    more.  So back in 2016, whenever the plaintiff described this

12    incident, he made clear that the officers told him they were

13    there to check on Autumn's welfare.  Just to make sure, I want

14    to show you the email where he wrote that the next day.

15          Can you bring up Exhibit 5, Mr. De Jesus.

16          Directing your attention to the fifth paragraph down.

17    "I asked her if she had a piece of paper saying that the child

18    should be with anyone else.  The other officer said that they

19    didn't need one because they are checking on the welfare of a

20    10-year-old child.  I said the child wasn't there.  I stopped

21    talking to the officers and asked to speak to their supervisor

22    and went to close the door."  That's it.  That's his version of

23    what happened, the day after.

24          He says it again a month later when he talks to IAB.

25          Could we have K1, please.

1          (Audio played)

2          MS. FADDIS:  But now that we're here, and he's asking

3     you for money, he won't admit the defendants told him they were

4     there to check on Autumn's well-being.  That detail has

5     disappeared from this story.  And why is that important?  This

6     detail about whether he was told that they were there to check

7     on Autumn's welfare, why is that important?  Because he knows

8     that's the concern that gives Officer Cadavid a reason to enter

9     the apartment, especially because he refused to cooperate with

10    them, which provided more cause for concern for Autumn's

11    well-being, more reason to enter the apartment.  So he has to

12    deny it.

13         So back at the door of the apartment, the defendants

14    are still asking the plaintiff if his daughter can come to the

15    door, if they can see her, among other things.  Even if you

16    believe the plaintiff that he told them then that she wasn't

17    home——and there's no reason to believe anything he says——he

18    still was not doing anything to help them figure out where she

19    was, if she was okay, and if she's where she's supposed to be

20    at all.  Just saying she's not here doesn't resolve the

21    situation.  She is for all intents and purposes missing.  And

22    in the middle of this back-and-forth, the plaintiff starts to

23    close the door.

24         Police officers are often confronted with split-second

25    decisions.  And that's the situation that Officer Cadavid found

1    himself in in that moment.  So here's what's going through

2    Officer Cadavid's head in the split second that door starts to

3    close.  They are concerned for this child's safety; the

4    plaintiff is acting very erratically; if this door closes, I

5    may never get it open again; and there may be a child in this

6    apartment.  So he makes a split-second decision.  Most of us,

7    maybe apart from the doctors, will never have to make this kind

8    of choice.  Police officers are asked to make them all the

9    time.  So Officer Cadavid makes the choice to push the door

10   back and step into the apartment.  And that is reasonable.  And

11   when he steps in, he asks the plaintiff again, "Where is your

12   daughter?"  And still doesn't get any information.  So he does

13   a quick sweep of the apartment.  According to the plaintiff

14   even, it's less than one minute.  He looks in places a child

15   could be—bedrooms, closets, the bathroom.  He goes into the

16   child's bedroom.  There is no child in this apartment.

17        So now Officer Cadavid has even more cause to be

18   concerned because where is this kid?  To be clear, the

19   plaintiff is still not offering any information to Officer

20   Cadavid, which is obviously very concerning.  So at this point

21   Officer Cadavid is kind of out of options.  They radio for a

22   supervisor and they wait.  And to be clear, they're waiting

23   because they still don't know where plaintiff's daughter is,

24   and because the plaintiff has also now demanded to speak to a

25   supervisor, having refused to answer any of these officers'

1    questions.

2              You're going to hear that one of the plaintiff's

3    claims is that he was falsely arrested.  Now there's no dispute

4    that he was never actually formally arrested.  He was never

5    placed in handcuffs, taken to a precinct, none of that.  So the

6    first thing you have to decide on this claim is whether you

7    think there even was an arrest.  And Judge Gardephe will

8    explain the law on this to you.  And here are some things to

9    keep in mind when you get to this question: the plaintiff never

10   left his apartment; no one ever touched him, or restrained him

11   in any way; and it's about 45 minutes from the time that the

12   officers radio for the lieutenant to come until the time that

13   Officer Trigueno is downstairs filling out the domestic

14   incident report with Ms. Sandy.  So factoring in the time the

15   plaintiff must have spent talking to the lieutenant, doing the

16   math on all of that, he is in the apartment with Officer

17   Cadavid well under 45 minutes.

18             Officer Cadavid told him, he told you, he wasn't free

19   to go.  The plaintiff wasn't free to go, because they're

20   waiting for the lieutenant.  That's the lieutenant the

21   plaintiff requested to speak with.  Officer Cadavid didn't do

22   anything else to keep the plaintiff from leaving.

23             I want to step back here and ask you to reflect for a

24   moment on the fact that the plaintiff has brought a federal

25   civil rights lawsuit because he was in his own home for less

```
 1   than 45 minutes while these officers were investigating the
 2   welfare of his daughter.  And when you think about that, I want
 3   you to think about the fact that he knew where his daughter was
 4   the entire time.  So if you decide that the plaintiff was
 5   technically arrested, you still have to consider whether there
 6   was probable cause to make an arrest.  That means did the
 7   defendants have a reason to believe the plaintiff had committed
 8   or was about to commit a crime.  And to be clear, by the time
 9   Officer Cadavid was entering the apartment, the defendants had
10   probable cause to arrest him, and that's for obstructing
11   governmental administration, which essentially is impeding
12   their investigation.  He did that through his words, his
13   actions, refusing to provide any information, yelling and
14   cursing at the officers, trying to close the door on them.
15   That's impeding their investigation.  They didn't arrest him,
16   though.  And they never intended to.  They were just trying to
17   find his daughter.
18        So after he enters, he realizes there's no child in
19   the apartment, Officer Cadavid positions himself near the door
20   inside the apartment where he can see the plaintiff, but he
21   leaves the door open.  He told you that's so he can leave
22   quickly if the plaintiff's erratic behavior escalates.  You
23   heard from Officer Cadavid and you heard from the plaintiff he
24   was in the kitchen, where all the knives are.  In a domestic
25   incident, which can often be volatile, as you heard, that's
```

1    something Officer Cadavid knows to watch out for.  And what's

2    more, you know that his concern was reasonable because the

3    plaintiff in fact did sit there at his kitchen counter

4    contemplating whether or not he could attack this officer with

5    a knife.

6          When the lieutenant arrives, the plaintiff produces

7    for the first time emails and paperwork relating to the custody

8    and visitation of his daughter.  The lieutenant reviews those

9    materials, makes a call to verify that the child is where he

10   says she is, tells Officer Cadavid he's sending another car to

11   confirm, and then told the officers they're done; reminds them

12   to complete the mandatory domestic incident report.

13         I'll note also, you heard from Officer Cadavid, one of

14   the first things the lieutenant said to the plaintiff was:  Why

15   aren't you cooperating with my officers?  So to be clear, this

16   incident ended when the plaintiff finally decided to explain

17   this situation to someone, meaning if he had done that from the

18   beginning with Officer Cadavid or Officer Trigueno, none of

19   this would have happened.  For that matter, if the plaintiff

20   had just tried to explain the situation to Ms. Sandy, maybe

21   there never would have been a 911 call.

22         So what the officers are telling you makes sense.  The

23   plaintiff's story, on the other hand, doesn't, and more

24   importantly, he's just not credible.

25         So I want to talk about the plaintiff's credibility.

1    It hasn't been a long trial, and most of it was spent listening

2    to the plaintiff answer questions he wished he'd been asked.

3    It was very clear that the plaintiff, even here, thinks he gets

4    to decide what's relevant for you to know, just like he decided

5    what was relevant for Ms. Sandy to know, just like he decided

6    what was relevant for these officers to know, because he has to

7    be in control of the narrative, and when he's caught saying

8    something inconsistent or unhelpful, he insists he's right, or

9    sometimes just changes his testimony, sometimes even right in

10   front of you.

11           So I want to start with the big one, which is that

12   when he testified on direct, repeatedly he claims he did

13   everything he could to convince the officers that his daughter

14   belonged with him.  He even testified he didn't have any

15   documents to show them.  But you know that in fact he had six

16   prior court orders he could have shown these officers.  He also

17   had an email from the family court on his phone.  That's the

18   same phone he's holding in his hand while he's writing an email

19   to the family court while Officer Cadavid is standing there

20   waiting for his supervisor to arrive.  And when he's confronted

21   about this, he starts arguing about the meaning of the word

22   "documents," which was his word.  He said I didn't have any

23   documents.  And he's confronted with the fact that in fact he

24   did have documents, a stack of paperwork.  He argues over what

25   that means.  Then he argued about whether he ever showed any

1    documents to the lieutenant, arguing that he only showed him

2    the email, even though he wrote, again, in Exhibit 5, which we

3    just looked at, the next day, "I showed him emails and

4    paperwork." And why does this tiny detail matter? Because

5    they know that not showing the email is one thing, maybe he

6    just didn't think of it, even though he was looking at it, but

7    not pulling out a stack of court orders when these officers are

8    trying to figure out where his child is supposed to be? That's

9    pretty hard to explain. That's not reasonable. And it

10   supports what these officers are saying, which is that he

11   refused to cooperate with them in any way.

12           Here's another example. The plaintiff told you in his

13   direct testimony that he contemplated helping Ms. Sandy. He

14   really wanted to. He really wanted, if he could, to help her

15   have an unscheduled visit with her daughter, he would have if

16   he could, but he decided not to, because he didn't know if he

17   could without court approval. That's what he told you. But

18   you know he gave a deposition back in 2021, and back then he

19   said flat out he didn't give Ms. Sandy any information about

20   Autumn because that information wasn't "relevant" to her.

21   That's the mother of his child. It's not relevant to her where

22   her daughter is. He went on to say he wasn't going to give her

23   access to his child. So it's not surprising he came up with a

24   different explanation here. And the truth is, he never

25   intended to give her any information. Why does that matter?

N911RAT1                    Summation - Ms. Faddis

1    Because it's the same way he refused to give these officers any

2    information because he didn't think it was relevant for them

3    either.  He gets to decide what's relevant for everybody—his

4    child's mother, the NYPD, even you.

5         Here's another one.  The plaintiff claims he had to

6    call 911 to get a supervisor to come to the apartment, because

7    he was scared.  I'll also remind you that he didn't actually

8    say that.  His attorney had to prompt him:  "Were you scared?"

9    And then he said yes.  But that's why he called 911.  The

10   problem with that is that the 911 records show that didn't

11   happen.  He didn't call until more than a minute after the

12   officers requested a supervisor.  And you know he knew they'd

13   already made that request because he told you very clearly he

14   could hear Officer Trigueno on her radio.

15        Why does this all matter?  Because he's trying to

16   change the narrative.  He's trying to convince you that Officer

17   Cadavid was out of control, needed to be reined in, but you

18   know that's not true because the defendants were the ones who

19   requested a supervisor.  And when the plaintiff did call 911

20   over a minute later, Officer Cadavid volunteered his badge

21   number.  But this is how he wants to convince you that he was

22   scared.  I'll remind you, when you're thinking about this, that

23   the plaintiff was yelling and cursing at Officer Cadavid, by

24   his own admission, threatening his family.  He said, *What would*

25   *you do if I came to your house and came after your family?*

1  Writing emails to family court to make some sort of record to

2  use against Ms. Sandy.  That's not a person who's scared.

3         Now yesterday plaintiff's counsel cross-examined

4  Officer Cadavid about whether or not he ever threatened to call

5  Child Protective Services.  He didn't.  But they did that to

6  distract from the fact that the plaintiff himself changed his

7  story, I've lost track of how many times, about whether or not

8  that actually happened.  He said here, no one ever threatened

9  to take his daughter, then he was confronted with his own email

10  to her lawyer in which he claimed that Officer Cadavid told him

11  he needed the plaintiff's ID to call Child Protective Services.

12  Then he was confronted with his deposition testimony in which

13  he said only that Officer Cadavid said he needed the ID so he

14  would know who he was talking to.  And in fact the plaintiff

15  even recounted in his deposition his own snarky response to

16  Officer Cadavid, which was essentially, *Don't you know whose*

17  *house you just broke into?*  No mention of Child Protective

18  Services.

19         Then later he says, well, he did mention CPS, but it

20  was sometime later in the conversation.  But even his own email

21  to his daughter's lawyer contradicts that.

22         And why is any of this important?  It's because first,

23  you know the plaintiff is embellishing what happened here from

24  day one.  The day after this happened, he's making allegations

25  these officers threatened him with things that never happened.

N911RAT1                      Summation - Ms. Faddis

1     More importantly, though, he's willing to say whatever he needs

2     in this courtroom to get what he wants.

3            And when you're thinking about the plaintiff's

4     credibility, I want you to also think about the emotional

5     injuries the plaintiff is claiming.  Now start with the

6     difference between his performance on Tuesday and his demeanor

7     when I was asking him questions.  That is, when his own

8     attorney was asking him questions, he could barely answer the

9     question "Who is Autumn?" without crying, but had no trouble

10    talking about this incident, even arguing about this incident,

11    when we were asking the questions.

12           And if you need a little more to understand that this

13    incident has not affected the plaintiff in the way he claims,

14    you heard his demeanor when he spoke to IAB about a month

15    afterward.  He's laughing, joking.  That is not a person who

16    has trouble being around police officers, and it is certainly

17    not a person who can't talk about this incident without crying.

18           I'll also remind you on this point that the plaintiff

19    spent a lot of time talking about how he sought medical

20    treatment for these emotional injuries.  And all you have

21    regarding that treatment, by the way, is the plaintiff's word,

22    for whatever that's worth.  First he claims he started seeking

23    mental health treatment in this case about a year after the

24    incident, then it was two——a year and a half, then it was two

25    summers, but really——and this didn't come out until

1    cross-examination——he didn't go see anyone for his supposed

2    mental health issues until March of 2019, two and a half years

3    later.  So why is he trying to move that date?  Because that

4    date is after he started this lawsuit.  And that doesn't look

5    great.

6          Now there's been a lot of talking in this trial about

7    the plaintiff, Ms. Sandy, their history, their custody fight,

8    and all of that is important, for a few reasons.  That history

9    helps you assess both of their credibility, helps you

10   understand their motivations, why they might say the things

11   they're saying now.  But in order to actually decide the claims

12   in this case, you can only consider what these officers knew at

13   the time of the incident.  And I'll drop a note here that if

14   that's not what plaintiff's counsel is focused on in their

15   summation, it's a distraction.

16         I'm going to talk about some other things I expect you

17   might hear from plaintiff's counsel.  I expect you might hear

18   that these officers could or should have made different

19   choices.  Maybe they should have let the door close and then

20   called the supervisor, taking the risk that the plaintiff, who

21   was erratic, aggressive, hostile, wouldn't hurt his daughter,

22   whose whereabouts they didn't know.  I don't really know what

23   they think these officers should have done differently because

24   even their own client says he thinks they did the right thing,

25   but at the end of the day, it doesn't matter.  Sitting here in

1    the peace and quiet of this courtroom, with all the benefit of

2    hindsight, the benefit of knowing that in the end Autumn was

3    fine, it doesn't matter if from this vantage point you can see

4    different or even better choices that could have been made,

5    because the Constitution doesn't demand perfection, or

6    omniscience.  All it demands is that these officers acted

7    reasonably.  So if they start making those kind of arguments,

8    it's another distraction, because if you're focused on the

9    right questions, the answers are clear.  And if they start

10   talking about what the officers could have done, might have

11   done differently, arguing, like they did with Officer Cadavid

12   yesterday, that he needed more information, I want you to

13   remember that the plaintiff had all of that information.

14   That's what Officer Cadavid was asking for.  The plaintiff knew

15   where Autumn was.  He had paperwork, email, showing that

16   Ms. Sandy was the parent with visitation, that he was the one

17   who had custody of his daughter, and he chose to withhold that

18   information.  Because again, in his words, it wasn't relevant

19   to them.

20          So if we're thinking about "what ifs," think, what if

21   the plaintiff had shared that information with the officers

22   when they first arrived at the door to check on the welfare of

23   his daughter?  And again, better yet, what if he had just told

24   Ms. Sandy where her daughter was, maybe there never would have

25   been a 911 call.

1          Now they might argue that Officer Cadavid said

2     yesterday that the situation wasn't "imminent." They used the

3     word, I lost track how many times. And this is a lawyer's

4     trick. Because "imminent" is a word the law uses in this

5     context, but maybe that's not the exact word Officer Cadavid

6     would use. He doesn't have to, because he described what

7     happened to you, the facts he was aware of, the circumstances

8     he was in. And he told you why he had serious concerns for

9     this child's safety, and why the situation was urgent.

10         Now I expect you may get a PowerPoint in plaintiff's

11    counsel's summation, and I just want to offer a word of warning

12    here, that if it starts with a slide that says Wentworth

13    Rattray, the plaintiff's full name, v. Officers Cadavid and

14    Trigueno, that's another trick. And why do I say that? It's

15    because they want you to see him as a person but not them.

16         If they get up here and start embellishing his

17    testimony, arguing about issues that no witness testified

18    about——maybe talking about how some people are distrustful of

19    the police, which they questioned Officer Cadavid about

20    yesterday, I want you to remember that the plaintiff himself

21    never used that word; he never said that about himself. So

22    that's another distraction, another trick.

23         And if they start talking about the time Officer

24    Cadavid was disciplined in a completely unrelated employment

25    matter a year after this incident, another distraction, another

N911RAT1                    Summation - Ms. Wang

1    trick.

2              I'm going to sit down in a minute, and I won't have

3    another chance to speak with you.  And I apologize I may not

4    have been as brief as I would have liked, but for—as absurd as

5    this case may seem to some or all of you, it is a serious

6    matter for these police officers.  This man has dragged them

7    into federal court, alleged they violated his constitutional

8    rights by doing their jobs.  So I am sorry if I've taken more

9    of your time than I intended, but it is what my clients

10   deserve.

11             Now this case is very simple.  Did these officers act

12   reasonably?  Of course they did.  And I've said it many times,

13   and I'm going to say it again.  Even the plaintiff agrees with

14   that.

15             And I'd like—could we have K2, please.

16             (Audio played)

17             MS. FADDIS:  We trust you will return the only verdict

18   in this case consistent with the evidence, and that is in favor

19   of the defendants.  Thank you.

20             THE COURT:  All right.  We'll now hear the plaintiff's

21   closing argument.

22             MS. GELLER:  Yes.  Thank you, your Honor.

23             MS. WANG:  Members of the jury, Officer Cadavid did

24   not believe there was imminent danger to anyone inside

25   Mr. Rattray's apartment on November 5, 2016.  That is what

1  Officer Cadavid told you yesterday.  Three days ago you were

2  informed that Mr. Rattray had brought four claims against

3  Officer Cadavid.  He brought a claim for an unreasonable search

4  of his home, in violation of his Fourth Amendment rights.  And

5  Mr. Rattray also brought a claim against Officer Trigueno for

6  failing to intervene while this unreasonable search was taking

7  place.

8          As Judge Gardephe will instruct you, under the Fourth

9  Amendment, a police officer may not enter or search someone's

10 home absent a warrant, consent, or exigent circumstances.

11 Judge Gardephe will instruct that exigent circumstances exist

12 when a police officer reasonably believes that entry or a

13 search is necessary in order to render emergency assistance to

14 an injured person or to protect someone from imminent danger.

15 Officer Cadavid never had a warrant; Officer Cadavid certainly

16 never had consent; and Officer Cadavid told you himself he did

17 not have exigent circumstances that justified his entry and

18 search of Mr. Rattray's home.

19         Mr. Rattray's remaining two claims are his claims

20 against Officer Cadavid for false arrest in violation of his

21 Fourth Amendment rights, and a final claim against Officer

22 Trigueno for failing to intervene with respect to the false

23 arrest.  Judge Gardephe will instruct you that this claim also

24 depends on whether or not exigent circumstances existed to

25 enter Mr. Rattray's home, and that Officer Cadavid had probable

1    cause to arrest.

2         Members of the jury, this one's not all that hard.

3    The one thing that all parties agree on is that Mr. Rattray was

4    not allowed to leave his apartment.  Now let's take a step

5    back.  What happened on November 5, 2016?  It was a long day.

6    You heard Mr. Rattray testify that he's a single dad, and he

7    just spent the whole day with Autumn, his 10-year-old daughter.

8    He took her to dance class, and then he took her to a playdate.

9    And later that afternoon, when Autumn asked to join her friend

10   to watch a performance, Mr. Rattray agreed.  And in that time

11   he took the opportunity to take a breather and go home.

12        But when he arrived home, he was met with Autumn's

13   mother.  Ms. Sandy was there to pick up Autumn.  But the

14   attorney for the family court had just recently indicated that

15   a new custody order would be in the mail and that November 5,

16   2016, was not a listed visitation date for Ms. Sandy.  So he

17   tells her that.  But even so, Autumn was not home.  She tells

18   her—so he tells her that Autumn's not home.  But as you've

19   heard, at this stage in their relationship, Mr. Rattray and

20   Ms. Sandy are engaged in a contentious family court proceeding,

21   and not wanting to upset Ms. Sandy further, Mr. Rattray advised

22   that she speak with her attorney and the family court and then

23   he went back upstairs into his home.

24        Mr. Rattray then sits at his kitchen counter and

25   begins drafting an email to the attorneys for the family court,

1    including Ms. Sandy's lawyer.  It's quiet.  Mr. Rattray's

2    alone.  The next thing he hears is a knock at the door.  NYPD.

3    Mr. Rattray testified that he attempted to speak with the

4    officers through the door, because he heard them just fine, but

5    they demanded that he open the door so they could see.  Officer

6    Cadavid threatened, *Open the door or do you want us to take the*

7    *door down?*  And what does Mr. Rattray do?  He complies.  He

8    opens the door.  Whether it was a crack, whether it was

9    6 inches, or whether it was 2½ feet wide, the door is opened.

10   There's no cries for help, there's no sound of anyone else in

11   the apartment, there's no sound of children.  You heard

12   Mr. Rattray testify that it was then for the first time that

13   officers Cadavid and Trigueno demand that he bring Autumn to

14   the door.  And in response Mr. Rattray tells them that his

15   daughter is not home.  But Officer Trigueno says, *If you don't*

16   *have a piece of paper saying she's supposed to be with you,*

17   *you're going to spend the night downtown.*  And that is what the

18   defense argues would inspire Mr. Rattray's cooperation?  They

19   first threaten to take down his door and then they threaten to

20   take him to jail?

21       You heard both officers Cadavid and Trigueno use the

22   word "negotiate," that they "negotiated" with Mr. Rattray on

23   November 5, 2016.  Officer Cadavid in particular testified at

24   trial that he had a whole back-and-forth negotiation with

25   Mr. Rattray.  This is their definition of negotiation?

1    Threatening to take down his door?  Threatening to take him

2    downtown?  The police can negotiate, but as Judge Gardephe will

3    instruct, the police cannot take away someone's constitutional

4    right and cross the threshold into someone's home unless there

5    are exigent circumstances.

6          At that point Mr. Rattray just said he's done.  He

7    told the officers that unless they get their supervisor, he's

8    done speaking with them, and tries to close the door.  But

9    Officer Cadavid had planned ahead.  Right when Mr. Rattray

10   opened the door, he placed his foot into the door, to prevent

11   the door from closing.  So then Officer Cadavid pushes his way

12   into the apartment.  He walked around, he conducted a search.

13   Officer Cadavid searched every room.  He searched Autumn's

14   room, he searched Autumn's closet, he searched under the bed,

15   he searched Mr. Rattray's room, in the bathroom, a search

16   anywhere between one and 15 minutes.  But even one minute of an

17   illegal search is too many minutes.

18         When he finishes that search, Officer Cadavid

19   testified that it was clear that Mr. Rattray's daughter was not

20   in that home.  And despite testifying that he had no reason to

21   believe that the girl was there, he remained in Mr. Rattray's

22   apartment.  And at that point, even if there was a reasonable

23   concern for Autumn's safety, there certainly were no safety

24   concerns in that home.

25         Defendants argue that they had exigent circumstances

1    that justified the unlawful entry and search of Mr. Rattray's

2    home when considering the totality of the circumstances.  While

3    Officer Cadavid explicitly stated in his testimony that he did

4    not believe there to be imminent danger, let's walk through

5    each one of defendants' arguments.

6           The events started based on a 911 call from Ms. Sandy.

7    What happened that night was that a mother was confused.

8    Ms. Sandy was confused because she thought it was her weekend

9    to see Autumn.  But we've all seen the family court order.

10   Ms. Sandy did not have a right to pick up Autumn on November 5,

11   2016.  And when Mr. Rattray told Ms. Sandy that Autumn was not

12   home, Ms. Sandy got upset.  Ms. Sandy was crying.  Ms. Sandy

13   was upset and crying not because she was concerned for her

14   daughter's safety but because she was worried that Autumn would

15   think that her mother wasn't going to show up.  She didn't want

16   her daughter to think that she didn't care, and she was upset

17   and crying because they just had a family court hearing and she

18   was not very happy about that outcome.  Ms. Sandy testified

19   that——vehemently testified that she was not concerned for

20   Autumn's safety that day.  She was never concerned for Autumn's

21   safety, "because, to be honest with you, he's a great dad.  If

22   I could say anything else, I would be lying, because Gary has

23   Autumn's best interests at heart."

24          Ms. Sandy testified that after she called 911, she

25   told the dispatcher that she had visitation rights that day and

1   that she didn't have her.

2          Members of the jury, we all also took a look at the

3   ICAD dispatch report from November 5, 2016.  It stated that

4   there was a female caller and that this was a custodial

5   dispute, and that the mother was crying because the father was

6   refusing to give the child back.  But the dispatch report was

7   also clear.  There was no weapons, there was no injuries, there

8   was no mention of concern or harm to Autumn's well-being.  This

9   was the——this was a custody dispute.

10         And you just heard defendants' counsel use the word

11  "missing."  There was no reason to assume that the child was

12  missing.  That was not in the report and that was not what

13  Ms. Sandy said.  When officers Cadavid and Trigueno arrived on

14  the scene, Ms. Sandy told both officers that Mr. Rattray had

15  told her that Autumn was not home, but that it was her turn,

16  and that was the reason why she called 911.  Now Officer

17  Cadavid also testified about the conversation, and he said that

18  Ms. Sandy told him that night on November 5, 2016, that

19  Mr. Rattray did drugs and that Mr. Rattray occasionally had

20  drug dealers in the apartment.  But you heard Ms. Sandy.

21  Ms. Sandy sincerely testified that that would be the farthest

22  from the truth, that he's never done that, and that she would

23  never say anything like that to anyone about him because that's

24  not the truth.  And because if it were true, then she wouldn't

25  want Autumn to stay with him.  We all heard that Ms. Sandy did

1    not want to be here.  We all saw that she had a difficult time

2    testifying on Tuesday.  But you saw her sit here and testify

3    vehemently over and over again that she never told anyone that

4    Gary did drugs and she never told anyone that Gary had drug

5    dealers in the apartment.  Drugs were never mentioned in the

6    ICAD dispatch report.  Officer Trigueno also testified that

7    Officer Cadavid, her senior partner, whom she trusted would

8    provide her with information, never testified of hearing about

9    drugs or drug dealers in the apartment.  Officer Trigueno, who

10   also spoke with Ms. Sandy that day, never heard Ms. Sandy say

11   that Mr. Rattray did drugs or had drug dealers in the

12   apartment.

13          Now we also looked at the domestic incident report.

14   That incident report was filled out by Officer Trigueno, and

15   she filled that out with the help of Ms. Sandy.  Officer

16   Trigueno responded to the possible drug and alcohol inquiry on

17   the form with "No."  Defense counsel suggests that Ms. Sandy

18   must be lying because for some reason this statement would harm

19   her custody arrangement with Mr. Rattray.  But Autumn is all

20   grown up now.  Autumn is attending the Naval Academy.

21   Ms. Sandy has no reason to worry about her custody.  There's no

22   reason for her to lie.

23          But members of the jury, use your logic here.  Who's

24   got something on the line?  And this is not the only time that

25   Officer Cadavid's testimony has been inconsistent with that of

1    the other witnesses and the evidence.  As you heard, Officer

2    Cadavid testified repeatedly that Ms. Sandy told him that she

3    was concerned for the safety of Autumn, but Ms. Sandy said that

4    never happened.  She would never say that.  And she said that

5    over and over again.  Officer Cadavid also said that

6    Mr. Rattray never informed him that his daughter was at a

7    friend's house prior to Lieutenant Khosh's arrival at the

8    apartment.  But Officer Trigueno's testimony directly

9    contradicts that.  Officer Trigueno testified that Mr. Rattray

10   told defendants that Autumn was at a friend's house just as

11   Officer Cadavid stepped into Mr. Rattray's apartment.

12          But members of the jury, Officer Cadavid can't even

13   get his own stories straight.  On Wednesday afternoon you heard

14   him testify about his own statement that Mr. Rattray——when

15   Mr. Rattray did not open the door, that it would be taken down.

16   Officer Cadavid had this whole story about how he personally

17   could not take down that door.  Because he was asked, "Could

18   you personally in that instance have broken the door down?"

19   And he responded, "No."  And he had this whole story about how

20   he would have to request a supervisor and then that supervisor

21   would have to request another supervisor, who would then have

22   to go to the emergency service unit, who would then presumably

23   come and take down the door.

24          But then Officer Cadavid said the exact opposite thing

25   the very next morning.  He testified that in this instance he

N911RAT1                    Summation - Ms. Wang

1    did have authority to take the door down.  And not only that,

2    but when asked about the testimony from the day before, he said

3    he doesn't remember.  Officer Cadavid could not remember his

4    testimony from the day before, not even a full 24 hours ago.

5          Members of the jury, think about how many times

6    Officer Cadavid said "I don't recall" or "I don't remember" in

7    this trial.  When the officers arrived at Mr. Rattray's door,

8    Officer Cadavid can recall almost nothing of what Mr. Rattray

9    says.  He recalls the questions that he asked Mr. Rattray, but

10   almost none of Mr. Rattray's responses.  It seems like Officer

11   Cadavid can only remember the parts of that night that are

12   helpful for his case.

13         And when you look at the parts of Officer Cadavid's

14   story that are corroborated, you're left with two things.  All

15   you have is Ms. Sandy's appearance on the scene and

16   Mr. Rattray's demeanor in his apartment.  Officers Cadavid and

17   Trigueno testified that Ms. Sandy's appearance and demeanor at

18   the scene caused them concern for Autumn's safety.  Ms. Sandy

19   was crying, Ms. Sandy was upset.  But Officer Cadavid, a police

20   officer of 17 years, testified that in terms of custody

21   disputes, that often when he arrives on the scene, many of the

22   people are already upset, they're already heated.  And that's

23   what Officer Cadavid understood this to be from the dispatch

24   report, a custody dispute.  But he also knows and testified

25   that just because someone is crying and just because someone is

1    more upset, that doesn't mean their story is any more true.

2    And moreover, when asked whether she heard Ms. Sandy say does

3    she fear for Autumn's safety, Officer Trigueno testified, "Not

4    those words," but just based on her crying.  We know why

5    Ms. Sandy was crying.  We know why Ms. Sandy was upset.

6    Officer Trigueno didn't have to guess.  She knew why Ms. Sandy

7    was crying.  The ICAD dispatch report stated that she was

8    crying because father was refusing to give child back.  And you

9    know Officer Trigueno, and as we know, Officer Trigueno never

10   asked Ms. Sandy why she was upset, or even, more directly,

11   never asked the question of whether Ms. Sandy was concerned for

12   Autumn's safety.  She could have asked the question, but she

13   didn't.  But to be clear, Officer Trigueno never heard

14   Ms. Sandy say that she was concerned for Autumn's safety or

15   that she had concerns for Autumn's well-being.  And as Officer

16   Trigueno testified to, this was just a custodial dispute.

17          Officer Cadavid and Officer Trigueno also make a big

18   deal about Mr. Rattray's demeanor.  He was yelling, he was

19   cursing.  And keep in mind officers Cadavid and Trigueno at

20   this time were threatening to take down his door, and

21   threatening to take him to jail.  And Officer Cadavid

22   continuously testified that Mr. Rattray wasn't doing what a

23   normal parent would do, because a normal parent would be more

24   cooperative, that a normal parent would be like, *What are you

25   talking about?  Here's my child.  Everything's fine.*  But that

1    sure would have been more difficult to do, and even impossible

2    to do, because Autumn wasn't home.  As Mr. Rattray repeatedly

3    told the officers, Autumn wasn't home.  But members of the

4    jury, this normal person is so far from what constitutes facts

5    establishing exigent circumstances.  In looking at

6    Mr. Rattray's behavior, Mr. Rattray never lunged at the

7    officers, he never moved in their way, he never reached for

8    them, he never prevented Officer Cadavid from moving around his

9    apartment.  In the beginning of the exchange Mr. Rattray stood

10   behind his door from the officers, and the only thing that

11   Mr. Rattray did after that was an attempt to retreat into his

12   apartment.  He was in his home——in his home, where there were

13   two——where there was one armed officer in his apartment, in his

14   home, and there was one armed officer by his door.

15        Now yesterday Officer Cadavid was asked——he was asked,

16   saying that was his basis for the testimony that she was in

17   imminent danger, referring to the drugs and drug dealers and

18   the yelling and cursing.  And Officer Cadavid responded:  "I

19   wouldn't consider that imminent danger."  When he was asked to

20   confirm, he said, "No, not my definition."

21        He was also asked:  "You didn't have a medical

22   emergency?"  "No."

23        He was also asked that he had no knowledge of a

24   medical emergency, and he confirmed that he didn't.

25        And then he was asked, "So this is not——going through

1   the specific situation, that this was not your definition of

2   imminent, right?"  And he responded, "Correct."

3          Officer Cadavid did not believe that there was a child

4   in imminent danger that night, and for that he has no exigent

5   circumstances that would justify his entry into that apartment.

6   He did not have exigent circumstances that would justify his

7   search of that apartment, and he did not have exigent——and he

8   did not have probable cause that would justify the false arrest

9   of Mr. Rattray in his apartment.  And Officer Trigueno failed

10  to intervene as she stood by the door, with her foot in the

11  doorway the entire time, as she watched all of this happen.

12  She did nothing.

13         At the end of the day, Mr. Rattray didn't bleed,

14  Mr. Rattray didn't have bruises, and Mr. Rattray didn't break

15  any bones, but that doesn't mean that this incident wasn't

16  terrifying, that doesn't mean that this incident wasn't scary,

17  and it doesn't mean that Mr. Rattray knew that one false move

18  could end up with him dead.  And that's what caused his

19  sleepless nights.  That's what caused his anxiety.  And that's

20  what caused him difficulty focusing——the fear that the police

21  could come in at any time and take Autumn at will.  Autumn,

22  who's the center of both her parents' worlds.

23         You can think Mr. Rattray is a jerk——Ms. Sandy

24  certainly thinks so——but you know what, you don't have to like

25  him or think he's a nice guy, because that does not and has not

N911RAT1                       Charge

1   ever been a basis for the police to violate his constitutional

2   rights.   That evening Mr. Rattray wanted to protect his home,

3   he wanted to protect his daughter, and he wanted to protect

4   himself.   The police are the professionals here.   The police

5   are trained to diffuse situations.   They are trained to

6   negotiate with difficult individuals.   They didn't have to like

7   Mr. Rattray.   But without a reasonable belief that there was

8   imminent danger to Autumn, Officer Cadavid had no exigent

9   circumstances to justify entering Mr. Rattray's home, Officer

10   Cadavid had no exigent circumstances to justify searching

11   Mr. Rattray's home, and Officer Cadavid had no probable cause

12   to justify placing Mr. Rattray under his—under arrest in his

13   home.   And Officer Trigueno had every obligation to intervene

14   as the violations were happening.

15          Members of the jury, we thank you for your time, we

16   thank you for your attention, and we ask that you find in favor

17   of Mr. Rattray.   Thank you.

18          THE COURT:  All right.  Ladies and gentlemen, we're

19   going to distribute copies of the jury instructions to you now.

20          Members of the jury, I will now instruct you as to the

21   law that governs this case.   You have each been handed a copy

22   of the instructions I will read.   Please do read along with me.

23   You will be able to take your copy of the instructions into the

24   jury room with you.

25          You have heard all of the evidence in the case as well

1    as the final arguments of the lawyers.  You have paid careful

2    attention to the evidence, and I am confident that you will act

3    together with fairness and impartiality to reach a just

4    verdict.

5            There are three parts to these instructions.  First,

6    there are general instructions about your role, and about how

7    you are to go about deciding the factual issues in this case.

8    I will then instruct you as to the law that applies to the

9    specific claims in this case.  Finally, there are more general

10   instructions about such matters as communications with the

11   Court, about deliberations, and about returning a verdict.

12           It is important that you listen carefully.  I'm

13   reading these instructions from a prepared text because the law

14   is made up of words that are very carefully chosen.  This is

15   not a time to ad lib.  So when I tell you what the law is, it

16   is critical that I use exactly the right words.

17           My duty is to instruct you on the law.  It is your

18   duty to accept these instructions of law and to apply them to

19   the facts as you determine them.  With respect to legal

20   matters, you must take the law as I give it to you.  If any

21   attorney has stated a legal principle different from any that I

22   state to you in my instructions, it is my instructions that you

23   must follow.

24           You are to consider these instructions together as a

25   whole; in other words, you are not to isolate or give undue

weight to any particular instruction.  You must not substitute
your own notions or opinions of what the law is or what you
think it ought to be.

        As members of the jury, you are the sole and exclusive
judges of the facts.  You decide what happened.  You must
determine the facts based solely on the evidence received in
this trial.  Any opinion I might have regarding the facts is of
absolutely no consequence.

        The personalities and the conduct of counsel in the
courtroom are not in any way at issue.  If you formed an
opinion of any kind as to any of the lawyers in the case,
favorable or unfavorable, whether you approved or disapproved
of their behavior as advocates, that should not enter into your
deliberations at all.

        From time to time, the lawyers and I had conferences
at the bench and other conferences out of your hearing.  These
conferences involved procedural and evidentiary matters, and
should not enter into your deliberations at all.

        Lawyers have a duty to object when the other side
offers testimony or other evidence that the lawyer believes is
not admissible.  It is my job to rule on those objections.  Why
an objection was made is not your concern.  You should not draw
any inference simply from the fact that a lawyer objects to a
question.  If I sustained the objection, you may not consider
the testimony or exhibit at issue; if I overruled the

1    objection, you should consider the testimony or exhibit just as

2    you would any other evidence in the case.

3           You must evaluate the evidence calmly and objectively,

4    without prejudice or sympathy.  You must be completely fair and

5    impartial.  Your verdict must be based solely on the evidence

6    presented at this trial, or the lack of evidence.  Our system

7    of justice cannot work unless you reach your verdict through a

8    fair and impartial consideration of the evidence.

9           You may not consider, in deciding the facts of the

10   case, any personal feelings you may have about the race,

11   national origin, sex or age of any party or witness.  You must

12   regard the parties as of equal standing in the community, and

13   of equal worth.  All parties are entitled to the same fair

14   trial at your hands.  They stand equal before the law, and are

15   to be dealt with as equals in this court.

16          The preponderance of the evidence standard applies to

17   all disputed issues in this case.

18          To establish by a preponderance of the evidence means

19   that the evidence of the party having the burden of proof must

20   be more convincing and persuasive to you than the evidence

21   opposed to it.  A preponderance of the evidence means the

22   greater weight of the evidence.  The difference in

23   persuasiveness need not be great: it requires only that you

24   find that the scales tip, however slightly, in favor of the

25   party having the burden of proof—-that what that party claims

is more likely than not true.  If you find that the credible

evidence as to a particular issue is evenly divided, then you

must find in favor of the party not having the burden of proof.

What is important here is the quality and

persuasiveness of the evidence relied on by a party, and not

the number of witnesses, the number or variety of the exhibits

that party introduced, or the length of time that party spent

on a particular subject.  In determining whether any fact has

been proven by a preponderance of the evidence, you may

consider the testimony of the witnesses, the exhibits received

in evidence, and any stipulated facts, regardless of which side

introduced this evidence.  Simply because I have permitted

certain evidence to be introduced does not mean that I have

decided that it is important or significant.  That is for you

to decide.

In determining the facts, you must rely upon your

recollection of the evidence.  The evidence in this case

includes the testimony of the witnesses and the exhibits

received in evidence.

As I instructed you at the outset of the trial, you

are not to consider questions asked by the lawyers as evidence.

It is the witnesses' answers that are evidence, not the

questions.  The questions are significant only insofar as they

put the answers in context.

From time to time, I asked witnesses questions.  You

1    should draw no inference from that.  My questions were only

2    intended for clarification or to expedite matters, and were not

3    intended to suggest any opinion on my part as to whether any

4    witness was more or less credible than any other witness, or

5    any view as to what your verdict should be.

6            If I struck or excluded testimony, you may not

7    consider that testimony in rendering your verdict.

8            To constitute evidence, exhibits must first be

9    received in evidence.  Exhibits marked for identification but

10   not admitted are not evidence, nor are materials that were used

11   only to refresh a witness's recollection.

12           Arguments by the lawyers are not evidence, because the

13   lawyers are not witnesses.  What they have said to you in their

14   opening statements and in their closing arguments may help you

15   understand the evidence and assist you in reaching a verdict,

16   but these arguments are not evidence.  Moreover, if your

17   recollection of the evidence differs from the statements made

18   by the lawyers in their arguments to you, it is your

19   recollection that controls.

20           Finally, any statements that I may have made during

21   the trial do not constitute evidence.  Similarly, any

22   statements or rulings I have made during the trial are not any

23   indication of my views as to what your decision should be.  The

24   decision here is for you alone.

25           It is for you alone to decide what weight, if any,

N911RAT1                    Charge

1    should be given to the testimony and the exhibits received in

2    evidence in this case.

3           Generally, there are two types of evidence that you

4    may consider in reaching your verdict.

5           Direct evidence is testimony by a witness about

6    something he or she knows by virtue of his or her own

7    senses—-something seen, felt, touched, or heard.  For example,

8    if a witness were to testify that when he or she left home this

9    evening, it was raining, that would be direct evidence about

10   the weather.  Direct evidence may also be in the form of an

11   exhibit.

12          Circumstantial evidence is evidence from which you may

13   infer the existence of certain facts.  For example, assume that

14   when you came into the courthouse this morning, the sun was

15   shining and it was a nice day.  Assume that the courtroom

16   blinds are drawn and you can't look outside.  As you are

17   sitting here, someone walks in with an umbrella, which is

18   dripping wet.  A few minutes later another person enters with a

19   wet raincoat.  Now, you can't look outside the courtroom and

20   see whether it is raining.  So you have no direct evidence of

21   that fact.  But based on the facts that I have asked you to

22   assume, you could conclude that it had been raining.

23          That's all there is to circumstantial evidence.  On

24   the basis of reason, experience, and common sense, you infer

25   from one established fact the existence or nonexistence of some

other fact.

The matter of drawing inferences from facts in evidence is not a matter of guesswork or speculation.  A proper inference is a logical, factual conclusion that you might reasonably draw from other facts that have been proven.  It is often the case that material facts—such as what a person was thinking or intending—are not easily proven by direct evidence.  Proof of such matters is often established by circumstantial evidence.

Circumstantial evidence is of no less value than direct evidence.

You should evaluate the credibility or believability of the witnesses by using your common sense.  Common sense is your greatest asset as a juror.  Ask yourself whether the witness appeared honest, open, and candid.  Did the witness appear evasive or as though he or she was trying to hide something?  How responsive was the witness when questioned by opposing counsel as opposed to that witness's responsiveness when questioned by his own lawyer?

If you find that any witness lied under oath, you should view the testimony of that witness cautiously and weigh it with great care.  It is for you to decide, however, how much of that witness's testimony, if any, you wish to believe.  Few people recall every detail of every event precisely the same way.  A witness may be inaccurate, contradictory, or even

N911RAT1                        Charge

untruthful in some respects, and yet entirely believable and

truthful in other respects.  It is for you to determine whether

such inconsistencies are significant or inconsequential, and

whether to accept all or reject all, or to accept some and

reject the balance of that witness's testimony.

            In sum, it is up to you to decide whether a witness's

testimony is truthful and accurate, in part, in whole, or not

at all, as well as what weight, if any, to give to that

witness's testimony.

            In evaluating the testimony of any witness, you may

consider, among other things:

            —the witness's intelligence;

            —the ability and opportunity the witness had to see,

hear, or know the things that the witness testified about;

            —the witness's memory;

            —any interest, bias, or prejudice the witness may

have;

            —the manner of the witness while testifying; and

            —the reasonableness of the witness's testimony in

light of all of the evidence in the case, including testimony

from other witnesses, and the exhibits that have been received

in evidence.

            You have heard evidence that, at some earlier time,

witnesses have said or done something that counsel argues is

inconsistent with their trial testimony.

1          Evidence of prior allegedly inconsistent statements
2     was introduced to help you decide whether to believe the trial
3     testimony of a witness.  If you find that a witness made an
4     earlier statement that conflicts with the witness's trial
5     testimony, you may consider that fact in deciding how much of
6     the witness's trial testimony, if any, to believe.

7          In making this determination, you may consider whether
8     the witness purposely made a false statement or whether it was
9     an innocent mistake; whether the inconsistency concerns an
10    important fact, or whether it had to do with an insignificant
11    detail; whether the witness had an explanation for the
12    inconsistency, and whether that explanation accords with your
13    common sense.

14         It is exclusively your decision, based upon all the
15    evidence and your own good judgment, whether the prior
16    statement was inconsistent, and if so how much weight, if any,
17    to give the inconsistent statement in determining whether to
18    believe all, part of, or none of that witness's testimony.

19         In deciding whether to believe a witness, you should
20    consider any evidence that the witness is biased in favor of,
21    or against, one side or the other.  Likewise, you should
22    consider evidence of any interest or motive that the witness
23    may have in cooperating with one side or the other.  You should
24    also take into account any evidence that a witness may benefit
25    in some way from the outcome of this case.

1          It is your duty to consider whether any witness has

2     permitted bias or interest to color his or her testimony.  If

3     so, you should view that witness's testimony with caution,

4     weigh it with great care, and subject it to close and searching

5     scrutiny.

6          Of course, the mere fact that a witness has an

7     interest in the outcome of this case does not mean that the

8     witness has not told the truth.  It is for you to decide from

9     your observations and applying your common sense and life

10    experience whether the possible interest of any witness has

11    intentionally or otherwise colored or distorted that witness's

12    testimony.  You are not required to disbelieve a witness with

13    an interest in the outcome of this case; you may accept as much

14    of that witness's testimony as you deem reliable and reject as

15    much as you deem unworthy of acceptance.

16         I will now turn to the law that governs the specific

17    claims in this case.

18         As you know, the plaintiff in this case is Wentworth

19    Rattray.

20         The defendants are officers José Cadavid and Alyssa

21    Trigueno of the New York City Police Department.

22         As I have said, all of the parties here are entitled

23    to the same consideration by you.  The fact that the defendants

24    are police officers does not mean that they are entitled to any

25    greater or lesser consideration by you.  Again, all parties

N911RAT1                      Charge

1    stand equal before the law.

2           You will be asked to render a separate verdict as to

3    each defendant.  Accordingly, you must consider separately, as

4    to each defendant, whether Mr. Rattray has proven his claims by

5    a preponderance of the evidence.  Each defendant is entitled to

6    have the claims against him or her decided on the basis of

7    their own acts, statements, and conduct.

8           Mr. Rattray's claims are brought under a federal civil

9    rights statute, Title 42, United States Code, Section 1983.

10   This statute provides a remedy for individuals who have been

11   deprived of their constitutional rights by a person acting

12   under color of state law.

13          Mr. Rattray has brought the following claims under

14   Section 1983:

15          1.  An unlawful search claim against Officer José

16   Cadavid;

17          2.  A false arrest claim against Officer Cadavid;

18          3.  A failure to intervene claim against Officer

19   Alyssa Trigueno related to the unlawful search claim against

20   Officer Cadavid; and

21          4.  A failure to intervene claim against Officer

22   Trigueno related to the false arrest claim against Officer

23   Cadavid.

24          The defendants deny all of Mr. Rattray's claims.

25          Section 1983 states that:

1          "Every person who, under color of any statute,

2    ordinance, regulation, custom, or usage, of any State . . .,

3    subjects, or causes to be subjected, any citizen of the United

4    States . . . to the deprivation of any rights, privileges, or

5    immunities secured by the Constitution and laws, shall be

6    liable to the party injured . . .."

7          To establish a Section 1983 claim, a plaintiff must

8    prove, by a preponderance of the evidence, each of the

9    following three elements:

10         First, that the acts complained of were committed by a

11   defendant acting under color of state law;

12         Second, that in committing these acts, the defendant

13   intentionally or recklessly deprived the plaintiff of a right

14   secured by the Constitution or laws of the United States; and

15         Third, that the defendants' acts were the proximate

16   cause of injuries sustained by the plaintiff.

17         I will now discuss each of these three elements in

18   detail.

19         The first element of a Section 1983 claim is that the

20   conduct complained of was committed by a defendant acting under

21   color of state law.  Here, it is undisputed that the

22   defendants—as officers of the New York City Police

23   Department—were acting under color of state law.

24         The second element of a Section 1983 claim is that the

25   defendant you are considering, in committing the conduct

N911RAT1                    Charge

1   complained of, intentionally or recklessly deprived Mr. Rattray

2   of a federal right.  In order for Mr. Rattray to establish this

3   element, he must show that the conduct a defendant engaged in

4   under color of state law caused Mr. Rattray to suffer the loss

5   of a federal right, and that, while engaged in that conduct,

6   the defendant acted with an intent to deprive Mr. Rattray of

7   his rights or with a reckless disregard for the law.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N911RAT1                    Charge

1          (In open court; jury present)

2          THE COURT:  An act is intentional if it is done

3    voluntarily and deliberately, and not because of mistake,

4    accident, negligence, or other innocent reason.  Intent can be

5    proven directly, or by reasonable inference from circumstantial

6    evidence.

7          An act is reckless if it is done in conscious

8    disregard of its known possible consequences.  In other words,

9    even if a defendant did not intentionally seek to deprive a

10   plaintiff of his rights, if he nevertheless purposely

11   disregarded the high probability that his actions would deprive

12   plaintiff of his rights, then the state of mind element would

13   be satisfied.

14         In determining whether a person acted intentionally or

15   recklessly, you should remember that there is no way of looking

16   into a person's mind.  You must consider what was done, what

17   the people involved said was in their minds, and your

18   evaluation of all of the testimony and other evidence

19   concerning this issue.

20         In order for a plaintiff to prevail on a Section 1983

21   claim, there must be some evidence of personal involvement by a

22   defendant.  Personal involvement may be shown through evidence

23   of direct participation, that is, personal participation by one

24   who has knowledge of the facts that rendered the conduct

25   illegal, or indirect participation, such as ordering or helping

N911RAT1                    Charge

1    others to commit the unlawful acts.

2              As I mentioned a moment ago, Mr. Rattray contends that

3    Officer Cadavid violated his constitutional rights by

4    subjecting him to an illegal search and an unlawful arrest.  He

5    further contends that Officer Trigueno violated his

6    constitutional rights by failing to intervene to prevent the

7    illegal search and unlawful arrest.  You will consider each

8    claim separately, and determine whether Mr. Rattray has proven

9    the elements of each claim by a preponderance of the evidence.

10             I will now discuss each of Mr. Rattray's claims in

11   detail.

12             The Fourth Amendment to the United States Constitution

13   protects the right of persons to be secure in their persons,

14   houses, papers, and effects against unreasonable searches and

15   seizures.  Mr. Rattray claims that his right not to be

16   subjected to an unreasonable search was violated when Officer

17   Cadavid searched his apartment on November 5, 2016.

18             As a general matter, in order to search a home, a

19   police officer must obtain a search warrant from a magistrate

20   or judge.  If a police officer does not have a search warrant,

21   an officer may not enter or search someone's home absent

22   consent or exigent circumstances.  Exigent circumstances exist

23   where a police officer reasonably believes that entry or a

24   search is necessary in order to render emergency assistance to

25   an injured person, or to protect someone from imminent injury.

N911RAT1                        Charge

1        In determining whether exigent circumstances existed

2   in this case, you must consider the totality of the

3   circumstances confronting the defendants, including whether

4   there was a need to make a prompt assessment based on the

5   information that was available.

6        In determining whether exigent circumstances existed,

7   the core question is whether the facts, as they appeared at the

8   moment of entry, would lead a reasonable, experienced officer

9   to believe that there was an urgent need to render aid or to

10  take immediate action with respect to Mr. Rattray's daughter.

11  On the other hand, exigent circumstances did not exist if a

12  reasonable, experienced officer in Officer Cadavid's position,

13  knowing the facts he knew, would not have believed entry was

14  necessary to render aid or to take action.

15       The question of whether a police officer reasonably

16  believed that someone was in danger or in need of assistance is

17  an objective one.  This question should be answered with regard

18  to what a reasonable officer would have believed under the

19  totality of the circumstances.  A search is reasonable under

20  the Fourth Amendment regardless of the individual officer's

21  state of mind as long as the circumstances viewed objectively

22  justify the search.

23       While Officer Cadavid must produce evidence supporting

24  the existence of exigent circumstances, the ultimate burden of

25  proof is on Mr. Rattray to prove that Officer Cadavid's entry

1    and search violated his Fourth Amendment right to be free from

2    unreasonable searches.  If you find that exigent circumstances

3    existed, that justify Officer Cadavid's entry into and search

4    of Mr. Rattray's home, then you must find in favor of Officer

5    Cadavid on Mr. Rattray's unlawful search claim.

6          Mr. Rattray claims that Officer Cadavid falsely

7    arrested him on November 5, 2016.

8          The elements of false arrest are:

9          One, the defendant intended to confine plaintiff;

10         Two, plaintiff was conscious of the confinement;

11         Three, plaintiff did not consent to the confinement;

12         And, four, confinement was not otherwise privileged.

13         A person has been confined if, in light of all the

14    circumstances, a reasonable person would have believed that he

15    was not free to leave.

16         In determining whether a reasonable person would have

17    believed that he was not free to leave, a jury may consider,

18    among other circumstances, the number of officers present,

19    whether an officer displayed a firearm, whether the officer

20    used force against the plaintiff, and whether the officer's

21    language or tone of voice indicated that compliance might be

22    compelled.  A jury must assess the coercive effect of an

23    officer's conduct as a whole, rather than considering in

24    isolation a particular aspect of an officer's conduct.

25         The burden is on Mr. Rattray to prove by a

1    preponderance of the evidence the first three elements.  If you

2    find that Mr. Rattray has not proven any one of the first three

3    elements, that is, that Officer Cadavid intended to confine

4    Mr. Rattray, that Mr. Rattray was conscious of the confinement,

5    and that he did not consent to the confinement, then you must

6    find for Officer Cadavid on the false arrest claim.  If you

7    find that Mr. Rattray has proven each of the first three

8    elements of the false arrest claim, then you must go on to

9    consider whether the confinement was privileged.

10           If exigent circumstances existed to enter

11    Mr. Rattray's home, and Officer Cadavid had probable cause to

12    arrest Mr. Rattray, then the confinement was privileged.

13           As I instructed you a moment ago in connection with

14    Mr. Rattray's unlawful search claim, a law enforcement

15    officer's entry into a home is unreasonable if it is not

16    supported by a search warrant, consent, or exigent

17    circumstances.  This rule applies with equal force to

18    Mr. Rattray's false arrest claim.  Accordingly, if you find

19    that Mr. Rattray has proven each of the first three elements of

20    a false arrest claim, and you find that exigent circumstances

21    did not exist to justify entry into Mr. Rattray's home, then

22    you must find for Mr. Rattray on his false arrest claim against

23    Officer Cadavid.  If you conclude that exigent circumstances

24    justified entry into Mr. Rattray's home, then you must go on to

25    consider whether probable cause existed to arrest Mr. Rattray.

1          On the issue of whether probable cause existed to

2     arrest Mr. Rattray, the defendants, and not Mr. Rattray, bear

3     the burden of proof.  I will now define probable cause.

4          Police officers have probable cause to arrest when

5     they have knowledge or reasonably trustworthy information of

6     facts and circumstances sufficient to warrant a person of

7     reasonable caution in the belief that the person to be arrested

8     has committed or is committing a crime.  An officer may arrest

9     a suspect only if there are specific and articulable facts,

10     together with rational inferences drawn from those facts that

11     reasonably suggest criminal activity has occurred or is

12     imminent.

13          Although probable cause requires more than a mere

14     suspicion of wrongdoing.  It does not require absolute

15     certainty or concrete proof of each element of a crime.

16     Moreover, because police officers in the field face practical

17     limitations in ascertaining an individual's state of mind, the

18     law affords officers significant latitude in determining

19     whether an individual has the necessary intent to commit a

20     crime.

21          The existence of probable cause is measured at the

22     moment of arrest, not based on later developments.

23     Accordingly, the question of whether probable cause existed is

24     not a matter of hindsight.  Instead, a jury must consider the

25     circumstances as they appeared to the officer at the time.

N911RAT1                    Charge

1    Moreover, the existence of probable cause is not negated simply

2    because Officer Cadavid may have ignored statements by

3    Mr. Rattray that his daughter was safe or was not in the home.

4    However, you should be aware that an officer's failure to make

5    a further inquiry, when a reasonable person would have done so,

6    may be evidence of a lack of probable cause.

7              Because the existence of probable cause is analyzed

8    from the perspective of a reasonable person standing in the

9    officer's shoes, the officer's actual subjective beliefs are

10   irrelevant to the determination of probable cause.

11             Because an arresting officer might not be aware of

12   every aspect of an investigation, you may also presume that the

13   information known to one officer is known to all of the other

14   officers working together on the investigation.  Furthermore,

15   probable cause may exist even if an officer has relied on

16   mistaken information, so long as it was reasonable for him to

17   rely on it.

18             In determining whether probable cause existed, there

19   need only have been probable cause to arrest Mr. Rattray for

20   any criminal offense.  Accordingly, if there was probable cause

21   to believe at the time of the arrest that Mr. Rattray had

22   committed any criminal offense, then the arrest was lawful.

23             Here, the defense contends that on November 5th, 2016,

24   probable cause existed to arrest Mr. Rattray for the offense of

25   obstructing governmental administration.  I will instruct you

1    as to the elements of that offense.  Bear in mind that you are

2    being asked only to decide whether the defendants had probable

3    cause to believe that Mr. Rattray had committed this crime, and

4    not whether Mr. Rattray was, in fact, guilty of this crime

5    beyond a reasonable doubt.

6            Under the New York penal law, a person is guilty of

7    obstructing governmental administration when he intentionally

8    obstructs, impairs, or prevents the administration of law or

9    prevents or attempts to prevent a public servant from

10   performing an official function by means of intimidation,

11   physical force, or interference, or by means of any

12   independently unlawful act.  One does not obstruct governmental

13   administration merely by refusing to answer police questions,

14   however.  And words alone, even if abusive, do not provide

15   probable cause to believe that the crime of obstructing

16   governmental administration has taken place.  The interference

17   at issue must be at least in part physical in nature.  Stated

18   another way, while mere words alone do not constitute physical

19   force or interference, words coupled with actions are

20   sufficient.

21           If you find that exigent circumstances justified entry

22   into Mr. Rattray's apartment, and that there was probable cause

23   to arrest Mr. Rattray, then you must find in favor of Officer

24   Cadavid on Mr. Rattray's false arrest claim.

25           Mr. Rattray has brought Section 1983 failure to

N911RAT1                    Charge

 1    intervene claims against Officer Trigueno.  All police officers
 2    have an affirmative duty to intervene to protect the
 3    constitutional rights of individuals from infringement by other
 4    police officers in their presence.  This means that if a police
 5    officer witnesses another officer committing an unlawful search
 6    or an unlawful arrest, the officer observing such misconduct
 7    has an affirmative duty to stop the constitutional violation,
 8    even if he or she is not directly involved in conducting the
 9    unlawful search or making a false arrest.  The observing
10    officer's failure to intervene would make him or her liable for
11    the preventible harm proximately caused by the other officer's
12    unlawful search or unlawful arrest.
13           In order for a plaintiff to prevail on a failure to
14    intervene claim, he must show that he suffered a preventible
15    violation of his constitutional rights.  Here, in order for
16    Mr. Rattray to prevail on his failure to intervene claim
17    against Officer Trigueno, as it relates to his unlawful search
18    claim against Officer Cadavid, Rattray must show that an
19    unlawful search occurred on November 5th, 2016.  Likewise, to
20    prevail on his failure to intervene claim against Officer
21    Trigueno as it relates to false arrest, Mr. Rattray must show
22    that he was unlawfully arrested on November 5th, 2016.
23    Accordingly, if you conclude that Mr. Rattray has not proven
24    his unlawful search claim against Officer Cadavid, his failure
25    to intervene claim against Officer Trigueno based on the

1    alleged unlawful search likewise fails, and if you conclude

2    that Mr. Rattray has not proven his false arrest claim against

3    Officer Cadavid, his failure to intervene claim against Officer

4    Trigueno based on the alleged unlawful arrest claim likewise

5    fails.

6         Moreover, an officer can only be held liable for

7    preventible harm caused by the actions of another officer if

8    there was a realistic opportunity to prevent the harm from

9    occurring.  Accordingly, if you find that Officer Trigueno did

10   not have sufficient time to intervene on Mr. Rattray's behalf,

11   in connection with either the alleged unlawful search or the

12   alleged unlawful arrest, assuming either one occurred, or if

13   she was incapable of intervening, because she was otherwise

14   engaged, then you should not hold her liable for failing to

15   intervene.

16        If Mr. Rattray has proven that Officer Cadavid, acting

17   under color of state law, recklessly or intentionally deprived

18   him of a constitutional right, or that Officer Trigueno failed

19   to intervene to prevent the deprivation of Mr. Rattray's

20   constitutional rights, the final element of a Section 1983

21   claim that he must prove is that the defendant you are

22   considering proximately caused injuries that Mr. Rattray has

23   proven he sustained.  Proximate cause means there must be a

24   sufficient causal connection between the act of the defendant

25   you are considering and any injury or damages sustained by the

1   plaintiff.  An act or omission is a proximate cause if it was a

2   substantial factor in bringing about or actually causing

3   injury.  That is, if the injury or damage was a reasonably

4   foreseeable consequence of that defendant's act.

5          A proximate cause need not always be the nearest cause

6   either in time or space.  In addition, there may be more than

7   one proximate cause of an injury or damage.  Many factors, or

8   the conduct of two or more people may operate at the same time,

9   either independently or together, to cause an injury.

10         A defendant is not liable if Mr. Rattray's injuries

11  were caused by a new or independent source that intervenes

12  between the defendant's acts or omissions and Mr. Rattray's

13  injuries, however.  A defendant is also not liable if

14  Mr. Rattray's injuries were caused by a third person, and the

15  defendant's acts or omissions were not a substantial factor in

16  bringing about or causing the injury.

17         I will now instruct you on damages.  You should not

18  infer that Mr. Rattray is entitled to recover damages merely

19  because I am instructing you on damages.  It is exclusively

20  your function to decide liability, and I am instructing you on

21  damages only so that you will have guidance should you decide

22  that Mr. Rattray is entitled to a recovery.  If you return a

23  verdict in favor of Mr. Rattray on liability, according to my

24  instructions on the law, then you must consider the issue of

25  damages.  If you return a verdict for Officer Cadavid or

1    Officer Trigueno as to liability on a particular claim, then

2    you need not consider damages as to that claim.

3              If you find that Mr. Rattray has proven one or more of

4    his claims by a preponderance of the evidence, you will go on

5    to consider the matter of compensatory damages.

6              There is no claim for economic damages in this case,

7    but Mr. Rattray is seeking damages for alleged emotional

8    distress.

9              You may award compensatory damages only for injuries

10   that Mr. Rattray proves were caused by a defendant's wrongful

11   conduct.  The damages that you award must be fair compensation,

12   no more and no less for the harm, if any, which resulted from a

13   defendant's wrongful conduct.  The purpose of the law is to

14   make Mr. Rattray whole, to put him in the same position that he

15   would have been in had there been no violation of his rights.

16   The purpose of such an award of damages is not to punish a

17   defendant.

18             You should not award compensatory damages for

19   speculative injuries, but only for the alleged emotional

20   distress that Mr. Rattray has proven that he actually suffered,

21   or which he has proven that he's reasonably likely to suffer in

22   the future.  You may award Mr. Rattray such amount you find is

23   fair and just compensation for any pain and suffering caused by

24   a defendant's misconduct, as well as for loss of liberty,

25   emotional distress, fear, personal humiliation, and indignation

N911RAT1                    Charge

1  as a result of a defendant's misconduct.

2          You may not award Mr. Rattray damages for an injury

3  that existed prior to the incidents at issue or for injuries,

4  pain, and suffering or emotional distress caused by factors

5  other than the unlawful conduct of the defendant.

6          In determining the appropriate amount of compensatory

7  damages to award to Mr. Rattray, you should be guided by

8  dispassionate common sense.  You must use sound discretion in

9  fixing an award of damages, drawing reasonable inferences from

10  the facts and evidence.  You may not award damages based on

11  sympathy, speculation, or guesswork.  On the other hand, the

12  law does not require that Mr. Rattray prove his damages with

13  mathematical precision, but only with as much definiteness and

14  accuracy as the circumstances permit.  No evidence of the

15  monetary value of such intangible things as pain and suffering

16  and emotional distress need be introduced into evidence.

17          If you return a verdict in Mr. Rattray's favor on one

18  or more of his claims, but find that Mr. Rattray has failed to

19  prove any amount of compensatory damages, you must award

20  Mr. Rattray nominal damages.  Nominal damages are awarded as a

21  recognition that a plaintiff's rights have been violated, even

22  if he suffered no actual injury.

23          You may not award both nominal and actual damages to

24  Mr. Rattray.  Either he suffered actual damages, in which case

25  you must award him actual damages, or else he did not, in which

1    case you must award nominal damages.  Nominal damages may only

2    be awarded for a token sum up to one dollar.

3          Mr. Rattray also seeks an award of punitive damages.

4    If you find that Mr. Rattray has proven by a preponderance of

5    the evidence that Officer Cadavid is liable, then you must

6    decide whether to award Mr. Rattray punitive damages as against

7    him.  Mr. Rattray also bears the burden of proof as to punitive

8    damages.  He must demonstrate by a preponderance of the

9    evidence that punitive damages are appropriate here.

10          The fact that I am giving you instructions on punitive

11    damages should not be considered an indication of any view on

12    my part as to what your verdict should be or whether the

13    punitive damages should be awarded.  As with compensatory

14    damages, I am providing this instruction to you merely to

15    provide guidance in the event you decide that Officer Cadavid

16    is liable on a claim, and that punitive damages are

17    appropriate.  It is entirely up to you to decide whether or not

18    punitive damages should be awarded in this case.

19          You may award punitive damages if you believe that

20    Officer Cadavid should be punished for conduct that was

21    motivated by an evil motive or intent, or that involved callus

22    disregard or reckless indifference to Mr. Rattray's rights.

23          Mr. Rattray is not entitled to punitive damages as a

24    matter of right.  In determining whether an award of punitive

25    damages is appropriate, you must make a judgment about Officer

1    Cadavid's conduct.  To make that judgment, it is important to

2    keep in mind the reasons for awarding punitive damages:  To

3    punish a defendant for malicious conduct against a plaintiff or

4    callus disregard for a reckless indifference to a plaintiff's

5    rights, and to deter the defendant, or others like the

6    defendant from engaging in similar conduct.  Thus, you should

7    consider whether the award of punitive damages will accomplish

8    this dual purpose of punishment and deterrence.

9            Here, Mr. Rattray argues that punitive damages are

10   appropriate because Officer Cadavid acted with conscious

11   wrongdoing, and acted wantonly, willfully, with ill will and

12   malice.  According to plaintiff, Officer Cadavid knew that

13   there were no exigent circumstances that could justify a

14   warrantless search of Mr. Rattray's apartment and Mr. Rattray's

15   arrest in his home, and he knew that there was not probable

16   cause to arrest Mr. Rattray.  Defense counsel responds that

17   Officer Cadavid did not act with conscious wrongdoing, and did

18   not act wantonly and willfully, or with ill will and malice,

19   and, instead, was motivated at all times by a concern for the

20   safety of Mr. Rattray's daughter.  Defense counsel also

21   contends that Officer Cadavid believed that exigent

22   circumstances justified the warrantless search of Mr. Rattray's

23   apartment, and any arrest of Mr. Rattray that took place in his

24   home, and that any arrest that did take place was supported by

25   probable cause.

1          The decision whether to award punitive damages against

2     Officer Cadavid is for and for you alone, subject to these

3     instructions.

4          Ladies and gentlemen of the jury, that concludes my

5     instructions to you concerning the specific claims in this

6     case.  You will soon retire to the jury room and begin your

7     deliberations.  All of the documentary exhibits that were

8     admitted into evidence during the trial will be sent into the

9     jury room.  If you wish to hear any of the audio evidence, let

10    us know, and we will play it for you here in the courtroom.  If

11    you want any of the testimony, you may request that.  Please

12    remember that it is not always easy to locate what you might

13    want, so be as specific as you possibly can be in requesting

14    exhibits or portions of testimony.

15         If you want any further explanation of the law as I

16    have explained it to you, you may also request that.  As I

17    noted earlier, however, you will each be permitted to take your

18    copy of the instructions into the jury room.

19         Any communication to me should be made in writing,

20    signed by your foreperson, include the date and time, and be

21    given to one of the Marshals.  Please make any notes as clear

22    and precise as possible.  Do not tell me or anyone else how the

23    jury stands on any issue until after a unanimous verdict is

24    reached.

25         It is your duty, as jurors, to consult with one

1    another, and to deliberate with a view to reaching an

2    agreement.  Each of you must decide the case for himself or

3    herself, but you should do so only after a consideration of the

4    case with your fellow jurors, and you should not hesitate to

5    change an opinion when convinced that it is erroneous.  Discuss

6    and weigh your respective opinions dispassionately, without

7    regard to sympathy, without regard to prejudice or favor for

8    either side, and adopt that conclusion which in your good

9    conscience appears to be most in accordance with the truth.

10         Your verdict must be unanimous, but you are not bound

11   to surrender your honest convictions concerning the affect or

12   weight of the evidence for the mere purpose of returning a

13   verdict or solely because of the opinion of other jurors.  Each

14   of you must make your own decision about the proper outcome of

15   this case based on your consideration of the evidence and your

16   discussions with your fellow jurors.  No juror should surrender

17   his or her conscientious beliefs solely for the purpose of

18   returning a unanimous verdict.

19         If you are divided, do not report how the vote stands,

20   and if you have reached a verdict, do not report what it is

21   until you are asked in open court.

22         Your verdict will be organized according to a verdict

23   form.  This form will assist you in reaching a verdict, and

24   list the questions you must answer based on the instructions

25   that I have given.

N911RAT1                          Charge

1          Finally, I referred a moment ago to a foreperson.  It

2  is customary for juror no. 1 to serve as a foreperson, and that

3  is what we will do here.  The foreperson doesn't have any more

4  power or authority than any other juror, and the foreperson's

5  vote or opinion doesn't count for any more than any other

6  juror's vote or opinion.  The foreperson is merely your

7  spokesperson to the Court.  The foreperson will send out any

8  notes, and when the jury has reached a verdict, the foreperson

9  will notify the Marshal that the jury has reached a verdict,

10 and you will come into open court and deliver your verdict.

11         After you have reached a verdict, your foreperson will

12 fill in the verdict form that has been given to you, sign and

13 date it, and advise the Marshal outside your door that you are

14 ready to return to the courtroom.

15         Each of you must be in agreement with the verdict that

16 is announced in court.  Once your verdict is announced by your

17 foreperson in open court and officially recorded, it cannot

18 ordinarily be revoked.

19         Members of the jury, that concludes my instructions to

20 you.  I will ask you to remain seated for a moment while I

21 confer with the attorneys to see if there are any additional

22 instructions that they would like me to give.

23         (Continued on next page)

24

25

N911RAT1                          Charge

1              (At sidebar; jury not present)

2              THE COURT:  Are there any objections to the charge?

3              MS. GELLER:  None from the plaintiff, your Honor.

4              MS. FADDIS:  Nor from the defense, your Honor.  Thank

5    you.

6              (Continued on next page)

N911RAT1                      Charge

1           (In open court; jury present)

2           THE COURT:  All right.  Please swear in the Marshal.

3           THE DEPUTY CLERK:  Yes, your Honor.

4           Please raise your right hand.

5           (Marshal sworn)

6           THE COURT:  Ladies and gentlemen, you may begin your

7     deliberations.

8           THE DEPUTY CLERK:  All rise.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court; jury not present)

2                    THE COURT:  Please be seated.

3                    All right.  I'm going to make the change to the

4     verdict sheet that defense counsel requested this morning.  Are

5     the exhibits in a condition to go back to the jury room?

6                    MS. FADDIS:  Your Honor, I think we need to assemble a

7     set, and have both sides look at it.  We can do that in a few

8     minutes.

9                    THE COURT:  All right.  Please do that, and I'll come

10    back with a corrected verdict sheet.

11                   MS. FADDIS:  Thank you.

12                   THE DEPUTY CLERK:  All rise.

13                   (Recess taken)

14                   THE DEPUTY CLERK:  I'm going to bring the verdict

15    sheet and the evidence to the jury, your Honor.

16                   THE COURT:  Okay.  Have the lawyers agreed on what's

17    going back?

18                   THE DEPUTY CLERK:  Yes.

19                   MS. GELLER:  Yes, your Honor.

20                   THE COURT:  Thank you.

21                   All right.  You are welcome to remain in the

22    courtroom, or be in some convenient location, as long as we can

23    reach you right away in the event of a juror note.  It's

24    entirely up to you.

25                   MS. GELLER:  Thank you, Judge.

1                THE DEPUTY CLERK:  All rise.

2                (Recess taken)

3                (In open court; jury not present)

4                THE COURT:  Please be seated.

5         I have received a note from the jury.  I'm marking it

6    as Court Exhibit 1, and it reads, as follows:  Exhibit A,

7    summary of 911 call; defense A, 911 call from Mrs. Sandy;

8    testimony from Mrs. Sandy on Tuesday; Officer Cadavid's

9    testimony when he was on the stand; Officer Trigueno testimony

10   on stand.  Today's date, and signed by the foreperson.

11        So, first question is, Exhibit A that they're seeking,

12   is it not a documentary exhibit that's already back there, or

13   not?

14                MS. GELLER:  I thought so.

15                MS. FADDIS:  Yes, your Honor.

16                THE COURT:  Is, in fact, Defense Exhibit A a summary

17   of a 911 call from Ms. Sandy?

18                MS. FADDIS:  It is the ICAD, your Honor.  Yes.

19                MR. DE JESUS:  And, your Honor, just to be clear,

20   it's -- in addition to Wendy Sandy's phone call, it also has

21   communications regarding when the call to the supervisor was

22   made by the officers, and when plaintiff made a phone call to

23   the 911 as well.

24                MS. GELLER:  It's the full incident report, your

25   Honor.

N911RAT1                        Charge

1          THE COURT:  That report includes a summary of Mrs. --

2      of Ms. Sandy's 911 call?

3          MS. GELLER:  Yes.

4          THE COURT:  That's part of it?

5          MS. GELLER:  Yes, your Honor.

6          MS. FADDIS:  Yes, your Honor.

7          THE COURT:  So I would propose to tell them that they

8      have Defense Exhibit A.  It's back there, and it's included in

9      the exhibits that we sent back, because there seems to be some

10     confusion on that point.

11         With respect to the testimony they seek, the parties

12     will have to prepare that to send back.  To the extent there's

13     colloquy in the transcript, that will have to be redacted.

14         MS. FADDIS:  Yes, your Honor.  I believe plaintiff

15     ordered the transcripts.

16         MS. GELLER:  We did order the transcripts.  Do you

17     want to work on mine, or work on the other --

18         MS. FADDIS:  Well, your Honor, I had a question.

19     Obviously the testimony of three witnesses, that's a

20     substantial heavy lift, and it's going to take us a while to

21     get through.  Would it be possible to just ask them if there

22     are particular portions of the testimony they are looking for?

23     The answer may be no, but in case they are, in fact, looking

24     for something specific, it may help us to --

25         THE COURT:  I will tell them, as I already did, that

1  retrieval of testimony takes time, and they should be aware of

2  that.  I guess I'm reluctant to ask them whether they want to

3  narrow their request, because it's presented as they want all

4  the testimony.  So I will tell them it's going to take time,

5  but I'm going to leave it up to them whether they want to

6  narrow their request or not.

7           MS. FADDIS:  Understood.  Thank you, your Honor.

8           MS. GELLER:  Are we sure we sent A back?  I'm thinking

9  back --

10          MS. FADDIS:  Your Honor, I believe we sent back to the

11  jury Exhibit A, Exhibit F, Exhibit Three, and Exhibit Five,

12  which I believe is everything, all the documents that are in

13  evidence, so --

14          THE COURT:  Does that fit with your recollection,

15  Ms. Geller?

16          MS. GELLER:  I thought it did, your Honor, and now,

17  because I have a note asking for it, my brain is working in

18  overtime.  I'm trying to remember if I saw it when we were

19  putting everything together, and I can't recall seeing it

20  specifically.  So if we have an extra copy, can we just send

21  them back a second copy?

22          MS. FADDIS:  I have no objection to sending a second

23  copy, your Honor, but I definitely remember there were four

24  documents that were handed to Mr. --

25          MS. GELLER:  Yeah, I thought so.

N911RAT1                    Charge

1          THE COURT:  Why don't we say, we thought you already

2    had Exhibit A, but if not, we'll send another copy back.

3          MS. FADDIS:  I believe the confusion is Exhibit A is

4    difficult to decipher, and, also, it's written in shorthand, so

5    they may believe there's a more complete transcript, because of

6    the way it was talked about at trial.

7          THE COURT:  Okay.  Let's bring in the jury.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N911RAT1                         Charge

```
 1                 (In open court; jury present)
 2                 THE COURT:  Please be seated.
 3                 Ladies and gentlemen, I have received your note, which
 4       I marked as Court Exhibit 1, and which I'll read into the
 5       record now.
 6                 Exhibit A, summary of 911 call; Defense A, 911 call
 7       from Mrs. Sandy; testimony from Mrs. Sandy on Tuesday; Officer
 8       Cadavid's testimony when he was on the stand; Officer Trigueno
 9       testimony on stand.  Dated today.  Signed by the foreperson.
10                 We were under the impression you already had Defense
11       Exhibit A, but we're going to send in another copy of it for
12       you.
13                 With respect to your request for testimony, we'll
14       begin working on that request.  It will take some time, so
15       please be patient.  We will send in the testimony with respect
16       to each witness as we finish it.  So we'll start with
17       Mrs. Sandy, because that was the first one.  When we're done
18       with that, we'll send that in.  Then we'll turn to Cadavid.
19       When we're done with that, we'll send that in, and then we'll
20       turn to Trigueno.  When we're done with her testimony, we'll
21       send that in.
22                 So I just wanted you to know, first of all, we're
23       going to send another copy of Exhibit A, and we are working on
24       your request for testimony.  We will get it to you as soon as
25       possible.
```

N911RAT1                          Charge

1              Thank you all very much.  Please continue your

2     deliberations.  Thank you.

3              JUROR:  Thank you.

4              THE DEPUTY CLERK:  All rise.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  Please be seated.

3              So I want counsel to agree on a copy of Defense

4    Exhibit A that we can send back in.  Then, as I indicated to

5    the jury, I don't want to wait until we have all the testimony.

6    When we're done with one witness, I want to send that back.

7    When we finish the next witness, send that back.  When we

8    finish with Officer Trigueno's testimony, send that back.  So I

9    don't want them sitting there with nothing.

10             MS. GELLER:  I think what we'll do, your Honor, is

11   I've sent transcript -- defense will work on one day.  We'll

12   work on day one.  They will work on day two.  Whoever is done

13   first will work on day three.  But that way we're not all

14   working on one at a time.  So we'll do it all together.

15             THE COURT:  All right.  Whatever the lawyers think is

16   the most efficient way to proceed, I'm on board with.  I just

17   wanted to get them some materials, so they're not -- I didn't

18   want to wait until we have everything before we send anything

19   back.  I'd like to get it to them as materials become

20   available.

21             So once you agree, please give the testimony to

22   Mr. Ruocco.  Mr. Ruocco will give it to the Marshal, and the

23   Marshal will give it to the jury.

24             MS. GELLER:  If I may, your Honor, just logistically,

25   we have it electronically.

N911RAT1                    Charge

1          THE COURT:  Yes.  Can we be helpful in any way?  Can

2   we print it out?

3          MS. GELLER:  Well, I think what we can do is redact on

4   the computer very easily, and we'll need the court to print

5   them out once we're done, because we don't have printing

6   facilities.

7          THE COURT:  Happy to do that.

8          MS. FADDIS:  Thank you.

9          THE COURT:  Coordinate with Louie on that.  He'll be

10  happy to do that.  He is very good at printing, actually.  So,

11  yes, we'll help you in any way we can.

12         MS. GELLER:  Thank you, your Honor.

13         MS. FADDIS:  Thank you, your Honor.

14         (Recess taken)

15         (In open court; jury not present)

16         THE COURT:  Please be seated.

17         The jury has reached a verdict.

18         THE DEPUTY CLERK:  Are you ready for the jurors, your

19  Honor?

20         THE COURT:  Yes.

21         (Continued on next page)

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N911RAT1                    Charge

1              (In open court; jurors present)

2              THE COURT:  Please be seated.

3              Madam foreperson, has the jury reached a verdict?

4              JUROR:  Yes, we have.

5              THE COURT:  With respect to question one, has

6     Wentworth Rattray proven, by a preponderance of the evidence,

7     his Section 1983 unlawful search claim against Officer Jose

8     Cadavid, how do the jury find, yes or no?

9              JUROR:  No.

10              THE COURT:  With respect to question no. two, has

11    Wentworth Rattray proven, by a preponderance of the evidence,

12    his Section 1983 unlawful arrest claim against Officer Jose

13    Cadavid, how do the jury find, yes or no?

14              JUROR:  No.

15              THE COURT:  Mr. Ruocco, would you please poll the

16    jury?

17              THE DEPUTY CLERK:  Yes, your Honor.

18              Juror no. 1, Alandria Richberg, is that your verdict?

19              JUROR:  Yes.

20              THE DEPUTY CLERK:  Juror no. 2, Mary Mitchell, is that

21    your verdict?

22              JUROR:  Yes.

23              THE DEPUTY CLERK:  Juror no. 3, James Mei, is that

24    your verdict?

25              JUROR:  Yes.

N911RAT1                    Charge

1            THE DEPUTY CLERK:  Juror no. 4, Roxanne Zabitz, is

2    that your verdict?

3            JUROR:  Yes.

4            THE DEPUTY CLERK:  Juror no. 5, Hallie Weiss, is that

5    your verdict?

6            JUROR:  Yes.

7            THE DEPUTY CLERK:  Juror no. 6, Dana Nolan, is that

8    your verdict?

9            JUROR:  Yes.

10           THE DEPUTY CLERK:  Juror no. 7, Wendy Chow, is that

11   your verdict?

12           JUROR:  Yes.

13           THE DEPUTY CLERK:  And juror no. 8, Ben Sims, is that

14   your verdict?

15           JUROR:  Yes.

16           THE DEPUTY CLERK:  Jurors polled.  Verdict unanimous.

17           THE COURT:  Ladies and gentlemen, as I told you at the

18   outset of the case, it would be a short case, but, nonetheless,

19   an important case.  It was obvious to everyone in the courtroom

20   the close attention that each one of you paid to the evidence,

21   so we're very much in your debt through your careful service.

22           I hope you have enjoyed your jury experience, and that

23   you'll tell your neighbors when they get a jury summons not to

24   be upset about it.  It's one of our most important duties as

25   American citizens, and as I also told you at the outset, our

N911RAT1                       Charge

1  system of justice would not exist without the willingness of

2  people like you to serve.

3          So thank you very much.  Have a pleasant weekend.  You

4  are now discharged.

5          THE DEPUTY CLERK:  All rise.

6          (Jury left the courtroom.)

7          THE COURT:  Please be seated.

8          Are there any applications with respect to the jury's

9  verdict?

10         MS. GELLER:  Well, your Honor, we would request, if

11  the Court would indulge us, through Wednesday to advise the

12  Court if there would be any post-trial briefings.  We just need

13  an opportunity to consult with our client.

14         THE COURT:  That's fine.  Anything else?

15         MS. FADDIS:  Not for the defendants, your Honor.

16  Thank you.

17         THE COURT:  All right.  We are adjourned.

18         MS. GELLER:  Thank you, Judge.

19         (Adjourned)

20

21

22

23

24

25