17 Civ. 8560 (PGG) (KHP)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WENTWORTH RATTRAY,

Plaintiff,

-against-

POLICE OFFICER CADAVID and POLICE OFFICER ALYSSA TRIGUENO,

Defendants.

# MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR A NEW TRIAL

***HON. SYLVIA O. HINDS-RADIX***
*Corporation Counsel of the City of New York*
*Attorney for Defendants PO Cadavid and PO Trigueno*
*100 Church Street*
*New York, N.Y. 10007*

*Of Counsel: Hannah V. Faddis*
*Tel: (212) 356-02486*

## TABLE OF CONTENTS

TABLE OF CONTENTS ........ I

TABLE OF AUTHORITIES ........ I

PRELIMINARY STATEMENT ........ 1

EVIDENCE PRESENTED ........ 2

STANDARD OF REVIEW ........ 8

ARGUMENT ........ 9

POINT I ........ 9

THE JURY'S VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE. 9

POINT II ........ 12

PLAINTIFF IS NOT ENTITLED TO A NEW TRIAL ON HIS CLAIMS FOR FALSE ARREST AND FAILURE TO INTERVENE ........ 12

POINT III ........ 13

PLAINTIFF IS NOT ENTITLED TO A NEW TRIAL BASED ON "NEWLY-DISCOVERED" EVIDENCE ........ 13

POINT IV ........ 15

PLAINTIFF CANNOT RAISE NEW ARGUMENTS ON REPLY ........ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

ABN Amro Verzekeringen BV v. Geologistics Americas, Inc.,
485 F.3d 85 (2d Cir. 2007)........15

Berry v. Dep't of Corr.,
2004 U.S. Dist. LEXIS 2045 (S.D.N.Y. Feb. 11, 2004)........13

Brigham City, Utah v. Stuart,
547 U.S. 398 (2006)........9

Chang v. City of Albany,
150 F.R.D. 456 (N.D.N.Y. 1993)........13

DLC Mgmt. Corp.,
163 F.3d 124 (2d Cir. 1998)........8

Ernst Haas Studio, Inc. v. Palm Press, Inc.,
164 F.3d 110 (2d Cir. 1999)........15

Frankel v. ICD Holdings S.A.,
939 F. Supp. 1124 (S.D.N.Y. 1996)........13

Harris v. O'Hare,
770 F.3d 224 (2d Cir. 2014)........9

Hurlman v. Rice,
927 F.2d 74 (2d Cir. 1991)........9

Kogut v. Cty. of Nassau,
No. 06 Civ. 6695 (JS), 2013 U.S. Dist. LEXIS 102198 (E.D.N.Y. July 22, 2013)........8

Manes v. Metro N. C. Railroad,
801 F. Supp. 954 (D. Conn. 1992), aff'd, 990 F.2d 622 (2d Cir. 1993)........8

Manley v. AmBase Corp.,
337 F.3d 237 (2d Cir. 2003)........8

Mindspirit, LLC v. Evalueserve Ltd.,
470 F. Supp. 3d 366 (S.D.N.Y. 2020)........8

O'Connell v. Onondaga Cty.,
No. 09 Civ. 0364 (FJS) (ATB), 2013 U.S. Dist. LEXIS 34475 (N.D.N.Y. Mar. 13, 2013)........8

Prendergast v. Pac. Ins. Co.,
No. 09 Civ. 6248 (MWP), 2013 U.S. Dist. LEXIS 144037 (W.D.N.Y. Sept. 25, 2013) ....8

Raedle v. Credit Agricole Indosuez,
670 F.3d 411 (2d Cir. 2012)....8

Tatum v. City of New York,
668 F. Supp. 2d 584 (S.D.N.Y. 2009)....8

U.S. v. Landau,
155 F.3d 93 (2d Cir. 1998)....8

Weissmann v. Freeman,
120 F.R.D. 474 (S.D.N.Y. 1988) ....13

Zink Comms. V. Elliott,
No. Civ. 4297 (CSH), 1990 U.S. Dist. LEXIS 14205 (S.D.N.Y. Oct. 24, 1990)....13

**Rules**

Rule 59 ....8

**PRELIMINARY STATEMENT**

On November 5, 2016, the defendants responded to a 911 call from the plaintiff's child's mother, hysterically crying, who claimed that the plaintiff was refusing to give over the child and voiced concerns for her daughter's safety. Ultimately, after the plaintiff refused to provide the defendants any information about the child's whereabouts or even the status of her custody between her parents, Officer Cadavid entered plaintiff's apartment to look for the child. Officer Cadavid remained in the apartment for approximately 40 minutes, most of which was spent waiting for a supervisor after the plaintiff demanded he respond. Only when the supervisor responded did the plaintiff finally divulge his daughter's location and provide paperwork explaining that he was her custodial parent. The officers all then departed. In denying defendants' motion for summary judgment, this Court held that, "it is for a jury to assess the facts to determine whether Cadavid was justified in entering the home to search for the child." (S.J. Order, ECF No. 225, p. 16). Having put that question to a jury and received an answer in the affirmative—that Officer Cadavid's actions were objectively reasonable under the circumstances—the plaintiff now urges the Court to reject the jury's determination by re-hashing the same arguments which were already rejected at trial. This Court should deny this motion in its entirety.

**EVIDENCE PRESENTED**

The evidence at trial relevant to plaintiff's claim for unlawful search was as follows. Plaintiff's child's mother, Wendy Sandy, testified that she traveled from Connecticut to pick up her daughter and was told by the plaintiff that she was not at home. (Trial Transcript ("Tr."), Faddis Decl., Ex. A, 65:1-4). Ms. Sandy then called the police. (Tr. 66:10-16). At trial, Ms. Sandy denied being worried about her daughter's safety, but admitted that she was very upset and crying. (Tr. 67-68). She repeatedly stated that she told the defendants that it was her turn to take her daughter home and the plaintiff had informed her the child was not available. (Tr. 68-70). Ms. Sandy further acknowledged, "I was very upset, because, like I said, again, I didn't want Autumn to think that I didn't care about anything, that I was taking it out on her. So my tone was not in the very best way. I was crying that whole entire time. I was like not very happy about the outcome with the court hearing, so I was very upset about it." (Tr. 71). Ms. Sandy admitted that she told the officers that it was her turn to see her daughter, but that the plaintiff was not telling her where the child was. (Tr. 87). Ms. Sandy denied repeatedly—each time in substantially the same terms—that she made any allegations of drug activity against the plaintiff. (Tr. 71:9-25, 89:16-90:1, 91:21-92:7).

On cross-examination, Ms. Sandy conceded that she had a very difficult relationship with the plaintiff, that she only appeared to testify during discovery because she was concerned that he could restrict her access to her daughter (Tr. 96:17-20), and that the plaintiff had told her she would be arrested if she did not participate. (Tr. 96:2-5).

Officer Cadavid testified to his recollections of the incident. Starting at the beginning, he recalled that the dispatcher relayed that Ms. Sandy was "hysterically crying" and described the plaintiff as aggressive. (Tr. 360). When they arrived, Officer Cadavid recalled that Ms. Sandy told him that it was her turn to have her daughter and the plaintiff was refusing to give her to her (Tr. 361) and that Ms. Sandy did not have any paperwork relating to custody. Ms. Sandy

was very "upset, emotional, crying." (Tr. 362). Officer Cavadid told Ms. Sandy that they would complete a Domestic Incident Report ("DIR") to document the dispute, because they were mandated to do so. (Tr. 361). After telling Ms. Sandy that a DIR would be prepared, but no other steps could be taken:

> [S]he became more upset, more emotional, and then she stated to me that she—that her daughter's life was in danger. She was not safe in the apartment. She also stated to [him] that Mr. Rattray does drugs and that he occasionally has drug dealers in the apartment.

(Tr. 363:12-19). At that point, Officer Cadavid testified, he was concerned for the child's safety and needed to check on her welfare. (Tr. 364). Officer Cadavid testified that when he approached the plaintiff's apartment, the officers identified themselves as police and stated that they needed to check on his daughter's welfare. (Tr. 365:18-23). Officer Cadavid recalled that when he knocked on the apartment door, the plaintiff "answered in a very strong manner, like started yelling, cursing at us." (Tr. 365:7-9). After initially refusing to open the door, the plaintiff eventually opened the door about six inches. Officer Cadavid could not see anything inside of the apartment. (Tr. 367:24-368:2). Officer Cadavid recalled that he requested to see the child, to check on the child, and the plaintiff repeatedly refused. (Tr. 368:14-18). Officer Cadavid articulated that his concerns for the child's safety were exacerbated by the plaintiff's behavior:

> [B]ased on how Mr. Rattray was, his demeanor, his attitude, the whole yelling and cursing…it was surprising the way he was acting. It made me think if he was under the influence of something, to be yelling like that and cursing…[I]t was surprising to me 'cause all I wanted to do was see his daughter, check on her, on her welfare. To me, a normal—a normal—a parent who has a officer at the door and is requesting to check on the welfdare would be like, you know, *What are you talking about? Here's my child. Everything's fine.* And that will be the end of it.

(Tr. 369:9-370:1). Rather, Officer Cadavid testified, the plaintiff refused to provide any information about his daughter's whereabouts—including whether she even was home. (Tr. 379:21-380:12). Officer Cadavid testified that, eventually, the plaintiff attempted to close the

door, which made him "more concerned, because he's trying to close the door on us, and that's leading me to believe that he's trying to hide something[.]" (Tr. 383:15-21). After the plaintiff attempted to close the door, Officer Cadavid stepped about a foot inside and asked the plaintiff again where his daughter was. (Tr. 384:14-385:3). Officer Cadavid testified that he entered the apartment because "[b]ased on the allegations of the mother, there was no time to actually go get a warrant...the daughter was not safe, that she was in danger." (Tr. 407:19-21). The plaintiff was still yelling and cursing, "getting more and more and more loud, to the point where his voice was almost becoming high-pitched." (Tr. 385:4-9). Because the plaintiff continued to refuse to answer any questions about his daughter's whereabouts, Officer Cadavid then conducted a sweep to see if she was in the apartment. (Tr. 385:10-386:2). She was not. (Tr. 386:3-4). Officer Cadavid testified that even up to that point the plaintiff had still not told him that his daughter was not home or that she was with friends. (Tr. 387:1-5). Thus, Officer Cadavid testified, he was still investigating the child's whereabouts. (Tr. 387:11-18). He confirmed that he still had concerns for her physical well-being at that point because "based on the allegations of the mother, based on how Mr. Rattray was acting, his demeanor, and his refusal to answer my questions of where she was, her whereabouts, [he] was more concerned about her well being and her safety." (Tr. 387:19-388-1). In fact, Officer Cadavid testified that after he determined the child was not in the apartment, his concern for her safety was even higher than before he entered:

> [T]he fact that the daughter was not in the apartment, and he was still not telling me where she was, I was concerned that something could have happened to her, and that he's trying to hide it, he's not telling me where she is.

(Tr. 409:16-20). Officer Trigueno testified that Officer Cadavid told her before going into the apartment building that they were going inside "based on the mother's concern" and "to see if the child was OK just based on the mother's reaction." (Tr. 293:4-10). She further stated that both officers knocked on the door and announced themselves as police. (Tr. 295:4-12). After

announcing themselves, Officer Trigueno recalled the plaintiff opening his door a crack (Tr. 295:17-22), after which defendants asked "for the child and to see if she was OK." (Tr. 296:20-24). Officer Trigueno testified that when the plaintiff cracked the door, she could see only a part of his face, and could hear nothing from inside the apartment. (Tr. 297:3-25). Officer Trigueno recalled plaintiff saying, in response to the defendants' inquiries, only that "she was fine and then that her mother wasn't going to see her today." (Tr. 298:17-24). Officer Trigueno testified that she recalled the plaintiff yelling at them:

> Your Honor, we were first calm with him. We were just trying to explain the reason we were there. And then his tone raised and our tones raised, but he just kept—it was based off his tone. He was very aggressive. He was yelling. There was a lot of—I remember cursing. I don't know the exact words that were said, but I remember it was a lot of aggression. And he looked mad based on the part of his face.

(Tr. 304:14-25; see also, Tr. 339:20-340:3). Officer Trigueno confirmed that she was concerned for the child's safety prior to Officer Cadavid entering the apartment:

> [J]ust based on the mother's demeanor, like how she approached us crying, and it—it was one and the same with the 911 call, just grew concerned like something must have happened to her daughter, and also the way the—Mr. Rattray opened, answering our questions, just was being very vague with her whereabouts, it just grew a concern, and we just wanted to find out more where she is. (Tr. 340:4-12).
>
> …
>
> We just felt that something happened to her based on just his vagueness, like what—why's he not telling us where she is, we just wanted to find out more, and it just—it just raised more the level of concern for the daughter. (Tr. 341:1-7)

Officer Trigueno confirmed that, although she did not hear Ms. Sandy's explicit concerns for her daughter's safety, she understood that "the child was definitely not safe" and "that something was off." (Tr. 345:18-23).

After Officer Cadavid checked the apartment, a call was made for a supervisor to respond and Officer Cadavid remained inside awaiting his arrival. (Tr. 389:2-4). Officer Cadavid

testified that he remained about one foot inside the apartment with the door open for safety reasons. (Tr. 389:16-24). Once the supervisor arrived, the plaintiff produced documentation regarding custody of his daughter and told the lieutenant where his daughter was, which information the lieutenant took steps to verify. (Tr. 391:1-395-10). Once the child's whereabouts had been confirmed, the officers departed the plaintiff's apartment. (Tr. 395:11-13).

The plaintiff testified extensively—albeit inconsistently—on his own behalf. On direct examination, the plaintiff claimed that he would have tried to facilitate a visit with Ms. Sandy, but did not know if he could. (Tr. 105:9-106:2). He further denied any aggressive behavior toward the officers and claimed that if he had had any documentation to show them demonstrating that he had custody of his daughter, he would have produced it to them. (Tr. 113: ; 138:9-13; 163:1-23; 166:8-22). However, on cross-examination, the plaintiff was thoroughly impeached on all of these points. On cross-examination the plaintiff was impeached with deposition testimony in which he admitted that he spoke to Ms. Sandy for less than one minute and did not provide her any information about her daughter's whereabouts simply because it was not "relevant" to her. (Tr. 182:8-186:1). He was further impeached with evidence that he had in his possession at the time at least six prior court orders and email correspondence regarding the custody dispute with Ms. Sandy, any of which would have made clear that he was the custodial parent. (Tr. 194:2-196:24). On this point, the plaintiff was further impeached with his own contemporaneous email correspondence which made clear that he only produced his email and documentation once a supervisor arrived on scene, although he had his phone and access to his email—which he was using—throughout the incident. (Trial Ex. 5, Faddis Decl., Ex. F; Tr. 220:21-222:12).

The plaintiff was further impeached with the same email correspondence which contained his own admission—which he denied at trial (Tr. 200:8-10)—that the defendants had

communicated that they were "checking on the welfare of a ten year-old child" before Officer Cadavid entered the apartment. (Tr. 201:3-202:3). This impeachment was compounded with further impeachment based on the plaintiff's December 2016 statement to the Internal Affairs Bureau, in which he stated that the defendants told him they needed proof that his child was safe, there, and supposed to be with him. (Tr. 203:4-13; Trial Ex. K-1, Faddis Decl., Ex. B). Plaintiff was also impeached with his statement to IAB in which he represented that at the time the defendants came to his apartment he had no "documentation" showing that his daughter was supposed to be with him. (Tr. 234:18-235:15; Trial Ex. K-1, Faddis Decl., Ex. B). The plaintiff admitted saying to Officer Cadavid, "What would you do if I came into your house after your kids?" (Tr. 236:12-16), though he denied it was intended as a threat. (Tr. 236:12-18). The plaintiff also conceded that he had considered at some point attacking Officer Cadavid with a knife. (Tr. 245:9-246:7), but denied ever yelling at the officer or cursing when they were outside the apartment. (Tr. 245:4-8). The plaintiff was further impeached as to when he sought medical treatment for his alleged emotional injuries (Tr. 240-242) after crying during his direct examination (Tr. 233:1-6).

Also admitted into evidence as Exhibit K-2 was a clip of the audio recording of the plaintiff's interview with IAB, in which he stated:

> That's what I was saying before: it's kind of weird that I'm here, because I – get, I – I understand and I – this is exactly what I want the officers to do ever, if my daughter's missing, I want them to go find her.
>
> (Trial Ex. K-2, Faddis Decl., Ex. C).

The Court also received in evidence *inter alia* the Domestic Incident Report ("DIR") (Trial Ex. F, Faddis Decl., Ex. D); 911 call summary ("ICAD") (Trial Ex. A, Faddis Decl., Ex. E), and plaintiff's email correspondence (Trial Ex. 5, Faddis Decl., Ex. F).

**STANDARD OF REVIEW**

In order for the Court "to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or…[that] the verdict is a miscarriage of justice, *i.e*., it must view the jury's verdict as against the weight of the evidence." Tatum v. City of New York, 668 F. Supp. 2d 584, 598 (S.D.N.Y. 2009) (Gardephe, J.) (citing Manley v. AmBase Corp., 337 F.3d 237, 244 (2d Cir. 2003)). "Accordingly, [o]n a motion for a new trial, the moving party bears [a] heavy burden." Mindspirit, LLC v. Evalueserve Ltd., 470 F. Supp. 3d 366, 377 (S.D.N.Y. 2020) (Gardephe, J.) (citing Prendergast v. Pac. Ins. Co., No. 09 Civ. 6248 (MWP), 2013 U.S. Dist. LEXIS 144037, at *5 (W.D.N.Y. Sept. 25, 2013)); see also Manes v. Metro N. C. Railroad, 801 F. Supp. 954, 956 (D. Conn. 1992), aff'd, 990 F.2d 622 (2d Cir. 1993)). "Furthermore, Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." Mindspirit (citing Kogut v. Cty. of Nassau, No. 06 Civ. 6695 (JS) (WDW), 2013 U.S. Dist. LEXIS 102198, at *2 (E.D.N.Y. July 22, 2013); see also O'Connell v. Onondaga Cty., No. 09 Civ. 0364 (FJS) (ATB), 2013 U.S. Dist. LEXIS 34475, at *1 (N.D.N.Y. Mar. 13, 2013). Moreover, "trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility, and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury," Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012) (citing DLC Mgmt. Corp., 163 F.3d 124, 134 (2d Cir. 1998); and U.S. v. Landau, 155 F.3d 93, 104 (2d Cir. 1998)).

## ARGUMENT

## POINT I

## THE JURY'S VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE

There was ample evidence from which the jury could have reached the conclusion that Officer Cadavid reasonably believed the plaintiff's daughter was in imminent danger thereby justifying the entry and search of the plaintiff's apartment. Plaintiff's arguments that Officer Cadavid himself disclaimed exigency or imminent danger are based on a narrow interpretation of a selection of the trial evidence, and do not suffice to establish that the jury's verdict was "egregious" or a "serious miscarriage of justice." With regard to exigency, the jury was properly charged as follows:

> Exigent circumstances exist where a police officer reasonably believes that entry or a search is necessary in order to render emergency assistance to an injured person or to protect someone from imminent injury.
>
> In determining whether exigent circumstances existed in this case, you must consider the totality of the circumstances confronting the defendants, including whether there was a need to make a prompt assessment based on the information that was available. In determining whether exigent circumstances existed, the core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or to take immediate action with respect to Mr. Rattray's daughter. On the other hand, exigent circumstances did not exist if a reasonable, experienced officer in Officer Cadavid's position, knowing the facts he knew, would not have believed entry was necessary to render aid or to take action.

(Jury Instr., ECF No. 277, p. 15). This charge was based on Hurlman v. Rice, 927 F.2d 74, 81 (2d Cir. 1991), Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006), and Harris v. O'Hare, 770 F.3d 224, 235 (2d Cir. 2014), as amended (Nov. 24, 2014). (Id.) There was ample evidence in the record of the facts and circumstances known to Officer Cadavid which would have led a reasonable officer to believe that it was necessary to enter the apartment to "render aid or take action." As Officer Cadavid explained—though his subjective belief is not relevant—the

compounding effect of the information he gathered at each stage of this incident corroborated and heightened his concern for the child's well-being.

In the first instance, Officer Cadavid testified that Ms. Sandy herself explicitly stated not only that Mr. Rattray was wrongfully keeping her child from her, but further that the child's life was in danger and there was drug activity in the apartment. When the officers approached the apartment, the plaintiff's demeanor and behavior, including yelling and cursing at them, cracking the door only partially, and refusing to provide any information about his daughter's whereabouts or custody, all supported an objectively reasonable belief that the child was in danger or had been harmed. This belief was further supported when the plaintiff attempted to close the door without providing the defendants any information about his daughter.

Plaintiff's motion takes issue with each of the pieces of this picture independently, without evaluating the "totality of the circumstances" as the jury was properly instructed to do. For example, defendants do not contend that Ms. Sandy's allegation of drug activity alone would have justified entry into the apartment. However, that allegation, in the context of other facts—including, her demeanor, her explicit stated concern for the child's safety, the plaintiff's demeanor, the plaintiff's complete refusal to provide any information about his daughter—would certainly have been relevant to the assessment of exigency.

As another example, plaintiff emphasizes the lack of sound coming from the plaintiff's apartment, to support the argument that it was not reasonable to believe the child was in danger. (Pltf. Memo. of Law, ECF No. 291. pp. 7, 10). However, there is an obvious contrary inference the jury might have drawn from this same evidence in favor of the defendants. That is, the officers were responding to an apartment in which a ten year-old child was supposed to be found. The fact that they could neither see—nor hear—any evidence of that child is, in and of

itself, noteworthy. In combination with all of the other circumstances of this encounter—the plaintiff's aggression, his refusal to open the door more than a crack, his refusal to provide any information about his daughter's whereabouts or custody, to name a few—the lack of sound coming from inside his apartment may have contributed to the jury's assessment that it was reasonable for Officer Cadavid to believe the child was in danger.

Plaintiff's motion further asks the Court to disregard all of the countervailing evidence which does not support his arguments. While plaintiff emphasizes Officer Cadavid's testimony in which he expressly said he would not use the word "imminent," he ignores his testimony—and that of Officer Trigueno—which described all of the facts and circumstances from which the jury could have determined that it was reasonable to believe he needed to enter to "render emergency assistance to an injured person or to protect someone from imminent injury."

Lastly, the plaintiff's motion ignores the deference to be awarded a jury's assessment of witness credibility. Based on the evidence adduced at trial, the jury could have had—and, based on its verdict, likely did have—serious doubts about the truthfulness of both Ms. Sandy and Mr. Rattray. Ms. Sandy's testimony was likely colored by her admissions regarding the contentious nature of her relationship with the plaintiff, including the fact that he had effectively utilized access to their child to leverage her cooperation with this lawsuit. Mr. Rattray himself was repeatedly impeached with prior inconsistent statements which thoroughly undermined his credibility as to what information he provided to the defendants when and his general demeanor. Indeed, it cannot go unremarked on that the plaintiff pursued this claim of unlawful entry to trial even though he himself had previously remarked, in sum and substance, that even he agreed the officers behaved reasonably. (Trial Ex. K-1, Faddis Decl., Ex. C).

Looking at the entire universe of evidence at trial, it is clear that the jury's verdict was not against the weight of the evidence. Accordingly, the Court should deny plaintiff's motion in its entirety.

## POINT II

## PLAINTIFF IS NOT ENTITLED TO A NEW TRIAL ON HIS CLAIMS FOR FALSE ARREST AND FAILURE TO INTERVENE

Plaintiff is not entitled to a new trial on his false arrest and failure to intervene claims, even if the Court finds that the verdict on unlawful entry was against the weight of the evidence. As the jury was correctly charged, plaintiff's claims for false arrest and failure to intervene each required a separate analysis under the law. The jury was not charged, nor does plaintiff contend, that a finding of liability on plaintiff's unlawful search claim would result in liability on his separate claims for false arrest and failure to intervene. Plaintiff's contention that "the false arrest and failure to intervene allegations rest, in large part, on the reasonableness of Officer Cadavid's entry" (Pltf. Memo. of Law, p. 16) mis-states the applicable law. (See, Jury Instr., ECF No. 277). Plaintiff's motion fails even to address the legal standards for either claim. Plaintiff fails to address how—even if the entry were unlawful—the remaining elements of the two other claims would have been satisfied. That is, the jury could simply have determined that plaintiff did not meet his burden of proof as to each of the elements of a false arrest claim, separate and apart from whether defendant Cadavid had lawfully entered the apartment. Similarly, the jury could simply have determined that plaintiff did not meet his burden of proof as to each of the elements of a failure to intervene claim—with regard to the unlawful search and false arrest claims—against defendant Trigueno.

Because plaintiff has entirely failed to address the sufficiency of the evidence underlying these claims with regard to the relevant law, his motion for a new trial as to these counts must be denied.

## POINT III

## PLAINTIFF IS NOT ENTITLED TO A NEW TRIAL BASED ON "NEWLY-DISCOVERED" EVIDENCE

Plaintiff's motion for new trial based on "newly-discovered" evidence is entirely without merit and must be rejected. As an initial matter, plaintiff has made no attempt to articulate or satisfy the legal standard justifying a new trial based on newly discovered evidence. A new trial may be granted on the basis of newly discovery evidence, where "1) the newly discovered evidence is of facts that existed at the time of trial; (2) the movant was justifiably ignorant of them despite due diligence; (3) the evidence is admissible and of such importance that it probably would have changed the outcome; and (4) the evidence is not merely cumulative or impeaching." Berry v. Dep't of Corr., 2004 U.S. Dist. LEXIS 2045, at *7 (S.D.N.Y. Feb. 11, 2004) (citing Frankel v. ICD Holdings S.A., 939 F. Supp. 1124, 1127 (S.D.N.Y. 1996); Weissmann v. Freeman, 120 F.R.D. 474, 476 (S.D.N.Y. 1988)). "[E]vidence…whose only effect is to contradict or attack the credibility of witnesses will not ordinarily warrant a new trial, in the absence of very unusual or extraordinary circumstances." Chang v. City of Albany, 150 F.R.D. 456, 461 (N.D.N.Y. 1993) (quoting Zink Comms. V. Elliott, No. Civ. 4297 (CSH), 1990 U.S. Dist. LEXIS 14205, at *10 (S.D.N.Y. Oct. 24, 1990)). As plaintiff has made no effort to justify a new trial under this standard, this motion should be denied outright.

As an initial matter, this evidence is not "newly discovered," since it consists of defendant's own trial testimony. On that basis alone, this motion should be denied.

Additionally, any suggestion that this testimony was new at trial is also without merit—and would not justify a new trial in any event. Lt. Khosh's involvement in this incident was well known to all parties at the time of trial. Indeed, plaintiff listed Lt. Khosh as a trial witness and elected not to call him. (See, JPTO, ECF No. 247, p. 9). More importantly, Officer Cadavid had previously testified at his deposition regarding Lt. Khosh's involvement. This testimony was specifically discussed in the Court's summary judgment order:

> There is conflicting evidence about whether Rattray shared new information with Lieutenant Koch that he had not already shared with Officer Cadavid. Defendants assert that while Rattray would not tell Officer Cadavid where his daughter was, Lieutenant Koch "obtained information about the whereabouts of the daughter and confirmed [her] location." (Def. R. 56.1 Stmt. (Dkt. No. 216-1) ¶¶ 59, 61-64, 73-74) Cadavid testified that Koch "aided [him] in [his] investigation [as] to the whereabouts of [Rattray's daughter] . . . by confirming [her] whereabouts." (Cadavid Dep. (Dkt. No. 211-2) at 50).

(SJ Order, ECF No. 225, p. 6). Thus, the broad strokes of Officer Cadavid's testimony on this topic had already been developed in discovery. Plaintiff's own failure to ask more precise questions of Cadavid at his deposition cannot now be leveraged to justify a new trial. Had there been any colorable argument that this evidence was improperly withheld during discovery, the time to make any application on those grounds was at trial, not after the jury rendered a verdict against the plaintiff. Had there been any inconsistency between Officer Cadavid's deposition and trial testimony, he could have been impeached accordingly. He was not, because his testimony was not inconsistent. In no event, however, does this testimony warrant a new trial.

For the foregoing reasons, plaintiff's motion for a new trial based on "newly-discovered" evidence must be denied.

**POINT IV**

**PLAINTIFF CANNOT RAISE NEW ARGUMENTS ON REPLY**

The Court should not consider any new arguments that plaintiff may attempt to raise on reply. To prevent unfairness to a movant's adversary, new arguments may not be made in a reply brief. Ernst Haas Studio, Inc. v. Palm Press, Inc., 164 F.3d 110, 112 (2d Cir. 1999); ABN Amro Verzekeringen BV v. Geologistics Americas, Inc., 485 F.3d 85, 100 n.16 (2d Cir. 2007) ("[W]e decline to consider an argument raised for the first time in a reply brief.") Thus, to the extent that plaintiff attempts to raise new arguments, those arguments should be disregarded.

**CONCLUSION**

For all the foregoing reasons, defendants respectfully request that the Court deny plaintiff's motion for a new trial, and grant such other relief as the Court deems appropriate.

Dated: New York, New York
October 10, 2023

HON. SYLVIA O. HINDS-RADIX
Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 356-2486

By: /s/
Hannah V. Faddis
*Senior Counsel*
Special Federal Litigation

cc: VIA ECF
*All Counsel of Record*