N8VDRAT1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

WENTWORTH RATTRAY,

                    Plaintiff,

          v.                              17 Civ. 8560 (PGG)

POLICE OFFICER JOSE CADAVID
(Badge No. 9085) and POLICE
OFFICER ALYSSA TRIGUENO,

                    Defendants.           Jury Trial
------------------------------x
                                          New York, N.Y.
                                          August 31, 2023
                                          9:30 a.m.

Before:

                    HON. PAUL G. GARDEPHE,

                                          District Judge

                         APPEARANCES

DUANE MORRIS, LLP
      Attorneys for Plaintiff
BY:  MELISSA S. GELLER, ESQ.
     YUDI KATIE WANG, ESQ.
     ANGELA J. BENOIT, ESQ.

NEW YORK CITY LAW DEPARTMENT
OFFICE OF THE CORPORATION COUNSEL
      Attorneys for Defendants
BY:  FELIX DE JESUS, ESQ., Assistant Corporation Counsel
     HANNAH V. FADDIS, ESQ., Assistant Corporation Counsel

```
 1                  (Case called; jury not present)
 2                  THE COURT:  Please be seated.
 3                  I understand the parties have some issues they want to
 4      raise.
 5                  MS. GELLER:  For the plaintiff, your Honor, very
 6      briefly, this is in the way of a heads up for a potential
 7      argument later.  We may have a Rule 50 application of our own
 8      on affirmative action -- excuse me, affirmative action --
 9      affirmative defenses; and as concern jury instructions,
10      yesterday in their Rule 50 application, defense counsel said
11      something about probable cause concerning obstruction of
12      governmental administration.  We intend to move on the ground
13      that under New York law, obstruction of governmental
14      administration does not exist where the obstruction is there is
15      only or merely the refusal to answer police questions.
16                  We will rely on -- I'm going to get the case wrong,
17      Uzoukwu v. City of New York.  That's 805 F.3d 409, 414 to 418,
18      (2nd Cir. 2015).  In that case, there is an extensive
19      discussion of well-established New York case law, and that case
20      actually involved a clarification on an instruction -- on jury
21      instructions on a 1983 action.
22                  We will also, when the Court conducts their charge
23      conference, oppose an instruction that the police had probable
24      cause to detain Mr. Rattray on the grounds of obstruction of
25      governmental -- obstruction of governmental and -- or
```

1  administration.  And, again, we're not arguing that now, but I

2  didn't want to raise it at the last minute.  I wanted everybody

3  to have the case that we intend to look at.

4             And that is all we have at this time, your Honor.

5             THE COURT:  All right.  Does the City have anything it

6  wants to say on this issue of whether there was probable cause

7  to believe that Mr. Rattray engaged in obstruction of

8  governmental administration?

9             MS. FADDIS:  Briefly, your Honor.  And I haven't had a

10  chance to brief this, because it's just been raised, but my

11  recollection, and I'm thinking now of *Lugo v. City of New York*,

12  (2nd Cir. 2019), 773 Fed. Appx. 68 --

13             THE COURT:  Could you go a little more slowly?

14             MS. FADDIS:  *Lugo v. City of New York*, (2nd Cir. 2019)

15  773 Fed. Appx. 68.

16             I'm not sure it's entirely on point, but my

17  recollection is the Circuit made clear that while OGA does

18  require some physical action on the part of the suspect, that

19  physical action can be relatively minor, and doesn't actually

20  require -- I think what Ms. Geller is alluding to in this line

21  of cases about simply the refusal to answer questions is not

22  enough.  It requires an additional physical act on the part of

23  the suspect, but that physical act doesn't actually have to

24  meet a terribly high threshold.

25             So in this instance, and I'd have to check the case

N8VDRAT1

1    law on this, I think we would argue if there's room to --

2    certainly closing the door, separating the officers from the

3    area where they believe the child to be would suffice.  Once

4    Officer Cadavid was in the apartment, assuming, of course, that

5    we established that there was exigency for him to be there, the

6    continued refusal constitutes -- would suffice to meet the

7    standard of OGA, which is actually a relatively low bar.

8         And certainly on qualified immunity I think there

9    would be room to find that there is arguably probable cause for

10   OGA, for either of those -- in either of those two ways.  With

11   regard to the first piece about what plaintiffs' counsel said,

12   I'm not sure what the anticipated Rule 50 is on affirmative

13   tests, so I guess we'll cross that bridge when we come to it.

14        And obviously I wanted to flag on the record we filed

15   a letter last night asking the Court's permission to amend the

16   Rule 50 motion that was made at the close of plaintiffs' case

17   yesterday, simply to assert the defense of qualified immunity,

18   which was inadvertently not raised explicitly in the motion.

19   The arguments supporting the qualified immunity motion are

20   essentially the same arguments supporting the motion for

21   objective reasonableness, but simply go to argue probable cause

22   or reasonable mistake.  As outlined in the letter, the defense

23   was asserted in all of the defendant's pleadings.  It was also

24   listed in the JPTO.  And, certainly, we would be entitled to

25   move on it at the close of our case as well.  We just wanted to

1    make sure the record was complete that we hadn't intentionally

2    left it out now.

3          THE COURT:  All right.  For the benefit of my law

4    clerk, plaintiff indicated that they are going to have a Rule

5    50 motion aimed at the defendant's defense, affirmative defense

6    of probable cause based on Mr. Rattray's alleged commission of

7    the crime of obstruction of governmental administration.

8    Counsel said that the facts here don't meet requirements for

9    that offense, citing the case called *Uzoukwu v. City of New*

10   *York*, 805 F.3d 409, at 418, (2nd Cir. 2015).  In response, the

11   defendant cited *Lugo v. City of New York*, 773 Fed. Appx. 68.

12         On the issue of qualified immunity in their request to

13   charge, the defendants said that they want me to submit special

14   interrogatories to the jury that go to the issue of qualified

15   immunity.  I have not received any suggested interrogatories.

16   I'm going to be charging the jury tomorrow, so it's time to

17   submit any special interrogatories that you want me to submit.

18         MS. FADDIS:  Yes, your Honor.  We can put those in

19   writing.  And just to preview, we anticipate, actually, a

20   single special interrogatory which goes to essentially the

21   standard for exigency, because I think that's really sort of

22   the lynchpin of qualified immunity analysis for both the

23   unlawful entry claim and the false arrest claim.

24         So I'd anticipate that's the only -- that will be the

25   subject of the special interrogatory.  And I can get language

1    to the Court this afternoon.

2            THE COURT:  I also wanted to say that I understand

3    from plaintiffs' letter yesterday that they are seeking to

4    include in the charge a request for punitive damages against

5    Officer Trigueno.  I don't understand what the basis is for

6    that, so I'm going to need more on why it would be appropriate

7    to charge the jury on punitive damages with respect to Officer

8    Trigueno.

9            MS. GELLER:  We can work on that, your Honor.

10           THE COURT:  Okay.  Are we otherwise prepared to

11   proceed?

12           MS. FADDIS:  Yes, your Honor.

13           MS. GELLER:  Yes, your Honor.

14           THE COURT:  Anything else, Ms. Faddis?

15           MS. FADDIS:  No, your Honor.  Thank you.

16           THE COURT:  Officer Cadavid, you can retake the stand.

17           You can bring in the jury.

18           (Continued on next page)

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE DEPUTY CLERK:  All rise

3              THE COURT:  Please be seated.

4              Good morning, ladies and gentlemen.  We will be

5    continuing this morning with the direct examination of Officer

6    Cadavid.

7              Officer Cadavid, you remain under oath.

8              Please proceed.

9              MS. FADDIS:  Thank you, your Honor.

10    JOSE CADAVID, resumed.

11   DIRECT EXAMINATION

12   BY MS. FADDIS:

13   Q.  Good morning, Officer Cadavid.

14   A.  Good morning, counsel.

15   Q.  I just want to start where we picked up -- or where we left

16   off yesterday.  You were describing for the jury that --

17   plaintiffs' behavior when you first approached his door and

18   started asking questions about his daughter.

19              Do you remember giving that testimony yesterday?

20   A.  Yes.

21   Q.  And just so we again pick up where we left off, can you

22   describe for the jury, when the door was closed and you were

23   talking to the plaintiff about his daughter initially, what was

24   his -- can you describe in sum and substance his response to

25   you?

1   A.  His response -- he was yelling, cursing at us behind a

2   closed door, and refusing to answer my questions.

3   Q.  And what questions -- again, you said you don't recall

4   specific words, but do you remember in sum and substance what

5   questions you were asking him?

6   A.  If I -- if we could talk to him; if he could open the door;

7   if I could see his daughter; and the whereabouts of his

8   daughter.

9   Q.  And did you convey to the plaintiff at that point, before

10  the door was open, that you were there to check on the welfare

11  of his daughter?

12  A.  Yes.

13  Q.  At any point, before that door opened, did the plaintiff

14  tell you that his daughter was not home?

15  A.  No.

16  Q.  At any point before that door opened, did the plaintiff

17  tell you that he had custody of his daughter and the mother had

18  no right to see her?

19  A.  No.

20  Q.  Now, Officer Cadavid, you've been a police officer for 17

21  years, right?

22  A.  Correct.

23  Q.  Was that the first domestic incident that you responded to

24  as a police officer?

25  A.  No.

1    Q.  And based on your experience as a police officer with

2    domestic incidents, are there any particular concerns you have

3    when responding to that type of job?

4              MS. GELLER:  Objection -- withdrawn.

5              THE WITNESS:  May I answer?

6              THE COURT:  You may answer.

7    A.  I'm sorry.  Can you repeat the question?

8    Q.  Absolutely.

9              Are there any specific concerns that you have as a

10   police officer responding to a domestic incident type job as

11   opposed to some other type of police job?

12   A.  Yes.

13   Q.  And could you just describe just generally for the jury

14   what those are?

15   A.  Generally, when we're responding to a domestic incident,

16   it's a more dangerous job for us to respond.  One reason is

17   because the layout of the apartment, we don't know the layout

18   of the apartment.  They do, the caller, or whoever's involved

19   in the family incident.  So we're at a disadvantage there.  And

20   normally, in a family dispute, both parties are heated.  So

21   when we arrive, they are already upset, angry, so we're

22   responding to a situation where both parties are already

23   heated, and we have to try to mediate the situation, and try

24   and calm everybody down.

25   Q.  Officer Cadavid, at some point after you told Mr. Rattray

1   that if he didn't open the door, it might be taken off, he did
2   open the door, right?
3   A.   Correct.
4   Q.   Okay.  And after the door was opened, what happened?
5   A.   After he opened the door, I immediately put my foot in the
6   doorway.
7   Q.   And could you just tell the jury why you did that?
8   A.   From experience, I've had multiple times where they will
9   open the door, and then they will shut it in my face.
10  Q.   So why is that a problem, or is that a problem?
11  A.   Because now I have to try and get the door open again.
12  Q.   Okay.  And why do you need the door open?
13  A.   Because in this incident, I'm trying to investigate the
14  welfare of their daughter.
15  Q.   Why does it matter in investigating the welfare of his
16  daughter if the door is open or not?
17  A.   Because if the door is not open, it becomes harder for us.
18  I have to go through the channels to try and get the door open,
19  so it becomes harder for me.  If the door is open, I could stop
20  it from being shut closed.
21  Q.   After -- what was the conversation that you had --
22  withdrawn.
23          What, if anything, did you say to the plaintiff after
24  he opened the door?  And, again, in sum and substance if you
25  don't recall the specific words.

1    A.  After he opened the door and I put my foot in the doorway,

2    I kept asking him if I could see his daughter, the whereabouts

3    of her, if she was home, and that I needed to see her.

4    Q.  And what was the plaintiff's reaction?

5    A.  He was refusing to answer my questions.  He was still

6    yelling, cursing, and he stated that we had no search warrant.

7    Q.  At that point, had you entered his home?

8           Let me be more specific.  At the point where the

9    plaintiff first said to you "you don't have a search warrant,"

10   had you entered his home yet?

11   A.  No.

12   Q.  Up to that point, had you told him you were going to enter

13   his home?

14   A.  No.

15   Q.  And can you describe what happened next?

16   A.  Mr. Rattray tries to close -- he tries to push the door

17   closed, but because my foot was in the way, he was unable to.

18   Now, at this point I'm more concerned, because he's trying to

19   close the door on us, and that's leading me to believe that

20   he's trying to hide something, why is he not producing his

21   daughter, showing me his daughter.

22          So at this point, I'm -- my concern level rises.  Now

23   I push my way in.

24   Q.  When you say your concern level rises, what were you

25   concerned about?

1    A.   The safety of his daughter.

2    Q.   And you said that he was closing the door, you thought he

3    might be trying to hide something, and that raised your concern

4    level, right?

5    A.   Correct.

6    Q.   Before he did that, did you have concerns about the safety

7    of his daughter?

8    A.   I still had concerns.

9    Q.   And prior to him trying to close the door, what were your

10   concerns based on?

11   A.   My concern was based on the allegations of Ms. Sandy, and

12   the way Mr. Rattray was acting, his demeanor, the way he was

13   yelling at us.

14   Q.   You said your foot prevented the door from closing.  What

15   happened next?

16   A.   So Mr. Rattray tried closing the door.  At this point -- at

17   this point I had to make a split second decision.  I -- the

18   best decision I could make was I pushed my way into the

19   apartment.

20   Q.   And when you pushed your way into the apartment, what was

21   the first thing you did when you crossed into the apartment?

22   A.   The door swung open.  Mr. Rattray stepped back, a few feet

23   back.  I entered the apartment.  I was approximately maybe a

24   foot into the apartment.

25   Q.   Okay.  And what happened next?

1    A.  I was still asking Mr. Rattray for the whereabouts, if I

2    could see his daughter, if she was home.  Mr. Rattray still

3    refused to answer.

4    Q.  When you say he refused to answer, do you -- did he say or

5    do anything, or was he completely silent, or something else?

6    A.  No.  He was still -- he was still yelling, still cursing at

7    us.  At this time, he mentioned that we had no search warrant,

8    and his yelling started getting more and more and more loud, to

9    the point where his voice was almost becoming high-pitched.

10   Q.  And what did you do next?

11   A.  I continued asking Mr. Rattray information about his

12   daughter, the whereabouts, if I could see her, and he was still

13   refusing.  At this point I took it upon myself to start looking

14   around the apartment while my partner watched Mr. Rattray.

15   Q.  When you say you were looking around the apartment, what

16   specifically did you do?

17   A.  I walked around the apartment.  I went into the bedrooms.

18   Q.  So you went into the bedrooms.  Where else in the apartment

19   did you go?

20   A.  The bathroom.

21   Q.  Did you look in any closets?

22   A.  Yes, I did.

23   Q.  Okay.  Did you look in the kitchen cabinets?

24   A.  No.

25   Q.  Why not?

1    A.  I was looking in general areas where the body of a girl

2    could fit.

3    Q.  And did you find the plaintiff's daughter?

4    A.  No, I did not.

5    Q.  At that point, did you have any reason to believe that

6    Mr. Rattray's daughter was in the apartment?

7    A.  No.

8    Q.  So once you determined that she wasn't in the apartment,

9    what did you do?

10   A.  I was still asking Mr. Rattray about the whereabouts, where

11   his daughter was, a few other things that I don't -- I don't

12   remember.

13   Q.  When you say a few other things, what do you mean?

14          MS. GELLER:  Objection.  He just said he doesn't

15   remember.

16          MS. FADDIS:  I'm just trying to understand if he asked

17   other questions, or what he means by that, your Honor.

18          THE COURT:  Okay.  Go ahead.

19          THE WITNESS:  I did ask him about his daughter, where

20   she was.  I also asked -- I remember asking him about court

21   paperwork.

22   Q.  Up to this point, are you -- so you've now completed the

23   search, and his daughter's not in the apartment, right?  That's

24   where we are in the story, right?

25   A.  Correct.

1    Q.  Up to that point, had Mr. Rattray ever said to you "my

2    daughter's not home?"

3    A.  He was still refusing to answer my questions.

4    Q.  Up to that point, had he ever said "she's with friends?"

5    A.  No.

6    Q.  Up to that point, had he ever said "her mother doesn't have

7    any right to see her today; I have email that proves it?"

8    A.  No.

9    Q.  Did he ever try to show you any paperwork?

10   A.  No.

11   Q.  And at some point did you or your partner request a

12   supervisor to the scene?

13   A.  Yes.

14   Q.  Why?

15   A.  Because I still need to know where his daughter was.  Since

16   I was trying to investigate her whereabouts, Mr. Rattray was

17   refusing to answer my questions, I needed my supervisor's

18   assistance, and Mr. Rattray also requested a full supervisor.

19   Q.  When you say you were investigating her whereabouts, do you

20   have concerns for her physical well being at this point?

21   A.  Yes.

22   Q.  Why?

23   A.  Because, based on the allegations of the mother, based on

24   how Mr. Rattray was acting, his demeanor, and his refusal to

25   answer my questions of where she was, her whereabouts, I was

1   more concerned about her well being and her safety.

2   Q.  At some point did a supervisor come to Mr. Rattray's

3   apartment?

4   A.  Yes.

5   Q.  Did you overhear the plaintiff make a 911 call?

6   A.  Yes.

7   Q.  And did you say anything on that 911 call?

8   A.  Yes.

9   Q.  What was that?

10  A.  I read out my badge number.

11  Q.  Why did you do that?

12  A.  So the 911 operator knows that there are officers there,

13  and to identify myself to the 911 operator.

14  Q.  And was that 911 call placed before or after you had

15  requested a supervisor to the scene?

16  A.  After.

17  Q.  Do you recall how long it took a supervisor to respond?

18  A.  My recollection, 20, 30 minutes.

19  Q.  And during that 20 to 30 minutes, where were you?

20  A.  I -- at that point, I was standing by the doorway.

21  Q.  When you say by the doorway, were you inside or outside of

22  the apartment?

23  A.  I was inside of the apartment, approximately a foot in

24  front of the doorway.

25  Q.  Was the door open?

1    A.  Yes.

2    Q.  Why did you remain in the apartment?

3    A.  Because we were waiting for the supervisor, and there was

4    an ongoing investigation.

5    Q.  When you say there was an ongoing investigation, what do

6    you mean?

7    A.  I was still -- I was investigating the whereabouts of his

8    daughter.

9    Q.  And you said you were by the door.  Where is the plaintiff?

10   A.  He's -- so there's a kitchen counter that runs

11   approximately three to four feet in front of me.  So he's

12   sitting at the edge of the kitchen counter.

13   Q.  And you said a moment ago that the door remained open the

14   whole time, right?

15   A.  Yes.

16   Q.  Why did the door remain open?

17   A.  So Mr. Rattray was still yelling at the top of his lungs.

18   At this time, while he's sitting at the edge of the counter, he

19   starts slamming the kitchen counter.  And the kitchen is --

20   it's right there, and I notice a block with knives.  And I'm

21   becoming more concerned, because now this could escalate to a

22   whole different level.  So I stand by the doorway, just in

23   case, if it does escalate, I could close the door and run down

24   the hallway to give myself distance between me and Mr. Rattray.

25   Q.  Was the plaintiff free to leave his apartment while you

1   were waiting for your supervisor?

2   A.   No.

3   Q.   Why not?

4   A.   First, he requested a supervisor, he wanted to speak to a

5   supervisor.  Second, it was a pending investigation.  I was

6   still -- I still needed to know the whereabouts of his

7   daughter.  At this point, I don't know if there was a crime

8   committed in regard to his daughter.

9   Q.   I'm sorry.  What was the last thing you said?

10  A.   At that point, I don't know whether there's a crime

11  committed against -- in regards to his daughter.

12  Q.   You don't know if there was a crime committed against his

13  daughter?

14  A.   Yes.

15  Q.   Did you suspect there was a crime committed against his

16  daughter?

17  A.   At that point, yes, I was suspecting.

18  Q.   And what was that suspicion based on?

19  A.   That suspicion was based on the mother's allegations,

20  Mr. Rattray's demeanor, his actions, and also his refusal to

21  answer my questions, to tell me her whereabouts, where she was,

22  and the fact that he tried closing the door on us.

23  Q.   Officer Cadavid, who was the supervisor who arrived on the

24  scene?

25  A.   Lieutenant Khosh.

1    Q.  And what happened when the lieutenant arrived?

2    A.  When the lieutenant arrived, I spoke to him.  I explained

3    to him the situation.  And then the lieutenant wanted to go

4    speak to Mr. Rattray.

5    Q.  Were you -- did you overhear the conversation between the

6    lieutenant and the plaintiff?

7    A.  Yes.

8    Q.  Do you -- what do you recall, if anything, about that

9    conversation?

10   A.  I recall the lieutenant telling Mr. Rattray, why are you

11   not cooperating with my officers, and he asked him for -- if he

12   had any paperwork, anything from the courts in regard to

13   visitation of their daughter, and he also asks the whereabouts

14   of Mr. Rattray's and Sandy's daughter.

15   Q.  And do you know if the plaintiff provided the lieutenant

16   any information?

17   A.  Yes.

18   Q.  Okay.  And do you know what that information consisted of?

19   A.  The whereabouts of his daughter.

20   Q.  What --

21            MS. GELLER:  Object -- withdrawn.

22   Q.  What, if any, further action did the lieutenant take that

23   you observed?

24   A.  The lieutenant took that information.  There was a call

25   made to where his daughter was to confirm that she was there.

1           MS. GELLER:  Objection, your Honor.  Foundation.

2           THE COURT:  Well, can you explore that?

3           MS. FADDIS:  Yes, your Honor.  The specific question

4    was what he observed, so I assume that's what he's responding

5    to, but let me pause here.

6    Q.  And, Officer Cadavid, let me ask you, you mentioned a phone

7    call.  Were you present for that phone call?

8    A.  Yes.

9    Q.  Okay.  Did you observe the lieutenant make a phone call?

10   A.  Yes.

11   Q.  Could you hear his side of the phone call?

12   A.  The lieutenant's side, yes.

13   Q.  Could you hear the other side?

14   A.  No.

15   Q.  Okay.  Based on the lieutenant's side of the phone call,

16   did you have an understanding of what the phone call consisted

17   of?

18   A.  Yes.

19   Q.  Okay.  And could you describe what the phone call consisted

20   of?

21   A.  I heard the lieutenant asking if their daughter was at the

22   location -- at the number that he was calling, and he asked for

23   the address.

24   Q.  Okay.  Do you know, again based on your own observations,

25   if the lieutenant took any further action to ascertain the

N8VDRAT1                         Cadavid - Direct

1    location of the plaintiff's daughter?

2    A.  Yes, he did.

3    Q.  And what was that?

4    A.  He was going -- he sent a unit over to that address to

5    physically confirm that she was there and she was okay.

6             MS. GELLER:  Objection, your Honor.  This is now

7    hearsay.

8             THE COURT:  I'm sorry.  I can't hear you.

9             MS. GELLER:  This is now hearsay.

10             THE COURT:  Well, you're going to have to lay a

11   foundation for how he knows this.

12             MS. FADDIS:  Sure, your Honor.

13   BY MS. FADDIS:

14   Q.  Did you have a further conversation with the lieutenant

15   after the phone call that he made?

16   A.  Yes.

17   Q.  Did he communicate to you that he intended to take any

18   further steps with regard to the plaintiff's daughter?

19   A.  Yes.

20   Q.  Okay.  And what did he communicate with you?

21             MS. GELLER:  Objection.  Still hearsay, your Honor.

22             MS. FADDIS:  It goes to his understanding, your Honor.

23             THE COURT:  I'll see the lawyers at sidebar.

24             (Continued on next page)

25


                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

N8VDRAT1                    Cadavid - Direct

1          (At sidebar; jury not present)

2          THE COURT:  I don't see it as hearsay.  Well, I'm not

3    sure exactly what the testimony is going to be, but if the

4    testimony is going to be that he told -- that the lieutenant

5    told Cadavid that he was sending a unit over to check on the

6    daughter, I don't see how that's hearsay.  It's not being

7    offered for the truth.

8          MS. GELLER:  Okay, your Honor.  I understand the

9    ruling.

10         THE COURT:  Is that what the testimony is?

11         MS. FADDIS:  That's it, your Honor.  Thank you.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2    BY MS. FADDIS:

3    Q.  Officer Cadavid, I'm just going to reask the last question.

4    Did you have an understanding of what the next steps Lieutenant

5    Khosh continued to take were?

6    A.  Yes.

7    Q.  Could you describe what he relayed to you?

8    A.  The next step was to send a police car over to the location

9    where their daughter was, and to physically confirm that she

10   was there and she was okay.

11   Q.  All right.  After that happened, what did you do?

12   A.  After that happened, we were satisfied that the daughter

13   was okay, we left.

14   Q.  When you say "we," who are you referring to?

15   A.  I'm sorry.  My partner and Lieutenant Khosh.

16   Q.  Okay.  Did you ever return to Ms. Sandy, to speak with

17   Ms. Sandy?

18   A.  Yes.

19   Q.  Okay.  Did you speak with her or did Officer Trigueno speak

20   with her or someone else?

21   A.  I believe I spoke to her.

22   Q.  Did Ms. Sandy complete a domestic incident report as far as

23   you know?

24   A.  Yes.

25   Q.  Did you assist her in -- well, did you prepare --

1   withdrawn.

2           The domestic incident report has to be completed by

3   both the victim and a police officer, right?

4   A.  Correct.

5   Q.  Were you the police officer that completed any portion of

6   the domestic incident report?

7   A.  I was not.

8   Q.  At any time did you have to review the domestic incident

9   report to verify it?

10  A.  No.

11  Q.  Now, Officer Cadavid, at any time on November 5th, 2016,

12  was the plaintiff arrested?

13  A.  No.

14  Q.  Did you ever threaten to place him in handcuffs?

15  A.  No.

16  Q.  Okay.  Did you have grounds to arrest him?

17  A.  Yes.

18  Q.  And for what?

19  A.  When I was asking Mr. Rattray for information in regard to

20  his daughter, he was refusing, and the fact that he tried

21  closing the door on us, I -- I had grounds of OGA, which is

22  obstructing governmental administration, in regard to my

23  investigation.

24  Q.  All right.  Officer Cadavid, I want to detour a little bit.

25  In 2017, did you give a statement in connection with a NYPD

1  investigation relating to an off-duty incident that you were

2  involved in?

3  A.  Yes.

4  Q.  Okay.  And were you charged administratively by your

5  employer, the NYPD, with making a false statement in that case?

6  A.  Yes.

7  Q.  And did you plead guilty to that administrative charge?

8  A.  I did.

9  Q.  And did you, in fact, make a false statement in the course

10  of that investigation?

11  A.  I did not.

12  Q.  I'm sorry.  The door closed.  I didn't hear you.

13  A.  No.

14  Q.  Why did you plead guilty to something you didn't believe

15  you had done?

16  A.  Okay.  So pending the investigation, I was placed on

17  administrative duty --

18            MS. GELLER:  Your Honor, I have an objection here.

19            THE COURT:  All right.  Do you want to be heard at

20  sidebar?

21            MS. GELLER:  Yes, please.

22            (Continued on next page)

23

24

25

1          (At sidebar; jury not present)

2          THE COURT:  So the background here is that at the

3    motion in limine stage, I addressed this issue of the officer

4    having plead guilty to making a false statement in the context

5    of a NYPD investigation of a hit and run, and I recollect that

6    there was an agreement between the lawyers put on the record at

7    the conference in which I ruled on the motions in limine that

8    plaintiff would be permitted to ask questions, ascertaining

9    that the officer had pled guilty or admitted making a false

10   statement in the context of an official NYPD investigation.

11   But counsel agreed that she would not go into the underlying

12   circumstances of the incident, which, as I said, was an alleged

13   hit and run.

14          So now we appear to be exploring the circumstances of

15   the officer's admission to the false statement.  I'm surprised,

16   because I thought we had an understanding of what was going to

17   come in concerning this incident.

18          So where are we going?

19          MS. FADDIS:  Yes, your Honor.

20          So the issue that I am trying to navigate very

21   carefully is that, as I recall the questions the plaintiff was

22   to be permitted were of the facts -- that plaintiff was to be

23   permitted to inquire into included asking the officer whether

24   he made a false statement in the course of an investigation.

25   The problem with that question is his response is going to be

1    no, because he does not believe he made a false statement.

2            He will, of course, admit that he plead guilty to it,

3    and certainly the ramifications of that are going to be

4    elicited, but he cannot truthfully for himself say that he made

5    a false statement.  So that's the conundrum that I am faced

6    with.

7            The only testimony that I intend to elicit will not

8    get into the underlying incident obviously.  As the Court noted

9    because of 403 implications and the probable -- because it

10   could become a side show in this case -- I am happy to withdraw

11   the question if plaintiff's counsel is not going to pursue this

12   line of questioning.  My expectation was if plaintiff's counsel

13   elicited the answer from him, that he did not, in fact, believe

14   he had made a false statement, I anticipate plaintiff's counsel

15   would ask the question, then why would you have pled guilty if

16   you didn't make the statement.  So it was simply to take the

17   sting out of it we were asking it now.

18           If that's not their intention, and they were not going

19   to do that, I'll withdraw the question, and we'll move on, and

20   we'll be done with it.

21           MS. GELLER:  Well, I'm a little perturbed, because we

22   had several conversations about this.  Counsel's concern was

23   very much that the hit and run issue not come into evidence,

24   because it was a side show.  We discussed pretty much in detail

25   what it would look like.  You wrote it up based on your

N8VDRAT1                        Cadavid - Direct

1    conversation with the Court, in which case an open-ended

2    question of why would you plead guilty if you didn't do it is

3    not a question that I think would be appropriate to ask.

4                   If you say --

5              THE COURT:  Well, we need to cut to the chase here.

6              MS. GELLER:  Yes, your Honor.

7              THE COURT:  I tend to agree with Ms. Geller that I did

8    not come away from the conference with any understanding that

9    he was going to dispute the merits of his plea.  There was

10   nothing that was said that would have suggested to anyone that

11   he actually was going to say that he plead guilty, but wasn't,

12   in fact, guilty of making a false statement.  There was no hint

13   of that, no intimation of that, and so that's why this is

14   surprising.

15             MS. FADDIS:  I apologize, your Honor.  I thought your

16   Honor had discussed sort of the factual background of the case

17   enough that that -- that how he came to the plea would have

18   been discussed, and certainly I apologize if that was my

19   oversight.  Again, he's not going to talk about the underlying

20   incident itself.

21                  I can proffer that his answer I expect will be that he

22   had been placed on modified duty pending the investigation.  He

23   wanted to resume work, and also that he was concerned about

24   that if he challenged it and lost, he was going to lose his

25   job, so he accepted his plea.  Plaintiff's counsel of course is

N8VDRAT1                        Cadavid - Direct

1    free to probe the merits of credibility of, you know, why --

2    what his explanation is.  And I don't think any of that needs

3    to touch the underlying incident itself, but I do think, given

4    the question that plaintiff's counsel intended to ask, and what

5    I understood and understand his answer was going to be, I sort

6    of -- don't have an alternative, but to offer some

7    explanations, unless plaintiff's counsel is not going to probe

8    the discrepancy, and certainly no one is disputing the legal

9    effect of the plea -- he was, in fact, found guilty by his own

10   admission, and he accepted discipline for it.  But he --

11         MS. GELLER:  The problem here is -- the question is,

12   you pled guilty to this, and he says he didn't do it.  Okay.

13   But you pled guilty, didn't you?  And that means you admitted

14   to the conduct.

15         But now they've opened up this idea that he's now

16   disputing his plea, and it allows them to rehabilitate the

17   witness before I impeached him, and ties my hands in the

18   ability to impeach his rehabilitation.  And that is not fair.

19   We had a very clear agreement about the scope of what this

20   could be, and I remember specifically the facts of the hit and

21   run were not coming in.  And so I would move to strike, your

22   Honor.

23         MS. FADDIS:  Your Honor, again, just to --

24         THE COURT:  Well, it has nothing to do with the hit

25   and run at all.  What we're talking about is his admission to

1  having made a false statement in the context of a NYPD

2  investigation.  That's what he -- that's what I understood we

3  were offering evidence on.

4             MS. GELLER:  Correct.

5             THE COURT:  It turns out, to our surprise, that even

6  though he pled guilty to making a false statement in the

7  context of an official NYPD investigation, he actually believes

8  that he did not make a false statement in the context of an

9  NYPD investigation.  So the circumstances of his plea have

10 become a lot more complicated than we understood at the time,

11 or at least I understood at the time.

12            So what counsel is saying is that she was concerned

13 that your questions about the plea would cause him to say that,

14 actually, he didn't make a false statement, but he plead guilty

15 to it anyway, and counsel wanted to get that unpleasant fact

16 out on the record now, and not wait for it to come out on

17 cross.

18            So to return to the context, the issue is whether you

19 intend to probe the circumstances of his false statement, or

20 whether you intend to just elicit that he made -- that he plead

21 guilty to making that false statement in context of an

22 unofficial NYPD investigation or not.

23            MS. GELLER:  Well, no.  The answer to the question is

24 I do not intend, or -- do not intend to probe the circumstances

25 of his false statement, because the Court's ruling was very

1    clear on that.  And we discussed it in limine, and we discussed
2    in particular the circumstances of the underlying issues behind
3    the plea.  And to the extent that he would say no -- and, quite
4    frankly, the fact that he doesn't believe that he actually did
5    something wrong is in his deposition, so this is not a new
6    issue.  We were aware of it.
7             THE COURT:  I wasn't, but --
8             MS. GELLER:  And when we brokered that agreement, that
9    was specifically with that in mind, that he might say no, in
10   which case the answer is, but you admitted it, didn't you?
11   That's what a plea means.  You admitted it.
12            MS. FADDIS:  Now, your Honor, I'm confused, because a
13   moment ago, my understanding was counsel was professing
14   surprise at his answer he didn't believe he made a false
15   statement, and now there's acknowledgment it was brought in
16   deposition and wasn't a surprise at all.
17            THE COURT:  Were you speaking of the hit and run, or
18   the false statement?
19            MS. GELLER:  I'm speaking about the hit and run, your
20   Honor.
21            THE COURT:  Okay.  His dispute about the hit and run
22   came out in deposition, but not his belief that, actually, he
23   had not made a false statement in the context of an
24   investigation --
25            MS. FADDIS:  Your Honor, I don't want to drag this out

 1    longer, but at bottom, they're part and parcel, because the

 2    statement, as I understand it, that seemed to have been made

 3    falsely, was regarding knowledge of his involvement.  And so

 4    the fact that it's been apparent to everyone that he has always

 5    maintained that when the accident happened, and he was not --

 6    the accident was he clipped someone, a vehicle mirror.  He has

 7    always maintained he didn't know it happened when it happened,

 8    and when he was told by a pedestrian on the roadway, he turned

 9    around and went back.

10         So he was then charged for saying in the investigation

11    that he didn't know, and ultimately resolved both those charges

12    with a plea.  I'm a little bit sort of stuck here, because he

13    can't honestly say he believes he made a false statement.  He

14    has already said he plead guilty to it, and elicited -- we

15    elicited he was disciplined for it.  If counsel is not going to

16    probe the discrepancy between his belief and the plea, then I'm

17    happy to leave it, and we don't need the answer.

18         THE COURT:  Would you be happy if I just struck the

19    question and answer?  Would that be satisfactory or not?

20         MS. GELLER:  Yes, your Honor.

21         I think we can strike the question and answer. I just

22    would like, just for the record, the circumstances of the hit

23    and run and the false statements themselves were all redacted

24    out of the information we have.  This actually is the first

25    time that I am hearing this, so I couldn't even probe it if I

1   wanted to.  But I do think it's fair for him to say -- I think

2   he can say, I don't think I made a false statement.  I think he

3   can say, I plead guilty because I wanted to get back to work.

4   It's fair game to say, but a plea is a plea.  You admitted it.

5   But I don't think it's fair to have him explain all the

6   circumstances of the case and information that we don't --

7            THE COURT:  I agree.

8            MS. FADDIS:  And I think I had said several times we

9   have no intension to do that.  The answer was he wanted to get

10  back to work, and, I didn't want to lose my job.

11           THE COURT:  Okay.  I'm going to propose that I strike

12  the question and answer, with the understanding that all the

13  plaintiff's counsel is going to get into is that he pled guilty

14  to making a false statement in the context of that NYPD

15  investigation.

16           Is that fair?

17           MS. GELLER:  Yes, your Honor.  That is my

18  understanding of the rulings in limine as well.

19           MS. FADDIS:  That's fair, your Honor.  Thank you very

20  much.

21           THE COURT:  Okay.

22           (Continued on next page)

23

24

25

N8VDRAT1                    Cadavid - Direct

1              (In open court; jury present)

2              THE COURT:  Sorry for the delay, ladies and gentlemen.

3    I am going to strike the last question and answer.  You should

4    disregard it.  It should play no role in your deliberations.

5              All right.  Go ahead.

6    BY MS. FADDIS:

7    Q.  Officer Cadavid, in connection with the guilty plea that

8    you testified to a moment ago, were you disciplined by your

9    employer?

10   A.  Yes.

11   Q.  And what was that discipline?

12   A.  It was one year probation, dismiss probation, and 30

13   vacation days taken away.

14   Q.  That was in 2017?

15   A.  For the 2017 incident.

16             THE COURT:  When you say dismissal of probation, does

17   that mean at any time during the one-year period, you could

18   have been dismissed at the discretion of the police

19   commissioner?

20             THE WITNESS:  Correct.

21             THE COURT:  Okay.

22   Q.  Officer Cadavid, were you equipped with a body-worn camera

23   on the date of this incident?

24   A.  No.

25   Q.  Had body-worn cameras been issued to your precinct at that

N8VDRAT1                     Cadavid - Direct

1    time?

2    A.   No.

3    Q.   Officer Cadavid, as a general matter, do you have an

4    understanding of whether a warrant is required to enter

5    someone's home without their permission?

6    A.   Yes.

7    Q.   What is our understanding?

8    A.   One, a crime being committed; and the second reason is

9    there's a medical emergency.

10   Q.   Did you have a warrant to enter the plaintiff's home in

11   this case?

12   A.   No.

13   Q.   Did you go get a warrant?

14   A.   No.

15   Q.   Why not?

16   A.   The process to get a warrant, it takes a lot of time.  It

17   takes -- it could take up to one, two days to actually get a

18   warrant.

19   Q.   So why didn't you get a warrant in this case?

20   A.   Based on the allegations of the mother, there was no time

21   to actually go get a warrant.

22   Q.   And when you entered the plaintiff's apartment without a

23   warrant, on what grounds do you believe you were able to do so?

24   A.   That the daughter was not safe, that she was in danger.

25   Q.   And I just want to recap.  When you approached the

1    plaintiff's apartment, were you concerned for his daughter's

2    safety?

3    A.   Yes.

4    Q.   Do you believe that she was possibly in danger?

5    A.   Yes.

6    Q.   And at that moment when you first approached his apartment,

7    why did you believe that she was possibly in danger?

8    A.   I was going based on the allegations of the mother, her

9    demeanor, how she was hysterically crying.  That gave me

10   concern that she was concerned for her daughter's safety.

11   Q.   And what specific allegations did she make regarding her

12   daughter's safety?

13   A.   She stated to me that her daughter was not safe in the

14   apartment, that Mr. Rattray does drugs, and that he

15   occasionally has drug dealers over at the apartment.

16   Q.   And when you first engaged the plaintiff, you're speaking

17   to him at his doorway, did you have concerns at that time

18   regarding his daughter's safety?

19   A.   While speaking to Mr. Rattray, my concern was rising.

20   Q.   I'm sorry.  I didn't hear that answer.  What was that?

21   A.   My concern was -- I was having more concern.

22   Q.   Okay.  And why?

23   A.   Again, based on the allegations of the mother, her

24   demeanor, and with the briefings that I was having with

25   Mr. Rattray while the door was closed, his actions, his

1    demeanor, his refusal to answer my questions, I was becoming

2    more concerned.

3    Q.  And after you entered the plaintiff's apartment, were you

4    still concerned for his daughter's safety?

5    A.  Yes.

6    Q.  Did you say at that point your concerns were the same as,

7    greater than, or less than, something else, the concerns you

8    had before you entered?

9    A.  I'm sorry.  Can you repeat?

10   Q.  I'm going to withdraw that question, because it was

11   terrible.

12        Let me ask you again.  What was your level of concern

13   after you searched the plaintiff's apartment compared to when

14   you were standing in the hallway outside his apartment?

15   A.  It was higher.

16   Q.  Why?

17   A.  Because he -- I -- the fact that the daughter was not in

18   the apartment, and he was still not telling me where she was, I

19   was concerned that something could have happened to her, and

20   that he's trying to hide it, he's not telling me where she is.

21   Q.  And, again, at any point did the plaintiff make any effort

22   to resolve those concerns that you had?

23   A.  No.

24        MS. FADDIS:  One moment, your Honor.  Nothing further

25   at this time, your Honor.

1           THE COURT:  All right.  Cross-examination.

2           MS. GELLER:  Thank you, your Honor.

3    CROSS-EXAMINATION

4    BY MS. GELLER:

5    Q.  Good morning, Officer Cadavid.

6    A.  Good morning, counsel.

7    Q.  I'd like to start, if I can, just at the end of your

8    testimony there.  We talked a little about were your

9    disciplined at the NYPD, right?

10   A.  Correct.

11   Q.  And in the course of an NYPD investigation, you were

12   charged with making a false statement?

13   A.  Correct.

14   Q.  And that was an investigation in which you were asked

15   questions, was it by IAB?

16           MS. FADDIS:  Objection, your Honor.  May we approach?

17           THE COURT:  Yes.

18           (Continued on next page)

19

20

21

22

23

24

25

N8VDRAT1                    Cadavid - Cross

1                    (At sidebar; jury not present)

2                    THE COURT:  Yes.

3                    MS. FADDIS:  Your Honor, we spent approximately 15

4        minutes hashing out what the cross-examination was going to be

5        on this topic, and this was not addressed.  And, certainly,

6        going into the nature of the investigation starts to chip away

7        at the very carefully brokered agreement we have had about what

8        can come into evidence about this discipline.

9                    THE COURT:  Well, I don't know how many questions

10       there are going to be, but I don't see anything improper with

11       asking who was asking the questions of him to which he lied.  I

12       don't see the problem with that particular question.

13                   MS. GELLER:  I'm simply going to ask that he was

14       expected to tell the truth of whoever he was going -- of

15       whoever he was talking to, and that he chose not to, and that

16       he pled guilty to it.

17                   MS. FADDIS:  I think the question could be asked

18       without implicating IAB or confusing the jury.

19                   THE COURT:  Well, they already heard about IAB.

20       There's already been testimony about IAB.

21                   MS. FADDIS:  I understand, your Honor, but with regard

22       to this context, when you -- the question is simply, you made

23       the statement, you're under an obliquation to tell the truth,

24       that's the question --

25                   THE COURT:  No, I think she's entitled to elicit who's

1    asking the questions.  I don't see an issue with that,

2    particularly given the jury's heard about the internal affairs

3    bureau extensively in the context of Mr. Rattray giving an

4    interview with them.

5         MS. FADDIS:  All right.  There was a proffer that -- I

6    don't know that the answer was yes, but we'll see what the

7    answer was.

8         THE COURT:  Okay.  Do you know who it was?

9         MS. GELLER:  I don't, and the point I will elicit

10   eventually, your Honor -- this was an official investigation.

11   That's the point.

12        MS. FADDIS:  Your Honor, if there's no good basis to

13   establish it was elicited from IAB, why not -- go down that

14   lane, since there's no reason to think IAB was even asking the

15   questions.  There was an investigation.  He had an obligation

16   to tell the truth --

17        THE COURT:  Well, it seems to me that IAB investigates

18   police officers, so I'm not sure you need any more than that

19   for a basis to answer the question.  He was under investigation

20   for conduct committed off duty.  That's ordinarily something

21   performed by the Internal Affairs Bureau.  If he says no, he

22   says no.  But I think there's a good faith basis for asking the

23   question.

24             (Continued on next page)

25

N8VDRAT1                         Cadavid - Cross

1              (In open court; jury present)

2    Q.  Officer, that investigation, was that conducted by IAB?

3    A.  No.

4    Q.  That -- and just for the jury's edification, IAB is the

5    Internal Affairs Bureau, right?

6    A.  Yes.

7    Q.  But it was an official investigation, right?

8    A.  Yes.

9    Q.  By another arm of the New York Police Department?

10   A.  Yes.

11   Q.  And in the course of that investigation, you were expected

12   to tell the truth, right?

13   A.  Yes.

14   Q.  And you understood that you were expected to tell the

15   truth?

16   A.  Yes.

17   Q.  And you admitted -- well, withdrawn.

18              You took a plea to making a false statement, right?

19   A.  Right.

20   Q.  And that effectively means that you admitted it, correct?

21   A.  No.

22   Q.  You pled guilty to making a false statement?

23   A.  Correct.

24   Q.  In an official NYPD investigation, correct?

25   A.  Correct.

N8VDRAT1                         Cadavid - Cross

1   Q.  And for that you were put on probation?

2   A.  Yes.

3   Q.  Just at the end of your testimony there -- no.  Withdrawn.

4          Let's go to your first contact with Ms. Sandy.

5          MS. GELLER:  If your Honor will forgive me a moment.

6   Q.  I think yesterday you testified that you encountered

7   Ms. Sandy in front of Mr. Rattray's apartment building?

8   A.  Yes.

9   Q.  And prior to that, you knew where to go, because dispatch

10  had told you where to go, right?

11  A.  (Nodding head)

12  Q.  And as part of the radio call, dispatch said, female

13  caller, crying, hysterical, father will not give child back, or

14  something to that effect, correct?

15  A.  Correct.

16  Q.  And so you understood when you got there that was a custody

17  dispute?

18  A.  Yes.

19  Q.  You already testified that, in terms of custody disputes,

20  that often when you get there people are already upset?

21  A.  Correct.

22  Q.  Things have already gotten heated, right?

23  A.  Yes.

24  Q.  So responding to a custody dispute with a crying

25  complainant is not necessarily an unusual thing, right?

1   A.  Correct.

2   Q.  And that does not automatically mean that the person who is

3   crying is entirely correct, correct?

4   A.  I'm sorry.  I didn't --

5   Q.  I'll withdraw the question.  Let me ask it a different way.

6         The person crying is not always in the right, correct?

7   A.  I can't determine that.

8   Q.  Well, you arrive on the scene, and there's somebody crying,

9   right?

10  A.  Yes.

11  Q.  And they tell you a story, correct?

12  A.  Correct.

13  Q.  And there's somebody else on the scene who's maybe also

14  upset, right?

15  A.  Correct.

16  Q.  And they tell you a story, right?

17  A.  Correct.

18  Q.  And just because somebody's crying doesn't mean that their

19  story is the one that you have to accept, right?

20  A.  Correct.

21  Q.  The person who's crying may actually be in the wrong,

22  right?

23  A.  It's a possibility.

24  Q.  They may have confused visitation days?  That's possible,

25  right?

1   A.  Yes.

2   Q.  They may be upset that they are not getting their way even

3   when they don't have visitation at any time; isn't that right?

4   A.  Yes.

5   Q.  And you understand that when you reply to calls, right?

6   A.  Yes.

7   Q.  So you approached Ms. Sandy, and she says something to the

8   effect of he won't -- it's my turn, and he won't give me my

9   daughter, right?

10  A.  Yes.

11  Q.  And at that point you say, well, the best that I can do for

12  you is to fill out a DIR?

13  A.  Correct.

14  Q.  The domestic incident report?

15  A.  Correct.

16  Q.  That she can -- that she can take to the judge?

17  A.  Correct.

18  Q.  And that's because you didn't have any real authority to

19  enforce visitation, right?

20  A.  Visitation, yes, I don't have authority.

21  Q.  You could enforce custody, correct?

22  A.  Correct.

23  Q.  But only if you had an order from the court?

24  A.  I need proof.

25  Q.  You need proof that somebody has custody to enforce it;

1   isn't that right?

2   A.  Correct.

3   Q.  And she didn't have anything with her, did she?

4   A.  Correct.

5   Q.  Now, she didn't use the word "visitation," right?

6   A.  She did.

7   Q.  She used the word specifically "visitation?"

8   A.  Yes.

9   Q.  She didn't say, it's my turn, and he won't give the child

10  back?

11  A.  She did state that.

12  Q.  And then at some point you say, well, I can't do anything

13  for you but to fill out this DIR, and you -- and then she tells

14  you, well, my daughter's not safe in the apartment?

15  A.  Correct.

16  Q.  Now, was your partner standing there at the time?

17  A.  Yes.

18  Q.  Your partner was standing there as she said "my daughter's

19  not safe in the apartment?"

20  A.  Yes.

21  Q.  And then Ms. Sandy says, well, he does drugs, and

22  occasionally has drug dealers in the apartment?

23  A.  Correct.

24          THE COURT:  Could you give us a sense of how close

25  Officer Trigueno was to you and Ms. Sandy during your

N8VDRAT1                          Cadavid - Cross

1    conversation with Ms. Sandy.

2                THE WITNESS:  That I don't recall.

3    Q.  Officer, do you recall if Officer Trigueno was close enough

4    to hear Ms. Sandy?

5                MS. FADDIS:  Objection, calls for speculation.

6                THE COURT:  Sustained.

7                MS. GELLER:  Your Honor, may I approach?

8                THE COURT:  Yes.

9    Q.  Officer, I'd like to provide you a copy of your deposition.

10               MS. GELLER:  Your Honor, it's marked Plaintiff's

11   Exhibit 17.

12   Q.  Officer Cadavid --

13               MS. GELLER:  And for the record, Plaintiff's Exhibit

14   17, your Honor, is a deposition of Jose Cadavid taken on

15   Friday, August 13, 2021, portions of which are in the record

16   from earlier.

17   Q.  Officer Cadavid, I'm going to have you hang onto that for

18   the time being.

19               Can you please turn to page 7?  And on page 7 of line

20   3 you are asked, I'm going to ask you if you can tell me just

21   in your words what you recall of that incident.  And your

22   response was, "me and my partner received a 911 call from your

23   child's mother in regard to a custody dispute.  Me and my

24   partner, we arrived at the location where the caller stated.

25   We approached.  We arrived to the scene of the address, and we

1    were met by a child's mother.  She explained to us that there

2    is an issue with the custody order.  She wanted to see -- and

3    she wanted to see her child.  That you refused to give her your

4    daughter.  So I explained to the complainant, your child's

5    mother, that I will do a domestic incident report, and if she

6    wishes, she could take that to the judge and show it to the

7    judge.  At this time she stated to me and my partner that her

8    daughter's life was in danger."

9            That's the testimony you gave in your deposition,

10   correct?

11   A.  Yes.

12   Q.  Now, in this deposition, this was another incident where

13   you were -- well, withdrawn.

14           You gave this deposition under oath, correct?

15   A.  Correct.

16   Q.  Same oath you gave to tell the truth today?

17   A.  Yes.

18   Q.  Now, in this narrative of what Ms. Sandy said to you, you

19   didn't say that she had visitation, right?

20   A.  On the deposition, no.

21   Q.  You said specifically, "an issue with the custody order,"

22   correct?

23   A.  Correct.

24   Q.  And you also said that she stated to you and your partner

25   that her daughter's life was in danger, right?

1    A.  Correct.

2    Q.  Now, at the time that you're standing -- you carry a memo

3    book, correct?

4    A.  Correct.

5    Q.  And at the time you're standing with Ms. Sandy and you're

6    hearing this story about drugs and drug dealers, you didn't

7    write that down anywhere, did you?

8    A.  No.

9    Q.  And you and Officer Trigueno, you go upstairs?

10   A.  Correct.

11   Q.  I'd like to show you what's already in evidence as

12   Defendant's Exhibit F.

13           Now, Officer Cadavid, this is the NYPD domestic

14   incident report, correct?

15   A.  Yes.

16   Q.  You did not write this document, right?

17   A.  I did not.

18   Q.  But you've seen this before?

19   A.  Yes.

20   Q.  And you understand this was filled out the night of the

21   incident?

22   A.  Yes.

23   Q.  And that Officer Trigueno wrote much of this document,

24   correct?

25   A.  Correct.

1    Q.  And where it says "possible drug and alcohol use," that's

2    checkmarked "no," right?

3    A.  Yes.

4    Q.  And here, briefly describe the circumstances of this

5    incident, we've seen this before as well, correct?

6    A.  Correct.

7    Q.  And TPO, that means I think we have on the record time,

8    place, location?

9    A.  Yes --

10             THE COURT:  I thought it was time, place, occurrence.

11             THE WITNESS:  Occurrence.

12             MS. GELLER:  Sorry.  My mistake.  Thank you, your

13   Honor.

14   Q.  Time, place, occurrence?

15   A.  Yes.

16   Q.  A dispute over custody of child, right?

17   A.  Yes.

18   Q.  That's what it says?

19   A.  Yes.

20   Q.  And taking a look at this narrative, there's nothing in

21   here about danger to the child, correct?

22             MS. FADDIS:  Objection, your Honor.  The witness

23   didn't write the document.

24             THE COURT:  I understand that, but she's asking a

25   question about what's in the document, so your objection is

1  overruled.

2  Q.  There's nothing in here about drugs in the document,

3  correct?

4  A.  No.

5  Q.  And nothing in here about concern for child safety,

6  correct?

7  A.  No.

8  Q.  And nothing in here about a concern that the child might be

9  dead, right?

10  A.  No.

11  Q.  And this is the narrative from Ms. Wendy, correct?

12  A.  Correct.

13  Q.  And there's nothing in here about drugs or drug dealers,

14  right?

15  A.  Correct.

16  Q.  And there's nothing in here about the child being in

17  danger, correct?

18  A.  Correct.

19  Q.  And there's nothing in here about her worried that her

20  child might be harmed, correct?

21  A.  Correct.

22  Q.  I'd like to show you what's been marked -- what's been put

23  in evidence as Exhibit 5, Plaintiff's Exhibit 5.

24         You didn't draft this document either, right?

25  A.  Correct.

1    Q.  But here in this, if you could look at the fourth paragraph

2    down, I opened the door, and they said they had a report that

3    the child is not being made available to the mother, and they

4    asked if I could come to the door.  And there's nothing about

5    drugs or drug dealers or concern for the child being in danger

6    or harmed in this paragraph, is there?

7            MS. FADDIS:  Objection, your Honor.  This is the

8    plaintiff's statement.

9            MS. GELLER:  It's in evidence, your Honor.

10           THE COURT:  Yes.  I understand that.

11           Again, counsel is just inquiring of the witness

12   whether those statements appear in this document.  The jury

13   understands that he didn't prepare the document.

14           Go ahead.

15           MS. GELLER:  Thank you, your Honor.

16   Q.  There is no mention of drugs in this paragraph, is there,

17   sir?

18   A.  Correct.

19   Q.  And there's no mention of drug dealers in this paragraph,

20   correct?

21   A.  Correct.

22   Q.  And there's no mention of the child being in danger,

23   correct?

24   A.  Correct.

25   Q.  And there's no mention of concern that the child might be

1    harmed, correct?

2    A.  Correct.

3    Q.  Now, when you arrived at the door, at Mr. Rattray's door,

4    and you knock, knock, knock, NYPD, right?

5    A.  Correct.

6    Q.  And that's pretty standard?  You announce yourselves so

7    people know police are on the line -- the ELMO and I are not

8    friends.

9            You didn't say bang, bang, bang, anybody in the

10   apartment with you, did you?

11   A.  No.

12   Q.  You never asked who's in the apartment, right?

13   A.  I don't recall.

14   Q.  And you never asked if there are any weapons in the home?

15   A.  Yeah, we would ask that.

16   Q.  You would ask that.  You asked that when you banged on the

17   door, are there weapons in the home?

18   A.  No.

19   Q.  Now, if a concern was that he potentially had drug dealers

20   in the apartment, that's something that's important to know,

21   right?

22   A.  Correct.

23   Q.  You would want to know if there's other adults in that

24   building -- in that apartment?

25   A.  Correct.

N8VDRAT1                        Cadavid - Cross

1    Q.  And you would want to know there's other adults in that

2    apartment, possibly breaking the law, right?

3    A.  Correct.

4    Q.  That would be important for you to know for your

5    investigation?

6    A.  Yes.

7    Q.  That would be important for you to know for your safety?

8    A.  Yes.

9    Q.  And that would be important for your partner to know for

10   her safety?

11   A.  Yes.

12   Q.  Because people doing bad things tend to react poorly,

13   correct?

14   A.  Correct.

15   Q.  But you didn't ask when you arrived at the door of his

16   apartment if there was anybody else in the apartment, correct?

17   A.  I don't remember.

18            MS. FADDIS:  Objection, asked and answered.

19   Q.  I'm sorry.  Could you repeat the answer?

20   A.  I don't remember.

21   Q.  Well, I think you just said you didn't, correct?

22            MS. FADDIS:  Objection, your Honor.  Mischaracterizing

23   the testimony.

24            THE COURT:  All right.  Did you ask about whether

25   there was anybody else in the apartment when you knocked on the

N8VDRAT1                         Cadavid - Cross

1   door?

2              THE WITNESS:  I don't remember asking.

3              THE COURT:  I'm sorry?

4              THE WITNESS:  I don't remember asking.

5              THE COURT:  Okay.

6   Q.  You don't remember asking either way is what your testimony

7   is?

8   A.  No, I don't remember.

9   Q.  All right.  So you're at the door, let's stay at the door

10  of the apartment for a minute, and just before he opens the

11  door, right, you're coming up, you're coming down a normal

12  hallway in a normal pre-war building in Manhattan, right?

13  A.  Yes.

14  Q.  And you don't hear a loud noise coming from the other side

15  of the door?

16  A.  I do not.

17  Q.  You don't hear any children at all?

18  A.  No.

19  Q.  No children's voices?

20  A.  No.

21  Q.  No crying?

22  A.  No.

23  Q.  No one screaming?

24  A.  No.

25  Q.  Nobody talking loudly?

```
 1   A.  No.
 2   Q.  You don't hear any talking at all, right?
 3   A.  No.
 4   Q.  Nobody crying for help?
 5   A.  No.
 6   Q.  And then Mr. Rattray eventually opens the door, right?
 7           Well, let's back up a second.  Bang, bang, bang.  You
 8   don't hear anything.  Again, same question, you don't hear a
 9   bunch of people talking, right?
10   A.  Correct.
11   Q.  You only hear one voice?
12   A.  Correct.
13   Q.  So now Mr. Rattray, he opens the door, right?
14   A.  Not right away.
15   Q.  We'll get to that, but eventually he opens the door?
16   A.  Yes.
17   Q.  And he opens the door you say a crack?
18   A.  Yeah.  Enough for me to put my foot in the doorway.
19   Q.  Enough for you to get your foot in the door?
20   A.  Yes.
21   Q.  But here again you don't hear any children in the
22   background?
23   A.  No.
24   Q.  And you don't hear anybody crying?
25   A.  No.
```

1    Q.  And here it's just Mr. Rattray, right?

2    A.  Yes.

3    Q.  You don't hear any other voices in the background?

4    A.  No.

5    Q.  No cries for help?

6    A.  No.

7    Q.  No drug dealers, right?

8    A.  At that point, I don't know.

9    Q.  At the time, you didn't see any sign of any drug dealers in

10   his apartment?

11   A.  Well, the way he had the door open, I can't see into the

12   apartment.

13   Q.  But you didn't see anything at the time, right?

14   A.  At what time?

15   Q.  When he had the door cracked, you did not see other adults

16   in the apartment?

17   A.  I can't see in the apartment.

18   Q.  And you didn't hear any other adults in the apartment?

19   A.  No.

20   Q.  Mr. Rattray wasn't covered in blood, right?

21   A.  No.

22   Q.  He didn't looked mussed or like he'd been in a scuffle,

23   correct?

24   A.  Well, at that time when the door is cracked open, I don't

25   remember seeing Mr. Rattray.

1    Q.  All right.  So at one point you -- then you've got your

2    foot in the door, and then you pushed the door open, and you

3    enter the apartment?

4    A.  Correct.

5    Q.  And now you're standing in the apartment, right?

6    A.  Correct.

7    Q.  And it's kind of small?

8    A.  Yes.

9    Q.  And you can see, for the most part, the majority of the

10   apartment?

11   A.  Yeah.

12   Q.  And it's just a normal apartment in a normal building in

13   Manhattan, right?

14   A.  Yes.

15   Q.  A well-kept home?

16   A.  From my recollection, yeah.

17   Q.  And no kids there either, right?  Don't see any children,

18   right?

19   A.  From my immediate point of view, no.

20   Q.  Okay.  And no blood?

21   A.  No.

22   Q.  No drug dealers there either, right?

23   A.  I still haven't established that.

24   Q.  No.  You're standing -- I'm asking, you're standing in the

25   apartment, right?  And you do not see any sign of any other

1   adults in that the apartment?

2   A.  In the area where I could see, no.

3   Q.  And there's no sign of anybody injured?

4   A.  No.

5   Q.  And there's no sign of imminent injury to anybody?

6   A.  At that point I can't establish that yet.

7   Q.  From where you're standing when you step into the door when

8   you first step into the apartment, there is no sign of imminent

9   injury to anybody?

10  A.  From there, no.

11  Q.  And at this point I think you testified that you're now

12  asking for the whereabouts of his daughter?

13  A.  Correct.

14  Q.  That's your testimony, right?

15  A.  Yes.

16  Q.  You want to know where she is?

17  A.  Yes.

18  Q.  And you still think she's in imminent danger inside the

19  home?

20  A.  I wouldn't say imminent.  I'm still concerned about her

21  safety.

22  Q.  Based on what Ms. Sandy said about Mr. Rattray doing drugs,

23  and having drug dealers over to the apartment occasionally?

24  A.  Based on that, and based on Mr. Rattray's attitude, and his

25  yelling and cursing and refusal to answer my questions.

1    Q.  Well, but as you're standing there, there's no torture
2    device on the wall, right?
3    A.  No.
4    Q.  It's just a home, yeah?
5    A.  From the looks of it, yeah.
6    Q.  So you don't see anything in this apartment that could give
7    rise to a concern that anybody was in imminent danger of being
8    harmed?
9    A.  In the area where I was standing, no.
10   Q.  And at this point you've really shifted your focus to
11   finding the child, haven't you?
12   A.  Yes.
13   Q.  And so now you take a turn, and you go into the child's
14   room, right?
15   A.  Yes.
16   Q.  And as you step into the room, you look around, and it's a
17   kid's room, right?
18   A.  Yes.
19   Q.  My Little Pony sheets?  Do you remember that?
20   A.  I don't remember.
21   Q.  But a kid's room?
22   A.  Yes, I could tell it was a kid's room.
23   Q.  Stuffed animals everywhere maybe?
24   A.  I don't remember.
25   Q.  Little girl's room per se you think?

1           MS. FADDIS:  Objection, your Honor.

2           THE COURT:  Ground?

3           MS. FADDIS:  Relevance.

4           THE COURT:  Overruled.

5    Q.  Little girl's room?

6    A.  I don't remember.

7    Q.  She had a bed, right?

8    A.  I do remember seeing her bed.

9    Q.  It wasn't a mattress on the floor, right?

10   A.  No.

11   Q.  And now you searched?  You searched the room?  You searched

12   the closets?

13   A.  Correct.

14   Q.  You testified I think everywhere a body could be hidden?

15   A.  Well, where she could -- where she could fit.

16   Q.  Oh, okay.  So everywhere -- so you weren't referring, when

17   you said everywhere a body could hide, you weren't suggesting

18   that you were looking for a dead body?

19   A.  No.

20           MS. FADDIS:  Objection, your Honor.  Mischaracterizes

21   the testimony.

22           THE COURT:  Overruled.

23           THE WITNESS:  No.

24   Q.  You were looking for a child who might be hiding?

25   A.  Correct.

1    Q.  Maybe hiding from the big, scary police officer?

2            MS. FADDIS:  Objection.

3            THE COURT:  Sustained.

4    BY MS. GELLER:

5    Q.  But you looked in her closet?

6    A.  Yes.

7    Q.  Lots of kids' clothes?

8    A.  I don't remember.

9    Q.  You looked under the bed?

10   A.  Yes, I did.

11   Q.  Then you went into Mr. Rattray's room, right?

12   A.  Yes.

13   Q.  Before we go there, there were no drugs that you saw

14   anywhere in this search, right?

15   A.  In the immediate area, no.

16   Q.  And there were no drug dealers hiding in the closet either,

17   right?

18   A.  No.

19   Q.  Okay.  And then you went into Mr. Rattray's bedroom?

20   A.  Correct.

21   Q.  And you searched his bedroom, too?

22   A.  I looked around.

23   Q.  Did you look in his closet?

24   A.  I don't remember if he had one.

25   Q.  I'm sorry.  Could you repeat that?

N8VDRAT1                    Cadavid - Cross

1    A.  I don't remember if he had one.

2    Q.  Did you look under his bed?

3    A.  That I do remember doing.

4    Q.  Nothing there either, right?

5    A.  No.

6    Q.  And then you searched his bathroom?

7    A.  I looked in the bathroom, yes.

8    Q.  No evidence in this search of his apartment that there was

9    any -- that there was any injury, any immediate injury to

10   anybody, right?

11   A.  Correct.

12   Q.  No evidence that there was imminent danger that anybody

13   would suffer an immediate injury, right?

14   A.  Correct.

15   Q.  No evidence that Mr. -- you saw no evidence of any drugs?

16   A.  Well, I wasn't -- that wasn't my concern.

17   Q.  Well, your concern was that she was not safe because Mr.

18   Rattray does drugs and has drug dealers over to the apartment,

19   right?

20   A.  My concern was her safety.

21              (Continued on next page)

22

23

24

25

1    BY MS. GELLER:

2    Q.    And based in part on the mother's statements to you

3    downstairs——

4    A.    She was not safe.

5    Q.    ——that she was not safe.  Because Mr. Rattray does drugs

6    and occasionally has drug dealers over the apartment, right?

7    A.    Part of it, yes.

8    Q.    And after you searched his home, what basis did you have

9    to——well, withdrawn.  I'll move on.

10              So now you've searched his home, and there's no danger

11    that you can see, no visible danger, right?

12    A.    Yes.

13    Q.    And certainly nothing to suggest that anybody is in

14    imminent danger.

15    A.    No.

16    Q.    Child's not even there.

17    A.    Correct.

18    Q.    And at this point you don't have a court order, right?

19    A.    No.

20    Q.    You don't have any document from anybody indicating to whom

21    this child——with whom this child should be with.

22    A.    Correct.

23    Q.    You don't have a document that says she should be with mom.

24    A.    Correct.

25    Q.    You don't have a document that says she should be with dad.

1   A.   Correct.

2   Q.   You don't have any idea, do you?

3        THE COURT:    I'm sorry.  Any idea about what?

4   Q.   Any idea who had proper custody of that child.

5   A.   I did not.

6   Q.   So now you've searched the apartment, you don't know who

7   has custody, but you elect to stay in the apartment, right?

8   A.   I——I did stay in the apartment.

9   Q.   And you stay in the apartment and you continue to

10  interrogate Mr. Rattray about the location of his daughter.

11  A.   I was asking him questions——the whereabouts of his

12  daughter.

13  Q.   Safe to say at this point you didn't like Mr. Rattray very

14  much, right?

15  A.   Well, I——that's not true.

16  Q.   Well, he'd been rude to you, yes?

17  A.   Yes.

18  Q.   And he'd been hostile to you?

19  A.   Yes.

20  Q.   And you testified that he yelled at you?

21  A.   Yes.

22  Q.   And that he cursed you?

23  A.   Yes.

24  Q.   And was generally unhappy with your presence in his home.

25  A.   Yes.

N8V1RAT2          Cadavid - Cross

1            MS. GELLER:    Your Honor, if I may, I have an issue

2    that I think will draw some discussion before I raise it and we

3    have an issue.  I would prefer to raise it at sidebar, your

4    Honor.

5            THE COURT:    All right.  Ladies and gentlemen, we'll

6    take our midmorning break.  Don't discuss the case, keep an

7    open mind, we'll be back to you shortly.  Thank you all very

8    much.

9            THE DEPUTY CLERK:    All rise.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:    Please be seated.

3          All right.  Ms. Geller, what's the issue?

4          MS. GELLER:    Your Honor, if I may, Officer Cadavid is

5     on cross.  It goes directly to what I plan to cross him on.  I

6     would request that he be excused from the courtroom, or that we

7     do this at sidebar.

8          THE COURT:    All right.  I guess we'll do it at

9     sidebar.

10          (At the sidebar)

11          MS. GELLER:    Thank you, your Honor.  I apologize.

12     This just didn't seem like it was appropriate to raise without

13     fronting the issue.

14          I intend to go into a line of questioning concerning

15     Officer Cadavid's intentions in that apartment.

16          THE COURT:    His intentions?

17          MS. GELLER:    His intentions.  One of the things that

18     happened at his deposition was Mr. Rattray asked——and this is

19     on page 28 of his deposition, starting at line 18——

20          "So when you conducted the search, what were you going

21     to do if you found the child?  What were you going to do with

22     the child?"

23          And Officer Cadavid answers:  "Take her outside."

24          Corporation counsel then interposes an objection

25     saying it calls for speculation, and the deposition moves on.

1          I think "Take her outside" is fair game, but there was

2     an objection on the record, and I did think it was proper to

3     raise it before bringing it up in front of the jury.

4          MS. FADDIS:   I'm sorry.  What page are we on?

5          MS. GELLER:   We are on page 28.  This is line 15-21.

6          THE COURT:   Let me just get the deposition.

7          MS. FADDIS:   Your Honor, you can look at mine if you

8     prefer.

9          THE COURT:   Okay.

10         MS. FADDIS:   Well, your Honor——

11         THE COURT:   Wait.  Let me read it, please.

12         MS. FADDIS:   I'm sorry.

13         THE COURT:   Okay.

14         MS. FADDIS:   The question is rephrased on the

15    following page and answered.  So yes, I would object to

16    introducing an incomplete answer to which there was an

17    objection, particularly when the question was rephrased and

18    answered on the subsequent page.

19         THE COURT:   Anyway, I don't really understand what the

20    relevance is.  Can you help me with the relevance.

21         MS. GELLER:   Yes, your Honor.  The argument that will

22    be made or that——the point that I'm seeking to make is that

23    Officer Cadavid intended to take the child to the mother

24    because he believed that she had custody and was intending to

25    enforce that custody even in the absence of a court order, that

N8V1RAT2          Cadavid - Cross

1   it wasn't about the welfare of the child but about locating the

2   child so that he could give her to mom.

3          MS. FADDIS:    Your Honor, that's a fair question for

4   cross-examination, but this is not proper impeachment on that

5   topic.

6          THE COURT:    I'm sorry?

7          MS. FADDIS:    Ms. Geller is free to ask the question on

8   cross-examination, but this can't be used as impeachment.  It's

9   an incomplete answer.

10          THE COURT:    I think you're just showing me this to

11   show that you have a good-faith basis for the question, right?

12          MS. GELLER:    Well, I intended to impeach him on his

13   answer that he intended to take the child outside.  That's the

14   highlighted portion, your Honor.

15          MS. FADDIS:    He didn't finish the answer, your Honor.

16          THE COURT:    True.  I mean, I do think it's

17   speculative, so I'm going to sustain the objection, so I will

18   not allow you to——

19          MS. GELLER:    Okay.

20          THE COURT:    ——to get into the question at line 18,

21   page 28.

22          MS. GELLER:    Thank you, Judge.  And that's why I

23   wanted to raise it at sidebar.  I didn't think it was

24   appropriate to put in front of the jury without the Court's

25   ruling.

N8V1RAT2                Cadavid - Cross

1              THE COURT:    I appreciate that.

2              MS. FADDIS:    Thank you.

3              MS. GELLER:    Thank you, Judge.

4              THE COURT:    We'll resume very shortly; let's say ten

5    minutes.

6              MS. GELLER:    Thank you.

7              (Recess)

8              (In open court; jury not present)

9              THE COURT:    Please be seated.

10             Are we prepared to proceed?

11             MS. GELLER:    Yes, your Honor.

12             THE COURT:    All right.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                (Jury present)

 2                THE COURT:    Please be seated.

 3                Ladies and gentlemen, we'll continue with the

 4    cross-examination of Officer Cadavid.

 5                Please proceed.

 6                MS. GELLER:    Thank you, your Honor.

 7    BY MS. GELLER:

 8    Q.   Officer Cadavid, I didn't take this back, you still have

 9    your book, right?

10    A.   Yes.

11    Q.   Thank you.

12                So yesterday and today, you testified that you

13    approached, knocked on the door, and announced yourselves.

14    A.   Correct.

15    Q.   And then you stated that your reason for being there was to

16    check on the welfare of his daughter.

17    A.   Correct.

18    Q.   And asked to see the child and if he could open the door,

19    right?

20    A.   Sorry?

21    Q.   And asked to see the child and if he could open the door.

22    A.   Yes.

23    Q.   And that was your testimony as to——that's the first thing

24    you said after you knocked on the door, right?

25    A.   Yes.
```

1    MS. FADDIS:    Objection, your Honor.  Vague as to which

2    statement.

3    THE COURT:    Well, we're talking about what happened

4    after he knocked on the door, as I understand it.

5    MS. FADDIS:    Understood, your Honor.  There were

6    questions, though, about three separate statements.  I'm just

7    unclear what statement we're asking was the first that he made.

8    MS. GELLER:    I'll clarify, your Honor.

9    THE COURT:    All right.

10   BY MS. GELLER:

11   Q.    You said those all at once, right?

12   A.    I don't recall.

13   Q.    Well, knock, knock, knock, *NYPD, we're here to check on the*

14   *welfare of your daughter, can you open the door*?

15   A.    No.

16   Q.    Now how did that work then, sir?

17   A.    We announce ourselves, the reason for being there;

18   Mr. Rattray responded, and then he wanted to know why we were

19   there, our reason; I explained; and there was a——then he

20   started getting——his level of voice started increasing, and

21   then——

22   Q.    Okay.  Well, let me——let's back up a second.

23   Okay.  So, because I misunderstood your testimony, I

24   want to make very clear, because you did testify that you

25   knocked on the door and that his response was to yell back,

1    right?

2    A.     Yeah, he——eventually, yeah, he——

3    Q.     That was your testimony, that he started yelling pretty

4    much as soon as you announced yourselves.

5              MS. FADDIS:     Objection, your Honor.  He didn't finish

6    answering the last question.

7              THE COURT:     You can complete your answer.

8              MS. GELLER:     Apologize, your Honor.

9              THE COURT:     Did you have more that you wanted to say?

10             THE WITNESS:     I was going to say, eventually, yeah, he

11   did start yelling.

12   BY MS. GELLER:

13   Q.     Okay.  Well, eventually he started yelling, right?

14   A.     Yes.

15   Q.     That wasn't what you testified to yesterday.  You testified

16   that he yelled in response to you announcing yourselves, right?

17   A.     After we announced and we explained the reason for being

18   there.

19   Q.     And his immediate response was to start yelling.

20   A.     For the most part, yeah, from, my recollection, yeah.

21   Q.     Okay.  I'd just like to work out the sequence, because just

22   a minute ago you also testified that he asked why you were

23   there.

24   A.     If I remember correctly, I——I think that's what he stated.

25   Q.     Okay.  So knock, knock, knock, *NYPD*.  What do you say next?

1     A.    I wait for a response.

2     Q.    Okay.  So you don't say, knock, knock, knock, *NYPD, we're*

3     *here to check on your daughter,* right?

4     A.    No.

5     Q.    You just say, knock, knock, knock, *NYPD.*

6     A.    No.

7     Q.    That's not what you said.

8     A.    No.  Initially, what we do is knock and wait for a

9     response.

10    Q.    So you didn't even announce that you were police officers.

11    A.    Not yet.

12    Q.    Okay.  So knock, knock, knock, silence——

13    A.    Yes.

14    Q.    ——right?  And Mr. Rattray answers, *Who is it?*

15    A.    Something of that substance, yes.

16    Q.    And then you say, *NYPD.*

17    A.    Yes.

18    Q.    And is this where you say that you're there to check on the

19    welfare of his daughter?

20    A.    At——no.

21    Q.    No.  So now you just say, *NYPD.*

22    A.    *NYPD*, and then I wait for——he——he responds.

23    Q.    Okay.  So now he responds, *What do you want?*

24    A.    Something of that substance, yes.

25    Q.    Okay.  So he wasn't screaming at you at this point.

1    A.    At that point, no.

2    Q.    Okay.  So he wasn't yelling right away, immediately, in

3    response to your knock, right?

4    A.    Yelling, no, but his tone of voice was a little loud.

5    Q.    Okay.  Well, he's talking through the door, right?

6    A.    Yeah, he's——yeah, he's talking through the door.

7    Q.    The door's not open yet, right?

8    A.    No.

9    Q.    So he says, *What do you want?*  And that's when you say,

10   *We're here to check on the welfare of your daughter?*

11   A.    Yes.

12   Q.    That's what you said to him, that you were there to check

13   on his daughter?

14   A.    From my recollection, yeah.

15   Q.    And then he starts yelling.

16   A.    Yeah.

17   Q.    But you don't remember what he said.

18   A.    No.

19   Q.    And before he opened the door, I think you also testified

20   that you asked to see the child and if he could open the door.

21   A.    Yes.

22   Q.    Did you say that before or after he started yelling?

23   A.    I don't recall.

24   Q.    And again, when he started yelling——well, withdrawn.

25        Do you remember at all what he said when you

1  said——when you asked to see the child and if he could open the

2  door?

3  A.    No, I don't remember.

4  Q.    You don't remember if he said she wasn't there?

5  A.    I don't remember.

6  Q.    And you don't remember if he said, *I have custody of the*

7  *child*?

8  A.    No, I don't.

9  Q.    But at some point you did request that he open the door.

10  A.    Yes.

11  Q.    And he did refuse to open the door.

12  A.    Yes.

13  Q.    Now you testified then that you threatened to take the door

14  down, right?

15  A.    Correct.

16  Q.    And I think in your testimony yesterday you said that your

17  intention with that, with making that statement, was to give

18  him a warning of what can happen if he doesn't cooperate and as

19  a tactic to make him think about it so he could stand back and

20  just reflect, okay, maybe I don't want this to happen, let me

21  open the door, right?

22  A.    Correct.

23  Q.    Now you, as a police officer, if you were responding to a

24  call and someone was screaming from the other side of the door,

25  *Help me, help me, I'm dying,* you know you can push that door

N8V1RAT2          Cadavid - Cross

1    down, right?

2    A.     Yes.

3    Q.     In fact, that is your job, correct?

4    A.     Correct.

5    Q.     And if you arrive at a door and you know that something

6    behind that——you have solid information that something behind

7    that door——well, withdrawn.  Let me try that again.

8              And if you get to a door and you have screaming and

9    shouting and children crying and cries of pain, you know you

10   can force your way through that door, right?

11   A.     Correct.

12   Q.     Because you know you have, from your own senses, knowledge

13   that something bad is happening in that apartment, right?

14   A.     Correct.

15   Q.     But here, you knew full well that you did not have the

16   authority to take that door down, right?

17   A.     I did.

18   Q.     Well, you testified that you'd have to call the supervisor.

19   A.     Well, it's on a base——it's based on the situation.  In this

20   situation, I did have authority to take the door down.

21   Q.     So when you testified, "What steps, if any, would you have

22   needed to take in order to accomplish that," "I would have to

23   request for a supervisor, and then a supervisor has to request

24   a higher-ranking supervisor, and then ultimately ESU would have

25   to be called," you're testifying today that wasn't the

N8V1RAT2                 Cadavid - Cross

1    situation.

2    A.    In this situation, no, but in general, that's——if it's not

3    an emergency, that's the steps we have to take.

4    Q.    Officer Cadavid, do you remember testifying yesterday in

5    answer to the question, "Officer Cadavid, as a police officer,

6    can you personally——could you personally, in that instance,

7    have broken the door down," and your answer, "Could I

8    personally?  No."  That was your testimony, right?

9    A.    I don't remember.

10   Q.    You don't remember that testimony from yesterday?

11   A.    No.

12   Q.    Is your testimony today that standing there in the hallway,

13   you personally would have broken that door down?

14   A.    Based on the allegation from the mother and Mr. Rattray's

15   attitude, his demeanor, and his refusal to answer my questions

16   and when he eventually did open the door and trying to close

17   the door on us.

18   Q.    That wasn't the question, sir.

19   A.    Oh.

20   Q.    When you threatened to take the door down, you knew,

21   standing in the hallway, that in order to do that, you would

22   have to call your supervisor, right?

23   A.    Not in that situation.

24   Q.    That was your intention if he didn't open the door, right?

25              THE COURT:   What was his intention?

1              MS. GELLER:    I'm sorry.

2    Q.    To call a supervisor was your intention if he didn't open

3    the door, right?

4    A.    I——it's——yes and no.

5    Q.    Well, sir, if you could, referring to Exhibit 17,

6    Plaintiff's 17, if you could take a look at page 15 of your

7    deposition, sir, at line 10, and let me know when you're there.

8    A.    Okay.

9    Q.    And in your deposition, you testified:

10             "The door was not open when you got to the apartment,

11   you stated, so what was your objective after knocking on the

12   door, and plaintiff not immediately open opening the door?"

13             "A.  To request a supervisor."

14             "Q.  So at that point you requested a supervisor."

15             "A.  No, but it was my plan."

16             And that was your testimony in your deposition, right?

17   A.    Correct.

18   Q.    Now going back to your interaction with Mr. Rattray, while

19   the door was still closed——

20             MS. GELLER:    Just a moment, your Honor.

21   Q.    And forgive me, Officer Cadavid.  I don't want to misstate

22   your testimony.  I think you did testify that you also said

23   that while the door was closed, you were there to check on the

24   welfare of the child; is that right?

25   A.    Correct.

1    Q.    If I could have you refer to page 12 of your deposition.

2    And when you get to line 20, let me know, please.

3    A.    Okay.

4    Q.    And at your deposition you testified, okay——

5              MS. FADDIS:    Objection, your Honor.  Is this

6    impeachment?  What is this being offered for?

7              THE COURT:    I don't see the inconsistency.

8              MS. GELLER:    Well, your Honor, it's a party statement

9    so it's not hearsay, and I could be heard at sidebar, your

10   Honor, unless you'd like me to make a proffer.

11             THE COURT:    Yes, I'll hear you at sidebar.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At the sidebar)

2                    THE COURT:    It is true that his deposition is an

3       admission, but on the other hand he's on the stand, and we're

4       not going to start with randomly reading excerpts of his

5       deposition for no reason.  So I just need to understand.  I

6       don't see anything inconsistent at line 20, so I don't

7       understand why you're reading the deposition.

8                    MS. GELLER:    Yes, your Honor.  If you take it over to

9       13, line 11, Officer Cadavid testified at the time that at the

10      door, he said that he was there to check on the welfare of the

11      child.  Mr. Rattray denies that they said this while they

12      opened the door.  It goes directly to whether——to Mr. Rattray's

13      response.  And Officer Cadavid testified in his deposition that

14      he does not recall what he said at the door after saying "I

15      would like to see your daughter," and that goes through 13,

16      line 11, your Honor.

17                   MS. FADDIS:    Your Honor, the problem with this is that

18      this is——the line of questioning that counsel is referring to

19      in the deposition is a chronological——a series of chronological

20      questions essentially about, "and then what happened, and then

21      what happened, and then what happened."  If there's a question

22      in the deposition, "Did you ever say X," if the same question

23      was being put to him now and the answer is inconsistent to what

24      the answer given in the deposition, I understand the

25      impeachment value, but this is suggesting to the jury that

N8V1RAT2            Cadavid - Cross

1    because he wasn't asked this question at the deposition and

2    therefore didn't answer it, that somehow that's inconsistent

3    with him saying now that he made the statement.

4              MS. GELLER:    Well, your Honor, he says:

5              "What happened after you knocked on the door?"

6              "He verbally responded."

7              "Okay.  Do you remember the response?"

8              "No, I don't."

9              We got that.  And I can skip that beginning section,

10    your Honor.

11              "Okay.  You don't recall the response?  Did you say

12    anything after the response?"

13              "I stated, I would like to see your daughter."

14              "Do you remember the response from that?"

15              "No, I don't."

16              THE COURT:    Okay.  So again, I'm just not seeing the

17    inconsistency.  He's testified that he knocked on the door and

18    said he wanted to see the daughter, and the deposition says he

19    stated that he would like to see the daughter.  Where is the

20    inconsistency?

21              MS. GELLER:    And then he says next, your Honor, "And

22    what did you say after my response?"  "I don't remember."

23              MS. FADDIS:    But it's a series of questions in

24    chronological order, what happened after that.  "I don't

25    remember" is not inconsistent with, At some point did you say

N8V1RAT2          Cadavid - Cross

1   that you were there to check on the welfare of the child?  Yes.

2   Those are two entirely separate questions.

3               THE COURT:    I'm just not understanding the

4   inconsistency.

5               MS. GELLER:    Okay.  I'll withdraw the question, your

6   Honor.

7               THE COURT:    Okay.

8               MS. FADDIS:    Thank you, your Honor.

9               (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2    BY MS. GELLER:

3    Q.   Now, Officer Cadavid, today you testified that——and please

4    correct me if I'm wrong, but I think you testified that while

5    you were standing at the door——well, withdrawn.  Let me provide

6    more context.

7              After Mr. Rattray opens the door, that's what we're

8    going to talk about now, after he's opened the door, right?

9    A.   Okay.

10   Q.   And he's standing at the door, and I think you testified

11   that he said something about, *Well, you don't have a warrant,*

12   or, *Do you have a warrant,* right?

13   A.   Correct.

14   Q.   And I think you testified——and I think you also testified

15   that when you stood in his apartment, you also asked——or he

16   also said something about how you don't have a warrant.  Did I

17   get your testimony right?

18   A.   Correct.

19   Q.   And you said no, right?

20   A.   Correct.

21   Q.   You didn't have a warrant, right?

22   A.   Correct.

23   Q.   Now as you were standing outside of Mr. Rattray's door——and

24   his door is open, right?

25              THE COURT:   Well, how open is it at this point?

1          MS. GELLER:    I'm sorry, your Honor.  I apologize.  I'm

2     going to try to be more specific.

3          THE COURT:    Well, I was asking the officer.  When he

4     first opened the door, how open was it?

5          THE WITNESS:    Maybe 5, 6 inches; enough for me to put

6     my foot in the doorway.

7          THE COURT:    Okay.  And I think you told us you could

8     see——could you see his face?

9          THE WITNESS:    I——I don't remember seeing his face.

10         THE COURT:    Could you see part of his face?

11         THE WITNESS:    I——I don't remember.

12         THE COURT:    Okay.

13    BY MS. GELLER:

14    Q.    So you remember the door being open a bit, but you don't

15    remember actually seeing Mr. Rattray.

16    A.    Correct.

17    Q.    Now you testified yesterday and today that you eventually

18    made entry into the apartment based on the complainant's

19    information from the day of the incident.  And by complainant,

20    you meant Ms. Wendy.

21    A.    By complainant, yes, Ms. Wendy.

22         THE COURT:    We've been referring to her as Ms. Sandy.

23    Could we just stay with that so we don't get confused.

24         MS. GELLER:    Yes, your Honor.  Yes.  Sorry.  Yes,

25    Ms. Sandy.

1    Q.    And that was the information, that the daughter wasn't safe

2    because the——we talked about this again, the drugs and the drug

3    dealers, right?

4    A.    Well, that was part of the information.  There was other

5    information I based my entry on.

6    Q.    No, I understand that, but we're talking just about the

7    section about the complainant's information; that's the

8    information you had, drugs and drug dealers, right?

9    A.    And she wasn't safe.

10   Q.    And she wasn't safe.  And you didn't have any more

11   information on that she wasn't safe beyond the drug and drug

12   dealers, right?

13   A.    From my recollection, correct.

14   Q.    Just that she wasn't safe generally.

15   A.    Yeah.

16            THE COURT:    Do you recall whether Ms. Sandy had said

17   anything about whether she could reach her daughter, that she'd

18   tried to reach her daughter that day and was not able to reach

19   her?  Do you recall her saying anything like that to you?

20            THE WITNESS:    To that substance, yes.

21   Q.    What did she say?

22   A.    That she——that she was trying to reach her, that she has a

23   cellphone, she wasn't answering her cellphone, she's been——she

24   was trying to contact her, and she was unsuccessful.

25   Q.    And the other reason you made entry was the plaintiff's

1    demeanor.

2    A.    Correct.

3    Q.    That he was being hostile, being rude, right?

4    A.    I didn't say hostile.  He was yelling, cursing.

5    Q.    I think hostile was the term——was the hostile term used in

6    your deposition, sir?

7    A.    In the deposition, yes.

8    Q.    And rude?

9    A.    Yes.

10    Q.    And that gave you more of a concern.

11    A.    It——yes.

12    Q.    Because I think you testified a normal person would be more

13    cooperative.

14    A.    Yes.

15    Q.    And I think your testimony was that a normal parent would

16    be, *What are you talking about,* would say, *What are you talking*

17    *about, here's my child, everything's fine*?

18    A.    Yes.

19    Q.    That was your testimony, right?

20    A.    Yes.

21    Q.    You've been a police officer kind of a long time, right?

22    A.    Correct.

23    Q.    You've encountered people who are mistrustful of the

24    police.

25    A.    I'm sorry?

1    Q.    You've encountered people who are mistrustful of the

2    police.

3    A.    Yes.

4    Q.    You've encountered people who don't want to talk to the

5    police.

6    A.    Correct.

7    Q.    And you know that people don't have to talk to you if they

8    don't want to, right?

9    A.    Correct.

10    Q.    You've arrested people before?

11    A.    Yes.

12    Q.    And you have that little spiel memorized, right?

13          THE COURT:    I'm sorry?

14          MS. GELLER:    Excuse me.  I apologize, your Honor.

15    Q.    When you arrest somebody, you have a series of things you

16    have to tell them, right?

17    A.    For the most part, yeah.

18    Q.    And one of them is that they have the right to remain

19    silent, correct?

20    A.    Correct.

21    Q.    And that applies whether you're under arrest or not.

22    A.    It's based on the situation.  If I'm doing an

23    investigation, asking questions, if they're under arrest, I do

24    let them know their rights.

25    Q.    Right.  But even if they're not under arrest, if you ask

1    them questions, they have the right to tell you they don't want

2    to answer.

3    A.    Correct.

4    Q.    And a person in their home, they don't have to let you in,

5    right?

6    A.    Correct.

7    Q.    They can keep their door shut, right?

8    A.    Yes.

9    Q.    They can close the door on you if they don't want to talk

10   anymore, right?

11   A.    They can.

12   Q.    They're allowed to do that.

13   A.    Yes.

14   Q.    There is no crime for closing the door because a police

15   officer is asking questions, right?

16   A.    No.

17   Q.    Now if you were——if a normal parent would say, *What are you*

18   *talking about, here's my child, everything's fine,* that's very

19   hard to do if the child isn't there, right?

20   A.    Correct.

21   Q.    And I think——well, withdrawn.

22          And you've testified, or did——and you really don't

23   remember everything that Mr. Rattray said to you that day,

24   right?

25   A.    No.

N8V1RAT2            Cadavid - Cross

1    Q.    He could have said she wasn't there, you don't remember,

2    right?

3    A.    I don't remember.

4    Q.    And when you asked the whereabouts of his daughter, you

5    don't remember what he said to that either, do you?

6    A.    No.

7    Q.    At some point I think you testified that——and you can tell

8    me if I've got this wrong, but I think at some point you

9    testified that you asked him to show you court papers?

10   A.    Correct.

11   Q.    And that was while you were in the apartment?

12   A.    Yes.

13   Q.    To prove that he had custody of the child.

14   A.    Not custody.  It was in regards to the visitations.

15   Q.    You were asking him to show you court papers as regards

16   visitation?

17   A.    Correct.

18   Q.    You were asking him to show you court papers that he had

19   visitation?

20   A.    Well, based on what Ms. Sandy was——what she was telling me,

21   the reason why she was there, I wanted to know if he had

22   paperwork that would show who had the daughter at what time,

23   what date.  I wasn't——I wasn't there to establish custody.

24   Q.    Right.  Because you——and you had no authority to enforce

25   visitation anyway, right?

1    A.    Correct, but I just wanted to see——I wanted to confirm what

2    Ms. Sandy was saying.

3    Q.    You were in his home, trying to confirm what Ms. Sandy was

4    saying; is that your testimony?

5    A.    Yes.

6    Q.    Even though if she did have visitation——withdrawn.

7          Even though——try this again.  Even though, even if you

8    had seen a piece of paper saying she had visitation, there was

9    nothing you could do, right?

10   A.    Yes.

11   Q.    The best you could do was fill out a DIR.

12   A.    Correct.

13   Q.    And you don't recall your partner, Officer Trigueno, saying

14   that, *If you don't have a piece of paper, you're going*

15   *downtown*; you don't recall that either, right?

16   A.    I do not.

17   Q.    And you don't recall the plaintiff requesting a supervisor

18   before he tried to close the door?

19   A.    No.

20   Q.    And you don't recall——when you were in the plaintiff's

21   apartment, you don't recall the plaintiff saying she was on a

22   playdate.

23   A.    I know——I know he didn't say that.

24   Q.    I'm sorry?  What was that?

25   A.    He didn't say that.

1    Q.    Your testimony is that he didn't say that.

2    A.    Yes.

3    Q.    If you could take a look at page 31, line 25, and we're

4    going to go over into line 32——excuse me.  Go onto the next

5    page.  Just let me know when you're there.

6    A.    Okay.

7    Q.    And in your deposition, you were asked:

8              "Do you recall me telling you she was on a playdate?"

9              And your answer:  "I do not.  I do recall you refusing

10    to answer my question."

11    A.    Yes.

12    Q.    So you didn't say in your deposition that he did not say

13    that, right?

14    A.    In my deposition, no.

15    Q.    So one of the reasons why you felt you had cause to make

16    entry was Mr. Rattray's demeanor.

17    A.    That was one of the reasons, yes.

18    Q.    Okay.  Because that's not how a normal person would react.

19    A.    Correct.

20    Q.    Now the Fourth Amendment standard that you have to comply

21    with is not normality, right?

22              MS. FADDIS:    Objection.

23              THE COURT:    Sustained.

24    Q.    So you bang on the door and there's a back-and-forth,

25    right?

N8V1RAT2                 Cadavid - Cross

1   A.   Yes.

2   Q.   You demand to see the child.

3   A.   I ask.

4   Q.   You demand——you asked that he produce the child.

5   A.   I ask to see the child.

6   Q.   And then you threaten to take his door down.

7   A.   Correct.

8   Q.   He opens the door, and you stick your foot in there, right?

9   A.   Correct.

10  Q.   Right away.

11  A.   Yes.

12  Q.   You don't wait for him to answer any questions; you stick

13  your foot in there right away.

14  A.   Correct.

15  Q.   So that you can make sure that door stays open.

16  A.   Yes.

17  Q.   That he can't exercise his right to close that door, right?

18           MS. FADDIS:    Objection.

19           THE COURT:    Sustained.

20  Q.   So that he can't close the door, right?

21  A.   Correct.

22  Q.   And then as he's got his door open, you demand to see the

23  child again.

24  A.   I ask——I asked to see the child and her whereabouts.

25  Q.   Okay.  And at this point you have no knowledge of who has

1    custody.

2    A.    No.

3    Q.    You have no knowledge of who has visitation.

4    A.    No.

5    Q.    You have no knowledge of the history of this custody

6    dispute.

7    A.    No.

8    Q.    You have no knowledge of the——you have no knowledge of the

9    relationships between the parties.

10   A.    No.

11   Q.    You have no knowledge if this has happened before.

12   A.    No.

13   Q.    You have no context for the history of this dispute at all,

14   right?

15   A.    I——I don't recall, 'cause when I spoke to Ms. Sandy, she

16   might have stated the history, but I don't remember that.

17   Q.    And so as Mr. Rattray's standing at the door and you're

18   asking to see his child, and you're asking him to prove the

19   whereabouts of his child, he's irate.

20   A.    He's——yeah.

21   Q.    And you continue to ask him to prove where his child is,

22   right?

23   A.    I continued——I continued to ask him where——if I could see

24   his child.

25   Q.    And when you were in his apartment and you did your search,

1    you approached and you asked for his ID, right?

2    A.    Yes.

3    Q.    And you held it in your hand, right?

4    A.    I don't remember.

5    Q.    Well, and at some point you threatened him with child

6    protective services, right?

7    A.    No.

8    Q.    You don't remember that?

9    A.    I never stated that.

10    Q.    Your testimony is that you didn't say, "When asked why they

11    needed my ID, he said he needed to know who he was talking to

12    for when he called child services"?  You didn't say that?

13    A.    No.

14    Q.    You had no basis to call child services at that point,

15    right?

16    A.    Not at that point, no.

17    Q.    No grounds to believe that Mr. Rattray was in some way

18    harming his daughter.

19    A.    I——at that point I didn't know yet.

20    Q.    You had no basis to believe that Mr. Rattray was harming

21    his daughter, right?

22    A.    Well, I had——I was going based on what the mother was——the

23    allegations the mother was saying.

24    Q.    Okay.  But Ms. Sandy didn't say he hurts her, right?

25    A.    No.

1    Q.    Didn't say——she didn't say he hits her, right?

2    A.    No.

3    Q.    She didn't say, *I'm worried he will harm her,* right?

4    A.    No.

5    Q.    And you didn't see any evidence of that in the apartment

6    when you searched it.

7    A.    No.

8    Q.    Now when you entered the apartment and you pushed the door

9    in, Mr. Rattray stood back, right?

10   A.    To my recollection, yeah, he——as soon as he noticed I was

11   pushing my way in, he took a few steps back.

12   Q.    He stepped back.  And he didn't try to push you out?

13   A.    No.

14   Q.    He didn't try to close the door and shove you out the door.

15   A.    No.

16   Q.    He made no attempt to stop you whatsoever.

17   A.    No.

18   Q.    No, he didn't make an attempt to stop you, right?

19   A.    Correct.

20   Q.    Now when you come in, you're in full police uniform, right?

21   A.    Yes.

22   Q.    And when you are on patrol, you have a bulletproof vest?

23   A.    Yes.

24   Q.    You wear that under your shirt?

25   A.    Yes.

N8V1RAT2            Cadavid - Cross

1    Q.    And it kind of makes you a little puffy, right?

2    A.    Yes and no.

3    Q.    You look like you've got something under your shirt, right?

4    A.    Yes and no.

5    Q.    Doesn't make you look bigger?

6    A.    It——also depends on the uniform you're wearing.  If you're

7    wearing a tighter, tighter shirt, yes; if you're wearing a more

8    looser shirt, no.

9    Q.    And you've got a belt here, right?

10   A.    Correct.

11   Q.    And a sidearm.

12   A.    Yes.

13   Q.    That's a gun.

14   A.    Yes.

15   Q.    And a baton.

16   A.    Yes.

17   Q.    It's one of those collapsible things.

18   A.    Yes.

19   Q.    That you can hit people if you have to, right?

20   A.    Yes.

21   Q.    Did you carry pepper spray?

22   A.    Yes.

23   Q.    That's also on your belt, right?

24   A.    Correct.

25   Q.    So you have a gun on one side and pepper spray on the

N8V1RAT2          Cadavid - Cross

1    other?

2    A.    Correct.

3    Q.    And a baton.

4    A.    Yes.

5    Q.    And a radio.

6    A.    Yes.

7    Q.    And when you entered the apartment, Mr. Rattray never made

8    any attempt to——withdrawn.

9              When you were in the apartment, before you start the

10    search, you testified you're having a conversation back and

11    forth with him.

12    A.    Correct.

13    Q.    And at this point all he's doing is refusing to answer your

14    questions, right?

15    A.    Yes.

16    Q.    He didn't put a hand on you, right?

17    A.    No.

18    Q.    So now you take a turn to enter his daughter's room,

19    correct?

20    A.    I don't remember which room I went into first.

21    Q.    You take a turn to search the apartment.

22    A.    I——I took a turn to look in the apartment.

23    Q.    And you searched the whole place.

24    A.    I looked throughout the apartment, yes.

25    Q.    And he never tried to stop you from that.

1    A.    No.

2    Q.    And now you testified he was very upset.

3    A.    Yes.

4    Q.    That his voice was high.

5    A.    It was much higher than before.

6    Q.    And that he was talking fast.

7    A.    He was talking fast?

8    Q.    I'm sorry.  Withdrawn.  But he was agitated.

9    A.    Yes.

10   Q.    And that——the fact that he was agitated, that, you said, I

11   think gave you more concern.

12   A.    Well, what gave me more concern was the fact that he was

13   trying to close the door on us.

14   Q.    Now, but you're standing in his apartment, I think you

15   testified——so your testimony is not that he was being upset in

16   the apartment was what gave you concern, it's that he tried to

17   close the door.

18   A.    Yes.

19   Q.    But when you're standing in the apartment, he might be

20   yelling, but he's not doing anything to impede you.

21   A.    To impede me?  No.

22   Q.    He didn't try to stop you from searching the apartment.

23   A.    No.

24   Q.    Didn't stand in your way.

25   A.    No.

1    Q.    Didn't put himself in front of any doors.

2    A.    No.

3    Q.    You didn't have to move him out of the way.

4    A.    No.

5    Q.    You didn't even have to ask him to move, did you?

6    A.    No.

7    Q.    And when you were done searching and you stayed in the

8    apartment, he never laid a hand on you, right?

9    A.    No.

10   Q.    Now I think there's been some dispute about how long it

11   took for the supervisor to arrive, but you stayed in the

12   apartment the entire time before the supervisor got there.

13   A.    Correct.

14   Q.    Mr. Rattray wasn't free to leave, was he?

15   A.    At that time, no.

16   Q.    Had he tried to leave, you would have stopped him.

17   A.    Correct.

18   Q.    And Officer Trigueno was standing at the doorway, right?

19   A.    I don't remember exactly where she was standing.

20   Q.    She was visible?

21   A.    Yes.

22   Q.    She was also armed, right?

23   A.    Yes.

24   Q.    Also in full police kit, right?

25   A.    Yes.

N8V1RAT2              Cadavid - Cross

1   Q.   And Mr. Rattray, he asked you to leave after your search.

2   A.   Yes.

3   Q.   And you chose not to, right?

4   A.   Correct.

5   Q.   You could have chosen to wait outside in the hall, couldn't

6   you?

7   A.   Yes.

8   Q.   And he lives on the third floor, right?

9   A.   Yes.

10  Q.   You weren't concerned he was going to throw himself out the

11  window, were you?

12  A.   No.

13  Q.   And you searched the apartment so you knew the child wasn't

14  there, right?

15  A.   Correct.

16  Q.   You knew she wasn't in any imminent danger.

17  A.   That's——at that point I hadn't yet established that.

18  Q.   She wasn't in any imminent danger in the apartment.

19  A.   No.

20  Q.   But you chose to stay in the apartment.

21  A.   Correct.

22  Q.   And Mr. Rattray, he asked if he could leave, right?

23  A.   Yes.

24  Q.   And you said no.

25  A.   Yes.

1    Q.    So he had to sit there and wait for your boss to get there,

2    right?

3    A.    Correct.

4            THE COURT:    How long did you wait?  How long did you

5    have to wait for the supervisor after you completed your search

6    of the apartment?

7            THE WITNESS:    From my recollection, approximately 20

8    minutes.

9    Q.    Now I think you testified that during this time period

10    Mr. Rattray was sitting at the——well, withdrawn.

11            At some point he called 911.

12    A.    Correct.

13    Q.    And you talked to 911 briefly.

14    A.    Yes.

15    Q.    You read your badge number into the phone.

16    A.    Yes.

17    Q.    So at some point you were standing close enough to read

18    your number into the phone, right?

19    A.    I was yelling——I yelled out my badge number.

20    Q.    You yelled out your badge number?  Not from across the

21    room, though, right?

22    A.    No, from where I was standing.  I believe I was in front of

23    the doorway.

24    Q.    So at some point you were close enough to state your badge

25    number into the phone.

1            MS. FADDIS:    Objection.  Argumentative.

2            THE COURT:    Overruled.

3    A.    When he had the phone on speaker, yes.

4    Q.    And you testified that you were standing over by the door.

5    A.    Correct.

6    Q.    That you were standing over by the door so you could run if

7    he grabbed a knife from a kitchen block; that was your

8    testimony?

9    A.    Yes.

10   Q.    Was that your testimony?

11   A.    Yes.

12   Q.    You didn't mention that in your deposition, did you?

13   A.    No.

14           MS. FADDIS:    Objection.

15           THE COURT:    Overruled.

16   A.    No.

17   Q.    You didn't say anything about knives in your deposition,

18   did you?

19   A.    No.

20           MS. FADDIS:    Objection.

21           THE COURT:    Overruled.

22   Q.    And you stated he was slamming the kitchen counter.

23   A.    With his hand, yeah, he was slamming the counter.

24   Q.    You didn't say that in your deposition either.

25   A.    No.

N8V1RAT2          Cadavid - Cross

1    Q.   And you were continuing to ask him the whereabouts of his

2    daughter.

3    A.   Correct.

4    Q.   So he was yelling in response to your questions?

5    A.   Yes.

6    Q.   And he was telling you to get out.

7    A.   Yes.

8    Q.   And for most of this time, the phone was on——was——excuse

9    me.  Withdrawn.

10              For most of this time there was an open connection

11   with 911.

12   A.   I don't recall.

13   Q.   And again, you chose to stay in the apartment and not

14   leave.

15   A.   Correct.

16              MS. GELLER:    If I could have just a moment, your

17   Honor.  I'm cutting.

18              THE COURT:    Yes.

19   Q.   Now, Officer Cadavid, you don't recall Mr. Rattray telling

20   you that he didn't have court paperwork, right?

21   A.   No.

22   Q.   You don't recall either way.

23   A.   No.

24   Q.   You also testified that when a supervisor arrived, he took

25   a number of steps.  Do you recall that testimony?

1    A.    What do you mean by steps?

2    Q.    That he inquired as to the whereabouts of the child.

3    A.    The supervisor?

4    Q.    The supervisor, correct.

5    A.    Yes.

6    Q.    And that you heard him make a phone call?

7    A.    Yes.

8    Q.    And that he sent a——or you understand that he sent a police

9    car——

10    A.    Correct.

11    Q.    ——to her location.  You didn't say any of that in your

12    deposition, did you?

13              MS. FADDIS:    Objection.

14              THE COURT:    All right.  I'll see the lawyers at

15    sidebar.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1           (At the sidebar)

2           THE COURT:    So there were a series of objections to

3   what the officer said or didn't say at his deposition.  Now I

4   of course wasn't given the deposition until the trial started,

5   so I have not studied what's in the deposition.  I am

6   confident, however, that the officer was asked in extensive

7   detail what happened inside the apartment and so therefore,

8   I've overruled two objections, one of which involved his

9   testimony about his concern that knives were readily available

10  to Mr. Rattray.  I can't remember the other instance.  But now

11  there's an objection about whether he testified at his

12  deposition about his supervisor making inquiry about where the

13  daughter was and then calling the residence where the daughter

14  was having a playdate and then sending a patrol car over to

15  that address to confirm that the child was actually there.  And

16  counsel has asked a question as to whether he testified to any

17  of this at his deposition, and I presume the answer is no.  So

18  once again, given the extent of the questioning about these

19  matters at the deposition, it seems likely to me that he would

20  have had an opportunity at his deposition to report that the

21  supervisor took all of these actions once he got to the

22  apartment.  If that's not so, let me know, but I'm operating on

23  that assumption.

24          MS. FADDIS:    So——thank you, your Honor.  So the

25  objections are to what have effectively been a series of

N8V1RAT2              Cadavid - Cross

1    impeachments by omission.  Obviously——

2              THE COURT:    Because we can all agree that these are

3    significant; these aren't sort of tangential matters.  These

4    are core items that you would think would have been discussed

5    at the deposition that apparently weren't.

6              MS. FADDIS:    Well, your Honor, the issue becomes the

7    deposition——the content of the deposition is dictated by the

8    questions that were asked by the plaintiff himself, who was

9    acting as his own attorney, so if there is a specific portion

10    of the testimony where he was asked questions in this vein and

11    this testimony would have been responsive and he didn't give

12    it, then I think the appropriate impeachment would be to ask

13    those questions, and lay the proper foundation for impeachment,

14    and then impeach him with his failure to answer the questions

15    in the same fashion he's testified today.  I don't have the

16    ability in this moment to go through every word of the

17    deposition so I can't swear that there was not a question that

18    arguably some of these things would have been responsive to,

19    which is part of the problem, because it's impossible to say,

20    in a general sense, well, you just didn't say X at the

21    deposition.  The question should be, you were asked the same

22    question and gave a different answer.  Impeachment by omission

23    leaves the jury with the impression that he was given the

24    opportunity to answer the question when in fact he may not have

25    been.

1     THE COURT:    Yes, and the complicating factor is that

2     the plaintiff himself was taking the deposition and he's not a

3     lawyer, and while there's reason to think a lawyer would have

4     pursued these matters in detail, perhaps the plaintiff didn't

5     because he's not a lawyer; he doesn't know how to conduct a

6     deposition.  So I'm concerned that where you're asking

7     questions about things that the officer omitted to say, I'm

8     concerned about whether there is a foundation that he was asked

9     a question that should have elicited this information and he

10     didn't give it.

11     MS. GELLER:    I tried to be very careful of that, your

12     Honor.  One of the reasons why I have not gone question by

13     question is because the depositions are very, very messy.

14     There was a fair amount of narrative questions that should not

15     go before the jury.  There was a fair amount of interference by

16     opposing counsel, interjections, long colloquies.  But where I

17     have asked omitting questions, I have tried to found them in a

18     place where the question itself was more open-ended, as in,

19     Where is your narrative *[sic]*?  I do think it's appropriate

20     rehabilitation if counsel wants to ask, Were you asked at your

21     deposition, and he can say no, but with respect to Lieutenant

22     Khosh, the line of——the question itself was:  "Do you remember

23     what you discussed with Lieutenant Khosh?"  And he said:  "I

24     don't recall."

25     MS. FADDIS:    Well, your Honor, in the deposition,

1    that's not the appropriate indication.  The question isn't, You

2    never mentioned this.  And to the extent the foundation for

3    this impeachment by omission seems to be general questions that

4    called for a narrative, if the question——if the open-ended

5    question was substantially specific that it seems it would have

6    called for this information, that too could be asked the

7    witness:  You were asked this question and in response, you did

8    not say X.  But simply saying you neglected to say this at your

9    deposition is not sufficient, and it leaves the misimpression

10   with the jury.

11               MS. GELLER:    I can read the relevant section in, if I

12   could have——I think that it's appropriate to maybe not read the

13   entirety of all the questions.  Some of them were quite long.

14   And then I think it's fair impeachment to say, You didn't

15   mention that here, did you, and you didn't mention that here,

16   did you?

17               THE COURT:    Yes.  I think given that the plaintiff

18   took the deposition, and the plaintiff's not a lawyer,

19   counsel's representation that the depositions are a mess——which

20   is consistent with the brief, cursory review I've done of his

21   deposition, there were lots of objections, not surprisingly,

22   because the plaintiff is not a lawyer——I'd be more comfortable,

23   when you're seeking to point out an omission, that it's tied to

24   something in the transcript.

25               MS. GELLER:    I understand, Judge.  And I'm almost

N8V1RAT2              Cadavid - Cross

1    done.  So I think we're at the end of this, and there's not

2    going to be very many more of these.

3                    THE COURT:    Okay.  So with respect to this one, can

4    you direct his attention to something in the deposition that

5    should have called for what the supervisor did.

6                    MS. GELLER:    Yes, your Honor.

7                    THE COURT:    Okay.

8                    MS. GELLER:    Absolutely.

9                    THE COURT:    All right.

10                   (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N8V1RAT2              Cadavid - Cross

```
 1              (In open court)
 2              MS. GELLER:    Just bear with me one moment, your Honor.
 3              THE COURT:    Yes.
 4    BY MS. GELLER:
 5    Q.    Officer Cadavid, I can't remember if there's a question
 6    pending.  If there is, it's withdrawn.
 7              Officer Cadavid, you testified earlier about steps
 8    that you saw or heard your lieutenant take when he arrived in
 9    the apartment, correct?
10    A.    Correct.
11    Q.    And if you could take a look at your deposition——
12              MS. GELLER:    Excuse me, your Honor.  I'm just trying
13    to find the place in the deposition.
14              THE COURT:    Yes.
15    Q.    Okay.  If I could direct your attention to page 124 of your
16    deposition, and at line 2-6, you were asked——
17              MS. FADDIS:    Objection, your Honor.  I don't know
18    where the end——first of all, what the end line is, but I'm
19    still going to have objections.
20              THE COURT:    All right.  Do you want to be heard at
21    sidebar again?
22              MS. FADDIS:    Yes, your Honor.  I apologize.  Thank
23    you.
24              (Continued on next page)
25
```

 1              (At the sidebar)

 2              THE COURT:    All right.  These particular excerpts are

 3    not really on point.  The witness is saying that he doesn't

 4    recall his conversation with the lieutenant, but what really

 5    matters here is his knowledge of what the lieutenant did

 6    specifically, whether he called the parent at whose home the

 7    daughter was having a playdate and whether he sent a patrol car

 8    to that residence to confirm that the daughter was actually

 9    there.  So what we need is questions and answers that bear on

10    Officer Cadavid's knowledge about the steps that Lieutenant

11    Khosh took to confirm that the daughter was safe, as well as

12    her whereabouts.

13              MS. FADDIS:    Your Honor, I will direct the Court and

14    counsel's attention to pages 50 and 51 of Officer Cadavid's

15    deposition; starting at line 12 on page 50, and it carries over

16    to line 3 on page 51.

17              THE COURT:    Okay.

18              MS. FADDIS:    I don't believe there's any more direct

19    testimony on point on this issue, but clearly he was never

20    asked anything that would have elicited the express testimony

21    that a car was sent or a phone call was made, and in a general

22    sense, though, he's entirely corroborating what the testimony

23    was today, which is that the lieutenant himself took steps to

24    verify the information and the confirmed the whereabouts of the

25    child, which is what he said today.

1            MS. GELLER:    Your Honor, I think, given——Officer

2    Cadavid testified multiple times in his deposition that he does

3    not recall his conversations with Lieutenant Khosh that night,

4    but I think given how messy it would be to come in, I'm just

5    going to withdraw the question, your Honor.

6            THE COURT:    Okay.

7            MS. GELLER:    I don't know how else to——given the

8    limitations of the depositions——

9            THE COURT:    Well, I mean, I will say that the language

10   cited by defense counsel really corroborates what his testimony

11   here was in the sense that he clearly testified at his

12   deposition that the lieutenant did in fact obtain information

13   about the whereabouts of the daughter and that she was at a

14   friend's house, and so that's certainly consistent with his

15   testimony here that the lieutenant confirmed that the daughter

16   was safe.

17            Now if you have any concerns about the objections that

18   I overruled, you let me know and I'll revisit those.

19            MS. FADDIS:    I'll look at that over the lunch break.

20   Thank you, your Honor.

21            THE COURT:    Okay.  How much longer do you have?

22            MS. GELLER:    Like five minutes.  I'm done, your Honor.

23            THE COURT:    Okay.

24            MS. FADDIS:    And we anticipate that we'll break for

25   lunch and we'll do redirect after lunch then?

1              THE COURT:    Yes.

2              MS. FADDIS:    Okay.  Thank you.

3              (In open court)

4    BY MS. GELLER:

5    Q.    Officer Cadavid, your search of this home on November 5 was

6    based on fear of drugs and drug dealers, right?

7              MS. FADDIS:    Objection.  Asked and answered.

8              THE COURT:    Overruled.

9    A.    That was part of it.

10   Q.    That you had heard from Wendy Sandy, Ms. Sandy from

11   downstairs?

12   A.    Yes.

13   Q.    You didn't have a court order.

14   A.    No court order.

15   Q.    You didn't know who had custody.

16   A.    No.

17   Q.    You didn't know who had visitation.

18   A.    No.

19   Q.    And you had no other information that the child was in

20   danger, right?

21   A.    Just from the allegations of Ms. Sandy.

22   Q.    And when you arrived at the door of the home, there was

23   nothing that provided you, before you knocked, nothing that

24   provided you further information to give you concern about the

25   date——about the welfare of that child, right?

N8V1RAT2          Cadavid - Cross

1    A.    No.

2    Q.    And other than Mr. Rattray yelling at you and cursing at

3    you and refusing to answer your questions, you had no other

4    information to suggest that the child was in danger, right?

5    A.    Well, now I have the allegations plus the actions of

6    Mr. Rattray.

7    Q.    And you never——by the way, you never said to him, we're

8    concerned for her safety because we think you may be on drugs,

9    right?

10   A.    I don't recall.

11   Q.    You never said to him, Ms. Sandy is downstairs and she says

12   the child is not safe because of drug use, right?

13   A.    I don't recall.

14   Q.    You don't recall telling him anything about the basis for

15   your concern for the welfare of that child, right?

16   A.    No.

17   Q.    You just said, *We're here to check on her welfare.*

18   A.    By my recollection, yes.

19   Q.    And maybe mentioned that Ms. Sandy was downstairs?

20   A.    Yes.

21   Q.    And mentioned that she wanted to see the child.

22   A.    I don't recall.

23   Q.    And so as you're standing at the door and Mr. Rattray is

24   irate.  Other than the drugs and the drug dealers downstairs

25   *[sic]*, and the fact that he was irate and argumentative and

1    refused to answer your questions, you had no other basis to

2    presume that child was in imminent danger, correct?

3                    MS. FADDIS:    Objection.

4                    THE COURT:    Grounds?

5                    MS. FADDIS:    Compound, calls for speculation, and

6    argumentative.

7                    THE COURT:    Sustained.

8    Q.    Okay.  So you've got the drugs and the drug dealers, right?

9    A.    Yes.

10                   MS. FADDIS:    Objection, your Honor.

11                   THE COURT:    Overruled.

12   Q.    And the yelling and the cursing.

13   A.    Yes.

14   Q.    And your analysis that it's not normal, it's not a normal

15   reaction, right?

16   A.    Yes.

17   Q.    And that's the basis for your belief that the child was in

18   imminent danger.

19   A.    Not imminent, but also from what Ms. Sandy stated, that she

20   was not safe, that she was in danger.

21   Q.    Okay.  That was the basis for your testimony that she was

22   in imminent danger.

23   A.    I wouldn't consider that imminent danger.

24   Q.    You wouldn't consider that imminent danger.

25   A.    No, not my definition.

N8V1RAT2              Cadavid - Cross

1   Q.   I think you defined imminent earlier in your testimony

2   today, right?  Well, let me——withdrawn.  Withdrawn.  I got that

3   wrong.

4            You defined when you can enter a home——

5   A.   Correct.

6   Q.   ——right?  And that was if you have a warrant?

7   A.   With a warrant, yes.

8   Q.   But you didn't have a warrant here.

9   A.   No.

10  Q.   It would take too long to get; that was your testimony,

11  right?

12  A.   Yes.

13  Q.   And you didn't have a medical emergency.

14  A.   No.

15  Q.   No knowledge of a medical emergency.

16  A.   No.

17  Q.   And so I think you just said that what we just went through

18  was not your definition of imminent, right?

19  A.   Correct.

20  Q.   So what was your basis for entering the apartment?

21  A.   Possible crime being committed.

22  Q.   Possible crime being committed.

23  A.   Yes.

24  Q.   Possible crime being committed was the yelling?

25  A.   No.  It was the——with the daughter, that she could be

N8V1RAT2            Cadavid - Cross

1   abused, she could be hurt.

2   Q.    Your testimony is that you believed the child was being

3   abused.

4   A.    Well, my——

5                 MS. FADDIS:    Objection.

6                 THE COURT:    Overruled.

7   A.    My testimony is based on the allegations from Ms. Sandy

8   saying that she's not safe and in danger, now I'm——there could

9   be a possible crime of Mr. Rattray either abusing the child or

10  some type of child crime.

11  Q.    Forgive me here for a minute, because I'm a little

12  confused.

13                We just went through the grounds for your entry, and

14  you don't believe that those were exigent circumstances, right?

15  Withdrawn.  You don't believe that those showed imminent

16  danger, as you define, it, right?

17  A.    Yes.

18  Q.    So you made entry into the apartment because you believe

19  that a crime was being committed?

20  A.    I was trying to establish, I was trying to investigate,

21  yes.

22  Q.    Okay.  Now Ms. Sandy just said, *My child isn't safe,* right?

23  A.    Yes.

24  Q.    She didn't say he abuses her.

25  A.    No.

1    Q.    She didn't say he hits her.

2    A.    No.

3    Q.    She didn't say he commits crimes against her.

4    A.    No.

5    Q.    She didn't mention any crime at all, did she?

6    A.    No.

7    Q.    She didn't even mention a concern for a crime, did she?

8    A.    Well, when she stated that she's not safe and in danger.

9    Q.    She didn't say, with any specificity, any crime against a

10   child when she talked to you, did she?

11   A.    No specific crime.

12   Q.    What she said was that he does drugs, right?

13   A.    That was one, yeah, one.

14   Q.    And that he has drug dealers over the apartment, right?

15   A.    Correct.

16   Q.    Those were the specifics she gave.

17   A.    Yes.

18   Q.    So when you're standing at the door, that's all the

19   information you have, right?

20   A.    Yes.

21   Q.    And you didn't make entry because you were concerned that

22   child was in imminent danger; that's your testimony?

23   A.    I'm sorry.  Can you repeat that question.

24   Q.    You didn't make entry because you were concerned the child

25   was in imminent danger.

N8V1RAT2            Cadavid - Cross

1   A.    Imminent danger, no.

2   Q.    You entered the apartment because you say here that you

3   thought he was committing some kind of crime against the child.

4   A.    I was trying to establish that.

5   Q.    Based on what Ms. Sandy said below.

6   A.    Yes.

7   Q.    Some unspecified crime against the child.

8   A.    Yes.

9   Q.    You can't articulate what that crime might be.

10  A.    At that point, no.

11  Q.    And you had additional concern because of the way

12  Mr. Rattray responded.

13  A.    Yes.

14  Q.    That when you asked to see his daughter, he told——he

15  refused to tell you where she was.

16  A.    Yes.

17  Q.    And that when you demanded he produce her, he refused to

18  comply.

19  A.    When I asked for him to show me his daughter, yes, he was

20  refusing.

21  Q.    Okay.  But you don't remember one way or the other that he

22  said she wasn't home.

23  A.    No, I do not recall.

24  Q.    You don't recall that.

25  A.    No.

N8V1RAT2

1    Q.    Or that she wasn't available; you don't recall that.

2    A.    No.

3    Q.    And so that just——and you didn't say to him, We think

4    something's happening in that apartment, did you?

5    A.    No.

6    Q.    You didn't say to him, We're concerned that the child is

7    being abused.

8    A.    No.

9    Q.    You didn't say to him, We're concerned that she's not safe.

10   A.    No.

11   Q.    You didn't say to him anything at all to suggest

12   that——withdrawn.

13                You didn't say to him anything to the fact that you

14   believed a crime was possibly being committed in that

15   apartment, did you?

16   A.    No.  I would not tell him that.

17   Q.    And after you were in the apartment and you stayed there

18   and it was clear the child wasn't there, you were still

19   concerned about a crime?

20   A.    Yes.

21   Q.    An unspecified potential crime against the child.

22   A.    Correct.

23                MS. GELLER:    Your Honor, if I may have a moment.

24                THE COURT:    Yes.

25                MS. GELLER:    Thank you, your Honor.  Nothing further.

N8V1RAT2

```
 1                THE COURT:    All right.  Ladies and gentlemen, we're

 2    going to take our luncheon recess.  The time now is 12:35.

 3    We'll resume at 1:35.  Don't discuss the case.  Please keep an

 4    open mind, because there's more evidence, and we'll be back to

 5    you at 1:35.  Thank you.

 6                THE DEPUTY CLERK:    All rise.

 7                (Jury not present)

 8                THE COURT:    Please be seated.

 9                How long do you anticipate the redirect is going to

10    be?

11                MS. FADDIS:    Maybe 15 minutes, your Honor.

12                THE COURT:    I'm sorry?

13                MS. FADDIS:    Maybe 15 minutes.

14                THE COURT:    Okay.  And does the defense have any

15    additional evidence?

16                MS. FADDIS:    No.

17                THE COURT:    Okay.  So the defendants will rest after——

18                MS. FADDIS:    I'm sorry.  I apologize to the Court.

19    Your Honor, I would say I would like to state on the record in

20    front of the jury that we adopt the testimony of Officer

21    Trigueno in our case in chief, but other than that, we will not

22    be putting on any additional evidence.

23                THE COURT:    You don't have any problem with that, do

24    you, Ms. Geller?

25                MS. GELLER:    No, your Honor.
```

N8V1RAT2

1          THE COURT:    Okay.  So we'll complete the testimony,

2     the defendants will rest.  I assume the plaintiff doesn't have

3     any rebuttal testimony?

4          MS. GELLER:    No, your Honor.  I do not think we have

5     any rebuttal testimony.

6          THE COURT:    Okay.  So what I want to do is complete my

7     work on the charge, to the extent I can, transmit the draft

8     jury instructions to you, and then reconvene for a charge

9     conference, I'm thinking 4:00.  We will likely get the charge

10    to you in tranches.  I can give you the first half pretty much

11    right away and then the second half will come later.  And I'll

12    be working on that over the lunch hour.

13         MS. GELLER:    Very good, your Honor.  Thank you.

14         THE COURT:    We'll resume at 1:35.

15         MS. FADDIS:    Thank you.

16         MS. GELLER:    Judge, just for timing purposes, do you

17    anticipate closing tomorrow after the charge conference?

18         THE COURT:    Well, yes.  So I want to have the charge

19    conference this afternoon, 4:00——

20         MS. GELLER:    Yes.

21         THE COURT:    ——and then I want to start with summations

22    at 9:30 tomorrow morning, and then obviously I'll give the jury

23    instructions right after the summations, and then the jury will

24    begin their deliberations.

25         MS. GELLER:    The only reason I ask is that we had some

N8V1RAT2

1    people coming through who wanted to see Ms. Benoit close, and

2    I'll tell them tomorrow morning.

3              THE COURT:    Tomorrow morning, yes.

4              All right.  Thank you.

5              MS. FADDIS:    Thank you, your Honor.

6              THE DEPUTY CLERK:    All rise.

7              (Luncheon recess)

```
 1                    (In open court; jury not present)

 2                    THE COURT:  Please be seated.

 3                    Anything I need to take up?

 4                    MS. GELLER:  Nothing from the plaintiff, your Honor.

 5                    MS. FADDIS:  Your Honor, I did have an opportunity to

 6      review Officer Cadavid's deposition over the lunch break with

 7      regard to the two line -- or two inquiries, the violation to

 8      which our objections were overruled earlier -- the first was an

 9      inquiry put to Officer Cadavid as to whether or not he said at

10      his deposition that the plaintiff was in an area with knives.

11                    THE COURT:  I can't hear you.

12                    MS. FADDIS:  I'm sorry.  The first was a question put

13      to Officer Cadavid, essentially, did you say at your deposition

14      anything about the plaintiff being near knives or something to

15      that effect; and the second was, did you say anything at your

16      deposition about the plaintiff slamming his hands on the

17      kitchen counter.

18                    I reviewed the deposition.  I have identified two

19      areas in the deposition where tangentially the plaintiff

20      inquired into the period of time in which this would have

21      happened.  In the first instance, the plaintiff withdrew the

22      question.  I'm at page 28, lines 7 through 9 of Officer

23      Cadavid's deposition.

24                    THE COURT:  Okay.

25                    MS. FADDIS:  Obviously, since the question was
```

1    withdrawn, the witness never had an opportunity to answer.  And

2    there was no follow up on anything that transpired during that

3    interval between the entry and the arrival of the lieutenant.

4    It moved on to the lieutenant's presence.

5         At page 149, at line 13, and this is being very

6    generous I think, there's a question put by the plaintiff to

7    Officer Cadavid, "when you arrived at plaintiff's home, was

8    plaintiff making any furtive movements?"  And there was an

9    objection by former defense counsel.

10         The plaintiff -- the witness was instructed to answer,

11    and then the answer was, "no, I can't answer," because he

12    didn't understand the question, on page 149.  And then we moved

13    on to a different topic.

14         I don't see anywhere else in the transcript where

15    arguably the defendant would have reasonably been expected to

16    provide the information that was inquired into earlier on

17    cross-examination.  Obviously, if plaintiff's counsel has

18    something they'd like to direct us to, I'm open to that, but

19    I've reviewed the transcript as such.  I think it would be

20    appropriate to instruct the jury that testimony should be

21    disregarded or should be stricken.

22         MS. GELLER:  We had argument at sidebar, your Honor.

23    I have understood the Court's ruling.  Given this proffer, I do

24    not think that we would oppose a motion to strike on that --

25    let me rephrase that.  That given the Court's ruling, I

1    understand the Court's position, and, therefore, will not argue

2    against the motion to strike on those grounds.

3         I would like just to put on the record there was never

4    any intention here to mislead anybody.  This was just a very

5    difficult deposition.

6         So given that, we would not oppose a motion to strike

7    in accordance with prior comments at sidebar based on our

8    understanding of the Court's ruling on the issue of omissions

9    in the depositions.

10        I hope that made sense.

11        THE COURT:  All right.  This is the instruction I

12   would propose to give to the jury.

13        You may recall that Officer Cadavid was questioned on

14   cross-examination about whether he testified at his deposition

15   about his concern that Mr. Rattray was in proximity to knives

16   and was slamming the kitchen counter.  I am striking those

17   questions and answers from the record, and you may not consider

18   them in your deliberations.

19        Is that acceptable?

20        MS. GELLER:  Yes, your Honor.

21        MS. FADDIS:  Yes, your Honor.

22        MS. GELLER:  Thank you, your Honor.

23        THE COURT:  All right.  Anything else before we bring

24   in the jury?

25        MS. GELLER:  Not from us, your Honor.

N8V1RAT2

1          MS. FADDIS:  Not from the defendants, your Honor.

2          THE COURT:  All right.  Officer Cadavid, you can

3    retake the stand.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Please be seated.

3          Ladies and gentlemen, I do have an instruction to give

4    you about some of the evidence we heard before lunchtime.  I

5    instruct you as follows:

6          You may recall that Officer Cadavid was questioned on

7    cross-examination about whether he had testified at his

8    deposition about his concern that Mr. Rattray was in proximity

9    to knives, and was slamming the kitchen counter.  I am striking

10   those questions and answers from the record, and you may not

11   consider them in your deliberations.

12         We will continue with the redirect examination of

13   Officer Cadavid.

14         MS. FADDIS:  Thank you, your Honor.

15   REDIRECT EXAMINATION

16   BY MS. FADDIS:

17   Q.  Good afternoon, Officer Cadavid.

18   A.  Good afternoon, counsel.

19   Q.  Officer Cadavid, before the lunch break you testified that

20   you would not tell an individual if you suspected them of a

21   crime necessarily.

22         Do you remember saying that?

23   A.  Correct.

24   Q.  Why is that?

25   A.  The reason why I wouldn't tell them that is because I don't

1    want the situation to escalate.

2    Q.  Can you explain what you mean by that?

3    A.  If I tell the person -- I'm sorry.  What was the question?

4    Q.  I can reask it.

5            When you say you wouldn't provide that information,

6    because you don't want to escalate a situation, what do you

7    mean by that?

8    A.  Well, if I tell the person that I'm investigating a

9    possible crime, or that they're the suspect of a possible

10   crime, I don't -- I won't tell them that when the case or -- in

11   this case I won't tell Mr. Rattray, because I don't want this

12   whole situation to get out of control, to escalate, because if

13   you tell a person that they're a possible suspect, it's unknown

14   how they're going to react.

15   Q.  Officer Cadavid, you were asked a lot of questions about

16   whether or not you believed that plaintiff's daughter was in

17   imminent danger.

18           Do you remember those questions?

19   A.  Yes.

20   Q.  And you said you wouldn't use the word "imminent," right?

21   A.  Yes.

22   Q.  Did you believe that his daughter was in danger?

23   A.  Yes.

24   Q.  Did you have concerns for her safety?

25   A.  Yes.

1   Q.  And did you believe that you needed to take urgent action

2   to address those concerns?

3   A.  Yes.

4   Q.  And why did you believe that you needed to act urgently?

5   A.  Based on the allegations from the mother, her demeanor, her

6   actions, also, with being in touch with Mr. Rattray, his

7   demeanor, his actions, his refusal to tell me where the

8   daughter was, or any information with regard to the daughter,

9   and the fact that he tried closing the door on us when I'm

10  still trying to find out where his daughter is, that lead me to

11  believe that she was in danger.

12  Q.  Officer Cadavid, you were also asked on cross-examination a

13  lot of questions about the allegations that Ms. Sandy made to

14  you regarding the plaintiff being a drug user and having drug

15  dealers in the apartment.

16         Do you remember those questions?

17  A.  Yes.

18  Q.  And you were asked specifically if Ms. Sandy said anything

19  more specific to you about her concerns for her daughter's

20  safety.

21         Do you recall being asked that?

22  A.  Yes.

23  Q.  And your answer was you don't recall her giving more

24  specific allegations, right?

25  A.  Yes.

1  Q.  When you spoke with Ms. Sandy in front of the building, and

2  she relayed the information to you about her concern for her

3  daughter's safety, the plaintiff being a drug user, drug

4  dealers being presented in the apartment, what was Ms. Sandy's

5  demeanor when you were having that conversation with her?

6  A.  She became more upset, more emotional.  That's all I

7  remember.

8  Q.  When you say upset and emotional, do you recall anything

9  about her tone of voice?

10  A.  No, I don't.

11  Q.  Officer Cadavid, you were also asked a lot of questions

12  about whether the plaintiff made certain specific statements to

13  you about his daughter's whereabouts.

14      Do you remember being asked about those topics?

15  A.  Yes.

16  Q.  And you said I believe, if I recall correctly, that you

17  didn't recall the plaintiff saying that the daughter wasn't

18  home; is that correct?

19  A.  Yes.

20  Q.  And you said you didn't recall the plaintiff saying his

21  daughter was at a play date, right?

22  A.  Yes.

23  Q.  You were asking the plaintiff about his daughter's

24  whereabouts?

25  A.  Correct.

1    Q.  Did you ask him more than once where his daughter was?

2    A.  Multiple times.

3    Q.  At any time did he convey to you the location of his child?

4    A.  He did not.

5    Q.  Did he give you any general idea of where she was?

6    A.  No.

7    Q.  You were also asked if you had, at any time while you were

8    speaking to Mr. Rattray, any background on the dispute between

9    him and Ms. Sandy.

10           Do you remember those questions?

11   A.  Yes.

12   Q.  And your testimony was that you did not have any background

13   information on the custody dispute, right?

14   A.  Custody dispute, no.

15   Q.  Did you have at any time any court orders in hand relating

16   to either custody or visitation for this child?

17   A.  No.

18   Q.  Did the plaintiff himself ever provide you with any

19   paperwork relating to the custody or visitation of this child?

20   A.  He did not.

21   Q.  Did he ever offer to provide you with such paperwork?

22   A.  No.

23   Q.  And, ultimately, did he give that paperwork to your

24   lieutenant when the lieutenant arrived?

25   A.  Yes.

1    Q.  Did -- withdrawn.

2              You were also asked a lot of questions about whether

3    or not you saw a child in the apartment when you entered,

4    right?

5    A.  Correct.

6    Q.  Okay.  Before you arrived at Mr. Rattray's apartment, did

7    you understand that his daughter was with him?

8    A.  Yes.

9    Q.  Okay.

10             MS. GELLER:  Objection.

11             THE COURT:  Ground?

12             MS. GELLER:  Withdrawn, your Honor.

13   BY MS. FADDIS:

14   Q.  Did you expect, prior to entering the apartment, that

15   Mr. Rattray's daughter was somewhere in the apartment?

16   A.  Yes.

17   Q.  When you entered a child's bedroom and saw no child, did

18   that influence your concerns for her safety in any way?

19   A.  Yes.

20   Q.  How?

21   A.  It lead me to believe that he might be hiding her in regard

22   to -- hiding her, so we don't see her.  And that -- it raised

23   my concern even more, because, in my -- in my head, I'm

24   thinking why would he be hiding her?  Is he trying to hide

25   something, so we don't see?  So I was getting more concerned

1   for their daughter's safety.

2   Q.  And, Officer Cadavid, I just want to show you briefly

3   what's in evidence as Defendants' F.

4            You were asked some questions about this document on

5   cross-examination, right?

6   A.  Correct.

7   Q.  Okay.  And you were asked -- well, withdrawn.

8            Just to reiterate, you didn't prepare the document,

9   right?

10  A.  I did not.

11           MS. FADDIS:  One moment, your Honor.

12  Q.  Officer Cadavid, do you know when this domestic incident

13  report was prepared?

14           MS. GELLER:  Objection -- withdrawn.

15  A.  This DIR was prepared after we went back downstairs.

16  Q.  Okay.  You were asked if this document states that there

17  was no possible drug or alcohol use.

18           Do you remember being asked that?

19  A.  Yes.

20  Q.  By the time you went back downstairs, had you completed --

21  had your interaction with Mr. Rattray ended?

22  A.  Yes.

23  Q.  And by the end of that interaction, did you have any

24  suspicion that he was under the influence of drugs or alcohol?

25  A.  No.

1  Q.  And, Officer Cadavid, you were also asked if this document

2  contained any statements regarding suspected child abuse,

3  right?

4  A.  Correct.

5          MS. GELLER:  Objection.

6          THE COURT:  Grounds?

7          MS. GELLER:  Let me see that a moment, your Honor.

8          THE COURT:  I'm sorry?

9          MS. FADDIS:  I'm on the wrong page.  Let me switch.

10          MS. GELLER:  What page are we talking about?

11          MS. FADDIS:  I'm asking a question right now, and then

12  I'm going to show the page.

13          MS. GELLER:  I'll withdraw.

14  Q.  Officer, Exhibit F, that says, is there reasonable cause --

15          MS. GELLER:  Objection.  That was not elicited in

16  direct, your Honor, or cross?

17          THE COURT:  I'll overrule the objection.

18  Q.  Officer Cadavid, do you recall being asked regarding the

19  domestic incident report, if it was recorded in any way that

20  there at any time was suspicion of child abuse?  Do you

21  remember being asked about that in cross-examination?

22  A.  Yes.

23  Q.  And does the domestic incident report say that there was a

24  suspicion of child abuse?

25  A.  It does not.

N8VDRAT3                         Cadavid - Recross

1   Q.  And why is that?

2            MS. GELLER:  Objection, your Honor.

3            MS. FADDIS:  I'll rephrase -- I'll withdraw the

4   question, and ask it again, your Honor.  I apologize.

5   Q.  Officer Cadavid, by the time the domestic incident report

6   was completed, did you have any reason to suspect that the

7   plaintiff's daughter was the subject of child abuse?

8   A.  No, I did not.

9   Q.  And why was that, at the time the domestic incident report

10  was prepared?

11  A.  At the time it was prepared, we had already established

12  where she was.  We -- there was a phone call made.  We

13  confirmed her whereabouts, and I believe the unit that was sent

14  over there to confirm if she was physically okay, all that

15  satisfied my concern of her -- there being possible child

16  abuse.  So I was satisfied that there was no such case, and

17  that's why it wasn't noted on the DIR.

18           MS. FADDIS:  Nothing further at this time, your Honor.

19           THE COURT:  All right.  Any recross?

20           MS. GELLER:  Yes, your Honor, very briefly.

21  RECROSS EXAMINATION

22  BY MS. GELLER:

23  Q.  You didn't fill out the DIR, right?

24  A.  I did not.

25  Q.  And you didn't review it at the time it was filled out?

N8VDRAT3                      Cadavid - Recross

1    A.  No.

2    Q.  And you didn't review the final at the time it was filled

3    out, right?

4              Excuse me.  Withdrawn.  Let me try that again.

5              And there was eventually -- well, we'll leave it at

6    that.

7              You didn't review the DIR that was filled out at the

8    scene?

9    A.  I did not.

10   Q.  Officer Trigueno filled that out, right?

11   A.  Yes.

12   Q.  And you didn't tell her what to say in there?

13   A.  I did not.

14   Q.  You just said --

15             MS. GELLER:  Well, if I could have just a moment, your

16   Honor?

17             THE COURT:  Yes.

18             MS. GELLER:  You know, your Honor, I think we are done

19   with our questions.  I think no more recross.

20             THE COURT:  I can't hear you.

21             MS. GELLER:  No more questions, your Honor.

22             THE COURT:  All right.  Anything else?

23             MS. FADDIS:  Not for the defendants with this witness,

24   your Honor.

25             THE COURT:  You can step down, Officer Cadavid.

 1          Do the defendants have additional evidence they wish

 2   to present?

 3          MS. FADDIS:  Your Honor, at this time the defendants

 4   adopt the testimony of defendant Alyssa Trigueno in full in

 5   their case in chief, and the defendants rest.

 6          Thank you.

 7          THE COURT:  All right.

 8          MS. GELLER:  No objection, your Honor.

 9          THE COURT:  All right.  Then the testimony of Officer

10   Trigueno will be considered adopted for purposes of the

11   defendants' case in chief.

12          Is there any rebuttal evidence on behalf of plaintiff?

13          MS. GELLER:  No, your Honor.

14          THE COURT:  All right.  Ladies and gentlemen, that

15   completes the presentation of evidence in this case, so let me

16   tell you what our schedule is going to be going forward.  I'll

17   be meeting with the lawyers this afternoon to discuss my

18   instructions on the law, so you're going to leave for the day

19   now.  When you come back at 9:30 tomorrow morning, you will

20   hear the closing arguments from the lawyer, and then I will

21   give you my instructions on the law.  And then the case will be

22   given to you for your deliberation and decision.

23          In the meantime, as always, please don't discuss the

24   case with anyone.  Do keep an open mind, because you haven't

25   heard the closing arguments from the lawyers, and you haven't

N8VDRAT3                        Cadavid - Recross

1   heard my instructions on the law.  So have a pleasant evening.

2   Please return at 9:30 tomorrow morning, and we'll go right into

3   closing arguments.

4            Thank you all very much.  Have a pleasant evening.

5            THE DEPUTY CLERK:  All rise.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court; jury not present)

 2              THE COURT:  The jury just got the very good news that

 3     the lunch is on the United States tomorrow.

 4              Please be seated.

 5              So during the lunch break, I did send the first 15

 6     pages of the charge to the lawyers.  I'm going to finish my

 7     work on the remaining 15 pages, and we'll get that to you.  So

 8     I'd like to reconvene for a charge conference at 4:00, or at

 9     any earlier time when the lawyers are ready to talk about the

10     charge.

11              Is that okay?

12              MS. GELLER:  It works for us, your Honor, unless -- I

13     think Mr. Ruocco said we can't both be in the courtroom, so

14     whenever the defense is ready, they can come find us, and we

15     can proceed.  If it's 4:00, it's 4:00, and if it's earlier,

16     we'll let the judge know.

17              THE COURT:  I'll be here.

18              MS. GELLER:  Yes.

19              THE COURT:  Then I do need from defendants whatever

20     interrogatory they want me to present to the jury in connection

21     with qualified immunity.

22              MS. FADDIS:  Yes, your Honor.  We will do that.  We'll

23     do that simultaneously, so we can get it to the Court quickly.

24              I also think, just for the purposes of the record, we

25     need to review our Rule 50 motion incorporating the testimony

1  of Officer Cadavid, which has now been completed, for

2  substantially the same reasons that Mr. De Jesus argued

3  yesterday.  I don't think the legal arguments change, but

4  certainly I think that Officer Cadavid's testimony supports the

5  arguments that were made, and supports the argument that he had

6  objective, sufficient evidence to believe there was an urgent

7  need to render assistance or aid to a ten-year-old child who,

8  as far as he could tell, was missing for all intents and

9  purposes.  And that the detention subsequent to that was

10  privileged.

11          And I would also incorporate in that motion the

12  arguments that were made in the letter we filed last night on

13  the docket regarding the application of qualified immunity.

14  Again, I don't think Officer Cadavid's testimony -- we would

15  ask that his testimony be considered in support of those

16  arguments.

17          I think that's it for the Rule 50, your Honor.

18          THE COURT:  Anything you want to say, Ms. Geller?

19          MS. GELLER:  I think, your Honor, unless you want to

20  hear argument now on that, my understanding is the Court will

21  reserve, so we will rest on our arguments, and request time to

22  be heard on qualified immunity at the appropriate time.

23          Concerning the privilege issue, and I do think this

24  may have something -- is relevant for jury instructions, I do

25  understand the claim of privilege is based on an argument that

1    Officer Cadavid had probable cause to detain Mr. Rattray based

2    on a purported obstruction -- I'm going to get this wrong,

3    obstruction of governmental administration.  I'll just say OGA

4    if we can all agree on that.  Our position is that the state of

5    the law in New York is fairly well settled, at least according

6    to the Second Circuit, that simply refusing to answer the

7    officer's questions is not sufficient to give rise to an OGA --

8    an OGA charge.

9            And I do think -- my understanding from counsel's

10    prior statement is that they assert that the closing of the

11    door constitutes an OG -- constitutes grounds for an OGA

12    charge.  Again, in the absence of showing something that

13    Mr. Rattray -- or, excuse me, that Officer Cadavid had -- that

14    Mr. Rattray was committing some wrong in closing or attempting

15    to close his door, an OGA charge does not suffice.

16            Mr. Rattray has a right to close his door, and is not

17    required to allow the officers to enter.  And I do believe

18    we're doing -- trying to find a case exactly on point, your

19    Honor, but the case law that we have found suggests that in

20    order for an OGA claim to prevail, there needs to be some

21    showing that the individual in question took some other

22    unlawful or inappropriate act, some form of actual obstruction,

23    your Honor, and that, I think, is precluded in this case.

24            THE COURT:  Well, I think that counsel is correct,

25    that a failure to answer questions is not -- does not

1    constitute obstructing governmental administration, and that

2    some physical force is necessary as predicate for the offense.

3    And here, as you point out, defendants argue that the attempted

4    closing of the door constitutes the necessary physical force.

5         So, Ms. Faddis, Ms. Geller is saying that, well, he

6    had every right to close the door, so how can that serve as the

7    predicate for an obstruction charge?

8         MS. FADDIS:  Your Honor, I'll say I don't have a case

9    on point, but just applying the law as I understand it, if

10   Officer Cadavid was lawfully entitled under an exigency to

11   enter the apartment, and as he was doing so the plaintiff was

12   trying to close the door on him, I think that would certainly

13   suffice for the physical requirement of an OGA.

14        There's no question, first and foremost, that Officer

15   Cadavid was conducting a lawful investigation into the welfare

16   of a minor.  So if the question of -- if the defendants can

17   establish or have established that there were exigent

18   circumstances, then he was entitled to enter the apartment, and

19   Mr. Rattray's verbal refusal to allow him to do so would not

20   constitute -- certainly his physical pushing of the door back,

21   attempting to close it on the officer would, and I would again

22   refer back to the *Lugo* case I cited this morning.  The physical

23   interference with governmental action in that case was merely

24   the moving of the plaintiff in and out of the area in which a

25   narcotics team was effecting the arrest of an unrelated

1    individual.  Without any actual physical contact with anyone,

2    without any actual physical inter -- contact, I'm sorry, just

3    simply moving in the location between the officers, in

4    proximity to them was sufficient.

5         I certainly think, bearing that in mind, attempting to

6    physically force the door closed while an officer is attempting

7    to make a lawful entry to conduct a search -- well, a search

8    for a minor would also meet that threshold.

9         MS. GELLER:  If I may, your Honor, I think that

10   somewhat confuses the issue, and I don't want to misstate the

11   case.  And I would refer back to the case that we cited

12   earlier.  I won't even attempt to pronounce it, but there has

13   to be some action, some action taken by -- some deliberate

14   action taken by the party to obstruct the investigation.

15        Now, if the officer believed he had exigent

16   circumstances, that is something the officer can allege, and

17   the officer can claim that he had a right to enter the

18   apartment over Mr. Rattray's objection.  But to say that

19   Mr. Rattray attempted to close the door to restore the privacy

20   of his home is not I think an action that is, on its face,

21   prohibited by any statute or rule or law.  In his mind, he had

22   a right to close the door.

23        If Officer Cadavid then believed there were exigent

24   circumstances to enter, and if he's proven right, that might

25   absolve him of the Fourth Amendment violation, but it doesn't

1    make an OGA claim absent some wrongful conduct of Mr. Rattray.

2    Wrongful conduct is not moving to exclude the officers from

3    entering his home.

4              And more to the point, here Mr. Rattray didn't move to

5    keep the officers from seizing evidence or make some

6    affirmative action to prevent them from affirmatively moving in

7    to arrest him with a proper warrant.  He didn't attempt to

8    impede something that was clearly stated as a -- as a pursuit

9    of wrongdoing.  He had -- there was a dispute.  There's

10   differing accounts of what that dispute was, but what is clear

11   is that nobody said to him, we think you're committing some

12   sort of misconduct and then he went to shut the door.

13             That does not, under our reading of the New York

14   statutes, as set forth in the case -- may allow for OGA, and I

15   do believe that *Lugo* is actually not on point.  And if the

16   Court will permit, Ms. Benoit has been reading all morning.  If

17   I could have her stand up and explain to the Court why we don't

18   think *Lugo* is on point, because I have not read it yet.

19             THE COURT:  Sure.  I mean, it starts with *Lugo* as a

20   summary order, and as I'm sure everybody here is aware, summary

21   orders are not to be relied on, because they're not

22   precedential.  So we kind of start with that problem.  But I'll

23   hear anything anyone wants to say about the *Lugo* case.

24             MS. GELLER:  No, your Honor.  We -- we can all read

25   the case, and we will continue to look for a case.  We have not

1    found a case directly on point.  We are looking for one.  We

2    will keep looking for one, your Honor.

3         THE COURT:  So the case that was cited, the reported

4    decision that was cited is *Uzoukwu*.  That's spelled

5    U-z-o-u-k-w-u.  It's 805 F.3d 409.  That case stands for the

6    proposition that silence -- the argument that silence

7    interfered with the officer's attempt to investigate cannot

8    serve as the basis for an obstructing governmental

9    administration charge.  The Court went on to say, in an effort

10   to help district courts confronting these obstructing

11   governmental administration charges told the district courts

12   that, "while mere words alone do not constitute physical force

13   or interference, words coupled with actions are sufficient."

14        So what the Second Circuit was saying in that case is

15   that silence standing alone can never be sufficient to

16   demonstrate the crime of obstructing governmental

17   administration, but words combined with physical force or

18   interference, or, as the courts said, words coupled with

19   actions, are sufficient to make out the crime of obstructing

20   governmental administration.

21        Now, here we have a somewhat factually complicated

22   situation where an officer is in the midst of an investigation,

23   and is attempting to check on the welfare of the child, and

24   alleges that, in the course of his investigation and

25   preliminary to a search of the apartment, that Mr. Rattray

1    attempted to close the door on him.

2            Plaintiff's counsel says, well, he had every right to

3    close the door on the officer, and certainly under some

4    circumstances, that's clearly correct.  But I haven't seen case

5    law that demonstrates to me that it's completely lawful under

6    the circumstances here.  So I welcome additional authority from

7    the parties on the issue of whether the conduct here could

8    possibly constitute obstruction of governmental administration,

9    but unless I get much clearer authority than I've seen so far,

10   my intention is to lay the issue before the jury, instruct them

11   on what constitutes obstruction of governmental administration,

12   and obtain a finding from them as to whether there was probable

13   cause to believe that Mr. Rattray had committed this offense at

14   the time.

15           So unless there's something else, I will complete my

16   work on the charge.  We'll get the rest of the charge to you,

17   and then we'll reconvene as soon as everyone is ready to.  In

18   any event, no later than 4:00.

19           MS. GELLER:  Thank you, your Honor.

20           On the obstruction point, we will continue to look at

21   the case more, but to the extent we do have an OGA charge, we

22   would request that part of the charge instruct the jury --

23   given the extent that non-responsiveness played in this crime,

24   we would request that the instruction include an instruction

25   that mere failure to answer is not sufficient.

N8VDRAT3                        Cadavid - Recross

1          THE COURT:  I will try to work that in.

2          All right.  So, like I said, we'll get the rest of the

3     charge to you, and then you let us know when you're ready to

4     reconvene.

5          MS. GELLER:  Thank you, your Honor.

6          THE COURT:  In any event, we'll meet at 4:00 if I

7     don't hear from you before then.

8          MS. FADDIS:  Thank you, your Honor.

9          THE COURT:  All right.  So we're in recess.

10          (Recess taken)

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N8V1RAT4

1          (In open court; jury not present )

2          THE COURT:    Please be seated.

3          All right.  We are here for purposes of our charge

4    conference.  I had previously provided the draft jury charge to

5    the lawyers, so I'm going to take their comments on it.  And

6    we're just going to walk through it page by page.  So whoever

7    has the first change, speak up.

8          MS. GELLER:    Your Honor, I will say that I have no

9    comments on the jury charge, just one comment on the verdict

10   sheet.

11         THE COURT:    Okay.

12         MS. FADDIS:    Your Honor, defendants' first comment on

13   the charge is at page 15.  And it would be the first two lines

14   of page 15.

15         THE COURT:    Yes.

16         MS. FADDIS:    This sentence, which instructs the jury

17   that the mere possibility that someone is in danger is not

18   sufficient to justify a warrantless entry into a home, citing

19   to the *Hurlman* case, I believe is incomplete but also

20   misleading in this context.  First, the *Hurlman* case involved

21   the seizure of a child, not simply the entry and search of a

22   home, so the standard I think is a little bit different, so we

23   would ask that actually this be taken out.  But in addition, I

24   believe the complete language from *Hurlman* instructs that while

25   the mere possibility is not sufficient, it goes on to say there

N8V1RAT4

1    needs to be evidence supporting the officers' knowledge that an

2    emergency exists.  So if this language remains, we would ask

3    that the remainder of that be——the balance of that be included

4    so that it's clear to the jury that mere possibility isn't

5    what——doesn't stand on its own.

6              THE COURT:   Can you print out that page.  The cite is

7    927 F.2d at 81.

8              THE LAW CLERK:   Yes.

9              MS. GELLER:   For the record, your Honor, we would

10   object to that language being out, that in my understanding of

11   the law——

12             THE COURT:   Well, I need the case.

13             MS. GELLER:   I understand, your Honor.

14             THE COURT:   I'm not talking to you.  Sorry.

15             MS. GELLER:   Oh.

16             THE COURT:   I need the case, 927 F.2d 81.

17             THE LAW CLERK:   Yes, sorry.

18             MS. FADDIS:   Your Honor, I'll just note that while the

19   Court is awaiting that, I believe that your Honor cited to

20   *Hurlman* in the summary judgment order in this case adopting

21   Judge Parker's report and recommendation on this claim, and the

22   parenthetical that the Court used referring to *Hurlman* in this

23   case reads——describes it as explaining that there needs to be

24   evidence supporting the officers' knowledge that an emergency

25   exists and the mere possibility of danger is not sufficient.

```
 1                THE COURT:    What page?

 2                MS. FADDIS:   I'm looking at the LEXIS pagination.

 3                THE COURT:    Oh, you don't have——you're not looking at

 4    the——

 5                MS. FADDIS:   One second, your Honor.  I think we have

 6    the original.  Hold on.  Sorry.

 7                THE COURT:    Because I have the summary judgment

 8    opinion in front of me, but it's——

 9                MS. FADDIS:   17, your Honor.

10                THE COURT:    17?  Okay.

11                MS. FADDIS:   I may have misspoken.  It may not be the

12    case that it's a direct quote from *Hurlman*.  I may have been

13    reading the parenthetical from your Honor's decision.  But the

14    block quote in the middle of the page.

15                (Discussion off the record)

16                THE COURT:    So I'm looking at page 81 of the *Hurlman*

17    decision, and the issue is whether there were exigent

18    circumstances, and the argument was that the child was located

19    in a household that had a history of sexual abuse, and the

20    argument was made that in this context, there's always a

21    possibility of danger to any child present, and the court

22    responded as follows:  "This statement may be true, but its

23    truth would hardly make it objectively reasonable to believe

24    that the circumstances were exigent.  If the mere possibility

25    of danger constituted an emergency, officers would always be
```

N8V1RAT4

1    justified in making a forced entry and seizure of a child

2    whenever the child was in the presence of a person who had such

3    a history."

4              So it does seem to me that the Second Circuit is

5    making the point that the mere possibility of danger is not

6    sufficient to justify the warrantless entry of a home.  Isn't

7    that what it says?

8              MS. FADDIS:   Yes, your Honor.  I think the issue here

9    is that, as the Court just pointed out, in the *Hurlman* case,

10   the Second Circuit was discussing essentially a permanent state

11   of being for a particular location, right?  So they're talking

12   about the fact that there are certain persons who reside in a

13   home with children, it can't always be the case that that

14   dwelling would be subject to exigency all the time because of

15   the status of those persons, which is I think highly

16   distinguishable from the facts of this case, where we have a

17   specific complaint at a specific moment in time, coupled with

18   specific allegations by the child's mother that the child was

19   in danger, which she tags on, you know——onto which she

20   elaborates about drug use and drug dealers in the apartment,

21   coupled then with the officers' observations, as Officer

22   Cadavid testified to, of the plaintiff's behavior in response

23   to their inquiries.  All of those things are I think

24   distinguishable from the circumstances of *Hurlman*, where we had

25   just sort of a permanent state of being.  This is a particular

N8V1RAT4

```
 1    situation.  These are specific articulable facts that have been
 2    relayed to the officer.  And so I think to leave the language
 3    in the charge as it is, saying alone the mere possibility
 4    without offering, as the parenthetical in the Court's decision
 5    does, the explanation that evidence supporting the officers'
 6    knowledge that an emergency exists would be required, I think
 7    that balance is needed to——
 8              THE COURT:    I've already said that.
 9              MS. FADDIS:    I think in this sentence, though, your
10    Honor, it's not there.  And so the absence of that I think
11    renders it somewhat——
12              THE COURT:    So in the sentences immediately before the
13    sentence you've cited——maybe I should just read it.  "In
14    determining whether exigent circumstances exist in this case,
15    you must consider the totality of the circumstances confronting
16    the defendants, including whether there was a need to make a
17    prompt assessment based on the information that was available.
18    In determining whether exigent circumstances existed, the core
19    question is whether the facts, as they appeared at the moment
20    of entry, would lead a reasonable, experienced officer to
21    believe there was an urgent need to render aid or to take
22    action.  On the other hand, exigent circumstances did not exist
23    if a reasonable, experienced officer, in Officer Cadavid's
24    position, knowing the facts he knew, would not have believed
25    entry was necessary to render aid or to take action."  So I've
```

1     presented the two ends of the spectrum in those sentences.

2               MS. FADDIS:    I agree, your Honor, and I think that

3     what the Court just read is an accurate statement of the law

4     and renders the sentence that we are objecting to unnecessary.

5     So I think that the easiest thing to do would be to just simply

6     remove it.  I think the language of a mere possibility without

7     the balance of the contrast of sort of evidence in hand I think

8     is going to leave the jury to wonder what that means, what is

9     "mere possibility," particularly when that phrasing, "mere

10    possibility," is drawn from a case that is so factually

11    dissimilar from the case we're dealing with.

12              THE COURT:    All right.  What do you say, Ms. Geller?

13              MS. GELLER:    Well, I think exigent circumstances, as

14    is defined in the jury charge and state of the law, is that

15    there is some need to take immediate and imminent action, and

16    what the Second Circuit says in *Hurlman* is that it's not enough

17    to found that basis, to simply say, oh, there's a possibility

18    that somebody——that some immediate action needs to be taken.

19    That is for the jury to determine whether or not those facts

20    and circumstances existed.  This sentence I think is important

21    here because there's been plenty of evidence that Officer

22    Cadavid himself only was operating on the possibility of a

23    potential crime being committed and the actual——the actual

24    right of entry is predicated on his knowledge that somebody

25    needs immediate assistance.  And so to say——to take this out I

1    think is unfair.  I think the mere possibility is insufficient

2    to support an incursion of the home.  That is what the Second

3    Circuit said.  It was unequivocal what the Second Circuit had

4    to say.  And they go on to say, "If mere possibility is

5    allowable, then warrantless incursions into the home will

6    become the norm."  They weren't distinguishing it on these

7    narrow set of facts; they were concerned about a broader use of

8    a mere possibility to allow incursion into the home in a case

9    extending beyond the facts of that case, a case just like this

10   one, your Honor.

11             MS. FADDIS:    Your Honor, the one thing I would say in

12   response is simply just the beginning of the paragraph from

13   which this language is drawn in *Hurlman* explicitly——the circuit

14   explicitly describes the factual——the facts of the case in

15   stating that none of the appellants have represented that they

16   had received reports of physical abuse by *Hurlman* or any of his

17   grandchildren and then goes on to essentially say there has not

18   been any specific complaints of abuse, neglect, etc.,

19   therefore, simply the history of this person would not be

20   sufficient to justify warrantless entry, which, again, is

21   highly distinguishable from the emergent circumstances of this

22   case.

23             THE COURT:    I think I've adequately described in the

24   earlier sentences that I just read what is and what is not

25   exigent circumstances, and I do believe this quote from *Hurlman*

1   is plucked out of context, and so I am going to delete that

2   sentence beginning, "You should be aware."

3           All right.  What's next?

4           MS. FADDIS:    Thank you, your Honor.

5           Your Honor, in this section we would also ask that the

6   Court——I don't have the citation in front of me, but that the

7   Court include language similar to that which Judge Parker

8   included in her report and recommendation on this claim, that a

9   concern for the child's safety could support a finding of

10  exigent circumstances.  There were several citations in the

11  report and recommendation, first to *Ray*, 626 F.3d 170 (3rd Cir.

12  2010), and to *Shakir*, 805 F. App'x 35, 38 (2d Cir. 2020), which

13  I think is important color to put on the specific facts of this

14  case, given how sort of nebulous the generic legal standards

15  can be, and that was this portion of the report and

16  recommendation that the Court adopted in its summary judgment

17  order.

18          THE COURT:    Well, you have to tell me specifically

19  what language you want.

20          MS. FADDIS:    Yes, your Honor.  The language would be,

21  "A concern for the child's safety could support a finding of

22  exigent circumstances," and that was obviously in the context

23  of denying the defendants' motion——recommending the denial of

24  the defendants' motion for summary judgment on that claim.

25          THE COURT:    But tell me exactly what language you want

N8V1RAT4

1    and where you want it placed.

2                MS. FADDIS:    Your Honor, I would replace the sentence

3    that was just deleted, or include it in the following

4    paragraph.  I think either would be appropriate.

5                THE COURT:    Okay.  And what is the language you want?

6                MS. FADDIS:    The language is, "A concern for the

7    child's safety could support a finding of exigent

8    circumstances."

9                THE COURT:    And what do you believe that that adds to

10   the language that's already there?

11               MS. FADDIS:    Your Honor, in certain cases it is

12   appropriate, when the concepts are this abstract, to provide

13   some guidance to the jury on——certainly it's not instructing

14   the jury that they must find that in this case but simply to

15   say this could satisfy this more abstract concept of exigency

16   as it's been explained in more general terms.

17               THE COURT:    Well, I mean, I'm willing to entertain

18   adding a reference to Mr. Rattray's child if you think that's

19   necessary.  So the sentence currently reads, "In determining

20   whether exigent circumstances existed, the core question is

21   whether the facts, as they appeared at the moment of entry,

22   would lead a reasonable, experienced officer to believe that

23   there was an urgent need to render aid or to take action with

24   respect to Mr. Rattray's daughter."

25               MS. FADDIS:    I think that would be fine, your Honor.

```
 1              THE COURT:    Would that make it more concrete?

 2              MS. FADDIS:    I think so, yes.

 3              THE COURT:    What do you say, Ms. Geller?

 4              MS. GELLER:    I don't think that's objectionable to us

 5   as to specificity.  I would ask that it say "take immediate

 6   action with regard to Mr. Rattray's daughter" because the

 7   standard is imminent danger.

 8              THE COURT:    Well, it says "urgent need to render aid

 9   or to take action with respect to Mr. Rattray's daughter."

10              MS. GELLER:    So one reason I hate jury charges is I

11   hate nitpicking language.  But I think the modifier to "urgent

12   need to render aid" needs to be "or urgent need to take

13   action," or something to that effect, regarding Mr. Rattray's

14   daughter, your Honor.

15              THE COURT:    I'm sorry.  So say again what you think it

16   should say.

17              MS. GELLER:    Yes, your Honor.  My concern is that it

18   says "urgent need to render aid or to take action," and I think

19   it would be clearer to say "urgent need to render aid or to

20   take urgent or immediate action," one of those words, just

21   because to suggest that urgent need to render aid or just to

22   take action generally——just to take action generally I think is

23   not the imminent danger standard.

24              THE COURT:    All right.  Do you have an objection to me

25   adding "immediate" before "action"?
```

 1              MS. FADDIS:    No, your Honor.

 2              THE COURT:    All right.  I'm going to add "immediate"

 3      before the word "action."

 4              So just for clarity, let me read the sentence to you.

 5      "In determining whether exigent circumstances existed, the core

 6      question is whether the facts, as they appeared at the moment

 7      of entry, would lead a reasonable, experienced officer to

 8      believe that there was an urgent need to render aid or to take

 9      immediate action with respect to Mr. Rattray's daughter."  Is

10      that acceptable?

11              MS. GELLER:    Acceptable to us, your Honor.

12              MS. FADDIS:    Yes, your Honor.  Thank you.

13              THE COURT:    Okay.  What's next, Ms. Faddis?

14              MS. FADDIS:    Thank you, your Honor.  Page 18.

15              THE COURT:    Yes.

16              MS. FADDIS:    There is a sentence, the second sentence

17      from the bottom, regarding ultimate disposition of criminal

18      charges.

19              THE COURT:    Right.

20              MS. FADDIS:    Which is not applicable in this case and

21      may be confusing for the jury.

22              THE COURT:    Well, what I will say is it seems to me

23      that language is in here to protect the defendants, so if you

24      don't want it——do you have an objection, Ms. Geller?

25              MS. GELLER:    No, I don't have an objection, your

```
1    Honor.
2                THE COURT:    All right.  So I'll be striking the
3    sentence beginning, "For this same reason."
4                MS. FADDIS:    Your Honor, the next comment we have is
5    regarding the sentence that begins at the last line of page 18
6    and carries to page 19.
7                THE COURT:    All right.
8                MS. FADDIS:    That reads, "Moreover, the existence of
9    probable cause is not negated simply because a police officer
10   ignored statements by the plaintiff that he was innocent."
11   Again, I don't think that applies here.
12               THE COURT:    All right.  What do you say, Ms. Geller?
13               MS. GELLER:    I'm just thinking through it, your Honor.
14   Just bear with me.
15               So I think some language needs——your Honor, I think
16   it's fine.
17               THE COURT:    You're agreeing to striking that sentence?
18   Again, the purpose of that language, in the context of a
19   Section 1983 case, it's protective of the defendants.  That's
20   why it's included.  So here, the defendant is recommending it
21   be taken out.
22               MS. GELLER:    I don't have an objection, your Honor.
23   I'm sorry.
24               THE COURT:    That's okay.  So we'll strike the sentence
25   beginning, "Moreover, the existence of . . ."
```

N8V1RAT4

```
1              Okay.
2              MS. FADDIS:    And your Honor, I believe that the
3    following sentence, which is the first complete sentence on
4    page 19, is dependent on the preceding sentence that we struck
5    and probably also needs to come out, as it regards inquiry into
6    a criminal defendant's protestations of innocence.
7              MS. GELLER:    I don't think that——I do think that there
8    is a sufficient or a substantial record in this case that
9    Mr. Rattray repeatedly denied——I'm trying to——repeatedly——well,
10   that Officer Cadavid either failed to inquire at certain times
11   or that Officer Cadavid——we're on probable cause right now,
12   right?
13             THE COURT:    Yes, this is probable cause.
14             MS. GELLER:    We're talking about probable cause for
15   OGA, correct?
16             THE COURT:    Could we just refer to it as obstruction.
17             MS. GELLER:    Yes, thank you.
18             THE COURT:    Yes, we're talking about whether there was
19   probable cause to support an arrest for obstruction of
20   governmental administration.
21             MS. GELLER:    I do think, your Honor, here there is
22   substantial evidence on the record that Mr. Rattray objected
23   repeatedly to the inquiries——that he stated repeatedly that the
24   child was not home, that——and that there is a valid argument
25   that a reasonable officer would have made further inquiry of
```

1    Ms. Sandy or made further inquiry in another way, a way other

2    than intruding into the home and arresting Mr. Rattray, so I do

3    think we would object to that coming out.

4              THE COURT:    What do you say?

5              MS. FADDIS:    Your Honor, I don't think that's the

6    factual inquiry that would be relevant here.  This is regarding

7    the probable cause to arrest the plaintiff for obstruction of

8    governmental administration, and so the underlying question of

9    whether or not additional investigation should have——or the

10   order of investigation into where the child should be I don't

11   think has any relevance to that inquiry.  We're all agreeing

12   investigation should have been done here about the child, and

13   it seems quibbling over who should have been spoken to first

14   isn't relevant to the OGA charge.

15             MS. GELLER:    An obstruction charge is directly

16   dependent on——obstruction charge in the home is directly

17   dependent on the validity of the incursion in the home in the

18   first place, so whether Officer Cadavid was justified in making

19   entry into the home in——the obstruction charge rises and falls

20   on whether Officer Cadavid is justified in making entry into

21   the home, and if he did not do proper inquiry in determining

22   whether he could make entry into the home, then the obstruction

23   charge I do not think——then this piece of the charge is valid

24   and should be included.

25             THE COURT:    All right.  I'm going to largely leave the

1    sentence in.  It will begin, "You should be aware that an

2    officer's failure to make further inquiry when a reasonable

3    person would have done so may be evidence of a lack of probable

4    cause."

5            MS. FADDIS:    Your Honor, I'm sorry.  I have to do

6    something very annoying, which is I think these sentences have

7    to travel together, so if that sentence is going to remain,

8    then I think we would withdraw our objection to the preceding

9    sentence and then just leave the charge as is.

10           THE COURT:    Well, the problem with the original

11    sentence is that I'm not sure it really addresses the factual

12    circumstances here.  It's not so much that Mr. Rattray was

13    saying that he was innocent, it's that he was saying that his

14    daughter was safe, right?

15           MS. GELLER:    Among other things, but correct, your

16    Honor, that she was not home, that she was safe——

17           THE COURT:    So if I was going to leave this sentence

18    in, Ms. Faddis, I would have to tie it in some fashion to the

19    facts here.  So it would say, "Moreover, the existence of

20    probable cause is not negated simply because Officer Cadavid

21    ignored statements by Mr. Rattray that his daughter was safe."

22           MS. FADDIS:    I'm sorry, your Honor.  Just give me a

23    moment to process that.

24           I don't know that I have an issue with that, your

25    Honor.  Just that it be "may have," "may have ignored"?

1          THE COURT:    Okay.  So the sentence would read,

2    "Moreover, the existence of probable cause is not negated

3    simply because Officer Cadavid may have ignored statements by

4    Mr. Rattray that his daughter was safe."  And then the next

5    sentence, the "However" would stay because now it makes sense

6    to have it there.  So it would read, "However, you should be

7    aware that an officer's failure to make further inquiry when a

8    reasonable person would have done so may be evidence of the

9    lack of probable cause."  Is everyone okay with that?

10         MS. GELLER:    If I could just proffer one minor

11   revision.  Simply because a police officer ignored statements——

12         THE COURT:    Well, it's not going to say a police

13   officer.  The whole point is to tie it to what's going on here,

14   so it's going to——let me read it again.

15         "Moreover, the existence of probable cause is not

16   negated simply because Officer Cadavid may have ignored

17   statements by Mr. Rattray that his daughter was safe."

18         MS. GELLER:    Yes, your Honor, and I would propose that

19   the end of that would say "or was not in the home."

20         THE COURT:    Do you have a problem with the addition of

21   "or was not in the home"?

22         MS. FADDIS:    Sorry.  One moment, your Honor.

23         THE COURT:    I'll read the sentence again.

24         "Moreover, the existence of probable cause is not

25   negated simply because Officer Cadavid may have ignored

1      statements by Mr. Rattray that his daughter was safe, or was

2      not in the home."

3                  MS. FADDIS:    I think that's fine, your Honor.

4                  THE COURT:    Okay.

5                  MS. FADDIS:    Your Honor, the defendants' next comment

6      is on page 23, as regards compensatory damages.

7                  THE COURT:    Yes.

8                  MS. FADDIS:    Under Section 1, Compensatory Damages,

9      the first sentence that begins, "If you find that Mr. Rattray

10     has proven," it goes on to say, "then you must determine an

11     amount that is fair compensation for his injuries."  I think it

12     skips a step and may be confusing for the jury, and I do think

13     that it's more clearly laid out as the charge progresses, but

14     in this first instance, I think it needs to say "must determine

15     if the plaintiff has proven a compensable injury," which I

16     think is the first——the first step of that analysis.

17                 MS. GELLER:    I think, what about——can I propose "then

18     you must determine an amount——"

19                 THE COURT:    Actually, what I'm going to do is, just to

20     short-circuit this, "If Mr. Rattray has proven one or more of

21     his claims by a preponderance of the evidence, then you will go

22     on to consider the matter of compensatory damages."

23                 MS. GELLER:    That's fine for us, your Honor.

24                 MS. FADDIS:    That's fine, your Honor.  Thank you.

25                 THE COURT:    Okay.

N8V1RAT4

1             MS. FADDIS:    And your Honor, I believe for the

2    defendants, the last comment we have on the charge is at

3    page 25, and this is simply to reiterate the defendants'

4    objection to the punitive damages charge.  The language of the

5    Court's proposed charge requires "evil motive, intent, or

6    callous disregard or reckless indifference to the plaintiff's

7    rights."  Even as regards Officer Cadavid——I'm mindful that

8    Officer Trigueno is not identified in this portion, but even as

9    concerns Officer Cadavid, there is simply no evidence in the

10   record by which a reasonable juror could conclude that any one

11   of those standards had been met.  The undisputed evidence, even

12   from the plaintiff himself, is that repeatedly Officer Cadavid

13   inquired about his daughter, he inquired about his daughter's

14   well-being, so whether or not——leaving aside the question of

15   whether or not his actions ultimately amount to a

16   constitutional violation, there can be no question as to what

17   his motive or intent was.  And I think that to allow this to go

18   to the jury runs the risk of an award that simply is not

19   supported by the factual record here.

20             THE COURT:    Do you wish to be heard?

21             MS. GELLER:    I do not wish to repeat word for word

22   what I argued in my letter, and I will rest on my letter, your

23   Honor.  I do think that while Mr. Rattray has said that Officer

24   Cadavid on some occasions did ask about the whereabouts of his

25   daughter, there is some substantial dispute in this evidence

1    about when he made that inquiry, whether he premised that

2    inquiry as a——whether he premised that inquiry with Mr. Rattray

3    about whether or not——about it being a welfare check, and,

4    quite frankly, his basis for being able to ask that question in

5    the first place.  So it is our position that Officer Cadavid

6    knew and had reason to know he had no business moving into that

7    apartment, and we do think, for all the reasons that we put

8    forth in our letter, that punitive damages against Officer

9    Cadavid is at least appropriate to go to the jury, your Honor,

10   especially given the substantial evidence and the arguments

11   that Officer Cadavid then created a *post hoc* justification in

12   the form of drugs and a drug dealer that was roundly refuted by

13   the person purported to have made that statement and was not

14   heard by any other witness, your Honor.

15            MS. FADDIS:    Your Honor, just a brief response to the

16   last portion of that, which is, to the extent that the

17   plaintiff's argument in favor of punitive damages is premised

18   upon what they believe are *post hoc* justifications for what

19   happened, that has nothing to do with Officer Cadavid's

20   supposed motivation at the time of the entry and the detention

21   of the plaintiff.  And whether or not he ultimately decided,

22   maybe I made a mistake, and decided to make something up, and

23   perhaps the jury finds that, has nothing to do with his

24   motivation at the time of the incident and there is nothing in

25   the record upon which this jury can conclude that he was

N8V1RAT4

1    motivated by anything other than responding to the complaint

2    that had been made by Wendy Sandy.

3            MS. GELLER:    I'm sorry.  I just——it is in our letter,

4    your Honor, but we did cite precedent from the Second Circuit

5    that discussed, in connection with punitive damages, among

6    other things, the attempt to cover up a violation of a

7    constitutional right later, so we rest on that argument, your

8    Honor.

9            THE COURT:    All right.  I'm going to issue a bench

10   ruling on two issues.  One is, the defendants had submitted a

11   letter about *Terry* stops, and I'm going to address that, and

12   I'm going to address the viability of a punitive damages claim

13   here also.

14           Defendants submitted a letter on the evening of

15   August 29, 2023, requesting that the jury be charged "on the

16   issue of justification for an investigative stop"; and also

17   arguing that the issue of punitive damages should not be

18   submitted to the jury.  (Def. Aug. 29, 2023 Ltr. (Dkt.

19   No. 274))

20           As to the request for a jury instruction concerning

21   investigatory stops, defendants argue that

22           "[b]ased on the evidence adduced at trial thus far,

23   there is a possibility that the jury could conclude that

24   plaintiff's detention was solely for the purpose of

25   investigating the whereabouts of the daughter, which would

1  require only proof of reasonable suspicion.  The jury should be

2  advised that plaintiff's detention may be privileged, even if

3  probable cause is lacking, if the defendants had reasonable

4  suspicion for an investigative stop."

5        *Id.* at 2-3.

6        "Reasonable suspicion" is the standard applicable to a

7  *Terry* stop.  *See United States v. Perea*, 986 F.2d 633, 644 (2d

8  Cir. 1993) (a stop short of an arrest was justified by

9  "reasonable suspicion of criminal activity") (citing *Terry v.*

10  *Ohio*, 392 U.S. 1 (1968)).  The evidence at summary judgment and

11  at trial indicates that to the extent that Mr. Rattray was

12  seized for purposes of the Fourth Amendment, that happened

13  while he was inside his home.  *See Rattray v. City of New York*,

14  2023 WL 2734419, at *13 (S.D.N.Y. Mar. 30, 2023) ("Rattray was

15  not exposed to public view when he opened his apartment

16  door.").  (Trial Tr. at 299) As I noted in the summary judgment

17  opinion, Second Circuit case law is clear that "'police

18  officers need either a warrant or probable cause plus exigent

19  circumstances in order to make lawful entry into a home.'"  *Id.*

20  (quoting *Loria v. Gorman*, 306 F.3d 1271, 1283 (2d Cir. 2002)).

21  In declining to adopt Magistrate Judge Parker's recommendation

22  that summary judgment be granted as to plaintiff's false arrest

23  claim against Officer Cadavid, I noted that "'*Terry* does not

24  apply inside a home.'"  *Id.* (quoting *United States v. Crapser*,

25  472 F.3d 1141, 1149 (9th Cir. 2007)).

N8V1RAT4

1            Defendants do not address the summary judgment

2    opinion, or the case law cited therein, in their letter, nor do

3    they suggest that the testimony elicited at trial suggests that

4    plaintiff was "exposed to public view" such that exigent

5    circumstances were not required to enter his home.  *See United*

6    *States v. Santana*, 427 U.S. 38, 42-43 (1976)(applying the "hot

7    pursuit" exception to the warrant requirement).  The request

8    that I instruct the jury that it may find that Officer

9    Cadavid's seizure of plaintiff within his home reasonable if it

10   was supported by "reasonable suspicion" is not consistent with

11   the case law regarding investigatory stops.  Accordingly, I

12   will not be giving the requested instruction.

13            As to punitive damages, "In a § 1983 action, punitive

14   damages may be awarded . . . when the defendant's conduct is

15   shown to be motivated by evil motive or intent, or when it

16   involves reckless or callous indifference to the federally

17   protected rights of others."  *Aponte v. Perez*, 75 F.4th 49, 55

18   (2d Cir. 2023).  To be entitled to punitive damages, the

19   plaintiff "'must show a positive element of conscious

20   wrongdoing.'"  *Id.* (quoting *Meyers*, 442 F.3d at 121); *see also*

21   *Lazaratos v. Ruiz*, 2003 WL 22283832, at *7 (S.D.N.Y. Sept. 30,

22   2003) ("The plaintiff must prove the defendant acted wantonly

23   or willfully or was motivated by ill will or malice.").  "A

24   jury [is also] permitted to award punitive damages in a § 1983

25   action when it finds that the defendant's violation of federal

1    law was intentional."  *McCardle v. Haddad*, 131 F.3d 43, 52 (2d

2    Cir. 1997).

3              "To warrant an instruction [on punitive damages],

4    '[a]ll that a party needs to show is that there is some

5    evidence supporting the theory behind the instruction so that a

6    question of fact may be presented to the jury.'"  *Cameron v.*

7    *City of New York*, 598 F.3d 50, 69 (2d Cir. 2010).  "The

8    plaintiffs' evidence need only be enough to permit the

9    factfinder to <u>infer</u> that the responsible official was motivated

10   by malice or evil intent or that he acted with reckless or

11   callous indifference.'"  *Id.*

12             A party is not entitled to an instruction on punitive

13   damages, however, where "there is no factual predicate in the

14   trial record" to support an inference of malice.  *See McCardle*,

15   131 F.3d at 52.  Conduct that amounts to a "violation of

16   clearly established Fourth Amendment principles, [does not]

17   *ipso facto* reveal reckless or callous indifference to [a

18   person's] rights."  *Id.*

19             Defendants argue that plaintiff is not entitled to an

20   instruction on punitive damages because he "has not

21   demonstrated that either Officer Cadavid or Officer Trigueno

22   intentionally violated federal law or that they were motivated

23   by evil motive or intent, or reckless or callous indifference."

24   (Def. Ltr. (Dkt. No. 274) at 1-2)

25             I intend to submit the issue of punitive damages to

1    the jury as to Officer Cadavid.  Plaintiff has not submitted

2    any cogent explanation of how a punitive damages award as to

3    Officer Trigueno would be appropriate.  I am persuaded that a

4    punitive damages claim should be submitted to the jury as to

5    Officer Cadavid because there is some evidence in the record

6    suggesting that he might have been aware that the circumstances

7    did not justify a warrantless search or an arrest in

8    plaintiff's home.  There is thus an argument that he acted with

9    a sense of conscious wrongdoing.  *See Aponte*, 75 F.4th at 55.

10   It's a weak claim, in my view, because of compelling evidence

11   that Officer Cadavid acted out of a concern for Rattray's

12   child.  But I will submit the punitive damages claim to the

13   jury given the standard that has been set by the Second Circuit

14   for the submission of such claims to the jury.

15              Plaintiff has argued that a punitive damages

16   instruction is appropriate because Officer Cadavid fabricated

17   witness Sandy's alleged allegations that her daughter was in

18   danger, that Rattray uses drugs, and that Rattray has drug

19   dealers over to his apartment.  The evidence indicates that

20   Officer Cadavid first made these assertions——about what Sandy

21   had allegedly told him——when he was deposed in 2021.  There are

22   cases, including cases cited by plaintiff, in which courts have

23   found that the fabrication of evidence constitutes proof of

24   conscious wrongdoing, justifying an award of punitive damages.

25   *See Cameron*, 598 F.3d 50.  But in all such cases I have seen,

N8V1RAT4

1     the alleged fabrication took place in some proximity to the

2     underlying alleged constitutional violation.  Here, the alleged

3     fabrication took place five years after the events in question.

4     I do not believe that conduct that Officer Cadavid allegedly

5     engaged in in 2021 sheds light on his state of mind in 2016.

6     In other words, if he fabricated evidence in 2021, that does

7     not tend to show that he engaged in conscious wrongdoing in

8     2016.  Accordingly, the alleged fabrication of evidence is not

9     the basis for my decision to submit the issue of punitive

10    damages to the jury, nor do I believe that that alleged

11    fabrication presents a basis for awarding punitive damages

12    against Officer Cadavid.

13              All right.  Before we turn to the verdict sheet, which

14    I'm going to ask my law clerk to distribute, are there any

15    additional requests for changes to the draft charge?

16              MS. FADDIS:    Your Honor, I just had one request with

17    regard to the language of the punitive damages charge——

18              THE COURT:    Yes.

19              MS. FADDIS:    —— which is that the second to last

20    paragraph of the charge, which appears on page 27 of the jury

21    instructions, summarizes the parties' arguments.

22              THE COURT:    Yes.

23              MS. FADDIS:    The defendants' preference would be that

24    the Court would not describe the arguments to the jury and that

25    the parties be permitted to do that on their own during

N8V1RAT4

1    summation.

2            THE COURT:    I'm handing the draft verdict sheet to my

3    clerk so that he can get it to you.

4            So let me tell you my logic.  I always feel that we

5    give such little guidance to juries with respect to how they're

6    to go about deciding punitive damages, and then we're often

7    unhappy with what they do, and I sometimes wonder, instead of

8    just being unhappy with what they do, we should actually try to

9    put more meat on the bones about what they're supposed to

10   consider.  So what I will say to you is that this paragraph is

11   an attempt to sort of distill what each side's contentions are

12   about why punitive damages are appropriate and why they are not

13   appropriate.  Now it may be that I have not accurately

14   presented each side's position, and I'm not wedded to this

15   language, but that's the motive for including it.  It's an

16   effort to distill for the jury why plaintiff believes an award

17   is appropriate and why defendant Cadavid believes that an award

18   is not appropriate.

19           Ms. Geller.

20           MS. GELLER:    I prefer jury charges to have more rather

21   than less.  I think they cut down on juror notes.  I think they

22   cut down on jury deliberation time.  I think this is a fair and

23   balanced statement of each side's position as concerns punitive

24   damages.  I think that it will streamline the deliberations and

25   cut down on notes.  So I would prefer to have it included.  I'm

N8V1RAT4

1    not——again, I don't feel like it's prejudicial to take it out,

2    but I do think it makes it easier for the jury.

3                 MS. FADDIS:    Your Honor, I think that it's a fair

4    representation of the defendants' position so I'm not going to

5    have an objection, and if the Court's preference is to provide

6    the jury some guidance, then that's fine with the defendants.

7                 THE COURT:    Okay.  All right.  Mr. Ruocco has

8    distributed to you a proposed verdict sheet, which currently

9    does not say VERDICT on it, but will in the next draft.  The

10   only thing I've added since the version that I sent around to

11   you earlier is question No. 5, which reflects defendants'

12   desire for a question that goes to the issue of qualified

13   immunity.  Other than that, it's in the form it was that I sent

14   out earlier.

15                MS. GELLER:    Your Honor, as concerns question 5, I

16   would ask that we make the same revision with regard to "urgent

17   need to render aid or take action" that we made earlier.  I

18   can't remember the exact language we used, but it was

19   something, either "took immediate action to" or something to

20   that effect.

21                THE COURT:    It was immediate action.

22                MS. GELLER:    And the only other comment I have——and

23   the Court will forgive me, but I haven't had a nominal damages

24   case go to a jury at this stage——if there could be an

25   interrogatory about nominal damages.  They're instructed on

1    nominal damages.  I think it is a separate category of damages.

2    So that was my only comment on the verdict form, your Honor.

3                THE COURT:    It probably should have a heading, should

4    have an entry for nominal damages, because I've charged them on

5    nominal damages.  It's possible they may not award compensatory

6    damages.  So what I would do is add, after paragraph 6, another

7    line saying, "If you conclude that Mr. Rattray is not entitled

8    to a compensatory damage award, do you award him nominal

9    damages?  Yes or no?  If so, in what amount?"  And again,

10   they've been told it's got to be a dollar or less, but——

11               MS. GELLER:    I just wouldn't want the jury to be

12   confused, your Honor.

13               THE COURT:    No.  And I think your point is well taken

14   because I've charged them on nominal damages but then I don't

15   have a question about nominal damage.

16               Ms. Faddis, do you have an objection to my adding, as

17   a paragraph 7, a question about nominal damages that would say

18   something like, "If you conclude that Wentworth Rattray is not

19   entitled to compensatory damages, do you award him nominal

20   damages?"  And I guess I could go on to say "of 1 dollar, yes

21   or no?"  Now they've been instructed they have to.  They've

22   been instructed if they find liability that they have to award

23   at least nominal damages, so if they find liability and they

24   have not awarded compensatory damages, they would have to

25   answer this yes.  So what are your thoughts, Ms. Faddis?

N8V1RAT4

1    MS. FADDIS:    I agree, your Honor.  This was going to

2    be our first request.  And I think the way I've seen it done

3    most recently is simply for it to mirror the "If yes," just put

4    a second question after that that says, "If no, what amount of

5    nominal damages do you award the plaintiff, not to exceed 1

6    dollar?"  Since they are mandatory.

7    MS. GELLER:    I think that also works.  I think that

8    would also work, your Honor.  I think I prefer the Court's

9    instruction, but I am not married to either method.

10    THE COURT:    I'm going to take Ms. Faddis's suggestion.

11    So it will just say, "If no, what amount of nominal damages do

12    you award, in an amount not to exceed 1 dollar?"  That will be

13    added after the sentence currently reading, "If yes."  So the

14    numbering will stay the same.

15    MS. FADDIS:    Thank you, your Honor.

16    The only other comment that the defendants had on the

17    verdict form is concerning the wording of the punitive damages

18    charge——or question, rather.  We would just ask that it mirror

19    the language of both the liability and the compensatory damage

20    questions so that it essentially follows the same formula, "Has

21    Mr. Rattray proven by a preponderance of the evidence," etc.

22    THE COURT:    All right.  Do you have any objection to

23    that?  It makes sense to me.

24    MS. GELLER:    No.  No objection, your Honor.

25    THE COURT:    Okay.

1              Okay.  Anything else either on the charge or the

2    verdict sheet?

3              MS. GELLER:    I don't believe so.  Nothing from

4    plaintiff, your Honor.  Oh, just——let me just check.

5              Nothing further, your Honor.

6              THE COURT:    Okay.

7              MS. FADDIS:    Nothing further from the defendants, your

8    Honor.  Thank you.

9              THE COURT:    All right.  We will make these changes and

10   get revised versions out to you sometime this evening.

11             MS. GELLER:    Thank you, your Honor.

12             THE COURT:    Thank you.  And we'll resume at 9:30

13   tomorrow morning.

14             MS. FADDIS:    Thank you.

15             MS. GELLER:    Thank you.

16             THE COURT:    Thank you.

17             (Adjourned to September 1, 2023, at 9:30 a.m.)

18

19

20

21

22

23

24

25

1                              INDEX OF EXAMINATION

2    Examination of:                                    Page

3     JOSE CADAVID

4    Direct By Ms. Faddis . . . . . . . . . . . . 379

5    Cross By Ms. Geller  . . . . . . . . . . . . 410

6    Redirect By Ms. Faddis . . . . . . . . . . . 500

7    Recross By Ms. Geller  . . . . . . . . . . . 508

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25