UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WENTWORTH RATTRAY,

                  Plaintiff,

      v.

THE CITY OF NEW YORK, POLICE
OFFICER JOSE CADAVID (BADGE NO.
9085), and POLICE
OFFICER ALYSSA TRIGUENO,

                  Defendants.

**MEMORANDUM**
**OPINION & ORDER**

17 Civ. 8560 (PGG) (KHP)

---

PAUL G. GARDEPHE, U.S.D.J.:

        In this Section 1983 action, Plaintiff Wentworth Rattray claims that New York City Police Department ("NYPD") Officer Jose Cadavid violated his Fourth Amendment rights by conducting an unlawful search of Rattray's apartment and arresting him without probable cause. Rattray further alleges that NYPD Officer Alyssa Trigueno is liable for failing to intervene in the unlawful search and false arrest. Defendants contend, inter alia, that exigent circumstances justified Officer Cadavid's entry into Rattray's home.

        Rattray's claims proceeded to trial on August 29, 2023. On September 1, 2023, the jury returned a verdict in favor of the Defendants, finding that Plaintiff had not proven by a preponderance of the evidence his Section 1983 unlawful search and false arrest claims against Officer Cadavid. Because the jury found no constitutional violation, Rattray's failure to intervene claim against Officer Trigueno likewise failed. (Verdict (Dkt. No. 279))

        On September 25, 2023, Plaintiff moved for a new trial pursuant to Fed. R. Civ. P. 59(a)(1) and 60(b)(2). (Pltf. Br. (Dkt. No. 291)) In moving for a new trial, Plaintiff argues that "[t]he verdict [was] against the weight of the evidence because Officer Cadavid admitted

that he did not have exigent circumstances to enter Mr. Rattray's home." (Id. at 10)  According to Plaintiff, Officer Cadavid's testimony "precludes" a finding by the jury that exigent circumstances justified the warrantless entry into Plaintiff's home.  (Id. at 11)  Rattray also complains that Officer Cadavid's testimony "regarding the statements and actions by the responding supervisor, Lieutenant [] Khosh[,] . . . . was new and was not previously provided by Defendants during the course of discovery when Mr. Rattray was pro se."  (Id. at 16)

## BACKGROUND

### I.    PROCEDURAL HISTORY

The Complaint was filed on November 2, 2017 (Cmplt. (Dkt. No. 2)); the Amended Complaint was filed on November 20, 2017 (Am. Cmplt. (Dkt. No. 6)); and the Second Amended Complaint ("SAC") was filed on June 29, 2018.  (SAC (Dkt. No. 42)).

On September 10, 2019, this Court granted in part Defendants' motion to dismiss the SAC.  (Dkt. No. 72)  On October 28, 2019, Rattray moved for leave to file the Third Amended Complaint ("TAC").  (Dkt. No. 75)

On November 7, 2019, this Court referred Rattray's motion to amend to Magistrate Judge Katharine Parker for a Report & Recommendation ("R&R").  (Dkt. No. 81)  In an April 20, 2020 R&R, Judge Parker recommended that Rattray be granted leave to amend as to certain claims. (R&R (Dkt. No. 87))  On July 16, 2020, this Court adopted Judge Parker's R&R (Dkt. No. 98), and Rattray filed the TAC on July 28, 2020.  (TAC (Dkt. No. 99))

The TAC asserts a Section 1983 unlawful search claim against Officers Cadavid and Trigueno; a Section 1983 false arrest claim against Officer Cadavid; and a Section 1983 failure to intervene claim against Officer Trigueno based on the alleged unlawful search and false arrest.  (Id.)

On April 15, 2022, Defendants moved for summary judgment on all of Rattray's claims. (Defs. Mot. (Dkt. No. 206))  This Court referred Defendants' motion to Judge Parker for an R&R. (Dkt. No. 208)  In a September 14, 2022 R&R, Judge Parker recommended that Defendants' motion be granted as to the unlawful search claim against Officer Trigueno, the false arrest claim against Officer Cadavid, and the related failure to intervene claim against Officer Trigueno , but denied as to the unlawful search claim against Officer Cadavid and the related failure to intervene claim against Officer Trigueno.  (R&R (Dkt. No. 221))

In a March 30, 2023 Memorandum Opinion & Order, this Court adopted Judge Parker's R&R in part.  (Dkt. No. 225)  This Court granted Defendants summary judgment on Plaintiff's unlawful search claim against Officer Trigueno, but otherwise denied Defendants' motion.  (Id.)

Plaintiff's remaining claims against (1) Officer Cadavid for false arrest and unlawful search; and (2) Officer Trigueno for failure to intervene in the alleged false arrest and unlawful search, proceeded to trial on August 29, 2023.

## II.    THE EVIDENCE AT TRIAL

The credible evidence at trial showed the following:

In or about 2006, Plaintiff Rattray had a daughter, "A.", with non-party Wendy Sandy.  (See Trial Transcript ("Tr.") 47-49 (Rattray))[1]  Rattray's relationship with Sandy later ended, and the two agreed that Rattray would have custody of their daughter, while Sandy would have visitation rights.  (See Tr. 50-51 (Rattray))  As time passed, Sandy became concerned that Rattray was deliberately interfering with her ability to see her daughter.  Accordingly, in 2016,

---

[1]  Citations to the trial transcript are to the page numbers assigned by the court reporter. Citations to other documents reflect page numbers designated by this District's Electronic Case Files ("ECF") system.

Sandy brought an action in New York City Family Court seeking joint custody. (Tr. 51 (Rattray) ("Q. And that informal agreement ended when she filed the lawsuit you mentioned, family court, in January of 2016? A. Correct."); Tr. 63-64 (Sandy) ("One of the reasons why I filed for custody of our daughter is because every time I have to pick her up, it was an excuse. . . . I am [A.'s] mom, and I need to spend more time with her[,] . . . . so I can be in her life."); Tr. 88 (Sandy) ("Q. In fact, prior to November 5th, 2016, plaintiff had previously denied you access to your daughter, correct? A. Yes. Q. And, in fact, just that year you had started a custody case against him? A. Yes. Q. And you did that because you wanted to be in your daughter's life? A. Yes. Q. And before you went to court, he had control over when you can see her? A. Yes, that's true."); Tr. 192 (Rattray) ("Ms. Sandy's petition was for joint custody."))

By the time Sandy filed her custody action, her relationship with Rattray was strained. (Tr. 89 (Sandy) ("Q. And it's fair to say that the plaintiff wasn't happy when you filed for custody? A. No, he was never happy with this. Q. And is it fair to say that you and him didn't have a good relationship? A. No, it wasn't [a good relationship].")) And in the fall of 2016, Sandy and Rattray were engaged in Family Court proceedings regarding custody of A. (See PX1 (Oct. 5, 2016 Family Court Order) (Dkt. No. 251-1) at 2)

In text messages to Rattray on Saturday, November 5, 2016, Sandy stated that she would be coming by later that day to pick up A., who was then ten years old. (Tr. 49 (Rattray); Tr. 61-62 (Sandy)) There is no evidence that Rattray – who had obtained full custody of A. (see PX1 (Oct. 5, 2016 Family Court Order) (Dkt. No. 251-4) at 2) – ever responded to Sandy's text messages. (See Tr. 62, 65, 68 (Sandy)) Sandy also called A.'s cell phone several times, but her calls went "straight to voice mail." (Tr. 65 (Sandy))

Rattray took his daughter to a dance class that day, and then to a playdate with a friend. (Tr. 104 (Rattray)) Although A.'s "playdates [generally lasted] two hours," on this occasion Rattray allowed A. to stay at her friend's house, and he returned home alone, arriving at his apartment shortly before 7:00 p.m. (See Tr. 58, 104-107 (Rattray); PX5 (Nov. 2016 Emails to Family Court Personnel) (Dkt. No. 259-5) at 3) Meanwhile – although Sandy had not made contact with either Rattray or A. – she decided to drive from Milford, Connecticut to Rattray's Manhattan apartment to pick up her daughter for the weekend. The drive to Manhattan took 1.5 to 2.5 hours. (Tr. 74-75 (Sandy)) Sandy brought Family Court papers with her which she understood gave her the right to see A. every other weekend, and to pick up her daughter on November 5, 2016 in particular. (Tr. 62 (Sandy); Tr. 84 (Sandy) ("Q. So you traveled from Milford, Connecticut, to New York City, because you believed it was your turn to take [A.]? A. I did not believe it was my turn to take [A.]. It was my turn. I had the paper there."))

After arriving at Rattray's apartment building – located at 42 West 120th Street in Manhattan – Sandy rang the doorbell. (Tr. 84 (Sandy); Tr. 284 (Trigueno)) Rattray came down to speak with her. She told Rattray that it was her "turn" to see her daughter. Rattray told Sandy that A. "was not home" and that Sandy would not be able to see her daughter that evening. He then closed the door and went back upstairs. (Tr. 84-85 (Sandy)) Their exchange took less than a minute. (Tr. 183 (Rattray))

Sandy believed that her daughter was upstairs – inside Rattray's apartment – and that Rattray was deliberately preventing her from seeing her daughter. (See Tr. 85 (Sandy) ("Q. And then he closed the door, as you previously testified, and went back up, inside? A. Yes. Q. But you didn't believe what the plaintiff was telling you, correct? A. Yeah, yeah, I did not.")) She became extremely upset. At 6:49 p.m., Sandy called 911 while "hysterical[ly] crying." She

5

told the 911 operator that she had "visitation rights today," that she had come to pick up her daughter, and that the father of the child was refusing to give the child to her. (DX A (911 Event Chronology) (Dkt. No. 258) at 3; Tr. 66-68 (Sandy))  Sandy told the 911 operator that she was standing in front of Rattray's apartment building at 42 West 120th Street, and she identified his apartment number. (DX A (911 Event Chronology) (Dkt. No. 258) at 3)

At trial, Sandy testified that she had become extremely upset by the time she called 911:

> THE COURT: . . . [H]ow would you describe your tone in speaking with the 911 operator?
>
> THE WITNESS: Well, I was very upset, and as a mom, and as my only child, I was very upset, and I was crying, because that – following that, it was a Wednesday, we had finished wrapping up with the court hearing, and I was very taken aback by all the stuff that I was hearing. And it wasn't true. So I was taken aback, and I was very upset about it. So I guess that did take me back into like that same week, because I was very upset about what was going on, and I didn't want it to go that way. So that's why maybe I sound like I was upset. But I was upset, because that week was a horrible week for me. So I was very upset about it, and not only that, I was upset that I was – I did text him to let him know I'm on my way. And when I get there, that she wasn't there. . . .
>
> I was very upset, because, like I said, again, I didn't want [A.] to think that I didn't care about anything, that I was taking it out on her. So my tone was not in the very best way. I was crying that whole entire time. I was like not very happy about the outcome with the court hearing, so I was very upset about it.

(Tr. 68 (Sandy))

Sandy called 911 "because it was [her] turn . . . and [A.] wasn't there." She believed that if the police came they would "provide and give [her] [A.], so [that she] can have [A.] for the weekend." (Tr. 86 (Sandy))  Sandy testified that she "was going to fight, no matter what, because I wanted to show [A.] that . . . I will go to the end of the earth for her." (Tr. 66 (Sandy))

NYPD Officers Cadavid and Trigueno responded to the 911 call at approximately 7:00 p.m. (Tr. 330 (Trigueno))  As they approached Rattray's apartment building at 42 West 120th Street, the officers encountered Sandy, who identified herself as the 911 caller. (Tr. 284-85 (Trigueno); Tr. 361 (Cadavid))  As the officers approached Sandy, they noticed that she was upset and crying. (Tr. 340, 345 (Trigueno); Tr. 361-62 (Cadavid))  Sandy told the officers that (1) it was her time to pick up her daughter; (2) Rattray had refused to let Sandy see her; (3) Sandy had not heard from her daughter; and (4) the girl was not answering her phone. (Tr. 291 (Trigueno); Tr. 361 (Cadavid); DXF (Nov. 5, 2016 Domestic Incident Report) (Dkt. No. 258) at 24)

Officer Cadavid told Sandy that he could issue a "Domestic Incident Report" ("DIR") – an NYPD form memorializing the details of a custody dispute – which she could show to a Family Court judge as proof that Rattray was not complying with the Family Court's custody order. (Tr. 337 (Trigueno); Tr. 362 (Cadavid))  Cadavid explained to Sandy that, given the circumstances, issuing a DIR was all that he could do; he was not authorized to enforce visitation rights. (Tr. 362-63 (Cadavid))  After Cadavid told Sandy that he could not enforce her visitation rights, she "became more upset [and] more emotional."  She told Officer Cadavid "that her daughter's life was in danger[] [and that she] was not safe in the apartment. [Sandy] also stated to [Officer Cadavid] that Mr. Rattray does drugs and that he occasionally has drug dealers in the apartment."[2]  (Tr. 363 (Cadavid))

---

[2] Sandy testified at trial that she did not make these statements to Officer Cadavid. (Tr. 71 (Sandy))  Her testimony on this point was not credible.  It was apparent at trial that Sandy was desperate to see her daughter that evening; that she believed that she had a legal right to see her; and that she believed that Rattray was improperly preventing her from seeing her daughter.  Sandy had attempted to arrange visitation that day, but neither Rattray nor her daughter had returned her text messages or calls.  Moreover, Sandy and Rattray were in the midst of a custody battle, and Rattray had interfered in the past with Sandy's efforts to maintain a relationship with

Given Sandy's distraught behavior and her statements about Rattray, Officer Cadavid became concerned for "the safety of [Sandy's] daughter [and] . . . . felt [he had] to go upstairs . . . to check on the welfare of the[] child." (See Tr. 364 (Cadavid)) The two officers then proceeded to Rattray's apartment on the third floor, knocked on the door, and told him that they were there to check on the welfare of his daughter. (Tr. 365 (Cadavid)) In response, Rattray "started yelling[] [and] cursing" at the officers, and refused to answer questions. (Tr. 365, 379-80 (Cadavid)) Rattray did not tell the officers that his daughter was not at home, nor did he explain that he had custody of the girl. (Tr. 380 (Cadavid)) Officer Cadavid repeatedly asked Rattray to open the door so that they could speak with him and see A., but Rattray refused. (Tr. 366-67 (Cadavid)) Officer Cadavid eventually threatened to take down the apartment door if Rattray did not open the door. Rattray then cracked the door open. (Tr. 366-68 (Cadavid))

---

her daughter. Although Sandy had not spoken with either Rattray or her daughter to confirm the visit, she nonetheless drove hours from Milford, Connecticut to Manhattan to see her daughter – only to be told that the girl was not at home and that Sandy would not be permitted to see her. Crying hysterically, she called 911, because she was prepared "to go to the end of the earth" to see her daughter and believed that police officers would be able to "give [her] [A.]" (Tr. 66, 86 (Sandy); (DXA (911 Event Chronology) (Dkt. No. 258) at 3) After Officer Cadavid explained to Sandy that all he could do was complete a DIR form, Sandy knew that unless she provided the officers with a compelling reason to go to Rattray's apartment, she had no chance of seeing her daughter. It was at this point that Sandy told Officer Cadavid that her daughter's life was in danger, that Rattray used drugs, and that drug dealers came to his apartment.

At trial, however, Sandy had compelling reasons to deny making these statements. As an initial matter, her statements about Rattray's drug use and association with drug dealers were lies: Rattray "never even drank in front of [her]" and was "a great dad." (Tr. 67, 71 (Sandy)) Moreover, Rattray had insisted that she testify – at deposition and at trial – in support of his Section 1983 claim. He had told her that if she did not testify "there would be a warrant for [her] arrest." (Tr. 92, 96 (Sandy)) In the end, Sandy "only agreed to testify at the deposition because [she] feared that if [she] did not cooperate [with Rattray] in giving that deposition, that would affect [her] ability to see [her] daughter." (Tr. 96 (Sandy))

In sum, Sandy's testimony concerning what she told Officer Cadavid – after he told her that all he could do was complete a DIR form – was not credible. By contrast, Officer Cadavid's testimony on this point was entirely credible.

8

Officer Cadavid then put his foot "between the door frame and the door to prevent [Rattray] from trying to close it." (Tr. 368 (Cadavid))

"[Y]elling[] [and] cursing," Rattray continued to refuse to answer Officer Cadavid's questions about his daughter, complaining that the officers "had no search warrant." (Tr. 383 (Cadavid)) Rattray soon attempted to close the door, but was unable to do so because Officer Cadavid's foot was in the way. (Id.)

At trial, Officer Cadavid testified that Rattray's belligerence, his refusal to answer questions, and his efforts to shut the apartment door made Cadavid's "concern level rise[]" regarding the safety of Rattray's daughter. Officer Cadavid concluded that – in refusing to show his daughter – Rattray was "trying to hide something." (Tr. 383-84 (Cadavid)) Making a "split second decision[,]" Officer Cadavid "pushed [his] way into the apartment." (Tr. 384 (Cadavid)) Once inside the apartment, Officer Cadavid again asked Rattray where his daughter was. Rattray refused to answer the question and became more agitated. (Tr. 384-85 (Cadavid)) Officer Cadavid then spent "approximately one minute" searching the apartment for Rattray's daughter. (Tr. 268 (Rattray); Tr. 385-86 (Cadavid)) The girl was not present in the apartment. (Tr. 386 (Cadavid))

After determining that the daughter was not in the apartment, Officer Cadavid again asked Rattray where his daughter was. Rattray did not provide any information about her whereabouts. He did not tell Cadavid that his daughter was at a friend's house, or that Sandy did not have custody of her. (Tr. 386-87 (Cadavid)) And although Officer Cadavid asked Rattray for "court paperwork" concerning custody of A., Rattray did not disclose that he had obtained multiple court orders awarding him custody of the girl, and granting Sandy only visitation

rights.[3]  (Tr. 386-87 (Cadavid); Tr. 192-196 (Rattray); PX2 (Oct. 24, 2016 Family Court Order)

(Dkt. No. 259-2) at 2)

        Shortly after Officer Cadavid's search of the apartment, Rattray called 911 to

complain and to request that a supervisor come to his apartment.  Officer Cadavid separately

requested that his supervisor come to the apartment to assist in investigating the daughter's

whereabouts.  (Tr. 129, 131 (Rattray); Tr. 387 (Cadavid))  NYPD Lieutenant Khosh arrived at

---

[3]  Rattray largely disputed Officer Cadavid's description of their interactions at the apartment
door and during Officer Cadavid's search.  According to Rattray, he was "pretty easygoing" with
the officers and had a "regular demeanor" when they arrived at his apartment.  Rattray also
testified that he told the officers that his daughter was not at home and that he had custody over
her.  (Tr. 112-16 (Rattray))  Rattray was not a credible witness, however.

For example, Rattray testified on direct examination that he did not show the officers proof that
he had custody of A. because he had no such proof; "[t]hey asked for papers, and I didn't have
any papers."  (Tr. 138 (Rattray))  On cross-examination, however, Rattray admitted that he had
obtained six Family Court orders granting him custody of A., and awarding Sandy only visitation
rights.  (Tr. 192-96 (Rattray))

And at the same time that Rattray was refusing to provide the officers with any information
concerning his daughter's whereabouts and the custody arrangements, he was writing emails to
Family Court personnel.  In a 7:01 p.m. email, Rattray advised the Family Court that Sandy was
"downstairs . . . expecting to pick up [A.]."  (PX5 (Nov. 2016 Emails to Family Court Personnel)
(Dkt. No. 259-5) at 3)  In a second email, Rattray states that "there are two officers who have
entered my home against my wishes and refuse to leave until I can provide proof that I should
have custody of [A.], of [A.'s] well being[,] and of [A.'s] whereabouts."  (Id. at 2)  While
Rattray testified at trial that the officers "never said" that "they were [at his apartment] to check
on [Rattray's] daughter's well-being" (Tr. 200 (Rattray)), it is apparent from Rattray's
contemporaneous email that this testimony – like much of Rattray's account – is false.

Rattray also testified that – 12 to 18 months after the November 5, 2016 incident – he sought
treatment for the alleged emotional trauma he had suffered.  He later admitted, however, that he
did not seek any such treatment until 2019, after this lawsuit was filed.  (Tr. 240-42 (Rattray))

In sum, Rattray was not a credible witness.  The credible evidence at trial demonstrated that he
was inexplicably belligerent and uncooperative throughout his encounter with Officer Cadavid.
His aggressive and violent behavior – considered together with Sandy's information that Rattray
used drugs and had drug dealers over to his apartment – gave Officer Cadavid concern about
A.'s safety.

the apartment about an hour later. (See Tr. 132 (Rattray))  He spoke with Rattray, and Rattray

stated that his daughter was at a friend's house. (See Tr. 391 (Cadavid))  Lieutenant Khosh then

sent "a police car over to the location where [the] daughter was[] to physically confirm" her

location and her safety.[4] (Tr. 395 (Cadavid))  After Lieutenant Khosh confirmed that Rattray's

daughter was safe, he and the Defendant officers left the apartment. (Id.)

## IV.    JURY VERDICT AND PLAINTIFF'S POST-TRIAL MOTION

On September 1, 2023, the jury returned a defense verdict, finding that Rattray

had not proven his Section 1983 false arrest and unlawful search claims against Officer Cadavid,

and thus had not proven his failure to intervene claims against Officer Trigueno. (Verdict (Dkt.

No. 279))  On September 5, 2023, this Court entered judgment in favor of Defendants.

(Judgment (Dkt. No. 281))

On September 25, 2023, Plaintiff moved for a new trial pursuant to pursuant to

Fed. R. Civ. P. 59(a)(1) and 60(b)(2). (Pltf. Br. (Dkt. No. 291))  Plaintiff argues that the jury's

verdict is against the weight of the evidence. (Id. at 10)

## DISCUSSION

## I.    LEGAL STANDARD

"Rule 59 of the Federal Rules of Civil Procedure permits a court, on motion, to

'grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new

trial has heretofore been granted in an action at [law] in federal court.'"  Springer v. Cedro, 894

F. Supp.2d 474, 481 (S.D.N.Y. 2012) (quoting Fed. R. Civ. P. 59(a)(1)(A)).  "The decision to

grant a new trial pursuant to Rule 59(a) is committed to the sound discretion of the trial judge."

---

[4] Rattray testified that Lieutenant Khosh never asked him where his daughter was, and that
Rattray never told Lieutenant Khosh where she was. (See Tr. 167 (Rattray))  Like much of
Rattray's testimony, this assertion was not credible.

Livingston v. Escrow, 2014 WL 1466469, at *2 (W.D.N.Y. Apr. 15, 2014) (citing Sequa Corp. v. GBJ Corp., 156 F.3d 136, 143 (2d Cir. 1998)). For a court "to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . [that] the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence." Manley v. AmBase Corp., 337 F.3d 237, 245 (2d Cir. 2003) (internal quotations and citations omitted). "Accordingly, '[o]n a motion for a new trial, the moving party bears [a] heavy burden.'" Prendergast v. Pac. Ins. Co., 2013 WL 5567656, at *5 (W.D.N.Y. Sept. 25, 2013) (quoting Manes v. Metro-North Commuter R.R., 801 F. Supp. 954, 956 (D. Conn. 1992), aff'd, 990 F.2d 622 (2d Cir. 1993)). "Furthermore, 'Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a "second bite at the apple."'" Kogut v. Cty. of Nassau, 2013 WL 3820826, at *2 (E.D.N.Y. July 22, 2013) (quoting O'Connell v. Onondaga Cty., 2013 WL 998598, at *1 (N.D.N.Y. Mar. 13, 2013)).

## II.    **ANALYSIS**

Plaintiff argues that the evidence at trial does not support a jury finding that exigent circumstances justified Officer Cadavid's warrantless entry into Rattray's home. (Pltf. Br. (Dkt. No. 291))

With respect to the exigent circumstances exception to the Fourth Amendment's warrant requirement, the Court instructed the jury as follows:

> As a general matter, in order to search a home, a police officer must obtain a search warrant from a magistrate or judge. If a police officer does not have a search warrant, an officer may not enter or search someone's home absent consent or exigent circumstances. Exigent circumstances exist where a police officer reasonably believes that entry or a search is necessary in order to render emergency assistance to an injured person, or to protect someone from imminent injury.

In determining whether exigent circumstances existed in this case, you must consider the totality of the circumstances confronting the defendants, including whether there was a need to make a prompt assessment based on the information that was available.

In determining whether exigent circumstances existed, the core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or to take immediate action with respect to Mr. Rattray's daughter. On the other hand, exigent circumstances did not exist if a reasonable, experienced officer in Officer Cadavid's position, knowing the facts he knew, would not have believed entry was necessary to render aid or to take action.

The question of whether a police officer reasonably believed that someone was in danger or in need of assistance is an objective one. This question should be answered with regard to what a reasonable officer would have believed under the totality of the circumstances. A search is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind[,] as long as the circumstances, viewed objectively[,] justify the search.

While Officer Cadavid must produce evidence supporting the existence of exigent circumstances, the ultimate burden of proof is on Mr. Rattray to prove that Officer Cadavid's entry and search violated his Fourth Amendment right to be free from unreasonable searches. If you find that exigent circumstances existed[] that justify Officer Cadavid's entry into and search of Mr. Rattray's home, then you must find in favor of Officer Cadavid on Mr. Rattray's unlawful search claim.

(Tr. 601-03)[5]

        Plaintiff argues that "Officer Cadavid did not have any objectively reasonable basis to believe [Rattray's daughter] was in imminent danger, even if the Court credits his testimony that Ms. Sandy stated there were drugs and possibly drug dealers in the apartment." (Pltf. Br. (Dkt. No. 291) at 11)  In this regard, Plaintiff argues that

when Officers Cadavid and Trigueno approached the apartment, they heard no evidence of any other person in the apartment, much less "drug dealers." When Mr. Rattray opened the door, Officers Cadavid and Trigueno both testified that they heard no evidence of other people in the apartment. Officer Cadavid testified that he entered the home because he believed some crime of child abuse was being committed. But, there was no evidence proffered by Ms. Sandy that Mr. Rattray abused [his daughter]. And there was no history of child abuse in Mr.

_____

[5] Plaintiff did not argue at trial, and has not argued in his motion for a new trial, that the Court's jury instruction concerning exigent circumstances is erroneous.

> Rattray's record, even if Officer Cadavid had run a search for Mr. Rattray's
> history. Neither defendant heard a child crying or calling for help, or saw any
> evidence that a child was in the apartment. Officer Cadavid offered no evidence
> at all to support a suspicion of child abuse.

(Id. at 11-12) (internal citations omitted)

      Plaintiff also quotes Officer Cadavid's testimony that while he was concerned that

A. was "not safe . . . [and] was in danger," he did not believe that she was in "imminent danger":

> "Q.    Okay. So you've got the drugs and the drug dealers, right?
>
> A.    Yes.
>
> . . . .
>
> Q.    And the yelling and the cursing.
>
> A.    Yes.
>
> Q.    And your analysis that it's not normal, it's not a normal reaction, right?
>
> A.    Yes.
>
> Q.    And that's the basis for your belief that the child was in imminent danger.
>
> A.    Not imminent, but also from what Ms. Sandy stated, that she was not safe, that
> she was in danger.
>
> Q.    Okay. That was the basis for your testimony that she was in imminent danger.
>
> A.    I wouldn't consider that imminent danger.
>
> Q.    You wouldn't consider that imminent danger.
>
> A.    No, not my definition."

(Id. at 13-14) (quoting Tr. 487 (Cadavid)); (see also id. at 14) (citing Tr. 489-91 (Cadavid

testifying that he did not believe that the child was in "imminent danger" and that he did not

enter the apartment because he believed the child was in "imminent danger"))

      Plaintiff goes on to argue that the evidence regarding exigent circumstances was

"insufficient to overcome the presumption that a warrantless entry is unreasonable[,]" and that

therefore "[t]he jury's verdict is against the weight of all available evidence[] [and a] new trial is warranted." (Id. at 15-16)

As an initial matter, the Court gives little weight to Plaintiff's argument that Officer Cadavid conceded that A. was not in "imminent danger." While Officer Cadavid testified that the circumstances did not meet his "definition" of "imminent" danger, he repeatedly testified that he believed – based on what Sandy had told him about Rattray and Rattray's behavior – that A. was "not safe," was "in danger," and "could be hurt," and that he "needed to take urgent action to address those concerns." (Tr. 487-91, 501-02 (Cadavid))

In any event, the jury's determination as to exigent circumstances did not turn on Officer Cadavid's subjective beliefs. As this Court instructed the jury, "[t]he question of whether a police officer reasonably believed that someone was in danger or in need of assistance is an objective one. . . . A search is reasonable under the Fourth Amendment[,] regardless of the individual officer's state of mind, as long as the circumstances[,] viewed objectively[,] justify the search." (Tr. 602; see also Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006) ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'") (quoting Scott v. United States, 436 U.S. 128, 138 (1978) (emphasis in Brigham City); Michigan v. Fisher, 558 U.S. 45, 49 (2009) ("the test . . . is not what [a police officer] believed, but whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger") (quoting Brigham City, 436 U.S. at 406).

In determining whether exigent circumstances exist, "'the totality of the circumstances confronting law enforcement agents in the particular case [must be considered].'" United States v. Klump, 536 F.3d 113, 117 (2d Cir. 2008) (quoting United States v. MacDonald,

15

916 F.2d 766, 769 (2d Cir. 1990) (en banc)). "Ultimately, '[t]he essential question in

determining whether exigent circumstances justified a warrantless entry is whether law

enforcement agents were confronted by an "urgent need" to render aid or take action.'" Loria v.

Gorman, 306 F.3d 1271, 1284 (2d Cir. 2002) (quoting MacDonald, 916 F.2d at 769) (quoting

Dorman v. United States, 435 F.2d 385, 391 (D.C. Cir. 1970) (en banc)). Here, the "totality of

the circumstances" confronting Officer Cadavid would have indicated to a reasonable police

officer that the ten-year-old A. might be in danger, and that there was an "urgent need" to "take

action" to ensure her safety.

      As an initial matter, when Officer Cadavid arrived at 42 West 120th Street – in

response to the 911 call – he encountered Sandy, the "hysterically crying" mother who had called

911. Sandy identified herself as the 911 caller, and the officers noticed that she was upset and

crying. (Tr. 284-85, 340, 345 (Trigueno); Tr. 360-62 (Cadavid)) Sandy told the officers that (1)

it was her time to pick up her daughter; (2) Rattray had refused to let Sandy see her; (3) Sandy

had not heard from her daughter; and (4) the girl was not answering her phone. (Tr. 291

(Trigueno); Tr. 361 (Cadavid); DXF (Nov. 5, 2016 Domestic Incident Report) (Dkt. No. 258) at

24) Sandy also told Officer Cadavid that "that her daughter's life was in danger[] [and that she]

was not safe in the apartment." Sandy explained "that Mr. Rattray does drugs and that he

occasionally has drug dealers in the apartment." (Tr. 363 (Cadavid)) In that moment, there was

no obvious reason for Officer Cadavid to distrust Sandy's account, and he quite reasonably

determined that he had "to go upstairs . . . to check on the welfare of the[] child." (Tr. 364

(Cadavid))

      When Officer Cadavid knocked on Rattray's door, he explained that he was there

to check on the welfare of Rattray's daughter. Rattray flew into a rage, aggressively yelling and

cursing; he refused to answer Officer Cadavid's questions about the whereabouts of his daughter, he refused to open the door, and he attempted to close his door once he cracked it open. (Tr. 365, 379-83 (Cadavid)) As Officer Cadavid testified, Rattray's behavior was "not a normal reaction" to the sort of welfare check that the officer was attempting to perform. (Tr. 487 (Cadavid)) Indeed, Rattray's aggressive behavior led Officer Cadavid to believe that Rattray might be "under the influence of something," which tended to corroborate Sandy's assertion that Rattray used drugs. (Tr. 369 (Cadavid)) Rattray's continued belligerence, his refusal to answer questions, his refusal to open his door, and his later efforts to close the door once opened made Officer Cadavid's "concern level rise[]" for the safety of the ten-year-old girl. Officer Cadavid concluded that Rattray was "trying to hide something." (Tr. 383-84 (Cadavid))

Rattray's behavior in response to the officers' child welfare check – considered together with Sandy's assertions that (1) she was scheduled to pick up her daughter at Rattray's apartment; (2) Rattray had refused to produce the girl; (3) Sandy could not reach her daughter; (4) the girl was not safe and Sandy feared for her life; and (5) Rattray used drugs and had drug dealers over to his apartment – sufficed to create exigent circumstances.

"Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." Fisher, 558 U.S. at 49. "'Probable cause for a forced entry in response to exigent circumstances requires finding a probability that a person is in "danger."'" Fernandez v. City of New York, 457 F. Supp. 3d 364, 381 (S.D.N.Y. 2020) (quoting Kerman v. City of New York, 261 F.3d 229, 236 (2d Cir. 2001)). "When information is received from a putative victim or an eyewitness, probable cause exists unless the circumstances raise doubt as to the person's veracity." Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001) (internal citations omitted); see also Lenzo v. City of New York, 2022 WL 656831, at *2

(S.D.N.Y. Mar. 4, 2022) (report of stalking made by arrestee's girlfriend was sufficient to sustain finding of probable cause absent indicia of falsity); Szil v. de Blasio, 2017 WL 11490683, at *3 (S.D.N.Y. Oct. 27, 2017) ("Plaintiff's allegations that police arrested him in response to a call from an alleged victim of domestic violence fail to state a claim that officers arrested him without probable cause. He does not allege, for example, that police officers had any reason to doubt his wife's statements."). As noted earlier, Officer Cadavid had no reason to doubt Sandy's veracity.

Loria v. Gorman, 306 F.3d 1271, 1276-77 (2d Cir. 2002) and United States v. Paige, 493 F. Supp. 2d 641, 647 (W.D.N.Y. 2007) – cited by Plaintiff (Pltf. Reply (Dkt. No. 295) at 3-4) – do not support his argument that exigent circumstances were absent here.

In Loria, police officers went to Loria's home to investigate a noise complaint. Loria refused to speak with the officers about the noise complaint, and then attempted to close his door on the officers. Loria, 306 F.3d at 1276-77. The defendant officer – Charles Gorman – pushed the door open, stepped into Loria's home, and arrested him, charging him with obstructing governmental administration. Id. at 1277. After the obstruction charge was dismissed, Loria brought a Section 1983 claim for false arrest arguing, inter alia, that there were no exigent circumstances justifying the warrantless arrest in his home. Id. at 1278-79, 1283-84. Defendant Gorman conceded that "at the time of the arrest no one was in danger and no 'emergency situation' existed." Id. at 1284. Given these facts, the Second Circuit concluded that "exigent circumstances were not present." Id. at 1285.

Loria provides no support for Rattray's arguments here. As discussed above, a reasonable officer would conclude – in the circumstances here – that there was an "urgent need" to determine whether A. was safe or was in danger. Acknowledging Plaintiff's argument that a

18

person's "lack of cooperation [with the police] does not create exigent circumstances" (Pltf. Reply (Dkt. No. 295) at 4), the facts here involve much more than a lack of cooperation.

In Paige, the court addressed a motion to suppress evidence recovered in a warrantless search of Paige's apartment. Police officers had responded to a 911 call reporting a stabbing "around the corner from" Paige's apartment building. Police found a stabbing victim at that location. Paige, 493 F. Supp. 2d at 643. Although there was "no evidence [that] connected the sole stabbing victim, found in front of [an apartment building located] some distance from Defendant's apartment, or any other participant in the altercation, to Defendant's apartment or to Defendant as the assailant[,]" police officers conducted a warrantless search of Paige's apartment, and recovered a firearm. Id. at 645, 647. In opposing Paige's motion to suppress, the Government argued "that the officers' warrantless entry was justified by exigent circumstances based on the need to locate and assist potential victims of the earlier altercation in front of Defendant's apartment." Id. at 647. The Paige court rejected that argument, because "there was no indication . . . that someone in the apartment was in need of assistance." Id. at 648. Here, by contrast, a reasonable officer would have concluded that a person in need of assistance – the ten-year-old A. – might be located inside Rattray's apartment.

In sum, Plaintiff Rattray has not demonstrated that the jury reached a "seriously erroneous result" in concluding that Officer Cadavid's search of Rattray's apartment was justified by exigent circumstances. Manley, 337 F.3d at 245 (internal quotations and citations omitted).

Plaintiff also argues that a new trial is warranted under Fed. R. Civ. P. 60(b)(2) because Officer Cadavid's testimony regarding certain "statements and actions by the responding supervisor, Lieutenant Filipp Khosh[,]" constitutes "new evidence." (Pltf. Br. (Dkt. No. 291) at

16)  The testimony referenced by Plaintiff concerns Lieutenant Khosh's direction that a patrol car confirm that A. was safe at her friend's home.  (See id.) (citing Tr. 475-76, 484, 390 (Cadavid)).

Because Rule 60(b) "allows extraordinary judicial relief, it is invoked only upon a showing of exceptional circumstances." Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986).  To obtain relief under Rule 60(b)(2), a party must show that "'(1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.'" United States v. Int'l Bhd. of Teamsters, 247 F.3d 370, 392 (2d Cir. 2001) (quoting United States v. IBT, 179 F.R.D. 444, 447 (S.D.N.Y. 1998)); accord Apex Emp. Wellness Servs., Inc. v. APS Healthcare Bethesda, Inc., 2017 WL 456466, at *7 (S.D.N.Y. Feb. 1, 2017).

Here, the alleged "new evidence" Plaintiff cites was not in fact new.  After extended colloquy with the lawyers at trial, and after reviewing Officer Cadavid's deposition (see Tr. 475-84), this Court concluded that Officer Cadavid "clearly testified at his deposition that the lieutenant did in fact obtain information about the whereabouts of the daughter and that she was at a friend's house." (Tr. 484)  Accordingly, there is no basis for relief under Rule 60(b)(2).

## CONCLUSION

For the reasons stated above, Plaintiff's motion for a new trial (Dkt. No. 290) is

denied.  The Clerk of Court is directed to terminate the motion and to close this case.

Dated: New York, New York
       February 24, 2025

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

21